**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

THE GAP, INC.,

               Plaintiff,

    v.

PONTE GADEA NEW YORK LLC,

               Defendant.

Case No. 20-cv-4541 (LTS) (KHP)

**ANSWER AND**
**COUNTERCLAIMS**

      Defendant Ponte Gadea New York LLC ("Ponte Gadea" or "Defendant"), by and through

its attorneys, Akerman LLP, hereby submits this Answer and Counterclaims to the Complaint of

Plaintiff, The Gap, Inc. ("Gap"), dated June 12, 2020 (the "Complaint"), and responds, alleges,

and avers, as follows on knowledge as to its own acts and otherwise on information and belief, as

follows:

**ANSWER**

**NATURE OF THE CLAIMS[1]**

      1.    Defendant denies the allegations contained in Paragraph 1 of the Complaint, but

avers that there is a pandemic caused by COVID-19, which has resulted in various governmental

orders.

      2.    Defendant denies the allegations contained in Paragraph 2 of the Complaint, but

admits that Gap leases commercial space from Defendant at the building located at 130 East 59th

Street, New York, New York, a/k/a 734 Lexington Avenue, New York, New York (the

---

[1] The section headings used in the Complaint are repeated in this Answer solely as a matter of convenience and do not constitute an admission.

"Premises") pursuant to a written lease agreement (the "Lease").

## PARTIES

3.    Admitted.

4.    Defendant denies the allegations in Paragraph 4, but avers that Defendant is a New York limited liability company, whose principal place of business is located in Miami, Florida.

## JURISDICTION AND VENUE

5.    The allegations contained in Paragraph 5 set for legal conclusions to which no response is required.

6.    The allegations contained in Paragraph 6 set for legal conclusions to which no response is required, but avers for jurisdictional purposes that the Premises is located within the Southern District of New York.

## FACTS

7.    Defendant denies the allegations contained in Paragraph 7 of the Complaint, but admits that, as of February 18, 2005, Gap entered into a lease, as tenant, with Defendant's predecessor-in-interest, UJA-FED Properties, Inc., as landlord, for the Premises pursuant to the Lease, and Defendant respectfully refers the Court to the Lease for its terms.

8.    Defendant admits that it is the current landlord under the Lease and successor-in-interest to UJA-FED Properties, Inc. with respect to the Lease.

9.    Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 9.

10.    Defendant denies the allegations in Paragraph 10 and respectfully refers the Court to the Lease for its terms.

11.    Defendant denies knowledge or information sufficient to form a belief as to the

truth of the allegations contained in Paragraph 11.

12.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12, but admits that Gap operates a retail apparel store at the Premises.

13.     Defendant denies the allegations contained in Paragraph 13, but admits that on March 7, 2020, the Governor of the State of New York issued Executive Order No. 202: Declaring a Disaster Emergency in the State of New York, and respectfully refers the Court to the Governor's Order for its terms.

14.     Defendant denies the allegations contained in Paragraph 14, but admits that on March 7, 2020, the Governor of the State of New York issued Executive Order No. 202.1: Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency, and respectfully refers the Court to the Governor's Order for its terms.

15.     Defendant denies the allegations contained in Paragraph 15, but admits that on March 12, 2020, the Mayor of the City of New York issued Emergency Executive Order No. 98: Declaration of Local State of Emergency, and respectfully refers the Court to the Mayor's Order for its terms.

16.     Defendant denies the allegations contained in Paragraph 16, but admits that on March 16, 2020, the Mayor of the City of New York issued Emergency Executive Order No. 100, and respectfully refers the Court to the Mayor's Order for its terms.

17.     Defendant denies the allegations contained in Paragraph 17, but admits that on March 18, 2020, the Governor of the State of New York issued Executive Order No. 202.6: Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency, and respectfully refers the Court to the Governor's Order for its terms.

18.     Defendant denies the allegations contained in Paragraph 18, but admits that on March 20, 2020, the Governor of the State of New York issued Executive Order No. 202.8: Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency, and respectfully refers the Court to the Governor's Order for its terms.

19.     Defendant denies the allegations contained in Paragraph 19, but admits that on March 20, 2020, the Mayor of the City of New York issued Emergency Executive Order No. 102, and respectfully refers the Court to the Mayor's Order for its terms.

20.     Defendant denies the allegations contained in Paragraph 20.

21.     Defendant denies the allegations contained in Paragraph 21.

22.     Defendant denies the allegations contained in Paragraph 22.

23.     Defendant denies the allegations contained in Paragraph 23 and respectfully refers the Court to the Lease for its terms.

24.     Defendant denies the allegations contained in Paragraph 24.

25.     Defendant denies the allegations contained in Paragraph 25.

26.     Defendant denies the allegations contained in Paragraph 26, but admits that, pursuant to the Lease, Defendant served Gap with the Five (5) Business Day Notice to Cure Default, dated May 26, 2020, demanding unpaid Fixed Rent in the total amount of $1,225,000.00 for April 2020 and May 2020, and also served Gap with a Three (3) Business Day Notice of Termination, dated June 8, 2020, terminating the Lease effective June 15, 2020 for Gap's failure to cure its default.

27.     Defendant denies the allegations contained in Paragraph 27.

28.     Defendant denies the allegations contained in Paragraph 28.

## COUNT ONE
## BREACH OF CONTRACT

29.     Defendant repeats and realleges each and every response in this Answer and Counterclaims contained in Paragraphs 1-28 above, as if fully set forth herein.

30.     Defendant denies the allegations contained in Paragraph 30, but admits that the Lease constitutes a binding and enforceable contract between Defendant and Gap.

31.     Defendant denies the allegations contained in Paragraph 31.

32.     Defendant denies the allegations contained in Paragraph 32.

33.     Defendant denies the allegations contained in Paragraph 33.

34.     Defendant denies the allegations contained in Paragraph 34.

## COUNT TWO
## DECLARATORY RELIEF

35.     Defendant repeats and realleges each and every response in this Answer and Counterclaims contained in Paragraphs 1-34 above, as if fully set forth herein.

36.     Defendant denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 36.

37.     Defendant denies the allegations contained in Paragraph 37.

38.     Defendant denies the allegations contained in Paragraph 38 and respectfully refers the Court to the Lease for its terms.

39.     Defendant denies the allegations contained in Paragraph 39, including subparagraphs (a)-(g).

40.     Defendant denies the allegations contained in Paragraph 40, but admits that Defendant disputes Gap's allegations with respect to the expiration of the Lease.

41.     Defendant denies the allegations contained in Paragraph 41, including subparagraphs (a)-(i).

42.     Defendant denies the allegations contained in Paragraph 42.

**COUNT THREE**
**RESCISSION**
**(Rescission/Cancellation of Lease)**

43.     Defendant repeats and realleges each and every response in this Answer and Counterclaims contained in Paragraphs 1-42 above, as if fully set forth herein.

44.     Defendant denies the allegations contained in Paragraph 44.

45.     Defendant denies the allegations contained in Paragraph 45.

46.     Defendant denies the allegations contained in Paragraph 46 and respectfully refers the Court to the Lease for its terms.

47.     Defendant denies the allegations contained in Paragraph 47.

48.     Defendant denies the allegations contained in Paragraph 48.

**COUNT FOUR**
**REFORMATION OF LEASE**

49.     Defendant repeats and realleges each and every response in this Answer and Counterclaims contained in Paragraphs 1-48 above, as if fully set forth herein.

50.     Defendant denies the allegations contained in Paragraph 50.

51.     Defendant denies the allegations contained in Paragraph 51.

52.     Defendant denies the allegations contained in Paragraph 52 and respectfully refers the Court to the Lease for its terms.

53.     Defendant denies the allegations contained in Paragraph 53.

54.     Defendant denies the allegations contained in Paragraph 54 and respectfully refers the Court to the Lease for its terms.

55.     Defendant denies the allegations contained in Paragraph 55.

56.     Defendant denies the allegations contained in Paragraph 56.

## COUNT FIVE
## MONEY HAD AND RECEIVED

57.     Defendant repeats and realleges each and every response in this Answer and Counterclaims contained in Paragraphs 1-56 above, as if fully set forth herein.

58.     Defendant denies the allegations contained in Paragraph 58.

59.     Defendant denies the allegations contained in Paragraph 59.

60.     Defendant denies the allegations contained in Paragraph 60 and respectfully refers the Court to the Lease for its terms.

61.     Defendant denies the allegations contained in Paragraph 61.

62.     Defendant denies the allegations contained in Paragraph 62.

63.     Defendant denies the allegations contained in Paragraph 63.

64.     Defendant denies the allegations contained in Paragraph 64.

65.     Defendant denies the allegations contained in Paragraph 65.

## COUNT SIX
## UNJUST ENRICHMENT

66.     Defendant repeats and realleges each and every response in this Answer and Counterclaims contained in Paragraphs 1-65 above, as if fully set forth herein.

67.     Defendant denies the allegations contained in Paragraph 67.

68.     Defendant denies the allegations contained in Paragraph 68.

69.     Defendant denies the allegations contained in Paragraph 69 and respectfully refers the Court to the Lease for its terms.

70.     Defendant denies the allegations contained in Paragraph 70.

71.     Defendant denies the allegations contained in Paragraph 71.

72.     Defendant denies the allegations contained in Paragraph 72.

73.     Defendant denies the allegations contained in Paragraph 73.

74.     Defendant denies the allegations contained in Paragraph 74.

## PRAYER FOR RELIEF

75.     The "WHEREFORE" paragraph (including subparagraphs (a)-(o)) which immediately follows paragraph 74 states various demands for relief to which no response is required but, should a response be required, Defendant denies that Gap is entitled to any relief whatsoever.

76.     Defendant denies any other allegations in the Complaint that are not specifically admitted or denied herein.

## AFFIRMATIVE DEFENSES

77.     Defendant asserts the following affirmative defenses without assuming the burden of proof on such defenses that would otherwise rest of Plaintiff.

## FIRST AFFIRMATIVE DEFENSE

78.     Gap fails to alleged facts sufficient to support judgment or a finding of liability against Defendant and, therefore, Gap's Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

79.     Gap's claims are barred by the terms of the Lease.

## THIRD AFFIRMATIVE DEFENSE

80.     Gap's claims are barred, in whole or in part, by the doctrine of assumption of risk.

## FOURTH AFFIRMATIVE DEFENSE

81.     Gap's claims are barred, in whole or in part, by the doctrine of waiver, estoppel, and/or laches based on Gap's own conduct.  Gap, among other things, continued to use and occupy the Premises throughout March, April, May, and June 2020, continues to occupy the Premises as

of the date of this Answer and Counterclaims, never advised Defendant of its claim of impossibility, impracticability, and/or casualty in advance of commencing this action, and has failed to vacate and surrender the Premises, notwithstanding Gap's allegations that the Lease terminated in March 2020.   On information and belief, as of the date of this Answer and Counterclaims,  Gap is operating the Premises as a retail apparel store and refusing to pay rent under the Lease for its continued use and occupancy of the Premises.

**FIFTH AFFIRMATIVE DEFENSE**

82.     To the extent Gap has suffered any damages for which the law would provide a remedy, which Defendant denies, Gap's damages must be reduced as a result of Gap's failure to mitigate its damages.

**SIXTH AFFIRMATIVE DEFENSE**

83.     To the extent Gap has suffered any damages for which the law would provide a remedy, which Defendant denies, Gap is not entitled to an award of consequential damages or attorneys' fees.

**SEVENTH AFFIRMATIVE DEFENSE**

84.     To the extent Gap's damages, if any, were caused or exacerbated by any act, or failure to act, on the part of Gap, any damages awarded to Gap should be reduced accordingly.

**EIGHTH AFFIRMATIVE DEFENSE**

85.     Defendant is entitled to a reduction or setoff from any verdict rendered against it based on the fact that Gap has used and occupied the Premises continuously without paying rent from March 2020 through, at the very least, the date of this Answer and Counterclaims, notwithstanding that Gap alleges the Lease terminated in March 2020, that Defendant's Notice of Termination terminated the Lease effective June 15, 2020, and that Defendant is entitled to

9

holdover rent.

## NINTH AFFIRMATIVE DEFENSE

86.     To the extent Gap has suffered any damages for which the law would provide a remedy, which Defendant denies, any such damage resulted from the acts or omissions of person or entities other than Defendant.

## TENTH AFFIRMATIVE DEFENSE

87.     The claims set forth in the Complaint, in whole or in part, are barred by the doctrine of unclean hands, as Gap failed to comply with its obligations under the Lease, including but not limited to serving any notices required under the Lease and failing to surrender and vacate the Premises, among other things.

## ELEVENTH AFFIRMATIVE DEFENSE

88.     Gap's claims fail to state a cause of action because Defendant has fulfilled all of its duties and obligations under the Lease.

## TWELFTH AFFIRMATIVE DEFENSE

89.     Gap's claims are barred, in whole or in part, by the doctrine of unjust enrichment, as Gap has used and occupied the Premises continuously without paying rent from March 2020 through, at the very least, the date of this Answer and Counterclaims, notwithstanding that Gap alleges the Lease terminated in March 2020, that Defendant's Notice of Termination terminated the Lease effective June 15, 2020.

## THIRTEENTH AFFIRMATIVE DEFENSE

90.     Defendant has yet to avail itself of its right to discovery, and does not fully know the circumstances alleged in Gap's Complaint.  Therefore, Defendant hereby notifies Gap that, until Defendant can avail itself of its right to discovery, it cannot be determined whether or not

Defendant will assert the above-stated affirmative and other defenses at trial, or whether those will be the only such defenses asserted.  Such defenses, however, are asserted in Defendant's Answer and Counterclaims to provide Gap with notice of Defendant's intention to assert such defenses and to avoid any issue of waiver of any such defenses.  Additionally, Defendant reserves the right to assert additional defenses as the course of discovery and investigation progresses.

## COUNTERCLAIMS

91.     Defendant Ponte Gadea New York LLC, repeats, realleges and incorporates each of the allegations, averments, responses, denials and affirmative defenses set forth in paragraphs 1 through 90 of the Answer to the Complaint as if fully set forth herein and further alleges against Plaintiff The Gap, Inc. on knowledge as to its own acts and otherwise on information and belief, as follows:

## NATURE OF THE ACTION

92.     Ponte Gadea, as landlord under the Lease, brings these counterclaims for breach of Lease for Gap's non-payment of rent and for a declaratory judgment that the Lease terminated on June 15, 2020.

93.     Gap's Complaint in this action is nothing more than a *post hoc* justification of its nationwide decision to cease payment of rent at all of its North American stores beginning in April 2020.  This was nothing less than a business decision that Gap made to capitalize on the generalized impact of COVID-19.  Indeed, Gap admits this was done to "preserve its finances" due to closures, yet sidesteps the fact that Gap's store is currently open and generating revenue but Gap continues to refuse to pay rent notwithstanding the resumption of business.

94.     While the Gap alleges in Paragraph 24 of its Complaint that the Lease terminated on March 19, 2020, Gap knows that this allegation is meritless because Gap has failed to take any

action to effectuate the purported termination of the Lease, including vacating the Premises.

95.     In fact, Gap continued to use and occupy the Premises throughout March 2020, April 2020, May 2020, and June 2020.

96.     Gap continues to occupy and use the Premises even as of the date of this Answer and Counterclaims.

97.     Yet, despite continuing to use and occupy the Premises, Gap failed to pay rent for April 2020, May 2020, June 2020, and July 2020, including failing to pay holdover rent that is required pursuant to Section 25.2 of the Lease, where "vacant and exclusive possession of the Premises is not surrendered to Landlord on the Expiration Date" of the Lease.

98.     The truth is that Gap breached and continues to breach its obligations under the Lease, resulting in Ponte Gadea asserting its right to declare an Event of Default and terminate the Lease pursuant to Article 21 of the Lease.

99.     Accordingly, Ponte Gadea served Gap with that certain Five (5) Business Day Notice to Cure Default, dated May 26, 2020 (the "Notice to Cure"), pursuant to Article 21 of the Lease.

100.    Ponte Gadea even gave Gap the courtesy of advance notice by email that it would be serving the Notice to Cure under the Lease.

101.    However, Gap failed to respond to the Notice to Cure in any way, including but not limited to failing to pay the outstanding rent demanded by the Notice to Cure.

102.    Thereafter, Ponte Gadea served Gap with that certain Three (3) Business Day Notice of Termination, dated June 8, 2020 (the "Notice of Termination"), pursuant to Article 21 of the Lease, which terminated the Lease effective June 15, 2020.

103.    Again, Gap failed to respond to the Notice of Termination.

104.    Instead, on June 12, 2020, Gap filed this action, claiming for the first time that the COVID-19 pandemic presents a "casualty" under the Lease and that the Lease actually terminated on March 19, 2020.  (*See* Compl. ¶ 24.)

105.    That same day, Gap sent Ponte Gadea a letter purporting to be a "supplemental notice of casualty" under Article 16 of the Lease.

106.    However, Gap had never even provided an initial notice of casualty under Article 16 of the Lease, and moreover the "supplemental notice of casualty" failed to comply with any of the requirements of Article 16.

107.    The Gap's *post hoc* justification for its nationwide decision not to pay rent is entirely unsupported by, and contrary to, the terms of the Lease.

108.    Contrary to Gap's contentions, the COVID-19 pandemic does not constitute a "casualty" under the Lease, and even if it did (which it does not), the Lease does not entitle Gap to an automatic and total rent abatement due to the purported casualty, and the Lease does not automatically terminate in the event of any "casualty."

109.    Pursuant to Article 16 of the Lease, in the event of fire or casualty, the Lease will only terminate under certain circumstances and on certain conditions, including the service of a termination notice by GAP, none of which have been met here.

110.    Accordingly, Gap's failure to pay the rent since March 2020 resulted in the termination of the Lease, and Ponte Gadea (1) is entitled to a declaration that the Lease properly terminated pursuant to Article 21; and (2) is entitled to recover all rent due and owing under the Lease, including but not limited to holdover rent as it accrues, beginning in April 2020 through and including the award of judgment in this action.

## PARTIES

111.    Pursuant to the allegations in the Complaint, Plaintiff The Gap, Inc. is a Delaware Corporation with its principal place of business in San Francisco, California.

112.    Ponte Gadea is a New York Limited Liability Company with its principal place of business located at 270 Biscayne Boulevard Way, Suite 201, Miami, Florida 33131.

## JURISDICTION AND VENUE

113.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

114.    Gap has waived any and all objections to venue in the Southern District of New York by having commenced suit here. In addition, venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because the Premises are within this district.

## FACTS

### A.  The Lease

115.    Gap, as tenant, and Ponte Gadea, as landlord, are parties to that certain Lease, dated as of February 18, 2005, for premises located at 734 Lexington Avenue, New York, New York 10022 a/k/a Unit A, 130 East 59th Street, New York, New York, 10022 (the "Premises").

116.    The Lease sets forth the parties' respective rights and obligations with respect to the Premises, including the payment of Rental, which includes Fixed Rent and Tax Payments, among other things.

117.    Specifically, Section 1.6 of the Lease requires Gap to pay Fixed Rent to Ponte Gadea on the "first (1st) day of each calendar month during the Term." *Id.* § 1.6.

118.    Additionally, the parties agreed that the lease term would end on the "Expiration

Date," that date being January 31, 2021, "the Fixed Expiration Date, or such earlier or later date that the term of this Lease expires or otherwise terminates pursuant to the terms hereof or pursuant to law." *Id.* § 1.2.

119.    Additionally, the parties agreed to certain termination rights in the event of a default under the Lease, including the non-payment of rent.

120.    Pursuant to Section 21.1 of the Lease, and "Event of Default" occurs in the event "[Gap] fails to pay any installment of Fixed Rent when due and such failure continues for five (5) Business Days after the date that Landlord gives notice of such failure to [Gap]." *Id.* § 21.1(A).

121.    An Event of Default also occurs in the event Gap fails to cure *any other* breach of the Lease within thirty (30) days' after Landlord gives notice of such default. *See id.* § 21.1(F).

122.    However, in such circumstances, Gap is excused from curing any such *other* breaches of the Lease if "such default cannot be remedied with reasonable diligence during such period of thirty (30) days (*including by reason of the occurrence of a Force Majeure Event*)." *Id.* (emphasis added).

123.    Sections 21.1 (A) and (F) of the Lease provide, in relevant part, as follows:

21.1. Events of Default.

The term "Event of Default" shall mean the occurrence of any of the following events:

(A) Tenant fails to pay any installment of Fixed Rent when due and such failure continues for five (5) Business Days after the date that Landlord gives notice of such failure to Tenant;

*            *            *

(F) *Tenant defaults in the observance or performance of any other covenant of this Lease* on Tenant's part to be observed or performed and Tenant fails to remedy such default within thirty (30) days after Landlord gives Tenant notice thereof, *except that if (i) such default cannot be remedied with reasonable diligence during such period of*

> *thirty (30) days (including by reason of the occurrence of a Force Majeure Event)*, (ii) Tenant takes reasonable steps during such period of thirty (30) days to commence Tenant's remedying of such default, and (iii) Tenant prosecutes diligently Tenant's remedying of such default to completion, then an Event of Default shall not occur by reason of such default….

*Id.* § 21.1 (emphasis added).

124.    The Lease further defines "Force Majeure Event" to mean "a strike or other labor trouble, fire or other casualty, governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, or any other cause beyond Tenant's reasonable control." *Id.* § 1.7(H).

125.    Thus, the parties expressly contemplated the possibility of a Force Majeure Event, but agreed that such an event would not entitle tenant to any rent abatement or deferment.

126.    Rather, the parties agreed that a Force Majeure Event would only constitute an exception to Gap's requirement to cure *any other breach of covenant* (*i.e.*, not the failure to pay Rentals, including Fixed Rent) upon thirty (30) days' notice from Landlord. *Id.* § 21.1.

127.    Section 21.2 of the Lease further provides that where an Event of Default occurs, Landlord is entitled to terminate the Lease on three (3) Business Days' notice.

128.    Specifically, Section 21.2 of the Lease provides:

> 21.2. <u>Termination.</u>
>
> If (1) an Event of Default occurs, and (2) Landlord, at any time thereafter (but prior to the date such Event of Default is cured it being agreed that Landlord may reject any such cure in Landlord's sole discretion), at Landlord's option, gives a notice to Tenant stating that this Lease and the Term shall expire and terminate on the third (3rd) Business Day after the date that Landlord gives Tenant such notice, then this Lease and the Term and all rights of Tenant under this Lease shall expire and terminate as of the third (3rd) Business Day after the date that Landlord gives Tenant such notice, and Tenant immediately shall quit and surrender the Premises, but Tenant shall nonetheless remain liable for all of its

obligations hereunder, as provided in Article 23 hereof and Article 24 hereof.

*Id.*, § 21.2.

129.    Additionally, the parties agreed in Article 23 of the Lease that in the event of Gap's default resulting in termination of the Lease, Gap must "immediately quit and peacefully surrender the Premises" to Ponte Gadea. *Id.* § 23.1(A)(1).

130.    Section 23.3 further provides that if the Lease is terminated due to an Event of Default, Ponte Gadea is entitled to recover damages, including but not limited to, unpaid Rentals due and owing and Deficiency rent as it arises. *Id.* § 23.3(A).

131.    Pursuant to Section 24.1, Gap is also required to pay Ponte Gadea "an amount equal to the costs that [Ponte Gadea] incurs in instituting or prosecuting any legal proceeding against [Gap] . . . after the occurrence of an Event of Default, together with interest thereon calculated at the Applicable Rate…." *Id.* § 24.1.

132.    In the event that the Lease terminates and Gap fails to vacate and surrender the Premises, Gap is also required to pay Ponte Gadea holdover rent pursuant to the terms of Section 25.2 of the Lease. *Id.* § 25.2.

133.    Specifically, Section 25.2 states:

25.2. <u>Holdover.</u>

If vacant and exclusive possession of the Premises is not surrendered to Landlord on the Expiration Date, then Tenant shall pay to Landlord on account of use and occupancy of the Premises, for each month (or any portion thereof) during which Tenant (or a Person claiming by, through or under Tenant) holds over in the Premises after the Expiration Date, an amount equal to (I) in respect of the first thirty (30) days that Tenant holdover in the Premises, one and one-half (1½) times the Fixed Rent and one hundred percent (100%) of the Additional Rent, in either case that was payable under this Lease during or with respect to the last month of the Term, and (II) in respect of any period of time thereafter, the greater of (i) two (2)

17

times the aggregate Rental that was payable under this Lease during the last month of the Term, and (ii) the then fair market rental value of the Premises. Landlord's right to collect such amount from Tenant for use and occupancy shall be in addition to any other rights or remedies that Landlord may have hereunder or at law or in equity (including, without limitation, Landlord's right to recover Landlord's damages from Tenant that derive from vacant and exclusive possession of the Premises not being surrendered to Landlord on the Expiration Date). Nothing contained in this Section 25.2 shall permit Tenant to retain possession of the Premises after the Expiration Date or limit in any manner Landlord's right to regain possession of the Premises, through summary proceedings or otherwise. Landlord's acceptance of any payments from Tenant after the Expiration Date shall be deemed to be on account of the amount to be paid by Tenant in accordance with the provisions of this Article 25.

*Id*.

134.    In addition to the foregoing, the parties agreed upon a procedure, which is set forth in Article 16 of the Lease, to address fire and other casualty situations that may occur in the Premises.

135.    A plain reading of Article 16 reveals that the parties contemplated that a "casualty" would include a fire or other event that causes physical damage to the Premises and of which the landlord has the independent ability to cure, neither of which has occurred.

136.    In accordance with the procedures outlined in Section 16.1 of the Lease, Gap is first required to "notify Landlord promptly of any fire or other casualty that occurs *in the Premises*." *Id.* § 16.1 (emphasis added).

137.    Thereafter, Ponte Gadea is required to "repair the damage to the Premises to the extent cause by fire or other casualty, with reasonable diligence" pursuant to Section 16.2 of the Lease.

138.    However, pursuant to Section 16.2, Defendant is not required "to restore Tenant's Property or any Alterations" to the Premises, nor is Ponte Gadea required to "restore the windows

for the Premises." *Id.*

139.   Moreover, Ponte Gadea is not "required to commence such restoration until Tenant gives Landlord the notice described in Section 16.1 hereof (unless Landlord otherwise has received actual notice of the fire or other casualty)." *Id.*

140.   The parties further agreed in Section 16.4 of the Lease to a rent abatement in the event a fire or other casualty renders all or any portion of the Premises unusable for a period of more than fourteen (14) days. *Id.* § 16.4.

141.   The parties further agreed that the rent abatement would end "on the date that Landlord Substantially Completes the restoration work described in Section 16.2 hereof." *Id.*

142.   Section 16.4 provides as follows:

> 16.4 <u>Rent Abatement.</u>
>
> If, as a result of a fire or other casualty, all or any portion of the Premises shall not be usable by Tenant, for a period of more than fourteen (14) consecutive days, for the conduct of Tenant's business therein in substantially the same manner as prior to such fire or other casualty, the Fixed Rent and the Tax Payment that is otherwise due and payable hereunder for the Premises shall be reduced in the proportion that the number of square feet of usable area of the Premises that is not usable by Tenant by reason of such fire or other casualty for more than such fourteen (14) day period, bears to the total usable area of the Premises immediately prior to such fire or other casualty, *which reduction of the Fixed Rent and Tax Payment shall be in effect for the period commencing on the date of the applicable fire or other casualty, and ending on the date that Landlord Substantially Completes the restoration work described in Section 16.2 hereof.*

*Id.* § 16.4 (emphasis added).

143.   Additionally, the parties agreed to certain termination rights in the event of a casualty occurring in the Premises less than a year before the Fixed Expiration Date of January 31, 2021. *Id.* § 16.7.

144.    Pursuant to Section 16.7 of the Lease, in the event the Premises is "substantially damaged" by fire or other casualty within one year of the Fixed Expiration Date, either Gap or Ponte Gadea may "elect to terminate this Lease by notice given to the other party within thirty (30) days after such fire or other casualty occurs." *Id.*

145.    For purposes of Section 16.7 of the Lease, "substantially damaged" means: "(a) a fire or other casualty precludes Tenant from using more than fifty percent (50%) of the Premises for the conduct of its business, and (b) Tenant's inability to so use the Premises (or the applicable portion thereof) is reasonably expected to continue until at least the earlier to occur of (i) the Fixed Expiration Date, and (ii) the one hundred twentieth (120th) day after the date that such fire or other casualty occurs." *Id.*

146.    When either party makes an election to terminate pursuant to Section 16.7, the Lease is then deemed to "expire on the thirtieth (30th) day after the notice of such election is given." *Id.*

147.    Additionally, in such circumstances, Gap "on or prior to such thirtieth (30th) day" is required to "vacate the Premises and surrender the Premises to Landlord free of [Gap's] Property (to the extent not damaged and still usable) and otherwise in its "as is" condition." *Id.*

148.    Section 16.7 provides in full as follows:

16.7 <u>Termination Rights at End of Term.</u>

If the Premises are substantially damaged by a fire or other casualty that occurs during the period of one (1) year immediately preceding the Fixed Expiration Date, then either Landlord or Tenant may elect to terminate this Lease by notice given to the other party within thirty (30) days after such fire or other casualty occurs. If either party makes such election, then the Term shall expire on the thirtieth (30th) day after the notice of such election is given, and, accordingly, Tenant, on or prior to such thirtieth (30th) day, shall vacate the Premises and surrender the Premises to Landlord free of Tenant's Property (to the extent not damaged and still usable) and

20

otherwise in its "as is" condition. Upon the termination of this Lease under this Section 16.7, the Rental shall be apportioned and any prepaid portion of the Rental for any period after the Expiration Date shall be refunded promptly by Landlord to Tenant (and Landlord's obligation to make such refund shall survive the Expiration Date). For purposes of this Section 16.7, the term "substantially damaged" shall mean that: (a) a fire or other casualty precludes Tenant from using more than fifty percent (50%) of the Premises for the conduct of its business, and (b) Tenant's inability to so use the Premises (or the applicable portion thereof) is reasonably expected to continue until at least the earlier to occur of (i) the Fixed Expiration Date, and (ii) the one hundred twentieth (120th) day after the date that such fire or other casualty occurs.

*Id.*

## B.  The Gap's Nationwide Decision Not to Pay Rent

149.    Beginning in or about March 2020, City and State officials issued various emergency orders purporting to require certain businesses to operate at reduced capacity.

150.    Notwithstanding the particular terms of any one lease, or the unique circumstances of each of its stores' locales, Gap made a nationwide, corporate decision to cease paying rent for all of the Gap's retail locations throughout the United States.

151.    On or about April 9, 2020, Gap contacted Ponte Gadea by phone and advised that Gap was taking the position that they were not responsible for rent payments, would not be paying April 2020 rent, and would be in touch in approximately two weeks.

152.    In Gap's Form 8-K filing, dated April 23, 2020, Gap publicly disclosed that it would "suspend rent payments" for all of its North American stores beginning in April 2020.

153.    Gap also disclosed that it planned "in certain instances to terminate the leases and permanently close some of the stores."

154.    Gap also acknowledged in this disclosure that "the landlords under a majority of the leases for our stores in the United States could allege that we are in default under the leases

and attempt to terminate our lease and accelerate our rents due thereunder."

155.    Thus, it became Gap's company-wide policy not to pay rent in any of its North American locations beginning in April 2020, without consideration of the actual terms of any of its individual leases, knowing that it would be a default under the Lease.

156.    In accordance with this new policy, and in violation of Article 1 of the Lease, Gap failed to pay Rentals, including Fixed Rent, in April 2020 for the Premises.

157.    The day after Gap's public disclosure, April 24, 2020, the parties spoke again by phone.  Gap repeated that it would not be paying rent and did not know if it would ever reopen the retail apparel store at the Premises because there was less than a year remaining on the Lease Term.

158.    In addition to failing to pay April 2020 Rentals, Gap also failed to pay Rentals, including Fixed Rent, in May 2020, June 2020, and July 2020 for the Premises.

### C. The Termination of the Lease

159.    Due to Gap's refusal to pay Rentals due in April 2020 and May 2020, Defendant served that certain Five (5) Business Day Notice to Cure Default, dated May 26, 2020, in accordance with the Lease, including but not limited to Section 21.1(A) of the Lease (the "Notice to Cure").

160.    The Notice to Cure advised Gap that it had failed to pay Fixed Rent in the total amount of $1,225,000.00, representing Fixed Rent for April 2020 and May 2020.

161.    The Notice to Cure further advised Gap that it was required to pay the total amount due and owing on or before June 5, 2020 (the "Cure Date").

162.    Additionally, the Notice to Cure advised Gap that "if Tenant fail[ed] to cure this default on or before the Cure Date, then Landlord [would] have the right to terminate Tenant's tenancy in accordance with the terms of Article 21 of the Lease…."

163.   Specifically, the Notice to Cure advised, in relevant part, as follows:

**PLEASE TAKE FURTHER NOTICE**, that you are hereby required to cure the foregoing defaults by paying the amount of $1,225,000.00 representing April and May 2020 rent to Landlord by check or wire transfer on or before June 5, 2020 (the "Cure Date"), that date being at least five (5) Business days after the service of this notice upon you.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 21.2 of the Lease, if Tenant fails to cure this default on or before the Cure Date, then Landlord will have the right to terminate Tenant's tenancy in accordance with the terms of Article 21 of the Lease, commence a summary proceeding to remove Tenant from possession of the Premises, and seek all appropriate relief and remedies under the Lease, at law, and in equity, including but not limited to Landlord's right to additional rent pursuant to Article 25 of the Lease in the event Tenant fails to vacate the Premises.

**PLEASE TAKE FURTHER NOTICE** that any costs and expenses, including attorneys' fees, that Landlord incurs in pursuing its rights and remedies against Tenant based on Tenant's default shall be recoverable by Landlord pursuant to Articles 21, 23, 24, and 25 of the Lease.

*Id*.

164.   Gap failed to respond to the Notice to Cure.

165.   Gap also failed to pay any of the outstanding rent due and owning by the Cure Date.

166.   Accordingly, an Event of Default existed under Section 21.1(A) of the Lease, entitling Ponte Gadea to terminate the Lease in accordance with its terms.

167.   Pursuant to Section 21.2 of the Lease, Ponte Gadea elected to terminate the Lease.

168.   Accordingly, Ponte Gadea served Gap with that certain Three (3) Business Day Notice of Termination, dated June 8, 2020, (the "Notice of Termination") terminating Gap's tenancy effective June 15, 2020 (the "Termination Date").

169.   Specifically, the Notice of Termination provided, in relevant part, as follows:

**PLEASE TAKE NOTICE** that Tenant failed to cure its default by June 5, 2020 (the "Cure Date") by paying to Landlord the total amount of outstanding Fixed Rent due and owing in the total amount of $1,225,000.00, representing (i) Fixed Rent in the total amount of $612,500.00 for outstanding April 2020 Fixed Rent that was due to Landlord on April 1, 2020, and (ii) Fixed Rent in the total amount of $612,500.00 for outstanding May 2020 Fixed Rent that was due to Landlord on May 1, 2020, pursuant to that FIVE (5) BUSINESS DAY NOTICE TO CURE, dated May 26, 2020 (the "Notice to Cure").

**PLEASE TAKE FURTHER NOTICE** that Landlord hereby elects to terminate your tenancy of the Premises on June 15, 2020 (the "Termination Date"), that date being at least three (3) business days from the expiration of the Cure Date given in the Notice to Cure, pursuant to Section 21.2 of that certain Lease, dated as of February 18, 2005, by and between UJA-FED Properties, Inc., predecessor-in-interest to Ponte Gadea New York, LLC ("Landlord") and The Gap, Inc. ("Tenant"), and as confirmed in the Gap Estoppel Certification, dated January 19, 2006 (collectively the "Lease").

P**LEASE TAKE FURTHER NOTICE** that pursuant to Section 21.2 of the Lease, Tenant remains liable for all of its obligations under the Lease, as provided in Articles 23 and 24 of the Lease.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 23.1 of the Lease, Tenant is required to immediately quit and peacefully surrender the Premises to Landlord by the Termination Date.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 25.2 of the Lease, if Tenant fails to surrender the Premises to Landlord on or before the Termination Date, Tenant is required to pay to Landlord use and occupancy of the Premises for each month (or any portion thereof) during which Tenant holds over in the Premises after the Termination Date, in an amount equal to (I) in respect of the first thirty (30) days that Tenant holdsover in the Premises, one and one-half (1 ½) times the Fixed Rent and one hundred percent (100%) of the Additional Rent, in either case that was payable under the Lease during or with respect to the last month of the Term, and (II) in respect of any period of time thereafter, the greater of (i) two (2) times the aggregate Rental that was payable under this Lease during the last month of the Term, and (ii) the then fair market rental value of the Premises.

Case 1:20-cv-04541-KHP   Document 9   Filed 07/07/20   Page 25 of 31

**PLEASE TAKE FURTHER NOTICE THAT** unless Tenant removes itself from the Premises on or before the Termination Date, Landlord will commence an action against Tenant to enforce its rights under the Lease, including but not limited to an action to recover unpaid rent and to declare that the Lease termination pursuant to this THREE (3) BUSINESS DAY NOTICE OF TERMINATION.

**PLEASE TAKE FURTHER NOTICE THAT** unless Tenant removes itself from the Premises on or before the Termination Date, Landlord also intends to commence, and will commence in accordance with applicable rules and orders, summary proceedings to remove Tenant from the Premises for the holding over after the expiration of your term and will demand the value of Tenant's use and occupancy of the Premises during such holding over pursuant to Article 25 of the Lease.

**PLEASE TAKE FURTHER NOTICE** that any costs and expenses, including attorneys' fees, that Landlord incurs in pursuing its rights and remedies against Tenant based on Tenant's default shall be recoverable by Landlord pursuant to Articles 21, 23, 24, and 25 of the Lease.

*Id*.

170.    Gap failed to respond to the Notice of Termination.

**D.  Gap's *Post Hoc* Justification and Failure to Vacate the Premises**

171.    Instead, Gap commenced this action on June 12, 2020, one Business Day before the termination of Gap's Lease pursuant to the Notice of Termination.

172.    For the first time, Gap claimed that the COVID-19 pandemic constitutes a "casualty" under Article 16 of the Lease, entitling Gap to a "complete abatement of rent beginning on or before March 19, 2020."

173.    Gap also claimed for the first time that "[b]ecause the Landlord was not able to restore the Premises, the abatement of rent was permanent and, indeed, the Lease terminated pursuant to law on the date Tenant closed its business in the Premises, March 19, 2020."

174.    The same day Gap filed this action, Gap also sent Ponte Gadea a letter purporting

to be a "supplemental notice of casualty," even though Gap never served any other notice of casualty pursuant to or in accordance with Section 16.1 of the Lease (the "Purported Casualty Notice").

175.   Specifically, the Purported Casualty Notice provided, in relevant part, as follows:

> Out of an abundance of caution, and cumulative to the notices provided in prior correspondence, and the actual notice you indubitably have received based upon publications by the government and all forms of media, please take notice, pursuant to Article 16 of the Lease, that the Premises were rendered wholly unusable by casualty on or about March 19 and each day thereafter as a result of the complete shutdown of retail operations in response to the COVID-19 crisis, including applicable civil orders preventing the operation of a retail store at the Premises. The casualty persisted for a period of more than fourteen (14) consecutive days, and prevented Tenant or any other retailer from conducting Tenant's or any other retail business therein in substantially the same manner as prior to such casualty. Based upon current regulations and guidelines, the Premises will continue to not be usable in substantially the same manner as prior to such casualty for the foreseeable future.

176.   Gap's purported "prior correspondence" never provided notice of a "casualty" as set forth in Article 16 of the Lease, nor did purported "publications by the government and all forms of media" qualify as notice as set forth in Article 16 of the Lease.

177.   Further, Gap's Purported Casualty Notice does not constitute proper notice under the Lease.

178.   Nor does Gap's Purported Casualty Notice advise of a "fire or other casualty *in* the Premises," which is required under Article 16 of the Lease.

179.   In fact, Gap is not claiming that the Premises was infected with the virus that causes COVID-19 and that the Landlord was required to restore the Premises in accordance with Section 16.2 of the Lease.

180.   Rather, Gap is claiming that emergency governmental orders required Gap to

reduce the number of occupants in the Premises.

181.    On information and belief, Gap continued to sell its retail apparel online and used goods in the Premises to fulfill online orders.

182.    Gap also continued to physically occupy the Premises throughout March, April, May,  June 2020, and through the present.

183.    Additionally, on information and belief, Gap has been using the Premises for curbside and in store pickup of online orders of its apparel.

184.    Yet, Gap failed to pay Rentals for April 2020, May 2020, June 2020 and July 2020.

185.    In fact, despite Gap's allegation that the Lease terminated effective March 19, 2020, Gap continues to use and occupy the Premises as of the date of this Answer and Counterclaims, without paying rent.

## COUNT I
## DECLARATORY JUDGMENT

186.    Ponte Gadea repeats and realleges the allegations contained in paragraphs 1 through 185 with the same force and effect as if fully set forth herein.

187.    An actual and justiciable controversy exists between the parties as to the termination of the Lease and Gap's obligation to pay Rentals under the Lease.

188.    Gap contends that the Lease terminated by law on March 19, 2020.

189.    Ponte Gadea contends that the Lease terminated due to an Event of Default under Section 21.1(A) of the Lease, effective June 15, 2020 pursuant to the Notice of Termination.

190.    In either event, the Lease is terminated.

191.    Yet, Gap has failed to vacate and surrender the Premises as required under the Lease.

192.    Therefore, among other things, Ponte Gadea is entitled to collect holdover rent

pursuant to Section 25.2 of the Lease.

193.    Notwithstanding Ponte Gadea's clear rights to Rentals under the Lease, Gap refuses to pay Rentals, claiming a "casualty" has rendered the Premises unusable under Article 16 of the Lease.

194.    By reason of the foregoing, Ponte Gadea is entitled to a declaration that: (i) an Event of Default occurred pursuant to Section 21.1(A) of the Lease due to Gap's non-payment of Fixed Rent for April 2020 and May 2020; (2) the Lease terminated on June 15, 2020 pursuant to the Notice of Termination; (3) Gap became a holdover tenant effective June 15, 2020, entitling Ponte Gadea to holdover rent in accordance with Section 25.2 of the Lease; and (4) Gap must immediately and peacefully surrender the Premises.

## COUNT II
## BREACH OF CONTRACT

195.    Ponte Gadea repeats and realleges the allegations contained in paragraphs 1 through 194 with the same force and effect as if fully set forth herein.

196.    The Lease is a binding and enforceable agreement between the Parties.

197.    Ponte Gadea fulfilled all of its obligations under the Lease.

198.    As set forth above and in the Lease, Gap is required to pay Rentals under the Lease, including but not limited to monthly installments of Fixed Rent on the first day of each calendar month.  *See* Lease § 1.5.

199.    In violation of the Lease, Gap failed to pay Rentals for April 2020, May 2020, June 2020, and July 2020.

200.    Due to Gap's non-payment of rent, Landlord declared an Event of Default pursuant to Section 21.1(A) of the Lease and elected to terminate the Lease pursuant to the Notice of Termination, effective June 15, 2020.

201.    Despite the termination of the Lease, Gap failed to vacate the Premises and continues to use and occupy the Premises as a retail apparel store.

202.    On information and belief, as of the date of this Answer and Counterclaims, Gap is using and occupying the Premises for in-person retail shopping, curbside and in-store pickup of online orders, among other things.

203.    Thus, as of June 15, 2020, Ponte Gadea became entitled to holdover rent in accordance with Section 25.2 of the Lease.

204.    Ponte Gadea is further entitled to all Rentals that may become due during the pendency of this action, through and including, January 31, 2021, and also in accordance with Ponte Gadea's rights under Section 25.2 of the Lease.

205.    By virtue of Gap's breach of the Lease, Ponte Gadea has been damaged in an amount to be determined at trial, but not less than $4.5 million, plus interest, costs, and attorneys' fees.

<u>**COUNT III**</u>
**BREACH OF CONTRACT**
(In the Alternative to Count II)

206.    Ponte Gadea repeats and realleges the allegations contained in paragraphs 1 through 205 with the same force and effect as if fully set forth herein.

207.    The Lease is a binding and enforceable agreement between the Parties.

208.    Ponte Gadea fulfilled all of its obligations under the Lease.

209.    As set forth above and in the Lease, in the event that the Lease terminates and Gap fails to vacate and surrender the Premises, Gap is also required to pay Ponte Gadea holdover rent pursuant to the terms of Section 25.2 of the Lease.  *Id.* § 25.2.

210.    Alternative to the breach set forth in Count II, and solely in the event the Court

determines that the Lease terminated due to a "casualty," as defined in Article 16 of the Lease, on or before March 19, 2020, as Gap alleges, Gap has failed to vacate the Premises on or about March 19, 2020, and continued to use and occupy the Premises as a retail apparel store in violation of the Lease.

211.    On information and belief, as of the date of this Answer and Counterclaims, Gap is using and occupying the Premises for in-person retail shopping, curbside and in-store pickup of online orders, among other things.

212.    Consequently, as of March 19, 2020, Gap became a holdover tenant and Ponte Gadea is therefore entitled to holdover rent in accordance with Section 25.2 of the Lease commencing on March 19, 2020.

213.    Ponte Gadea is further entitled to all Rentals that may become due during the pendency of this action, through and including, January 31, 2021, and also in accordance with Ponte Gadea's rights under Section 25.2 of the Lease.

214.    By virtue of Gap's breach of the Lease, Ponte Gadea has been damaged in an amount to be determined at trial, but not less than $4.5 million, plus interest, costs, and attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, Ponte Gadea respectfully requests that this Court enter judgment against

Gap as follows:

a) Dismissing the Complaint against Ponte Gadea in its entirety;

b) Declaring that an Event of Default occurred pursuant to Section 21.1(A) of the Lease due to Gap's non-payment of Fixed Rent for April 2020 and May 2020;

c) Declaring that the Lease terminated on June 15, 2020 pursuant to the Notice of Termination;

d) Declaring that Gap became a holdover tenant effective June 15, 2020, entitling Ponte Gadea to holdover rent in accordance with Section 25.2 of the Lease;

e) Declaring that Gap must immediately quit and peacefully surrender the Premises;

f) Awarding Ponte Gadea damages in an amount to be determined at trial, but not less than $4.5 million, plus interest, costs, and attorneys' fees; and,

g) Granting Ponte Gadea such other and further relief as this Court deems just and proper.

Dated: New York, New York
July 7, 2020

**AKERMAN LLP**

By: */s/ Darryl R. Graham*
    Darryl R. Graham
    Darryl.Graham@akerman.com
    Kathleen M. Prystowsky
    Kathleen.Prystowsky@akerman.com
520 Madison Avenue, 20th Floor
New York, New York 10022
Tel: (212) 880-3800
Fax: (212) 259-7181

*Attorneys for Defendant*
*Ponte Gadea New York LLC*