# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE GAP, INC.,<br><br>                              Plaintiff,<br><br>           v.<br><br>PONTE GADEA NEW YORK LLC,<br><br>                              Defendant. | Case No. 20-cv-4541 (LTS) (KHP) |

## <u>DECLARATION OF ALINA TOYOS</u>

Alina Toyos declares, under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct:

1.      I am Vice President of Asset Management of Ponte Gadea USA, Inc., which wholly owns Defendant Ponte Gadea New York LLC ("Ponte Gadea" or "Defendant") in the above-captioned action.

2.      Other than expressly set forth herein, this Declaration is made on personal knowledge.

3.      I respectfully submit this Declaration in support of Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56, and Alternatively, for Use and Occupancy *Pendente Lite*.

4.      Plaintiff The Gap, Inc. ("Gap"), as tenant, and Ponte Gadea, as landlord, are parties to that certain Lease, dated as of February 18, 2005 ("Lease"), for premises located at 734 Lexington Avenue, New York, New York 10022 a/k/a Unit A, 130 East 59th Street, New York, New York, 10022 (the "Premises"). A true and correct copy of the Lease is attached hereto as <u>Exhibit A</u>.

5.      Gap failed to pay April 2020 Fixed Rent for the Premises, which was due and owing on April 1, 2020, pursuant to Section 1.6 of the Lease.

6.      On or about April 9, 2020, Gap phoned Ponte Gadea and advised that it would not be paying rent for April 2020.

7.      Thereafter, Gap failed to pay Fixed Rent for May 2020, June 2020, July 2020, and August 2020.

8.      Gap also failed to pay rent and other amounts due under the Lease for May 2020, June 2020, July 2020, and August 2020.

9.      Before filing this action, Gap never advised Ponte Gadea that there had been a casualty under the Lease.  A true and correct copy of a letter from Gap to Ponte Gadea, dated June 12, 2020, which was received on June 15, 2020, is attached hereto as Exhibit B.

10.      Gap never advised Ponte Gadea that it had exercised any termination right under the Lease due to a casualty.

11.      Gap continued to use and occupy the Premises throughout April 2020, May 2020, June 2020, July 2020, and through the date of this summary judgment motion.

12.      Gap continues to use and occupy the Premises as of the date of this Declaration.

13.      Gap continues to use the Premises to advertise its goods to people and vehicles that passed by the store's windows where its advertisements are displayed.

14.      Gap continues to use the Premises to store its merchandise.

15.      Gap never surrendered the Premises to Ponte Gadea.

16.      Gap never returned the keys to Ponte Gadea.

17.      I understand that Gap has re-opened operations of its retail store at the Premises in some form, for example curbside pickup.

18.    Ponte Gadea served that certain Five (5) Business Day Notice to Cure Default, dated May 26, 2020 (the "Notice to Cure").

19.    Gap failed to respond to the Notice to Cure.

20.    Gap failed to pay the Fixed Rent for April 2020 and May 2020 that was due and owing by the Cure Date under the Notice to Cure.

21.    Gap failed to commence a *Yellowstone* injunction to toll the expiration of the Cure Date.

22.    On behalf of Ponte Gadea, I served Gap with that certain Three (3) Business Day Notice of Termination, dated June 8, 2020, (the "Notice of Termination"), terminating Gap's tenancy effective June 15, 2020 (the "Termination Date").  A true and correct copy of the Notice of Termination is attached hereto as Exhibit C.

23.    As of the date of this Declaration, Gap has never vacated or surrendered the Premises to Ponte Gadea.

24.    As of August 1, 2020, Gap owes Ponte Gadea the total amount of **$5,671,155.80**, which includes the below amounts less set-off in the amount of $6,273.70:[1]

  a.    Unpaid Rental in the total amount of $2,902,013.85, which represents Fixed Rent ($1,531,250), Additional Rent ($13,042.32), and the Tax Payment ($1,357,721.53).  *See* Lease §§ 1.4(B), 1.5, 2.1(G), 24.2.

  b.    Holdover Charges (June 16, 2020 – August 31, 2020) in the total amount of $2,775,415.65. *Id.* § 25.2.

25.    As Gap continues to use and occupy the Premises, the Holdover Charges continue

---

[1] True and correct copies of the invoices Ponte Gadea sent to Gap for rent due and owing under the Lease, which further explains each category and the noted set-off, are attached hereto as a composite Exhibit D.

to accrue on a monthly basis pursuant to Section 25.2, in the total amount of $1,230,216.93 per month. *Id*. ¶ 25.2; *see also* Exhibit D.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: Miami, Florida
       August 17, 2020

                                  _____
                                      Alina Toyos

# Exhibit A

Powered by Proskauer Commercial Leasing System 1.03
© Proskauer Rose LLP 2002-2004
Patent Pending

LEASE

between

UJA-FED PROPERTIES, INC.,

Landlord,

and

THE GAP, INC.,

Tenant.

734 Lexington Avenue
New York, New York  10022

as of February 18, 2005

# TABLE OF CONTENTS

**Article/Section**     **Page**

**ARTICLE 1 SURRENDER; DEMISE, TERM, FIXED RENT** ........................................... 1

  1.1.    EXISTING LEASE. .................................................................................................. 1
  1.2.    DEMISE. .............................................................................................................. 2
  1.3.    NEW PREMISES COMMENCEMENT DATE. ........................................................... 2
  1.4.    RENT COMMENCEMENT DATE. ........................................................................... 3
  1.5.    FIXED RENT. ........................................................................................................ 3
  1.6.    PAYMENTS OF FIXED RENT. ................................................................................ 4
  1.7.    CERTAIN DEFINITIONS. ........................................................................................ 5

**ARTICLE 2 ESCALATION RENT** ........................................................................... 7

  2.1.    TAX DEFINITIONS. ............................................................................................... 7
  2.2.    TAX AND OPERATING EXPENSE ESCALATIONS. .................................................. 8
  2.3.    TAX REDUCTION PROCEEDINGS. ....................................................................... 10
  2.4.    AUDITING OF TAX PAYMENTS. .......................................................................... 12

**ARTICLE 3 PERCENTAGE RENT** ........................................................................ 13

  3.1.    CERTAIN DEFINITIONS. ...................................................................................... 13
  3.2.    PAYMENT OF PERCENTAGE RENT. ..................................................................... 16
  3.3.    BOOKS AND RECORDS. ....................................................................................... 17

**ARTICLE 4 USE** ................................................................................................ 18

  4.1.    PERMITTED USE. ................................................................................................ 18
  4.2.    LIMITATIONS. ..................................................................................................... 19
  4.3.    RULES. ............................................................................................................... 19
  4.4.    TENANT'S SIGNS. ............................................................................................... 20
  4.5.    RETAIL USE. ...................................................................................................... 20
  4.6.    WIRELESS INTERNET SERVICE. ......................................................................... 21

**ARTICLE 5 LIMITED SERVICES** ......................................................................... 22

  5.1.    CERTAIN DEFINITIONS. ...................................................................................... 22
  5.2.    CLEANING. ......................................................................................................... 22
  5.3.    WATER. ............................................................................................................. 22
  5.4.    STEAM. .............................................................................................................. 23
  5.5.    COOLING TOWER. .............................................................................................. 23
  5.6.    NO OTHER SERVICES. ........................................................................................ 23
  5.7.    LABOR HARMONY. ............................................................................................. 24
  5.8.    REIMBURSEMENT. .............................................................................................. 24

**ARTICLE 6 ELECTRICITY** .................................................................................. 24

  6.1.    CAPACITY. ......................................................................................................... 24
  6.2.    ELECTRICITY FOR THE BUILDING. ..................................................................... 24
  6.3.    ELECTRICITY FOR THE PREMISES/DIRECT METERING. ...................................... 25
  6.4.    TERMINATION OF ELECTRIC SERVICE. .............................................................. 26

i

**ARTICLE 7 INITIAL CONDITION OF THE PREMISES/LANDLORD'S WORK/REDEVELOPMENT WORK** ................................................................ **26**

7.1.   CONDITION OF PREMISES. ................................................................ 26
7.2.   INITIAL WORK. ................................................................................. 27
7.3.   CLOSING OF STORES IN THE EXISTING PREMISES. ......................... 27
7.4.   LANDLORD'S WORK. ....................................................................... 28
7.5.   NEW PREMISES WORK. .................................................................... 30
7.6.   REDEVELOPMENT WORK. ................................................................ 31

**ARTICLE 8 ALTERATIONS** ........................................................................ **32**

8.1.   GENERAL. ....................................................................................... 32
8.2.   ALTERATIONS CRITERIA. ................................................................. 32
8.3.   APPROVAL PROCESS. ...................................................................... 33
8.4.   PERFORMANCE OF ALTERATIONS. ................................................... 33
8.5.   FINANCIAL INTEGRITY. ................................................................... 34
8.6.   EFFECT ON BUILDING. ..................................................................... 36
8.7.   TIME FOR PERFORMANCE OF ALTERATIONS. ................................... 36
8.8.   REMOVAL OF ALTERATIONS AND TENANT'S PROPERTY. ................... 36
8.9.   CONTRACTORS AND SUPERVISION. ................................................. 37
8.10.  LANDLORD'S EXPENSES. .................................................................. 38
8.11.  INITIAL ALTERATIONS. ................................................................... 39

**ARTICLE 9 REPAIRS** ................................................................................ **40**

9.1.   LANDLORD'S REPAIRS. .................................................................... 40
9.2.   TENANT'S REPAIRS. ........................................................................ 40
9.3.   CERTAIN LIMITATIONS. ................................................................... 41
9.4.   OVERTIME. ..................................................................................... 41

**ARTICLE 10 ACCESS; LANDLORD'S CHANGES** ....................................... **42**

10.1.  ACCESS. .......................................................................................... 42
10.2.  LANDLORD'S OBLIGATION TO MINIMIZE INTERFERENCE. ................. 42
10.3.  RESERVED AREAS. .......................................................................... 42
10.4.  DUCTS, PIPES AND CONDUITS. ........................................................ 43
10.5.  KEYS. .............................................................................................. 43
10.6.  LANDLORD'S CHANGES. .................................................................. 43

**ARTICLE 11 UNAVOIDABLE DELAYS AND INTERRUPTION OF SERVICE** ........... **44**

11.1.  UNAVOIDABLE DELAYS. ................................................................... 44
11.2.  INTERRUPTION OF SERVICES. .......................................................... 44

**ARTICLE 12 REQUIREMENTS** .................................................................. **45**

12.1.  TENANT'S OBLIGATION TO COMPLY WITH REQUIREMENTS. .............. 45
12.2.  LANDLORD'S OBLIGATION TO COMPLY WITH REQUIREMENTS. .......... 45
12.3.  TENANT'S RIGHT TO CONTEST REQUIREMENTS. .............................. 45
12.4.  CERTIFICATE OF OCCUPANCY. ........................................................ 46

**ARTICLE 13 QUIET ENJOYMENT** ............................................................ **47**

ii

13.1.    QUIET ENJOYMENT. .................................................................................. 47

**ARTICLE 14 SUBORDINATION ................................................................ 47**

14.1.    SUBORDINATION. ....................................................................................... 47
14.2.    TERMS OF NONDISTURBANCE AGREEMENTS. ........................................... 48
14.3.    ATTORNMENT. ........................................................................................... 50
14.4.    AMENDMENTS TO THIS LEASE. ................................................................. 50
14.5.    TENANT'S ESTOPPEL CERTIFICATE. .......................................................... 50
14.6.    LANDLORD'S ESTOPPEL CERTIFICATE. ...................................................... 51
14.7.    RIGHTS TO CURE LANDLORD'S DEFAULT. ................................................. 51
14.8.    ZONING LOT MERGER AGREEMENT. ......................................................... 51
14.9.    EXISTING MORTGAGES AND EXISTING SUPERIOR LEASES. ....................... 52

**ARTICLE 15 INSURANCE ........................................................................... 52**

15.1.    TENANT'S INSURANCE. ............................................................................. 52
15.2.    LANDLORD'S INSURANCE. ......................................................................... 53
15.3.    MUTUAL WAIVER OF SUBROGATION. ........................................................ 53
15.4.    EVIDENCE OF INSURANCE. ........................................................................ 54
15.5.    NO CONCURRENT INSURANCE. .................................................................. 54
15.6.    TENANT'S OBLIGATION TO COMPLY WITH LANDLORD'S FIRE AND CASUALTY
INSURANCE. .......................................................................................................... 54
15.7.    TENANT'S INSURANCE PROCEEDS. ............................................................ 55

**ARTICLE 16 CASUALTY .............................................................................. 56**

16.1.    NOTICE. ..................................................................................................... 56
16.2.    LANDLORD'S RESTORATION OBLIGATIONS. .............................................. 56
16.3.    TENANT'S RESTORATION OBLIGATIONS. ................................................... 56
16.4.    RENT ABATEMENT. ................................................................................... 57
16.5.    LANDLORD'S TERMINATION RIGHT. .......................................................... 57
16.6.    TENANT'S TERMINATION RIGHT. .............................................................. 57
16.7.    TERMINATION RIGHTS AT END OF TERM. ................................................. 58
16.8.    NO OTHER TERMINATION RIGHTS. ........................................................... 59

**ARTICLE 17 CONDEMNATION .................................................................. 59**

17.1.    EFFECT OF CONDEMNATION. .................................................................... 59
17.2.    CONDEMNATION AWARD. ......................................................................... 60
17.3.    TEMPORARY TAKING. ............................................................................... 61

**ARTICLE 18 ASSIGNMENT AND SUBLETTING ..................................... 61**

18.1.    GENERAL LIMITATIONS. ............................................................................ 61
18.2.    LANDLORD'S EXPENSES. ........................................................................... 62
18.3.    RECAPTURE PROCEDURE. ......................................................................... 62
18.4.    CERTAIN TRANSFER RIGHTS. .................................................................... 65
18.5.    TRANSFER TAXES. .................................................................................... 67
18.6.    TRANSFER PROFIT. .................................................................................... 67
18.7.    PERMITTED TRANSFERS. ........................................................................... 68

**ARTICLE 19 RENEWAL ............................................................................... 70**

19.1.   RENEWAL OPTION. ............................................................................ 70
19.2.   LEASE PROVISIONS APPLY. ................................................................. 70

**ARTICLE 20 FAIR MARKET RENT** ............................................................... **71**

20.1.   CERTAIN DEFINITIONS. ...................................................................... 71
20.2.   FAIR MARKET RENT ASSUMPTIONS. ................................................... 71
20.3.   FAIR MARKET PROCEDURE. ............................................................... 71

**ARTICLE 21 DEFAULT** ............................................................................... **72**

21.1.   EVENTS OF DEFAULT. ........................................................................ 72
21.2.   TERMINATION. ................................................................................... 73

**ARTICLE 22 TENANT'S INSOLVENCY** ......................................................... **73**

22.1.   ASSIGNMENTS PURSUANT TO THE BANKRUPTCY CODE. ...................... 73
22.2.   REPLACEMENT LEASE. ....................................................................... 74
22.3.   INSOLVENCY EVENTS. ........................................................................ 75
22.4.   EFFECT OF STAY. ............................................................................... 76
22.5.   RENTAL FOR BANKRUPTCY PURPOSES. ............................................... 77

**ARTICLE 23 REMEDIES AND DAMAGES** ..................................................... **77**

23.1.   CERTAIN REMEDIES. .......................................................................... 77
23.2.   NO REDEMPTION. .............................................................................. 78
23.3.   CALCULATION OF DAMAGES. .............................................................. 78

**ARTICLE 24 LANDLORD'S AND TENANT'S EXPENSES AND LATE CHARGES** ..... **79**

24.1.   LANDLORD'S AND TENANT'S COSTS AFTER EVENT OF DEFAULT. ......... 79
24.2.   INTEREST ON LATE PAYMENTS. ......................................................... 80

**ARTICLE 25 END OF TERM** ....................................................................... **80**

25.1.   END OF TERM. ................................................................................... 80
25.2.   HOLDOVER. ....................................................................................... 80

**ARTICLE 26 NO WAIVER** .......................................................................... **81**

26.1.   NO SURRENDER. ................................................................................ 81
26.2.   NO WAIVER. ...................................................................................... 81
26.3.   NO WAIVER BY TENANT. .................................................................... 81

**ARTICLE 27 JURISDICTION** ...................................................................... **82**

27.1.   GOVERNING LAW. .............................................................................. 82
27.2.   SUBMISSION TO JURISDICTION. .......................................................... 82
27.3.   WAIVER OF TRIAL BY JURY. ............................................................... 82

**ARTICLE 28 NOTICES** .............................................................................. **83**

28.1.   ADDRESSES; MANNER OF DELIVERY. ................................................. 83

**ARTICLE 29 BROKERAGE** ......................................................................... **84**

29.1.   BROKER. ........................................................................................... 84

iv

**ARTICLE 30 INDEMNITY**.................................................................................. 84

    30.1.    Tenant's Indemnification of the Landlord Indemnitees. ............................... 84
    30.2.    Landlord's Indemnification of the Tenant Indemnitees. ............................. 85
    30.3.    Indemnification Procedure................................................................... 86

**ARTICLE 31 LANDLORD'S CONSENTS** ........................................................ 87

    31.1.    Certain Limitations............................................................................ 87
    31.2.    Expedited Arbitration. ....................................................................... 88

**ARTICLE 32 ADDITIONAL PROVISIONS** ................................................... 88

    32.1.    Tenant's Property Delivered to Building Employees............................... 88
    32.2.    Not Binding Until Execution. .............................................................. 89
    32.3.    No Third Party Beneficiaries............................................................... 89
    32.4.    Extent of Landlord's Liability............................................................. 89
    32.5.    Survival. .......................................................................................... 89
    32.6.    Recording. ....................................................................................... 89
    32.7.    Entire Agreement............................................................................. 90
    32.8.    Exhibits........................................................................................... 90
    32.9.    Gender; Plural. ................................................................................. 90
    32.10.    Divisibility. ...................................................................................... 90
    32.11.    Vault Space. .................................................................................... 90
    32.12.    Adjacent Excavation. ........................................................................ 90
    32.13.    Captions. ......................................................................................... 91
    32.14.    Parties Bound................................................................................... 91
    32.15.    Authority. ........................................................................................ 91
    32.16.    Rent Control. ................................................................................... 92
    32.17.    Consequential Damages...................................................................... 92
    32.18.    Tenant's Advertising. ........................................................................ 92
    32.19.    Advertising and Trademarks................................................................ 92
    32.20.    Confidentiality. ................................................................................ 93

## DEFINED TERMS

| Term | Page |
|------|------|
| Affiliate | 5 |
| Alterations | 32 |
| Alterations Notice | 33 |
| Amortized Transfer Expenses | 63 |
| Annual Statement | 16 |
| Applicable Breakpoint | 13 |
| Applicable Rate | 5 |
| Appraiser | 72 |
| Assessed Valuation | 7 |
| Banana Republic | 5 |
| Bankruptcy Code | 73 |
| Base Electrical Capacity | 24 |
| Base Rate | 5 |
| Base Rental Amount | 71 |
| Base Taxes | 7 |
| Basic Sublease Provisions | 67 |
| Broker | 84 |
| Building | 1 |
| Building Change | 36 |
| Building Systems | 22 |
| Business Days | 5 |
| Casualty Statement | 57 |
| Claim | 86 |
| Commencement Date | 2 |
| Compliance Challenge | 45 |
| Condominium Board | 47 |
| Condominium Declaration | 47 |
| Consumer Price Index | 5 |
| Control | 5 |
| Core Drilling Work | 30 |
| Deficiency | 78 |
| Delivery Conditions | 2 |
| Discontinuation Date | 25 |
| Estimated Restoration Date | 57 |
| Event of Default | 72 |
| Excluded Amounts | 7 |
| Existing Lease | 1 |
| Existing Premises | 2 |
| Existing Premises Work | 28 |
| Expedited Arbitration Proceeding | 88 |
| Expiration Date | 2 |
| Fair Market Rent | 71 |
| First Tax Year | 7 |

First Year Taxes...................................................................................................7
Fixed Expiration Date............................................................................................2
Fixed Rent...........................................................................................................3
Force Majeure Event............................................................................................6
Gap Entrance......................................................................................................39
Governmental Authority......................................................................................45
Gross Sales........................................................................................................14
High Speed Line...................................................................................................6
Holidays..............................................................................................................6
HVAC.................................................................................................................22
Indemnitee.........................................................................................................86
Indemnitor.........................................................................................................86
Initial Alterations................................................................................................32
Initial Alterations Plans......................................................................................39
Initial Tenant.......................................................................................................6
Insolvency Events..............................................................................................76
Institutional Lender............................................................................................55
Intellectual Property Rights................................................................................92
Landlord...............................................................................................................1
Landlord Deadline..............................................................................................28
Landlord Indemnitees........................................................................................85
Landlord Liability Claim......................................................................................85
Landlord's Award...............................................................................................60
Landlord's Determination...................................................................................71
Landlord's Plans.................................................................................................28
Landlord's Property Policy..................................................................................53
Landlord's Work.................................................................................................28
Lease Year.........................................................................................................16
Lessor................................................................................................................47
Monthly Statement.............................................................................................16
Mortgage...........................................................................................................47
Mortgagee..........................................................................................................47
Net Worth Requirement........................................................................................6
New Premises......................................................................................................2
New Premises Commencement Date....................................................................2
New Premises Rent Commencement Date............................................................3
New Premises Scheduled Commencement Date...................................................2
New Premises Work............................................................................................28
New Slab..........................................................................................................104
Nondisturbance Agreement................................................................................47
Occupancy Agreement.......................................................................................61
Outside Date........................................................................................................3
Percentage Rent Rate........................................................................................16
Permitted Party..................................................................................................61
Person.................................................................................................................6
Predecessor Landlord..........................................................................................1

Predecessor Tenant ..................................................................................................75
Premises ...................................................................................................................2
Proposed Transfer Terms.........................................................................................63
Qualified Alteration .................................................................................................37
Real Property ...........................................................................................................1
Recapture Date .........................................................................................................63
Recapture Procedure ................................................................................................62
Recapture Space .......................................................................................................63
Recapture Termination.............................................................................................64
Recapture Termination Notice.................................................................................63
Redevelopment Work ..........................................................................................29, 31
Renewal Notice ........................................................................................................70
Renewal Option ........................................................................................................70
Renewal Term ..........................................................................................................70
Rent Notice ..............................................................................................................71
Rentable Area...........................................................................................................6
Rental .......................................................................................................................3
Rental Value.............................................................................................................71
Requirements ...........................................................................................................45
Reserved Areas ........................................................................................................43
Rules ........................................................................................................................19
Scheduled New Premises Rent Commencement Date .............................................3
Second Bite Termination Notice..............................................................................58
Settlement ................................................................................................................87
Slab ..........................................................................................................................104
Specialty Alterations................................................................................................32
Storefront .................................................................................................................28
Storefront Work .......................................................................................................28
Subsequent Year Taxes ...........................................................................................7
Substantial Completion ...........................................................................................32
Successor..................................................................................................................48
Successor Limitation Items......................................................................................49
Superior Lease .........................................................................................................48
Tax Payment ............................................................................................................8
Tax Protest Request .................................................................................................10
Tax Share .................................................................................................................8
Tax Statement ..........................................................................................................8
Tax Year...................................................................................................................8
Taxes ........................................................................................................................7
Tenant ......................................................................................................................1
Tenant Delay............................................................................................................6
Tenant Indemnitees .................................................................................................85
Tenant Liability Claim .............................................................................................84
Tenant Obligor.........................................................................................................76
Tenant Unit ..............................................................................................................20
Tenant's Award ........................................................................................................60

Tenant's Determination .................................................................................71
Tenant's Liability Policy ...............................................................................52
Tenant's Property ..........................................................................................32
Tenant's Property Policy ...............................................................................52
Tenant's Signs ...............................................................................................20
Tenant's Termination Date .............................................................................3
Term ................................................................................................................2
Termination Notice ........................................................................................3
Threshold Month ..........................................................................................16
Transfer .........................................................................................................61
Transfer Date ................................................................................................63
Transfer Expenses .........................................................................................63
Transfer Inflow .............................................................................................68
Transfer Notice .............................................................................................62
Transfer Outflow ..........................................................................................68
Transfer Profit ..............................................................................................67
Transferee .....................................................................................................63
Transferor .....................................................................................................63
Unamortized Alterations Costs ....................................................................56
Utility Company ...........................................................................................24
Work Access .................................................................................................42
Work Deposit ................................................................................................35

## EXHIBITS

Exhibit "1.3"          New Premises

Exhibit "4.3"          Rules

Exhibit "4.4"          Tenant's Signs

Exhibit "5.6"          Point of Connection Plan

Exhibit "7.2-1"        Surrender Space

Exhibit "7.2-2"        Initial Work

Exhibit "7.4(A)"       Landlord's Plans

Exhibit "7.4(F)"       Existing Premises

Exhibit "7.5"          New Premises Work

Exhibit "8.2"          Area of No Slab Penetration

Exhibit "8.11(A)"      Initial Alterations

THIS LEASE, dated as of the 18th day of February, 2005, by and between UJA-FED
PROPERTIES, INC., a New York not for profit corporation, having an address at 130 East 59th
Street, New York, New York 10022, as landlord, and THE GAP, INC., a Delaware corporation,
having an address at 901 Cherry Avenue, San Bruno, California 94066, as tenant (the Person that
holds the interest of the landlord hereunder at any particular time being referred to herein as
"Landlord"; subject to Section 18.1(D) hereof, the Person that holds the interest of the tenant
hereunder at any particular time being referred to herein as "Tenant").

## WITNESSETH:

WHEREAS, Landlord wishes to demise and let unto Tenant, and Tenant wishes to hire
and take from Landlord, on the terms and subject to the conditions set forth herein, certain
premises that are located in the building that is known by the street address of 130 East 59th
Street, New York, New York 10022 (the "Building"; the Building, together with the plot of land
on which the Building is constructed, being collectively referred to herein as the "Real
Property").

NOW, THEREFORE, in consideration of the premises, and other good and valuable
consideration, the mutual receipt and legal sufficiency of which the parties hereto hereby
acknowledge, Landlord and Tenant hereby agree as follows:

Article 1
SURRENDER; DEMISE, TERM, FIXED RENT

1.1. Existing Lease.

The term "Existing Lease" shall mean the Agreement of Lease, dated as of March 8,
1989, between Landlord's predecessor-in-interest United Jewish Appeal-Federation of Jewish
Philanthropies of New York, Inc. ("Predecessor Landlord"), as owner, and Tenant, as tenant, as
amended by (i) an Amendment of Lease, dated as of July 1, 1990, between Predecessor Landlord
and Tenant, (ii) a Second Amendment of Lease, dated as of November 8, 1990, between
Predecessor Landlord and Tenant, (iii) a Third Amendment of Lease, dated as of October 2,
1991, between Predecessor Landlord and Tenant, (iv) a Fourth Amendment of Lease, dated as of
October 21, 1993, between Predecessor Landlord and Tenant, and (v) a Fifth Amendment of
Lease, dated as of September 30, 1995, between Predecessor Landlord and Tenant. Landlord has
succeeded to the interests of Predecessor Landlord as landlord under the Existing Lease.
Landlord and Tenant hereby agree that the Existing Lease terminated as of midnight on the day
immediately prior to the date hereof and is therefore of no further force or effect. Landlord and
Tenant shall have no further rights or obligations under the Existing Lease except for those rights
and obligations set forth therein that are expressly stated to survive the expiration or termination
thereof (it being agreed that Tenant shall continue to pay to Landlord escalations or amounts on
account of operating expenses and taxes (however defined in the Existing Lease) pursuant to the
Existing Lease, in accordance with Section 2.2(A) hereof).

1.2.    Demise.

Subject to the terms of Section 7.1 hereof, Landlord hereby leases to Tenant and Tenant hereby hires from Landlord the premises (the "Existing Premises") leased by Landlord to Tenant as of the day immediately prior to the date hereof pursuant to the terms of the Existing Lease for a term to commence on the date hereof (the "Commencement Date") and to end on January 31, 2021 (the "Fixed Expiration Date"; the Fixed Expiration Date, or such earlier or later date that the term of this Lease expires or otherwise terminates pursuant to the terms hereof or pursuant to law, being referred to herein as the "Expiration Date"; the term commencing on the Commencement Date and ending on the Expiration Date being referred to herein as the "Term"), it being acknowledged that the Existing Premises constitutes a separate condominium unit and the New Premises shall constitute a separate condominium unit (the term "Premises" shall mean the space leased by Landlord to Tenant pursuant to this Lease from time to time, it being agreed that as of the Commencement Date the Premises shall be comprised of only the Existing Premises).

1.3.    New Premises Commencement Date.

(A)    Subject to the terms hereof, Landlord hereby leases to Tenant and Tenant hereby hires from Landlord, the premises (the "New Premises") located on the second (2nd) floor of the Building comprising approximately fourteen thousand nine hundred forty (14,940) square feet of Rentable Area and as depicted on Exhibit "1.3" attached hereto and made a part hereof, for a term commencing on the New Premises Commencement Date and ending on the Fixed Expiration Date, or such earlier or later date that the Term expires or otherwise terminates pursuant to the terms hereof or pursuant to law. The term "New Premises Commencement Date" shall mean the earlier to occur of (x) the date that Landlord delivers the New Premises to Tenant with the Delivery Conditions satisfied, and (y) the date that Landlord would have delivered the New Premises to Tenant with the Delivery Conditions satisfied but for any Tenant Delays. In no event shall Landlord deliver the New Premises to Tenant as provided in the immediately preceding clause (x) prior to July 22, 2005 (the "New Premises Scheduled Commencement Date"). The term "Delivery Conditions" shall mean that (i) Landlord has delivered the New Premises to Tenant with the New Premises Work Substantially Completed in accordance with Article 7 hereof and (ii) Landlord has reviewed and delivered its written comments to Tenant's plans and specifications for the Initial Alterations submitted to Landlord in accordance with Article 8 hereof, provided that Tenant has delivered to Landlord such plans and specifications no later than thirty (30) days prior to the New Premises Scheduled Commencement Date (it being agreed that if Tenant does not deliver such plans and specifications to Landlord at least thirty (30) days prior to the New Premises Scheduled Commencement Date, then the term "Delivery Conditions" shall mean the occurrence of only the event described in clause (i) of this sentence). Within thirty (30) days after the date upon which Landlord delivers the New Premises to Tenant, Landlord shall advise Tenant of any Tenant Delays, provided that Landlord's failure to so advise Tenant shall not affect the validity of any such Tenant Delay unless such failure continues for thirty (30) days following request therefor. Notwithstanding anything to the contrary contained in this Section 1.3(A), if Landlord is able to deliver the New Premises to Tenant with the New Premises Work Substantially Completed in accordance with Article 7 hereof prior to the New Premises Scheduled Commencement Date, then Tenant, at Tenant's option, may elect to accept delivery of the New Premises on such earlier date.

2

(B)    Subject to the terms of this Section 1.3(B), Tenant shall have the right to terminate this Lease if Landlord fails to deliver the New Premises to Tenant with the Delivery Conditions satisfied on or prior to February 15, 2006, which date shall be extended one (1) day for each day of Tenant Delay (February 15, 2006, as such date may be extended, being referred to herein as the "Outside Date"), by giving notice (the "Termination Notice") thereof to Landlord no later than twenty (20) days after the Outside Date.  If Tenant gives a Termination Notice to Landlord on or prior to twenty (20) days after the Outside Date, then this Lease shall terminate on the tenth (10th) day (such day being referred to herein as "Tenant's Termination Date") after the date that the Termination Notice is given to Landlord.  If Tenant exercises Tenant's right to terminate this Lease as provided in this Section 1.3(B), then Tenant, on Tenant's Termination Date, shall vacate the Premises and surrender the Premises to Landlord in accordance with the terms of this Lease that govern Tenant's obligations upon the expiration or earlier termination of the Term.

1.4.    Rent Commencement Date.

(A)    Subject to the terms of this Section 1.4, the term "New Premises Rent Commencement Date") shall mean the earlier to occur of (x) one hundred eighty days after the New Premises Commencement Date (the one hundred eightieth day after the New Premises Commencement Date being referred to herein as the "Scheduled New Premises Rent Commencement Date"), and (y) the date that Tenant occupies any portion of the New Premises and opens therein for the conduct of business with the public.  If the New Premises Commencement Date occurs more than twenty (20) days after the New Premises Scheduled Commencement Date, then the New Premises Scheduled Rent Commencement Date shall be adjourned by two (2) days for each day after such twentieth (20th) day that the New Premises Commencement Date did not occur (so that, for example, if the New Premises Commencement Date occurred thirty (30) days after the New Premises Scheduled Commencement Date, then the Scheduled New Premises Rent Commencement Date shall be two hundred (200) days after the New Premises Commencement Date).  If the Scheduled New Premises Rent Commencement Date occurs during the period of time commencing on November 15th of any given calendar year and ending on January 31st of the immediately succeeding calendar year, then the Scheduled New Premises Rent Commencement Date shall instead be February 1st of the aforesaid immediately succeeding year (it being understood that the New Premises Rent Commencement Date shall occur on the date that Tenant occupies any portion of the New Premises and opens therein for the conduct of business with the public, including during the period of time commencing on November 15th of any such year and ending on January 31st of the immediately succeeding calendar year).

(B)    The term "Rental" shall mean, collectively, the Fixed Rent, the Tax Payment and the additional rent payable by Tenant to Landlord hereunder.

1.5.    Fixed Rent.

The annual fixed rent for the Premises (the "Fixed Rent") shall be:

3

(1)     Four Million Seventy-Six Thousand Nine Hundred Eight Dollars and 80/100 Cents ($4,076,908.80) per annum ($339,742.40 per month) for the period commencing on the Commencement Date and ending on May 15, 2005;

(2)     Five Million Thirty Thousand Dollars and No Cents ($5,030,000.00) per annum ($419,166.67 per month) for the period commencing on May 16, 2005 and ending on the day immediately prior to the New Premises Rent Commencement Date;

(3)     Five Million Six Hundred Fifty Thousand Dollars and No Cents ($5,650,000.00) per annum ($470,833.33 per month) for the period commencing on the New Premises Rent Commencement Date and ending on November 30, 2010;

(4)     Six Million Four Hundred Fifty Thousand Dollars and No Cents ($6,450,000.00) per annum ($537,500.00 per month) for the period commencing on December 1, 2010 and ending on November 30, 2015; and

(5)     Seven Million Three Hundred Fifty Thousand Dollars and No Cents ($7,350,000.00) per annum ($612,500.00 per month) for the period commencing on December 1, 2015 and ending on the Fixed Expiration Date; provided, however, that if Tenant exercises the Renewal Option pursuant to Article 19 hereof, then, commencing on December 1, 2020 and ending on the last day of the Renewal Term, the Fixed Rent for the Premises shall be an amount equal to the Rental Value therefor per annum determined in accordance with Article 19 hereof.

1.6.     Payments of Fixed Rent.

(A)     Tenant shall pay the Fixed Rent in lawful money of the United States of America that is legal tender in payment of all debts and dues, public and private, at the time of payment, in equal monthly installments, in advance, on the first (1st) day of each calendar month during the Term, at the office of Landlord or such other place as Landlord may designate from time to time on at least thirty (30) days of advance notice to Tenant, without any set-off, offset, abatement or deduction whatsoever (except to the extent otherwise expressly set forth herein).

(B)     If Tenant or Tenant's Affiliates generally commence to pay rents to landlords for their stores by wire transfer or electronic funds transfer on a regular basis, then Tenant shall pay the Fixed Rent when due hereunder by wire transfer of funds or electronic funds transfer to an account designated from time to time by Landlord on at least thirty (30) days of advance notice to Tenant (it being agreed that initially Tenant shall contact Landlord and request that Landlord designate such account).

(C)     If the Commencement Date or the New Premises Rent Commencement Date, as the case may be, is not the first (1st) day of a calendar month, then (x) the Fixed Rent due hereunder for the calendar month during which the Commencement Date or the New Premises Rent Commencement Date, as the case may be, occurs shall be adjusted appropriately based on the number of days in such calendar month and Tenant shall pay to Landlord such amount (adjusted as aforesaid for such calendar month) on the Commencement Date or the New Premises Rent Commencement Date, as the case may be, pursuant to an invoice given by Landlord to Tenant, and (y) Tenant shall be required to pay the Fixed Rent set forth on such invoice to Landlord no later than thirty (30) days after the date Landlord gives such notice to

4

Tenant. If the Fixed Rent payable hereunder increases on a day other than the first day of a calendar month, then the Fixed Rent payable for such month shall be appropriately prorated based upon the number of days that occur in such month. If the Expiration Date is not the last day of a calendar month, then the Fixed Rent due hereunder for the calendar month during which the Expiration Date occurs shall be adjusted appropriately based on the number of days in such calendar month.

1.7.    Certain Definitions.

(A)    The term "Affiliate" shall mean a Person that (1) Controls, (2) is under the Control of, or (3) is under common Control with, the Person in question.

(B)    The term "Applicable Rate" shall mean, at any particular time, the lesser of (x) two hundred (200) basis points above the Base Rate at such time, and (y) the maximum rate permitted by applicable law at such time.

(C)    The term "Banana Republic" shall mean Banana Republic LLC or any successor to Banana Republic pursuant to Section 18.7 hereof, provided that any such successor shall continue in the business of selling first class apparel, at a comparable price point, of a quality similar to or better than the merchandise sold in the stores operated by Banana Republic LLC as of the date hereof.

(D)    The term "Base Rate" shall mean the rate of interest announced publicly from time to time by JP Morgan Chase Bank, or its successor, as its "prime lending rate" (or such other term as may be used by JP Morgan Chase Bank (or its successor), from time to time, for the rate presently referred to as its "prime lending rate").

(E)    The term "Business Days" shall mean all days, excluding Saturdays, Sundays and Holidays.

(F)    The term "Consumer Price Index" shall mean the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, All Items (1982-84 = 100), seasonally adjusted, for the most specific area that includes the location of the Building, or any successor index thereto. If the Consumer Price Index is converted to a different standard reference base or otherwise revised, then the determination of adjustments provided for herein shall be made with the use of such conversion factor, formula or table for converting the Consumer Price Index as may be published by the Bureau of Labor Statistics or, if said Bureau does not publish such conversion factor, formula or table, then with the use of such conversion factor, formula or table as may be published by Prentice-Hall, Inc. or any other nationally recognized publisher of similar statistical information. If the Consumer Price Index ceases to be published, and there is no successor thereto, then Landlord and Tenant shall use diligent efforts, in good faith, to agree upon a substitute index for the Consumer Price Index.

(G)    The term "Control" shall mean direct or indirect ownership of more than fifty percent (50%) of the outstanding voting stock of a corporation or other majority equity interest if not a corporation and the possession of power to direct or cause the direction of the

5

management and policy of such corporation or other entity, whether through the ownership of voting securities, by statute or by contract.

(H)     The term "Force Majeure Event" shall mean a strike or other labor trouble, fire or other casualty, governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, or any other cause beyond Tenant's reasonable control.

(I)     The term "Holidays" shall mean all days observed as legal holidays by either (x) the State of New York, or (y) the United States of America.

(J)     The term "High Speed Line" shall mean any T1 or cable line installed by Tenant as part of the Initial Alterations in connection with Tenant's telecommunications needs in the Premises.

(K)     The term "Initial Tenant" shall mean the requirement that Tenant is the Person that executed and delivered this Lease initially as the tenant hereunder or a Person that succeeds to such Person pursuant to the terms of Section 18.7 hereof.

(L)     The term "Net Worth Requirement" shall mean that Tenant's tangible net worth is greater than One Hundred Million Dollars ($100,000,000), as evidenced by Tenant's financial statements that are audited by an independent certified public accountant in a manner sufficient for filings required by The Securities and Exchange Commission.

(M)     The term "Person" shall mean any natural person or persons or any legal form of association, including, without limitation, a partnership, a limited partnership, a corporation, and a limited liability company.

(N)     The term "Rentable Area" shall mean the area which the parties have agreed following Landlord's Substantial Completion of the New Premises Work is (i) twenty-two thousand seven hundred fifty-two (22,752) square feet for the Existing Premises, (ii) fourteen thousand nine hundred forty (14,940) square feet for the New Premises, and (iii) thirty-seven thousand six hundred ninety-two (37,692) square feet in the aggregate.

(O)     The term "Tenant Delay" shall mean any delay Landlord encounters in its performance of (I) the New Premises Work caused by (i) any request by Tenant that Landlord delay in proceeding with any segment or part of the New Premises Work, (ii) any changes or requests for changes by Tenant to the New Premises Work; or (iii) any material omission, negligence or willful misconduct of Tenant, or its officers, agents, servants or contractors, or (II) the Landlord's Work caused by (i) Tenant's failure to meet a Tenant Deadline, or (ii) any material omission, negligence or willful misconduct of Tenant, or its officers, agents, servants or contractors.

6

Article 2
ESCALATION RENT

2.1.   Tax Definitions.

(A)    The term "Assessed Valuation" shall mean the amount for which the condominium units in which the Premises are located are assessed pursuant to applicable provisions of the New York City Charter and of the Administrative Code of The City of New York, in either case for the purpose of calculating all or any portion of the Taxes.

(B)    The term "Excluded Amounts" shall mean (i) any taxes imposed on Landlord's income, (ii) corporation, franchise, estate or inheritance taxes imposed on Landlord, (iii) mortgage lien taxes, transfer gains taxes, gross receipts, transfer taxes, tax increment financing or recording fees, documentary stamp taxes, or succession taxes imposed on Landlord, and (iv) any other similar taxes imposed on Landlord (and any penalties or interest imposed on the foregoing).

(C)    The term "Base Taxes" shall mean an amount equal to the greater of (x) Seven Hundred Fifty Thousand Dollars ($750,000), and (y) the Taxes for the Tax Year commencing on July 1, 2005 and ending on June 30, 2006.

(D)    The term "First Year Taxes" shall mean (I) if the New Premises Rent Commencement Date occurs on or prior to June 30, 2006, an amount equal to the product of (x) Two Thousand Fifty-Four Dollars and 79/100 Cents ($2,054.79), and (y) the number of days occurring in the period of time commencing on the New Premises Rent Commencement Date and ending on the immediately succeeding June 30th, and (II) if the New Premises Rent Commencement Date occurs on or after July 1, 2006, an amount equal to the sum of (x) Seven Hundred Fifty Thousand Dollars ($750,000), and (y) the amount, if any, by which the Taxes for the Tax Year in which such New Premises Rent Commencement Date occurs exceed the Base Taxes (the Tax Year in which the New Premises Rent Commencement Date occurs being referred to herein as the "First Tax Year").

(E)    The term "Subsequent Year Taxes" shall mean for each Tax Year occurring after the First Tax Year, an amount equal to the sum of (x) Seven Hundred Fifty Thousand Dollars ($750,000), and (y) the amount, if any, by which the Taxes for such Tax Year exceed the Base Taxes.

(F)    The term "Taxes" shall mean the aggregate amount of real estate taxes and any general or special assessments that in each case are imposed upon the condominium units in which the Premises are located, without taking into account (a) any discount that Landlord receives by virtue of any early payment of Taxes, (b) any penalties or interest that the applicable Governmental Authority imposes for the late payment of such real estate taxes or assessments (except to the extent that any such penalties or interest are charged by such Governmental Authority by virtue of Tenant's failure to timely pay to Landlord any Tax Payments), (c) any Excluded Amounts, or (d) except as otherwise expressly provided herein, any exemption or deferral of Taxes to which such condominium units are entitled under any program that a Governmental Authority adopts to promote the improvement or redevelopment of real property

7

or by reason of its ownership by a tax exempt entity; provided, however, that if, because of any change in the taxation of real estate, any other tax or assessment, however denominated (including, without limitation, any franchise, income, profit, sales, use, occupancy, gross receipts or rental tax), is imposed upon such condominium units, the owner thereof, or the occupancy, rents or income derived therefrom, in substitution for any of the Taxes, then such other tax or assessment to the extent substituted shall be included in Taxes for purposes hereof (assuming that such condominium units are Landlord's sole asset and the income therefrom is Landlord's sole income). Taxes shall include, without limitation, (i) assessments made upon or with respect to any "air" and "development" rights now or hereafter appurtenant to or affecting such condominium units, (ii) any fee, tax or charge imposed by any Governmental Authority for any vaults or vault spaces that in either case are appurtenant to such condominium units, and (iii) any taxes or assessments levied after the date of this Lease, in whole or in part, for public benefits to such condominium units, including, without limitation, any business improvement district taxes and assessments. If any such real estate taxes or assessments are payable in installments without interest, premium or penalty, then Landlord shall include in Taxes for any particular Tax Year only the installment of such real estate taxes or assessments that the applicable Governmental Authority requires Landlord to pay (and that Landlord actually pays) during such Tax Year. If Tenant, at Tenant's cost and expense, installs any machinery or equipment in the Premises or otherwise expends any funds in connection with the Premises, and any such installation or expenditure results in an exemption or abatement of Taxes, then Taxes shall take into account such exemption or abatement of Taxes (it being agreed that if any such abatement or exemption results in Taxes being deferred and due at a later date, then Tenant shall not be entitled to such exemption or abatement).

(G)     The term "Tax Payment" shall mean the product of (x) the Tax Share, and (y) the First Year Taxes or the Subsequent Year Taxes, as the case may be.

(H)     The term "Tax Share" shall mean one hundred percent (100%). Landlord covenants that during the Term the condominium units will not be modified, beyond a *de minimis* extent, to include any space in the Building that is not included in such condominium units on the date hereof.

(I)     The term "Tax Statement" shall mean a statement that shows the Tax Payment for a particular Tax Year.

(J)     The term "Tax Year" shall mean each twelve (12) month period of time from July 1st through June 30th (or such other period as hereinafter may be duly adopted by the Governmental Authority then imposing Taxes as its fiscal year for real estate tax purposes).

2.2.    Tax and Operating Expense Escalations.

(A)     Tenant shall continue to pay through May 15, 2005 escalation rent in respect of the Existing Premises pursuant to and in accordance with the terms and provisions of the Existing Lease that govern the payment of any tax and operating escalations or amounts on account of operating expenses or taxes (however defined or denominated in the Existing Lease), as if the Existing Lease had not terminated. In respect of any period of time prior to May 16, 2005, Landlord's and Tenant's respective rights and obligations with respect to such escalation

8

rent shall be governed pursuant to the applicable terms and provisions of the Existing Lease. If Tenant makes any estimated payments on account of escalation rent in respect of the Existing Premises prior to May 16, 2005, then such estimated payments shall be settled and adjusted as of May 15, 2005 pursuant to the applicable terms and provisions of the Existing Lease with respect thereto. If Tenant makes any payments on account of escalation rent in respect of the Existing Premises prior to May 16, 2005, which payment is in respect of any period of time occurring from and after May 16, 2005, then Tenant shall be entitled to a refund (or, at Landlord's option, a credit against Tenant's next then installments of Rental due hereunder) for the portion of any such payment in respect of any period of time from and after May 16, 2005.

(B)      Subject to the provisions of this Section 2.2, from and after the New Premises Rent Commencement Date, Tenant shall no longer have any obligation to make any payments in respect of operating expenses but shall pay to Landlord, as additional rent, the Tax Payment.

(C)      Subject to the provisions of this Section 2.2, Tenant shall pay to Landlord the Tax Payment for the First Tax Year (if the First Tax Year occurs on or prior to June 30, 2006) (x) in its entirety on the New Premises Rent Commencement Date, if the New Premises Rent Commencement Date occurs between January 1st and June 30th, and (y) in two (2) installments as follows, if the New Premises Rent Commencement Date occurs between July 1st and December 31st: (I) the first (1st) installment on the New Premises Rent Commencement Date, in an amount equal to product of (x) the Tax Payment for such First Tax Year, and (y) the quotient (expressed as a percentage) derived by dividing the number of days occurring in the period of time commencing on the New Premises Rent Commencement Date and ending on the immediately succeeding December 31st by the number of days occurring in such First Tax Year, and (II) the second (2nd) installment on the January 2nd following the New Premises Rent Commencement Date in an amount equal to the amount derived by subtracting from the Tax Payment due in respect of the First Tax Year, the installment of the Tax Payment described in the immediately preceding clause (I). Tenant shall pay to Landlord the Tax Payment for the First Tax Year (if the First Tax Year occurs on or after July 1, 2006) or any Tax Year that occurs after the First Tax Year on or prior to the thirtieth (30th) day before the date that the applicable Governmental Authority obligates Landlord to make the corresponding payment of Taxes for such Tax Year. If the New Premises Rent Commencement Date occurs on or after July 1, 2006, then the Tax Payment for the First Tax Year shall be an amount equal to the product obtained by multiplying (X) the Tax Payment that would have been due hereunder if the New Premises Rent Commencement Date was the first (1st) day of such Tax Year, by (Y) a fraction, the numerator of which is the number of days in the period beginning on the New Premises Rent Commencement Date and ending on the last day of such Tax Year, and the denominator of which is three hundred sixty-five (365). If the applicable Governmental Authority requires Landlord to pay the Taxes for a Tax Year in more than one (1) installment, then Tenant shall pay the Tax Payment to Landlord for such Tax Year in a corresponding number of installments. Tenant shall not be required to make a Tax Payment to Landlord (or to pay an installment thereof to Landlord) earlier than the thirtieth (30th) day after the date that Landlord gives Tenant a Tax Statement therefor. If Tenant's obligation to make the Tax Payment hereunder commences on a date that is not the date that the applicable Governmental Authority requires Landlord to make a corresponding payment of Taxes, then Tenant shall pay to Landlord, on such date that Tenant's obligation to make the Tax Payment hereunder commences, the installment of the Tax Payment

9

due hereunder for the corresponding period, which installment shall be apportioned appropriately.

(D)  If the Expiration Date is not the last day of a Tax Year, then the Tax Payment for the Tax Year during which the Expiration Date occurs shall be an amount equal to the product obtained by multiplying (X) the Tax Payment that would have been due hereunder if the Expiration Date was the last day of such Tax Year, by (Y) a fraction, the numerator of which is the number of days in the period beginning on the first (1st) day of such Tax Year and ending on the Expiration Date, and the denominator of which is three hundred sixty-five (365) (or three hundred sixty-six (366), if such Tax Year includes the month of February in a leap year).

(E)  The Tax Payment shall be computed initially on the basis of the Assessed Valuation in effect on the date that Landlord gives the applicable Tax Statement to Tenant (as the Taxes may have been settled or finally adjudicated prior to such time) regardless of any then pending application, proceeding or appeal to reduce the Assessed Valuation, but shall be subject to subsequent adjustment as provided in Section 2.3 hereof.

(F)  Tenant shall pay the Tax Payment regardless of whether Tenant is exempt, in whole or part, from the payment of any Taxes by reason of Tenant's diplomatic status or otherwise.

(G)  If Taxes are required to be paid on any date or dates other than as presently required by the Governmental Authority imposing Taxes, then the due date of the installments of the Tax Payment shall be adjusted so that each such installment is due from Tenant to Landlord thirty (30) days prior to the date that the corresponding payment is due to the Governmental Authority.

(H)  Landlord's failure to give to Tenant a Tax Statement for any Tax Year shall not impair Landlord's right to give to Tenant a Tax Statement for any other Tax Year. Landlord shall not have the right to require Tenant to make a Tax Payment for a particular Tax Year unless Landlord gives to Tenant a Tax Statement for such Tax Year within one hundred eighty (180) days after the last day of such Tax Year.

(I)  Landlord shall give to Tenant a copy of the relevant tax bill for each Tax Year (to the extent that the applicable Governmental Authority has issued such tax bill to Landlord) together with any Tax Statement delivered to Tenant.

2.3.  Tax Reduction Proceedings.

(A)  Landlord (and not Tenant) shall be eligible to institute proceedings to reduce the Assessed Valuation.

(B)  Subject to the terms of this Section 2.3(B), Tenant shall have the right from time to time to request (a "Tax Protest Request") that Landlord indicate whether Landlord intends to file a notice of protest with respect to a particular Tax Year. Tenant shall not have the right to give a Tax Protest Request to Landlord earlier than the sixtieth (60th) day before, or later than the twentieth (20th) day before, the last day that applicable Requirements permit Landlord to file a notice of protest for such Tax Year and, notwithstanding anything to the contrary

contained herein, in no event at any time during the last three (3) years of the Term. If Tenant gives a Tax Protest Request to Landlord, then Landlord shall have the right to give to Tenant, not later than the tenth (10th) day before the last day that applicable Requirements permit Landlord to file a notice of protest for the applicable Tax Year, a notice indicating whether Landlord intends to file a notice of protest for such Tax Year. If Landlord so indicates that Landlord intends to file such notice of protest, then Landlord shall do so in accordance with applicable Requirements. If (I) (i) Landlord so indicates that Landlord does not intend to file such notice of protest, or (ii) Landlord fails to respond to the Tax Protest Request on or prior to the tenth (10th) day before the last day that applicable Requirements permit Landlord to file a notice of protest, as aforesaid, and (II) Tenant gives to Landlord, not later than the fifth (5th) day before the last day that applicable Requirements permit Landlord to file a notice of protest for the applicable Tax Year, a notice directing Landlord to file such notice of protest, then Landlord shall file such notice of protest for the applicable Tax Year in accordance with applicable Requirements, and, if Landlord has not theretofore settled or compromised the Taxes for the applicable Tax Year, institute and prosecute a tax certiorari proceeding for the applicable Tax Year. If (i) Tenant gives a Tax Protest Request to Landlord as contemplated by this Section 2.3(B), (ii) Landlord indicates in response to the Tax Protest Request that Landlord intends to file a notice of protest, (iii) Landlord subsequently elects not to institute and prosecute a tax certiorari proceeding for the applicable Tax Year, and (iv) Landlord has not theretofore settled or compromised the Taxes for the applicable Tax Year, then Landlord shall give Tenant notice thereof not later than the twentieth (20th) day before the last day that applicable Requirements permit Landlord to institute such tax certiorari proceeding. If (x) Landlord gives such notice to Tenant, and (y) Tenant gives to Landlord, not later than the tenth (10th) day before the last day that applicable Requirements permit Landlord to institute a tax certiorari proceeding for the applicable Tax Year, a notice directing Landlord to file such tax certiorari proceeding, then Landlord shall file and prosecute in good faith such tax certiorari proceeding for the applicable Tax Year in accordance with applicable Requirements.

       (C)    If, after a Tax Statement has been sent to Tenant, an Assessed Valuation that Landlord used to compute the Tax Payment for a Tax Year is reduced, and, as a result thereof, a refund of Taxes is actually received by, or credited to, Landlord, then Landlord, promptly after Landlord's receipt of such refund (or such refund is credited to Landlord, as the case may be), shall send to Tenant a Tax Statement adjusting the Taxes for such Tax Year and setting forth, based on such adjustment, the portion of such refund for which Tenant is entitled a credit as set forth in this Section 2.3(C) (it being understood that Landlord shall have the right to pay from any such refund the expenses incurred by Landlord in obtaining such refund and that, accordingly, the aggregate amount of the refund used to adjust Taxes as aforesaid shall be net of such expenses). The portion of such refund to which Tenant is entitled shall be limited to the portion of the Taxes, if any, that Tenant had theretofore paid to Landlord on account of the Tax Payment for the Tax Year to which the refund is applicable on the basis of the Assessed Valuation before it had been reduced. The Tax Payment paid by Tenant for such Tax Year (after taking into account such refund) shall be an amount equal to the Tax Payment that Tenant would have paid hereunder if the Assessed Valuation used in computing Taxes for such Tax Year had reflected initially the aforesaid reduction thereof that yielded such refund. If (x) Tenant is entitled to a credit against Rental pursuant to this Section 2.3(C), and (y) the Expiration Date occurs prior to the date that such credit is exhausted, then Landlord shall pay to Tenant the unused portion of such credit on or prior to the thirtieth (30th) day after the Expiration Date (and

Landlord's obligation to make such payment shall survive the Expiration Date). If (i) Landlord receives such refund (or a credit therefor) after the Expiration Date, and (ii) Tenant is entitled to a portion thereof as contemplated by this Section 2.3(C), then Landlord shall pay to Tenant an amount equal to Tenant's share of such refund (or such credit) within thirty (30) days after the date that such refund is paid to Landlord (or such refund is credited to Landlord, as the case may be) (and Landlord's obligation to make such payment shall survive the Expiration Date). Notwithstanding anything to the contrary contained in this Section 2.3, in no event shall any reduction or refund of Taxes as provided herein result in First Year Taxes or any Subsequent Year Taxes being less than Seven Hundred Fifty Thousand Dollars and No Cents ($750,000.00).

2.4. Auditing of Tax Payments.

(A)     Any Tax Statement that Landlord gives to Tenant shall be binding upon Tenant conclusively unless, within one (1) year after the date that Landlord gives Tenant such Tax Statement, Tenant gives a notice to Landlord objecting to such Tax Statement. Tenant's right to give such notice (and conduct the audit contemplated by this Section 2.4) shall survive the Expiration Date (to the extent that the Expiration Date occurs earlier than one (1) year after the date that Landlord gives the applicable Tax Statement to Tenant). If Tenant gives such notice to Landlord, then, subject to the terms of this Section 2.4, Tenant may examine Landlord's tax bills and calculations relating to such Tax Statement to determine the accuracy thereof. Tenant may perform such examination on reasonable advance notice to Landlord, at reasonable times, in Landlord's office or, at Landlord's option, at the office of Landlord's managing agent or accountants. Tenant, in performing such examination, shall have the right to be accompanied by a reputable certified public accountant or reputable consultant; provided, however, that Tenant shall not be entitled to be so accompanied by any such certified public accountant or any such consultant unless Tenant and such certified public accountant or such consultant certify to Landlord in a written instrument that is reasonably satisfactory to Landlord that the compensation being paid by Tenant to such certified public accountant or such consultant is not conditioned or otherwise contingent (in whole or in part) on the extent of any reduction in the Tax Payment that derives from such examination. Tenant shall not have the right to conduct any such audit unless Tenant delivers to Landlord a statement, in a form reasonably designated by Landlord, signed by Tenant and Tenant's certified public accountant or consultant to which such tax bills and calculations are proposed to be disclosed, pursuant to which Tenant and such certified public accountant or such consultant agrees to maintain any non-public information obtained from such examination in confidence.

(B)     If it is determined ultimately that (i) Landlord, in a Tax Statement, overstated the Tax Payment, and (ii) Tenant overpaid the Tax Payment for a particular Tax Year, then Tenant shall be entitled to credit the amount of such overpayment of the Tax Payment against the Rental thereafter coming due hereunder, together with interest thereon calculated at the Base Rate to the date that Tenant uses such credit (it being understood that such interest shall be calculated assuming that the last payments made to Landlord on account of the Tax Payment for the applicable Tax Year constitute such overpayment); provided, however, that if such overpayment exceeds five percent (5%) of the Tax Payment, then (I) such interest shall be calculated at the Applicable Rate, and (II) Landlord shall also reimburse Tenant for the reasonable out-of-pocket costs paid or incurred by Tenant in performing Tenant's audit of Landlord's books and records (it being understood that Landlord shall pay the amount described

12

in this clause (II) within thirty (30) days after Tenant gives to Landlord reasonable supporting documentation describing the aforesaid costs of Tenant's audit). If (x) Tenant is entitled to a credit against Rental pursuant to this Section 2.4(B), and (y) the Expiration Date occurs prior to the date that such credit is established, first applied or exhausted, then Landlord shall pay to Tenant the unused portion of such credit on or prior to the later of (x) the thirtieth (30th) day after the Expiration Date, and (y) thirty (30) days after the determination of such credit (and Landlord's obligation to make such payment shall survive the Expiration Date).

      (C)    Nothing contained in this Section (C) shall constitute an extension of the date by which Tenant is required to pay the Tax Payment to Landlord hereunder.

## Article 3
## PERCENTAGE RENT

3.1.    Certain Definitions.

      (A)    The term "Applicable Breakpoint" shall mean, with respect to a Lease Year, the quotient obtained by dividing (i) the Fixed Rent payable hereunder for such Lease Year for the Premises, by (ii) the Percentage Rent Rate; it being agreed that if the first Lease Year does not commence on a January 1st or if the last Lease Year does not end on a December 31st, or if during any Lease Year the Premises or a portion thereof are closed for the conduct of business by virtue of a fire or other casualty, then the Applicable Breakpoint for any such Lease Year shall be prorated, calculated by multiplying the Applicable Breakpoint (on an annualized basis) by the sum of the following percentages for each month contained in such first or last Lease Year or by the sum of the following percentages for any portion of the Lease Year during which a fire or casualty occurs for the months in which the Premises are open (which shall be prorated for a partial month occurring during any such partial Lease Year):

| | | |
|---|---|---|
| (1) | January | .054 |
| (2) | February | .046 |
| (3) | March | .071 |
| (4) | April | .056 |
| (5) | May | .059 |
| (6) | June | .075 |
| (7) | July | .070 |
| (8) | August | .132 |
| (9) | September | .098 |
| (10) | October | .063 |

13

    (11)    November    .096

    (12)    December    .180.

    (B)    The term "Gross Sales" shall mean the gross amount received by a Permitted Party from all sales, both for cash and on credit, made or rendered in, or generated from such Permitted Party's operation of business in, the Premises (and in cases of sales on credit whether or not payment be actually made therefor) for the applicable Lease Year in question and including the gross amount received by Tenant for merchandise sold pursuant to orders received in, or generated from, the Premises although filled elsewhere, including, without limitation:

    (1)    the proceeds of sales for all goods, wares and merchandise sold, and services performed, in either case by a Permitted Party, from the business conducted at, upon or from the Premises by a Permitted Party,

    (2)    the proceeds of sales for which the applicable Permitted Party makes delivery or performance at or from the Premises (regardless of the location at which such sales originate),

    (3)    the proceeds of sales that are made, and orders that are received, in either case in or at the Premises (regardless of whether delivery or performance is made at or from the Premises),

    (4)    the proceeds of sales that are made by mechanical or vending devices that are located at the Premises and available to the general public, and

    (5)    the proceeds of sales originating from whatever source but for which a Permitted Party in the normal and customary course of such Permitted Party's operations credits or attributes to such Permitted Party's business conducted in the Premises.

provided, however, that Gross Sales shall not include:

    (a)    amounts received with respect to any sale to the extent of the net amount of any refund made or credit allowed upon any such sale, where the merchandise, or some part thereof, is returned and accepted by Tenant;

    (b)    exchanges or transfers of merchandise between other stores of Tenant where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has been made at, in, upon or from the Premises;

    (c)    returns to suppliers or manufacturers;

    (d)    the amount of any city, county, state or federal sales, use, luxury or excise tax on such sales, which is both added to the selling price (or absorbed therein) and paid to the taxing authorities by any Permitted Party,

    (e)    any penalty charged by Tenant for a returned check;

14

(f)      reimbursement of amounts for postage, express or delivery services, including, but not limited to, United Parcel Service, incurred in delivering merchandise to customers, provided that such charges are at all times properly segregated from amounts includable in Gross Sales and so identified on Tenant's records;

(g)      any sale at a discount pursuant to the employee discount program of Tenant or its Affiliates to the extent that such sales do not exceed three percent (3%) of the total Gross Sales in any Lease Year;

(h)      receipts from vending machines and coin-operated games from which revenues are donated to charitable organizations or which are not available for use by the public and receipts from pay telephones;

(i)      any charge added by a Permitted Party to its regular cash price as a finance charge for sales on credit, provided that such charge is at all times properly segregated from amounts included in Gross Sales and so identified on such Permitted Party's records; each transaction involving the extension of credit shall be treated as a sale for the regular cash price in the month in which such transaction occurred, without regard to the time payment is made or title passes;

(j)      any sale of fixtures or equipment not in the regular course of a Permitted Party's business or after use thereof;

(k)      gift certificates, or like vouchers, until such time as the same have been converted into a sale by redemption at the Premises;

(l)      internet or catalogue sales, except that any such sales generated by a customer's use within the Premises of a kiosk or machine to generate such sales shall be included in Gross Sales

(m)      layaway sales until the time that such merchandise is delivered to the customer at the Premises or shipped to the customer from another location;

(n)      the amount of any special discount to customers for damaged or defective merchandise;

(o)      the amount of any promotion or coupon discount granted to the customer;

(p)      charges collected from customers for fittings and alterations;

(q)      any charges paid to the issuers of credit, debit or charge cards and for check, debit or charge authorization fees; and

(r)      bad debt expense with respect to merchandise sold on credit or purchased by check or debit card.

15

Notwithstanding the foregoing, during any Lease Year in which Gross Sales equal or exceed ninety-five percent (95%) of the Applicable Breakpoint for such Lease Year, the exclusions set forth in the immediately preceding clause (q) and clause (r) shall no longer be applicable and any amounts described in such clauses shall be included in Gross Sales for such Lease Year.

(C)     "Percentage Rent Rate" shall mean eight percent (8%).

(D)     The term "Lease Year" shall mean each period of one (1) year beginning on each January 1st and ending on each December 31st that occurs during the Term, provided that if the Commencement Date is not January 1st, then the first Lease Year shall commence on the Commencement Date and if the Expiration Date is not December 31st, then the last Lease Year shall end on the Expiration Date.

### 3.2.    Payment of Percentage Rent.

(A)     Within thirty (30) days after the last day of any calendar month occurring during a Lease Year, Tenant (or the applicable Permitted Party) shall submit to Landlord a statement (the "Monthly Statement"), in the form of the Annual Statement, except that each Monthly Statement shall contain a statement of Gross Sales for the applicable calendar month, and shall contain the cumulative Gross Sales to date for the applicable Lease Year. Tenant's obligation to pay Percentage Rent during any particular Lease Year shall commence in the first month during such Lease Year (such month being referred to herein as the "Threshold Month") in which the Gross Sales for such Lease Year shall first exceed the Applicable Breakpoint for such Lease Year. Within thirty (30) days after the end of any Threshold Month, Tenant shall pay to Landlord, as additional rent, an amount equal to the product of (x) the Percentage Rent Rate, by (y) the annual Gross Sales for the applicable Lease Year through the end of such Threshold Month that exceed the Applicable Breakpoint. For each calendar month occurring during the Lease Year after such Threshold Month, Tenant shall pay to Landlord, as additional rent, an amount equal to the product of (x) the Percentage Rent Rate, by (y) the Gross Sales for such calendar month. Tenant shall pay any such additional rent calculated as aforesaid within thirty (30) days after the end of any Threshold Month or any calendar month occurring during such Lease Year following a Threshold Month, as the case may be. Tenant shall have the right to submit separate Monthly Statements and Annual Statements to Landlord for each store that occupies a Tenant Unit, it being agreed, however, that the Percentage Rent shall be calculated and paid based on the aggregate Gross Sales contained in both Monthly Statements or Annual Statements, as the case may be.

(B)     Tenant shall submit to Landlord on or before the sixtieth (60th) day after the last day of each Lease Year (including, without limitation, the last Lease Year, as to which Tenant's obligation shall survive the termination of this Lease) a statement (the "Annual Statement"), signed and certified as being true and correct by a corporate officer of Tenant (or the other applicable Permitted Party), showing the Gross Sales during the preceding Lease Year and a calculation of the Percentage Rent payable with respect to the Lease Year in question based upon such Gross Sales.

(C)     If an Annual Statement indicates that Percentage Rent is payable for the applicable Lease Year, then such Annual Statement shall be accompanied by an amount equal to

16

the excess of (I) the amount of Percentage Rent payable as shown thereon, over (II) the amount, if any, previously paid by Tenant on account of Percentage Rent for such Lease Year. If such Annual Statement indicates that the amount previously paid by Tenant on account of Percentage Rent for such Lease Year exceeds the Percentage Rent payable for such Lease Year, then Tenant shall have the right to credit against the Rental thereafter coming due hereunder an amount equal to such excess; provided, however, that if the Expiration Date occurs prior to the date that such credit is exhausted, then Landlord shall pay to Tenant the unused portion of such credit on or prior to the thirtieth (30th) day after the Expiration Date (it being understood that Landlord's obligation to make such payment to Tenant shall survive the Expiration Date).

3.3.   Books and Records.

(A)   Tenant shall (or shall cause the applicable Permitted Party to) prepare, and keep for a period of not less than three (3) years following the end of each Lease Year during the Term, true and accurate books of account and records, conforming to generally accepted accounting principles, consistently applied, of all transactions from which Gross Sales are derived, and shall make such books and records available to Landlord during such three (3) year period pursuant to clause (B) of this Section 3.3.

(B)   Subject to the terms of this Section 3.3, Landlord, at its expense, shall have the right, upon reasonable prior notice to Tenant, to cause a complete audit of any Annual Statement (and the corresponding books and records of the applicable Permitted Party) to be performed by an independent certified public accountant that Landlord designates reasonably. Tenant shall make all such books and records available for examination at the office where such books and records are regularly maintained (and if such books and records are not maintained in an office located in the continental United States, then Tenant shall provide true, complete and correct copies of such books and records in such city where the Building is located). Landlord shall keep confidential the information that Landlord obtains from such audit, except that Landlord shall have the right to disclose such information (i) to the extent required by law (including, without limitation, state or federal securities laws or the rules of any organized stock exchange), (ii) to Landlord's lenders, investors and consultants that, in each case, have good reason to gain access to such information, (iii) to prospective purchasers and Lessors, (iv) to the extent such information is otherwise available to the general public, and (v) to the extent reasonably required in connection with Landlord's enforcement of Landlord's rights hereunder.

(C)   Any audit that is performed at the request of Landlord as contemplated by Section 3.3(B) hereof shall be binding conclusively upon Tenant unless, within forty-five (45) days after Tenant receives the written report of the audit performed by Landlord's accountants, Tenant notifies Landlord that Tenant disputes the results of such audit.

(D)   If Landlord exercises Landlord's right to audit the books and records of Tenant or the other applicable Permitted Party as contemplated by this Section 3.3, then Tenant shall pay Landlord within thirty (30) days after the Percentage Rent for the applicable Lease Year is determined as provided in this Section 3.3, an amount equal to the excess of (I) the Percentage Rent for the applicable Lease Year that is due to Landlord as so determined, over (II) the Percentage Rent (if any) that Tenant has theretofore paid to Landlord for the applicable Lease Year. Subject to the terms of this Section 3.3(D), if such determination indicates that Tenant

17

understated Gross Sales by five percent (5%) or less, then the payments to be made to Landlord for Percentage Rent as a result of such understatement shall bear interest at the Base Rate (calculated from the date that such Percentage Rent was first due and payable to Landlord hereunder). If such determination indicates that Tenant understated Gross Sales by more than five percent (5%), then (x) the aforesaid interest shall be calculated at the Applicable Rate, and (y) if additional Percentage Rent is due to Landlord by reason of such understatement, Tenant shall pay the reasonable fees and disbursements of the accountant engaged by Landlord to perform such audit, within thirty (30) days after the date that Landlord submits to Tenant an invoice therefor. Nothing contained herein constitutes a waiver of Landlord's rights against Tenant to the extent deriving from an Event of Default.

(E) If there arise differences or disputes between Landlord and Tenant concerning Gross Sales, then Tenant shall preserve the applicable books and records (including all supporting data and any other records from which Gross Sales may be tested or determined) until a final resolution or final determination of such dispute or difference.

## Article 4
## USE

### 4.1. Permitted Use.

Subject to Section 4.2 hereof, Initial Tenant shall use the Premises, and shall permit Banana Republic to use the Tenant Unit that comprises the Banana Republic store, only for the operation of first-class retail businesses (i) under the Gap and Banana Republic trade names, for the sale of apparel and accessories and such other merchandise categories as are consistent with other stores operating under the Gap trade name and the Banana Republic trade name as of the date hereof, and (ii) at Initial Tenant's or Banana Republic's option, as the case may be, under such other trade names as are then being operated by Initial Tenant or Banana Republic, as the case may be, for the sale of such merchandise categories as are consistent with other stores operating under the Gap trade name and the Banana Republic trade name, as the case may be, as of the date hereof, and, in either case, for uses reasonably incidental thereto. Subject to Section 4.2 hereof, Initial Tenant shall cause any Person claiming by, through or under Initial Tenant to use the Premises, and any Person who is not Initial Tenant shall use the Premises, only for the operation of a first-class retail business for the sale of apparel and accessories, home furnishings and accessories, gourmet kitchen equipment, jewelry (in a store similar in quality to Bailey, Banks & Biddle or Movado stores), high-end audio, video and computer equipment (in a store similar in quality to Sony and Apple stores), luggage or leather goods (in a store similar in quality to T Anthony stores) or as a shoe store or financial services institution, and for uses reasonably incidental thereto. Discount, promotional and off-price retailers shall not be considered to be "first-class."' By way of example only, the following retailers, as they operate on the date of this Lease, shall not be deemed "first-class": Daffy's, Century 21, Conway's, Payless Shoes, Parade of Shoes, Strawberry's, Mandee, Rainbow, DSW Shoes, Marshalls, TJ Maxx, and Joyce Leslie.

18

4.2.    Limitations.

Tenant shall not use the Premises or any part thereof, or permit the Premises or any part thereof to be used:

        (1)    for the conduct of any gambling or gaming activities;

        (2)    for the sale or use of beverages containing alcohol;

        (3)    for any activity that has prurient appeal or is otherwise pornographic or obscene;

        (4)    for the sale or use of any materials that have prurient appeal or are otherwise pornographic or obscene;

        (5)    for the sale of merchandise in a manner that does not conform to the standards that first-quality retailers employ in buildings that are similar to the Building in the vicinity thereof (and, accordingly, Tenant shall conduct no auction, fire sale or "going out of business sale" in the Premises);

        (6)    by any Governmental Authority or any other Person having sovereign or diplomatic immunity;

        (7)    for the sale, storage, preparation, service or consumption of food or beverages in any manner whatsoever, other than pre-packaged, non-refrigerated food items that are sold by Tenant (or its Affiliates) in Tenant's (or such Affiliate's) stores in buildings comparable to the Building as long as no more than two hundred (200) square feet of Rentable Area is used for the sale of such food items;

        (8)    as an employment agency, executive search firm or similar enterprise, labor union, school, or vocational training center (except for the training of employees of Tenant who are employed at the Premises); or

        (9)    for the sale of office supplies, luggage, electronics, housewares, hardware, or as a photo, drug or convenience store, except as expressly provided in Section 4.1 hereof.

4.3.    Rules.

Subject to the terms of this Section 4.3, Tenant shall comply with, and Tenant shall cause any other Person claiming by, through or under Tenant to comply with, the rules set forth in Exhibit "4.3" attached hereto and made a part hereof, and other rules that Landlord hereafter adopts from time to time on reasonable advance notice to Tenant, including, without limitation, rules that govern the performance of Alterations (such rules that are attached hereto, and such other rules, being collectively referred to herein as the "Rules"), provided that any other rules that Landlord hereafter adopts from time to time as aforesaid may not increase Tenant's obligations or reduce Tenant's rights, in either case, to more than a *de minimis* extent. Nothing contained in this Lease shall be construed to impose upon Landlord any obligation to enforce the Rules or the terms of any other lease against any other tenant, and Landlord shall not be liable to

Tenant for violation thereof by any other tenant. Landlord shall not enforce any Rule against Tenant that Landlord is not then enforcing against all other retail tenants in the Building. If a conflict or inconsistency exists between the Rules and the provisions of the remaining portion of this Lease, then the provisions of the remaining portion of this Lease shall control.

4.4.    Tenant's Signs.

Subject to the terms of this Section 4.4, Tenant shall have the right to erect and maintain signs at the locations described in, and in accordance with the specifications described in, Exhibit "4.4" attached hereto and made a part hereof (any such signs erected by Tenant being referred to herein as "Tenant's Signs"). Tenant shall not have the right to erect Tenant's Signs other than Tenant's Signs depicted on Exhibit "4.4" attached hereto without first obtaining Landlord's prior consent to such replacement Tenant's Signs, which consent shall not be unreasonably withheld, conditioned or delayed as long as any such replacement Tenant's Sign is located (x) entirely within the sign band for the Building shown on Exhibit "4.4" attached hereto, or (y) within the same locations as the blade signs shown on Exhibit "4.4" attached hereto for the Tenant's Signs that identify the Gap store, as the case may be (it being agreed that such blade signs can only be maintained if the tenant hereunder is the Initial Tenant). Tenant's installation of Tenant's Signs shall be performed at Tenant's cost in accordance with the provisions set forth in Article 8 hereof. Tenant shall not have the right to erect a Tenant's Sign that would create the impression in the mind of a reasonable person that the Building is named for Tenant. Tenant, at Tenant's expense, shall operate, maintain and repair any Tenant's Sign that Tenant erects pursuant to this Section 4.4 in accordance with customary standards for first-class office buildings in the vicinity of the Building and in compliance with all applicable Requirements. Tenant, at Tenant's cost and expense, shall remove Tenant's Signs promptly upon the earlier to occur of (x) the Expiration Date, and (y) the date that Tenant has no further right to erect or maintain Tenant's Sign pursuant to this Section 4.4 (it being agreed that any Tenant's Sign that constitutes a blade sign shall be deemed to be a Specialty Alteration the removal of which shall be governed pursuant to the applicable terms and provisions of Article 8). Subject to Landlord's right to erect scaffolding and sidewalk bridges in connection with any Redevelopment Work pursuant to Section 7.6 hereof or Landlord's complying with an applicable Requirement, Landlord shall not block or otherwise obscure any Tenant's Sign.

4.5.    Retail Use.

(A)    Tenant shall be permitted to operate two (2) separately demised distinct stores in the Premises (each portion of the Premises as separately demised following the completion of the New Premises Work being referred to herein as a "Tenant Unit"), as provided in Section 18.7(E) hereof.

(B)    Tenant shall store in the Premises only the merchandise that Tenant sells on a retail basis at the Premises. Tenant shall not permit its customers to form lines that extend outside of the Premises. Tenant shall maintain the appearance of the Premises, including, without limitation, the display of the merchandise being sold therein, in a first-class manner consistent with the majority of Gap and Banana Republic stores located in first-class buildings in Manhattan (excluding for purposes of this Section 4.5(B) the Gap store located at 680 Fifth Avenue and the Banana Republic store located in the 630 Fifth Avenue building). Tenant shall

not install or otherwise display in the windows of the Premises (x) any signs that are, or have the appearance of being, temporary in nature, (y) any signs promoting a liquidation sale or a sale in contemplation of ceasing business operations, or (z) any signs that would typically be installed by a so-called "discount" retailer. Tenant shall not have the right to affix any signs to the interior or exterior of the window glass in the Premises, except that Tenant may affix to the interior of the window glass (x) customary signs that indicate Tenant's acceptance of credit cards and Tenant's hours of operation, and (y) signs that are consistent with the types of signs installed in Gap and Banana Republic stores in midtown Manhattan as long as such signs are consistent with a first-class retail use. Tenant shall not use any system that directs light, sound or odors outside of the Premises for purposes of advertising or promotion (whether such light, sound or odors emanate from the interior or the exterior of the Premises). Tenant shall not distribute, place or install outside of the Premises (but otherwise on the Real Property) any handbills, placards, signs or other similar materials (subject, however, to Tenant's right to install Tenant's Sign in accordance with Section 4.4 hereof). Tenant shall not have the right to prop open the doors or windows of the Premises. Tenant shall not have the right to install any awnings or other similar devices on the exterior of the storefront of the Premises. Tenant shall not have any right to use the sidewalk that is adjacent to the Premises for any purpose other than ordinary ingress and egress.

(C)     If Tenant closes for the conduct of business in the Premises or any portion thereof, then Tenant, at Tenant's cost and expense, shall maintain the interior of the Premises so that the Premises shall appear clean and orderly as viewed from the street outside the Premises, and shall cause the Premises to be lighted in substantially the same manner as if the Premises were open for the conduct of retail trade in the ordinary course. If Tenant closes for the conduct of business in the Premises or any portion thereof as aforesaid, then Tenant acknowledges that Landlord shall have the right to control the appearance and lighting of the windows of the Premises (and the interior of the Premises which is visible from the street outside the Premises), signage and the storefront of the Premises and, accordingly, Tenant, at Tenant's cost and expense, shall promptly comply with Landlord's reasonable directives with respect thereto as well as any other reasonable directives of Landlord with respect to other portions of the Premises (it being agreed that Landlord shall not use such control to cause the Premises to appear disorderly or neglected). If Tenant does not comply with any such directives of Landlord, then Landlord shall have the right to perform such directives on Tenant's behalf at Tenant's cost and expense, it being agreed that Landlord shall have the right to access the Premises in order to perform such directives.

4.6.     Wireless Internet Service.

Tenant shall not solicit other occupants of the Building to use wireless Internet service that emanates from the Premises. Tenant shall not permit the signals of Tenant's wireless Internet service (if any) to emanate beyond the Premises or otherwise interfere in any material respect with any Building Systems.

21

Article 5
LIMITED SERVICES

5.1.   Certain Definitions.

(A)   The term "Building Systems" shall mean the service systems of the Building, including, without limitation, the mechanical, gas, steam, electrical, sanitary, HVAC, elevator, plumbing, and life-safety systems of the Building (it being understood that the Building Systems shall not include any systems that Tenant installs in the Premises as an Alteration).

(B)   The term "HVAC" shall mean heat, ventilation and air-conditioning.

5.2.   Cleaning.

(A)   Tenant, at Tenant's expense, shall clean daily all portions of the Premises.

(B)   Tenant shall comply with any refuse disposal program (including, without limitation, any waste recycling program) that Landlord imposes reasonably or that is required by Requirements.  Tenant, at Tenant's cost and expense and subject to applicable Requirements, shall remove all refuse and rubbish (including refuse and rubbish generated in connection with any Alterations performed by Tenant) from the Premises directly to the street, using a reputable carting service therefor.

(C)   Tenant shall not clean any window in the Premises, nor require, permit, suffer or allow any window in the Premises to be cleaned, in either case from the outside in violation of Section 202 of the New York Labor Law, any other Requirement, or the rules of the Board of Standards and Appeals, or of any other board or body having or asserting jurisdiction. Tenant, in Tenant's sole discretion, shall have the right to designate a reputable window cleaning service to perform any window cleaning permitted pursuant to this Lease.

5.3.   Water.

Landlord shall provide, through the Building Systems, (x) in respect of the New Premises, cold water at one (1) connection point located in the New Premises designated by Landlord, and (y) in respect of the Existing Premises, cold water in the locations where cold water is distributed to the Existing Premises as of the date hereof, only for ordinary drinking, cleaning and lavatory purposes. Landlord shall measure Tenant's consumption of water in the Premises using a submeter that is installed and maintained by Tenant at Tenant's cost and expense.  Tenant shall pay to Landlord, as additional rent, for Tenant's consumption of water as measured by such submeter, an amount equal to Landlord's actual cost for water consumed by Tenant, which cost shall include any reasonable, out-of-pocket costs incurred by Landlord in reading such submeter.  Tenant shall pay for such water on or prior to thirty (30) days after Tenant's receipt of a reasonably substantiated statement therefor from time to time given to Tenant by Landlord (it being agreed that Landlord shall not give Tenant more than one such statement in any given thirty (30) day period of time).  Landlord shall not be required to make any other installations in the Premises to distribute water within the Premises.  Landlord shall not be required to repair or maintain during the Term any installations that exist in the Premises that

22

distribute water in the Premises. Nothing contained in this Section 5.3 limits the provisions of Article 11 hereof.

### 5.4. Steam.

Landlord shall provide, through the Building Systems, in order for Tenant to heat the Premises, steam, when and as requested by Tenant, through equipment to be installed by Tenant at Tenant's cost and expense (or equipment that is currently installed in the Existing Premises). Landlord shall measure Tenant's consumption of steam in the Premises using a submeter that is installed, maintained and repaired by Tenant. Tenant shall pay to Landlord, as additional rent, for Tenant's consumption of steam as measured by such submeter, an amount equal to Landlord's actual cost of such steam to Tenant, which cost shall include any reasonable, out-of-pocket costs incurred by Landlord in reading such submeter. Tenant shall pay for such steam on or prior to thirty (30) days after Tenant's receipt of a reasonably substantiated statement therefor from time to time given to Tenant by Landlord (it being agreed that Landlord shall not give Tenant more than one such statement in any given thirty (30) day period of time). Landlord shall not be required to make any other installations in the Premises to distribute steam within the Premises. Landlord shall not be required to repair or maintain during the Term any installations that exist in the Premises that distribute steam in the Premises. Nothing contained in this Section 5.3 limits the provisions of Article 11 hereof.

### 5.5. Cooling Tower.

Subject to the terms of this Section 5.5, Tenant shall continue to have the right to maintain its cooling tower located on the roof of the fourth (4th) floor of the Building and any equipment connecting such cooling tower with Tenant's air-conditioning systems in the Premises. Tenant, at Tenant's cost and expense, shall maintain, repair and replace such cooling tower and related equipment so as to keep the same in good working order and condition. Tenant, at Tenant's sole cost and expense, shall also maintain, repair and replace (i) the roof, dunnage and substructure under the cooling tower if such portion of the roof is damaged by reason of the operation, maintenance, repair or replacement of the cooling tower, and (ii) any portion or portions of the Building that are damaged as a result of the malfunctioning or disfunctioning of the cooling tower or related equipment or the maintenance, repair, or replacement thereof. Prior to May 15, 2005, Tenant, at Tenant's cost and expense, shall remove and relocate in accordance with all applicable Requirements and the Rules the water pumps for such cooling tower from their current location on the third (3rd) floor of the Building to a location within the Premises and shall repair any damage caused to the Building in connection with such removal and relocation.

### 5.6. No Other Services.

Landlord shall not be required to provide any services to support Tenant's use and occupancy of the Premises, except to the extent expressly set forth herein. Water, sewer, electricity and steam shall be provided to the Premises through the points of connection shown on Exhibit 5.6 attached hereto and made a part hereof.

23

5.7.    Labor Harmony.

If (i) Tenant employs, or permits the employment of, any contractor, mechanic or laborer in the Premises, whether in connection with any Alteration or otherwise, (ii) such employment interferes or causes any conflict with other contractors, mechanics or laborers engaged in the maintenance, repair, management or operation of the Building or any adjacent property owned or managed by Landlord, and (iii) Landlord gives Tenant notice thereof (which notice may be given verbally to the person employed by Tenant with whom Landlord's representative ordinarily discusses matters relating to the Premises), then Tenant shall cause all contractors, mechanics or laborers causing such interference or conflict to leave the Building immediately and, thereafter, Landlord shall cooperate with Tenant in taking such other action as may be reasonably necessary to resolve such conflict.

5.8.    Reimbursement.

On or prior to thirty (30) days after Landlord's rendition of an invoice therefor, Tenant shall reimburse Landlord for the costs incurred by Landlord in engineering and purchasing the new cooling tower located on the roof of the Building, which was originally intended to provide Tenant's condenser water needs in the Premises, which reimbursement amount shall be equal to One Hundred Twenty-Eight Thousand Dollars ($128,000).

Article 6
ELECTRICITY

6.1.    Capacity.

Subject to the terms of this Article 6, from and after the Direct Meter Date pursuant to Section 6.3 hereof, Landlord shall provide to the Premises thirteen (13) watts of electrical capacity (demand load) per square foot of usable area in the Premises (such electrical capacity being referred to herein as the "Base Electrical Capacity"). Tenant, during the Term, shall use electricity in the Premises only in such manner that complies with the requirements of the utility company serving the Building (the "Utility Company"). Tenant shall not permit the demand for electricity in the Premises to exceed the Base Electrical Capacity.

6.2.    Electricity for the Building.

Landlord shall arrange with the Utility Company to provide electricity to the Building Systems and the common areas of the Building. Landlord shall not be liable to Tenant for any failure or defect in the supply or character of electricity furnished to the Building, except to the extent that such failure or defect results from Landlord's negligence or willful misconduct. Landlord shall not be required to make any installations in the Premises to distribute electricity within the Premises. Landlord shall not be required to maintain or repair during the Term any installations that exist in the Premises on the Commencement Date that distribute electricity in the Premises.

24

6.3.    Electricity for the Premises/Direct Metering.

(A)    Subject to the terms of this Section 6.3(A), electricity to the Existing Premises shall continue to be provided in accordance with the terms of the Existing Lease, it being acknowledged by Landlord and Tenant that Tenant currently obtains electric current for the Existing Premises on a direct basis from the Utility Company.  Landlord, at Landlord's expense and upon prior notice to Tenant (which notice may be oral) shall cause such direct electricity service for the Existing Premises to be discontinued in February or March 2005 (the date upon which such direct electric service is so discontinued being referred to herein as the "Discontinuation Date").  On the Discontinuation Date, Landlord, at Landlord's cost and expense, shall install temporary switchgear in the Building and through the use thereof shall continue to provide electrical capacity to the Existing Premises in sufficient capacities for Tenant to continue conducting business in the Existing Premises in the same manner as prior to the Discontinuation Date and to perform its Initial Alterations therein and in the New Premises. Except as otherwise required by virtue of an emergency, Landlord's discontinuation of such direct electricity and installation of such temporary switchgear on the Discontinuation Date shall be performed at times other than during Tenant's business hours.  Tenant shall pay for electricity provided to the Existing Premises and the New Premises from and after the Discontinuation Date in accordance with this Section 6.3.  As part of Landlord's Work, Landlord, at Landlord's cost and expense, shall install a two thousand (2,000) amp switch in the location shown on Landlord's Plans.  Tenant covenants that Tenant shall draw no more than one thousand three hundred seventy-two (1,372) amps of electrical capacity from such switch for its use in the Premises (which substantially equates to thirteen (13) watts of electrical capacity (demand load) per square foot of usable area in the Premises as set forth in Section 6.1 hereof).

(B)    Tenant shall continue to be directly metered for electric current provided to the Existing Premises from and after the Discontinuation Date and, accordingly, shall continue to pay for electric current provided to the Existing Premises directly to the Utility Company. Tenant, however, shall pay for electric current provided to the New Premises from and after the date that Tenant commences the performance of its Initial Alterations therein (which date may occur prior to the New Premises Commencement Date pursuant to Article 7 hereof) in an amount equal to the product obtained by multiplying (I) $0.00411, by (II) fourteen thousand nine hundred forty (14,940), by (III) the number of days in the period commencing on such date that Tenant commences its Initial Alterations in the New Premises and ending on the date that Tenant is directly metered for such electric current with the Utility Company (which Tenant shall accomplish as part of its Initial Alterations).  Landlord shall give Tenant an invoice for the aforesaid fee from time to time (but not less frequently than monthly).  Tenant shall pay the aforesaid fee to Landlord on or prior to the thirtieth (30th) day after the date that Landlord gives each such invoice to Tenant.  From and after the date that Tenant is directly metered for the electric current provided to the New Premises, Landlord shall have no obligation to provide electricity to the New Premises and Tenant shall obtain electric current for the New Premises directly with the Utility Company pursuant to an agreement between Tenant and the Utility Company and shall directly pay such Utility Company for such electricity.

25

6.4.    Termination of Electric Service.

(A)    If Landlord is required by any Requirement to discontinue furnishing electricity to the Premises as contemplated hereby, then this Lease shall continue in full force and effect and shall be unaffected thereby, except that from and after the effective date of any such Requirement, (x) Landlord shall not be obligated to furnish electricity to the Premises, and (y) Tenant shall not be obligated to pay to Landlord the charges for electricity as described in this Article 6.

(B)    If Landlord discontinues Landlord's furnishing electricity to the Premises pursuant to a Requirement, then Tenant shall use Tenant's diligent efforts to obtain electricity for the Premises directly from the Utility Company.  Tenant shall pay directly to the Utility Company the cost of such electricity.  Tenant shall have the right to use the electrical facilities that then exist in the Building to obtain such direct electric service (without Landlord having any liability or obligation to Tenant in connection therewith).  Nothing contained in this Section 6.4 shall permit Tenant to use electrical capacity in the Building that exceeds the Base Electrical Capacity.  Tenant, at Tenant's expense, shall make any additional installations that are required for Tenant to obtain electricity from the Utility Company.  Landlord shall not discontinue furnishing electricity to the Premises as contemplated by this Section 6.4 (to the extent permitted by applicable Requirements) until Tenant obtains electric service directly from the Utility Company.

Article 7
INITIAL CONDITION OF THE PREMISES/LANDLORD'S WORK/REDEVELOPMENT
WORK

7.1.    Condition of Premises.

Subject to Section 9.1 hereof and this Article 7, (a) Tenant shall accept possession of the Existing Premises in the condition that exists on the Commencement Date "as is," and (b) Landlord shall have no obligation to perform any work or make any installations in order to prepare the Building or the Existing Premises for Tenant's occupancy (it being agreed that Landlord shall be required to complete any repair obligations with respect to the Existing Premises that were ongoing as of the Commencement Date in accordance with the applicable terms of the Existing Lease).  Subject to Section 9.1 hereof and Section 7.5 hereof, (a) Tenant shall accept possession of the New Premises in the condition that exists on the New Premises Commencement Date "as is," and (b) Landlord shall have no obligation to perform any work or make any installations in order to prepare the Building or the New Premises for Tenant's occupancy, it being agreed that as set forth in Section 7.5 hereof after the New Premises Commencement Date Landlord shall complete any punchlist items relating to the New Premises Work and shall Substantially Complete any New Premises Work that remained uncompleted as of the New Premises Commencement Date by virtue of an acceleration thereof caused by a Tenant Delay.  Except as expressly set forth herein, Landlord has made no representations or promises with respect to the Building, the Real Property, the Existing Premises, or the New Premises.

26

7.2.    Initial Work.

(A)    Tenant shall deliver to Landlord no later than (i) February 21, 2005 (the "Initial Surrender Date"), the portion of the Existing Premises described on Exhibit "7.2-1" attached hereto and made a part hereof as the "Phase I Takeback Area" and the "Phase I Work Area" (collectively, the "Phase I Surrender Space"), and (ii) May 2, 2005, the portion of the Existing Premises described on Exhibit "7.2-1" attached hereto as the "Phase II Takeback Area" and the "Phase II Work Area." Landlord, at Landlord's cost and expense, shall perform in each of the Phase I Work Area and the Phase II Work Area the work (the "Initial Work") described on Exhibit "7.2-2" attached hereto and made a part hereof. Tenant acknowledges that Landlord must use the portion of the Existing Premises adjacent to the Phase I Work Area in order for Landlord to perform the Initial Work in the Phase I Work Area and accordingly grants Landlord access to such portion of the Existing Premises during the period of time from and after the Initial Surrender Date and through the date the Initial Work is Substantially Completed. Landlord shall reimburse Tenant on or prior to thirty (30) days after Tenant's rendition of a statement therefor for the out-of-pocket, reasonable costs incurred by Tenant for the removal and replacement of merchandise required to permit Landlord's access to the Phase I Work Area, posting of security guards and other personnel to monitor such access by Landlord to the Existing Premises, relocation of the security equipment within the Phase I Work Area, and movement to and from the Premises of the high-density shelving, and storage costs with respect to such high-density shelving, if such shelving is reused within the Premises (which statement shall have annexed thereto documentation that reasonably substantiates the costs set forth thereon).

(B)    Tenant agrees that the Phase I Takeback Area and the Phase II Takeback Area shall be permanently surrendered to Landlord on the Initial Surrender Date (for the Phase I Takeback Area) and May 2, 2005 (for the Phase II Takeback Area). Accordingly, from and after the applicable surrender date, (i) the Existing Premises shall no longer include the Phase I Takeback Area (it being agreed that there shall be no diminution in the Rental payable hereunder by reason thereof), and (ii) Landlord and Tenant shall have no further obligations to each other with respect to the Takeback Area other than any such obligations that are expressly stated in this Lease to survive the expiration or termination thereof.

7.3.    Closing of Stores in the Existing Premises.

On or prior to April 10, 2005, Tenant shall close the Existing Premises for the conduct of business to the general public. Not later than May 1, 2005, but subject to adjournment if and to the extent that Landlord's Work affecting the Existing Premises impairs Tenant's ability to complete the demolition work by such date, Tenant, at Tenant's cost and expense, (i) shall Substantially Complete the demolition of the Existing Premises in accordance with such portion of the plans and specifications related thereto annexed as Exhibit "8.11(A)" attached hereto and made a part hereof that describe such demolition and related work, (ii) in connection with, but at the end of, the performance by Tenant of the foregoing demolition and related work, shall demolish the temporary walls erected by Landlord in performing the Initial Work, and (iii) shall leave the Existing Premises in a broom-clean condition that is safe for Landlord to commence the applicable Landlord's Work therein. Tenant acknowledges that during the period of time that from and after April 11, 2005, Landlord shall be commencing the performance of the Existing

27

Premises Work and the Storefront Work, including the erection of a sidewalk shed in front of the Existing Premises.

    7.4.    Landlord's Work.

        (A)    "Landlord's Work", which Landlord shall perform at Landlord's cost and expense, consists of (i) the Initial Work, (ii) the work (the "Existing Premises Work") to the Existing Premises described on the plans and specifications ("Landlord's Plans") annexed as Exhibit "7.4(A)" attached hereto and made a part hereof, (iii) the work (the "New Premises Work") to the New Premises described on Landlord's Plans, and (iv) the work (the "Storefront Work") to construct a new two (2) story storefront (the "Storefront") for the Premises in accordance with Landlord's Plans.  Subject to adjournment by virtue of a Tenant Delay as provided in this Section 7.4, Landlord agrees to Substantially Complete Landlord's Work not later than the following dates (each a "Landlord Deadline"):  (I) March 6, 2005 with respect to the Initial Work (provided that Landlord will endeavor to Substantially Complete the Initial Work not later than March 4, 2005); (II) May 20, 2005 with respect to that portion of the Existing Premises Work that involves reinforcement of the Building's existing structure; (III) July 1, 2005 with respect to all other Landlord's Work in the portion of the Premises to be occupied by Banana Republic, including the portion of the Storefront Work that involves the storefront for such portion of the Premises; and (IV) July 22, 2005 for all other Landlord's Work.

        (B)    Tenant acknowledges that Landlord's Plans include plans and specifications related to work being performed by or on behalf of Landlord in respect of the entire Building, including Landlord's Work, and that Landlord has no obligation to Tenant to perform any work described on Landlord's Plans pursuant to this Section 7.4 other than Landlord's Work.  Landlord's Work is described solely on those plans and specifications annexed as Exhibit "7.4(A)" and Exhibit "7.2-2" attached hereto that reference in whole or in part the Premises with respect to work to be performed therein or in connection with the Premises.  Tenant shall be permitted to perform certain of its Initial Alterations in the Premises at the same time that Landlord is performing Landlord's Work therein, it being expressly agreed that, with respect to each element of Landlord's Work described in Section 7.4(A), Landlord's performance of Landlord's Work shall take priority over such performance of the Initial Alterations.  Accordingly, if, prior to the Landlord Deadline for an element of Landlord's Work, Landlord determines, in its reasonable judgment, that Tenant's performance of its Initial Alterations shall cause Landlord not to meet a Landlord Deadline for such element of Landlord's Work, then, upon Landlord's request therefor, Tenant shall immediately cease such performance of the Initial Alterations to the extent that (and in the area of the Premises that) such performance of the Initial Alterations is causing Landlord not meet the Landlord Deadline for such element of Landlord's Work, until such time that Landlord reasonably determines that Tenant can resume its Initial Alterations therein without causing any such interference and notifies Tenant thereof (which notice may be oral).  Tenant agrees that Landlord shall have no liability to Tenant if Tenant is interrupted in the performance of its Initial Alterations as aforesaid and Tenant shall not be entitled to any penalties, abatements of Rental or additional free rent by reason thereof.

        (C)    Notwithstanding anything to the contrary contained herein, it is expressly agreed that the Landlord Deadlines shall be appropriately adjourned by virtue of the occurrence of a Tenant Delay.  If Landlord fails to meet a Landlord Deadline (as such Landlord Deadline

may be adjourned as aforesaid), other than by virtue of the occurrence of a Tenant Delay which affected Landlord's ability to meet the applicable Landlord Deadline, then Tenant shall be entitled to an abatement of the Fixed Rent payable hereunder (i) for each day that Tenant is actually delayed in the completion of its Initial Alterations by reason of Landlord's failure to meet the applicable Landlord Deadline, and (ii) in an amount equal to the funds spent by Tenant to mitigate the effect of any such delay in the completion of the Initial Alterations that Tenant would not have spent but for such delay (e.g., by spending money to hire construction labor on an overtime basis to make up for any such delay), but not in excess of the Fixed Rent attributable to the number of days that Tenant would have been delayed by virtue of Landlord's failure to meet the Landlord Deadline absent such expenditure of funds, provided that the aggregate abatement to which Tenant shall be entitled shall not exceed the Fixed Rent attributable to the number of days by which Landlord failed to meet the applicable Landlord Deadline. Tenant expressly acknowledges that Tenant shall not be entitled to more than a one (1) day abatement of the Fixed Rent as aforesaid for any particular day that Tenant is so delayed in the performance of its Initial Alterations (even if Tenant is delayed on such particular day by virtue of Landlord's failure to meet more than one (1) Landlord Deadline).

(D)     Landlord shall perform the Landlord's Work in a good workerlike manner and in accordance with all applicable Requirements. Landlord shall obtain all permits and approvals required in connection with the Landlord's Work pursuant to applicable Requirements and shall pay any fees in connection therewith. All materials and equipment installed by Landlord as part of the Landlord's Work shall be of first-quality. All architects, engineers and other consultants engaged by Landlord to perform the Landlord's Work shall be licensed in the State of New York. Tenant shall grant Landlord access to the Existing Premises to the extent necessary for Landlord to perform the Landlord's Work. Tenant acknowledges that Landlord's performance of the Landlord's Work and the other work shown on Landlord's plans (the "Redevelopment Work") may interfere with Tenant's performance of the Initial Alterations, that Landlord's Work may prevent Tenant from using the Premises at certain times as aforesaid, and that the Redevelopment Work may adversely affect Tenant's use of the Premises and further acknowledges that Tenant shall not be entitled to any rent credit or diminution in the Rental payable hereunder by virtue of Landlord's performance of the Landlord's Work or the Redevelopment Work except as expressly provided in this Article 7. Following Landlord's completion of the New Premises Work, Landlord represents that the live load capacity of the Slab shall be not less than seventy-five (75) pounds per square foot.

(E)     Landlord shall remove any asbestos or asbestos-containing materials discovered (a) in the storefront of the Premises, (b) in any exterior perimeter columns abutting the Premises during Landlord's performance of the Storefront Work, or (c) in the New Premises in connection with Landlord's performance of the New Premises Work, it being agreed that Tenant shall reimburse Landlord for Landlord's costs in removing any such asbestos or asbestos-containing materials on or prior to thirty (30) days after Landlord's rendition of an invoice therefor to the extent that such asbestos or asbestos containing materials removed by Landlord were installed during the term of the Existing Lease or the Term of this Lease by Tenant or any party claiming by, through or under Tenant (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon). Upon Landlord's completion of such removal of any asbestos or asbestos-containing materials in the New Premises, Landlord shall apply for a Form ACP-5 with respect to the New Premises, and shall

29

deliver such Form ACP-5 to Tenant promptly upon Landlord's receipt thereof. During the Term from and after the New Premises Commencement Date, Landlord, at Landlord's cost and expense, shall remove any asbestos or asbestos-containing materials discovered in the Premises by Tenant (and with respect to which Tenant notifies Landlord) that were not installed by Tenant or any Person claiming by, through or under Tenant, it being agreed that Tenant, at Tenant's cost and expense, shall be responsible for (x) removing any Alterations and otherwise performing any work necessary for such asbestos or asbestos-containing materials to be accessible so that such abatement to be performed, and (y) performing any restoration work to the Premises following any such abatement.

(F)     Effective as of the date that Landlord Substantially Completes Landlord's Work in the portions of the Building that constitutes the Gap store and the new Banana Republic store, the Existing Premises shall be as shown on Exhibit "7.4(F)" attached hereto and made a part hereof.

7.5.     New Premises Work.

(A)     Subject to the terms of this Section 7.5, Landlord's performance of the New Premises Work is a condition to the occurrence of the New Premises Commencement Date.

(B)     Prior to Landlord's performing certain carbon fiber work in the New Premises, Tenant, at Tenant's cost and expense, shall perform the following work (the "Core Drilling Work") within the area of the carbon fiber installation in the New Premises: (i) perform core drillings in the locations where Tenant intends to penetrate the slab in such area of the New Premises; and (ii) insert sleeves into such slab penetrations around which Landlord, at Landlord's cost and expense, shall install carbon fiber. Tenant shall perform the Core Drilling Work on or prior to five (5) Business Days after Landlord gives Tenant notice thereof (which notice may be oral).

(C)     Tenant agrees that after Landlord commences the installation of carbon fiber in the slab of the New Premises as aforesaid, Tenant shall not be permitted at any time during the term of this Lease to do any core drilling in the New Premises in the area of the carbon fiber installation. Tenant shall not be permitted to perform any Initial Alterations in the New Premises during the period of time when Landlord is performing the portion of the New Premises Work that is comprised of Landlord's leveling the slab therein, and Tenant shall not attach anything to the slab or otherwise install any improvements that shall interfere with such leveling prior to such leveling.

(D)     Within the seven (7) day period of time prior to the date that Tenant takes actual possession of the New Premises, Landlord and Tenant shall perform a walkthrough of the New Premises and during such walkthrough shall develop a written list of punchlist items of the New Premises Work that need to be completed by Landlord from and after the New Premises Commencement Date. Landlord shall use commercially reasonable efforts to complete the punchlist items on or prior to thirty (30) days after the New Premises Commencement Date. Landlord shall have the right to enter the New Premises subsequent to the New Premises Commencement Date to complete such punchlist items and the payment of Fixed Rent or any other item of Rental shall not be affected thereby. If Tenant takes actual possession of the New

30

Premises and there are no punchlist items that were identified by Landlord and Tenant during such walkthrough, then it shall be rebuttably presumed that Landlord completed the New Premises Work as of the New Premises Commencement Date (except for latent defects).

7.6.   Redevelopment Work.

Tenant acknowledges that Landlord intends to perform work (the "Redevelopment Work") to redevelop the Building during the Term.  Tenant acknowledges that construction barricades, scaffolding and sidewalk bridges and a hoist may be erected around the Building, including in front of or adjacent to the Premises, and that construction activity in or around the Building may be ongoing for substantial periods of time in connection with such Redevelopment Work or otherwise.  Landlord agrees that (i) Landlord will not require Tenant (or, in turn, Banana Republic) to close either Tenant Unit for the operation of its business during its normal business hours in order to enable Landlord to perform the Redevelopment Work, (ii) Landlord will not perform the Redevelopment Work in a manner which will deny the public reasonable access to the Premises, (iii) in performing the Redevelopment Work, Landlord will not voluntarily interrupt, during the normal business hours of Tenant's or Banana Republic's operation at the Premises, the services that Landlord is obligated to supply to the Premises under Article 5 of this Lease, and (iv) the hoist will be erected on Fifty-Ninth Street, unless Landlord is required by any Requirement to erect such hoist in another location around the Building.  Tenant agrees that Tenant shall not be entitled to any compensation therefor, nor any abatement or diminution of Fixed Rent or any other item of Rental, nor shall the same constitute an actual or constructive eviction, in whole or in part, by reason of inconvenience or annoyance to Tenant, or injury to or interruption of Tenant's business, or otherwise, nor impose any liability upon Landlord or its agents.  Tenant, at Tenant's cost and expense, shall have the right in accordance with applicable Requirements to place tasteful signage on any portions of a sidewalk bridge or scaffolding erected by Landlord that are immediately adjacent to the Premises, it being agreed that Landlord shall have the right to place signage on any such bridge or scaffolding to the extent required by Requirements and to identify Landlord or any Person working on the construction of the Building (but Landlord shall not sell any space on such bridge or scaffolding to another Person for purposes of advertising such Person's business or products).  From and after the date that Tenant opens in the Premises for the conduct of business to the public, Landlord, at its expense and solely to the extent permitted by applicable Requirements, shall move Landlord's signs that are located on such bridge or scaffolding so that such signs are located solely on the portion of such bridge or scaffolding facing Fifty-Ninth Street which is not fronting the Premises, or on the hoist.  If Landlord erects any hoist, scaffolding or sidewalk bridge in front of or adjacent the Premises in connection with the Redevelopment Work or otherwise, then Landlord shall not leave any such scaffolding or sidewalk bridge in place at any time after the date that Landlord is no longer required in accordance with applicable Requirements to have such scaffolding or sidewalk bridge in place by virtue of the Redevelopment Work or otherwise.  Notwithstanding the foregoing, nothing contained herein shall relieve Landlord of any liability it may have arising from Landlord's negligence.  In the event that Landlord breaches the covenants set forth in clauses (i), (ii) or (iii) of this Section 7.6 and as a result of such breach Tenant is prevented from publicly operating the Gap store for more than fourteen (14) days and/or Banana Republic is prevented from publicly operating the Banana Republic store for more than fourteen (14) days, the Fixed Rent and the Tax Payment that is otherwise due and payable hereunder shall be reduced in the relative proportions that the total square footage of usable area that each

31

affected Unit unable to be publicly operated bears to the total usable area of the Premises, which reduction(s) of the Fixed Rent and Tax Payment shall be Tenant's sole and exclusive remedy (subject, however, to the provisions of Section 16.4 hereof) and shall be in effect for the period commencing on each fifteenth (15th) day of such inability to so operate, as applicable, and ending on the applicable day(s) of the cessation thereof.

## Article 8
## ALTERATIONS

### 8.1.    General.

(A)    Except as otherwise provided in this Article 8, Tenant shall not make any Alterations without Landlord's prior consent.

(B)    The term "Alterations" shall mean alterations, installations, improvements, additions or other physical changes (other than decorations) in each case in or to the Premises that are made by or on behalf of Tenant or any other Person claiming by, through or under Tenant; provided, however, that Alterations shall not include the New Premises Work or Landlord's Work.

(C)    The term "Initial Alterations" shall mean the Alterations to prepare the Premises for Tenant's initial occupancy of the New Premises and for Tenant's continued occupancy of the Existing Premises.

(D)    The term "Specialty Alterations" shall mean Alterations that (i) consist of the installation of a raised flooring system, (ii) consist of the installation of a vault or other similar device or system that is intended to secure the Premises or a portion thereof in a manner that exceeds the level of security that a reasonable Person uses for ordinary retail space, (iii) consist of a blade sign, or (iv) consist of the Gap Entrance.

(E)    The term "Substantial Completion" or words of similar import shall mean that the applicable work has been substantially completed in accordance with the applicable plans and specifications, if any, it being agreed that such work shall be deemed substantially complete notwithstanding the fact that minor or insubstantial details of construction or demolition, mechanical adjustment or decorative items remain to be performed.

(F)    The term "Tenant's Property" shall mean Tenant's personal property (other than fixtures), including, without limitation, Tenant's movable fixtures, movable partitions, telephone and other equipment, furniture, furnishings and decorations.

### 8.2.    Alterations Criteria.

All Alterations shall be consistent with a first-class retail use. Notwithstanding anything to the contrary contained in this Lease, Tenant may not perform any Alteration that (i) affects any part of the Building other than the Premises, (ii) requires any alterations, installations, improvements, additions or other physical changes to be performed in or made to any portion of the Building other than the Premises, (iii) reduces the value or utility of the Building, (iv)

32

impedes Landlord's access to Reserved Areas in any material respect, (v) violates or renders invalid the certificate of occupancy for the Building or any part thereof, or (vi) is comprised of a slab penetration in the floor of the portion of the Premises located on the second (2nd) floor of the Building in the locations shown on Exhibit "8.2" attached hereto and made a part hereof. Landlord's consent shall not be required with respect to any Alteration except (i) for Alterations that affect the structure of the Building, (ii) for Alterations that affect the Building Systems, (iii) to the extent expressly provided in this Lease, and (iv) for Alterations performed by a tenant hereunder (other than the Initial Tenant) or any subtenant of a tenant hereunder (other than Banana Republic).

    8.3.    Approval Process.

        (A)    Tenant shall not perform any Alteration (including the Initial Alterations) unless Tenant first gives to Landlord a notice thereof (an "Alterations Notice") that (i) refers specifically to this Section 8.3, and (ii) includes six (6) copies of the plans and specifications for the proposed Alteration (including, without limitation, layout, architectural, mechanical and structural drawings, to the extent applicable) in CADD format that contain sufficient detail for Landlord and Landlord's consultants to reasonably assess the proposed Alteration.

        (B)    If (x) Tenant gives Landlord an Alterations Notice, and (z) Landlord fails to respond to the Alterations Notice within thirty (30) Days after the date that Tenant gives the Alterations Notice to Landlord, then Landlord shall be deemed to have consented to such Alteration (to the extent that Landlord's consent was required with respect to the particular Alteration).

        (C)    Landlord shall have the right to object to a proposed Alteration for which Landlord's consent is required hereunder only by giving notice thereof to Tenant, and setting forth in such notice a statement in reasonable detail of the grounds for Landlord's objections.

        (D)    With respect to Alterations for which Landlord's consent is required under this Article 8, Landlord shall have the right to (a) disapprove any plans and specifications for a particular Alteration in part, (b) reserve Landlord's approval of items shown on such plans and specifications pending Landlord's review of other plans and specifications, and (c) condition Landlord's approval of such plans and specifications upon Tenant's making revisions to the plans and specifications or supplying additional information.

        (E)    Tenant acknowledges that (i) the review of plans or specifications for an Alteration by or on behalf of Landlord, or (ii) the preparation of plans or specifications for an Alteration by Landlord's architect or engineer (or any architect or engineer designated by Landlord), is solely for Landlord's benefit, and, accordingly, Landlord makes no representation or warranty that such plans or specifications comply with any Requirements or are otherwise adequate or correct.

    8.4.    Performance of Alterations.

        (A)    Tenant, at Tenant's expense, prior to the performance of any Alteration, shall obtain all permits, approvals and certificates required by any Governmental Authorities in connection therewith. Landlord shall have the right to require Tenant to make all filings with

Governmental Authorities to obtain such permits, approvals and certificates using solely with respect to the Initial Alterations an expeditor designated reasonably by Landlord (provided that the charges imposed by such expeditor are commercially reasonable).  Upon the request of Tenant, Landlord shall join in any applications for any permits, approvals or certificates required to be obtained by Tenant in connection with any permitted Alteration (provided that the applicable Requirement requires Landlord to join in such application) and shall otherwise cooperate with Tenant in connection therewith.  Tenant shall reimburse Landlord for any reasonable, out-of-pocket costs, including, without limitation, reasonable attorneys' fees and disbursements, that Landlord incurs in so joining in such applications and cooperating with Tenant, within thirty (30) days after the date that Landlord gives to Tenant an invoice therefor from time to time (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon).

(B)     Prior to performing any Alteration, Tenant shall also furnish to Landlord duplicate original policies of, or, at Tenant's option, certificates of, (1) worker's compensation insurance in amounts not less than the statutory limits (covering all persons to be employed by Tenant, and Tenant's contractors and subcontractors, in connection with such Alteration), (2) "Builder's All Risk" course of construction insurance in an amount reasonably required by Landlord, and (3) commercial general liability insurance (including property damage and bodily injury coverage), in each case in customary form, and in amounts that are not less than Five Million Dollars ($5,000,000) with respect to general contractors and One Million Dollars ($1,000,000) with respect to subcontractors, naming the Landlord Indemnitees as additional insureds; provided, however, that Landlord may annually increase such amounts to reflect the amounts then being required by landlords of similar buildings in midtown Manhattan.

(C)     Upon completion of each Alteration, Tenant, at Tenant's expense, shall (1) obtain certificates of final approval for each Alteration to the extent required by any Governmental Authority, (2) furnish Landlord with copies of such certificates, and (3) give to Landlord copies of the "as-built" plans and specifications for such Alterations, which plans and specifications shall be in CADD format solely if Tenant in the ordinary course of Tenant's business prepares its plans and specifications in such format.

(D)     All Alterations shall be made and performed substantially in accordance with the plans and specifications therefor as approved by Landlord, all Requirements and the Rules.  All materials and equipment incorporated in the Premises as a result of any Alterations shall be first-quality.

8.5.     Financial Integrity.

(A)

(1)     Tenant shall not permit any materials or equipment that are incorporated in the Premises in connection with any Alterations to be subject to any lien, encumbrance, chattel mortgage or title retention or security agreement.

(2)     Subject to the terms of Section 8.5(A)(3) hereof, Tenant shall not make any Alteration at a cost for labor and materials (as reasonably estimated by Landlord's architect,

34

engineer or contractor) in excess of Ten Thousand Dollars ($10,000), either individually or in the aggregate with any other Alterations constructed in any particular period of twelve (12) consecutive months, prior to Tenant's delivering to Landlord a performance bond and a payment bond that covers Tenant's obligation to pay the applicable contractor and the applicable contractor's obligation to pay its subcontractors (in either case issued by a surety company and in form reasonably satisfactory to Landlord), each in an amount equal to one hundred twenty percent (120%) of such estimated cost; provided, however, that on each anniversary of the Commencement Date, the aforesaid amount of Ten Thousand Dollars ($10,000) shall be adjusted to reflect the percentage increase in the Consumer Price Index from the Consumer Price Index that is in effect on the Commencement Date. Notwithstanding the foregoing, as long as Tenant is (I) The Gap, Inc. or an Affiliate thereof, then Tenant shall not be required to post any such bond in respect of the Initial Alterations, and (II) (x) The Gap, Inc. or an Affiliate thereof, and (y) Tenant meets the Net Worth Requirement, then Tenant shall not be required to post any such bond for Alterations performed subsequent to the Initial Alterations.

(3)     If Tenant is obligated to deliver a performance bond and a payment bond to Landlord as provided in Section 8.5(A)(2) hereof, then Tenant shall have the right to deposit with Landlord an amount in cash equal to the amount of such bonds that is otherwise required by Section 8.5(A)(2) hereof (such amount in cash being referred to herein as the "Work Deposit"). If Tenant deposits the Work Deposit with Landlord, then (i) Tenant shall not have the obligation to deliver to Landlord the performance bond and the payment bond as provided in Section 8.5(A)(2) hereof for the applicable Alteration, and (ii) Landlord shall disburse the Work Deposit (or the applicable portion thereof) to Tenant or Tenant's designee from time to time, within ten (10) days after Tenant's request therefor (but in no event more frequently than once during any particular calendar month), provided that Tenant delivers to Landlord, simultaneously with each such disbursement, waivers of lien from all contractors and subcontractors for material theretofore supplied, or labor or services theretofore performed, in connection with the applicable Alterations. If any mechanic's lien is filed against the Real Property for work claimed to have been done for, or for materials claimed to have been furnished to, Tenant (or any Person claiming by, through or under Tenant), then Landlord shall have the right (but not the obligation) to use the Work Deposit to discharge such mechanic's lien. Nothing contained in this Section 8.5(A)(3) diminishes Tenant's obligations under Section 8.5(A)(4) hereof. Landlord shall pay to Tenant any remaining balance of the Work Deposit for a particular Alteration within ten (10) days after the date that (x) Tenant has Substantially Completed the applicable Alteration, and (y) Tenant has delivered to Landlord waivers of lien from all contractors and subcontractors.

(4)     Tenant shall discharge of record any mechanic's lien that is filed against the Real Property for work claimed to have been done for, or for materials claimed to have been furnished to, Tenant (or any Person claiming by, through or under Tenant) within thirty (30) days after Tenant has received notice thereof, at Tenant's expense, by payment or filing the bond required by law.

(B)     Subject to the terms of this Section 8.5(B), within thirty (30) days after the Substantial Completion of any Alterations, Tenant shall deliver to Landlord: (I) waivers of lien (x) with respect to the Initial Alterations, solely from Tenant's general contractor, and (y) with respect to all Alterations other than the Initial Alterations, from all contractors, subcontractors, materialmen, architects, engineers and other Persons who may file a lien against the Real

35

Property in connection with such Alterations, and (ii) a certificate from Tenant's independent licensed architect certifying that, in his or her opinion, the Alterations have been completed in accordance with the final detailed plans and specifications for such Alterations as approved by Landlord; provided, however, that with respect to the Initial Alterations, Tenant shall deliver to Landlord within sixty (60) days after the date Tenant opens in the Premises for the conduct of business with the public (i) a waiver of lien from its general contractor, and (ii) a certificate from Tenant's independent licensed architect certifying that, in his or her opinion, the Initial Alteration have been completed in accordance with the final detailed plans and specifications therefor as approved by Landlord subject to *de minimis* variations. Tenant shall not be required to deliver to Landlord any waiver of lien if Tenant is disputing in good faith the payment which would otherwise entitle Tenant to such waiver, provided that (x) Tenant keeps Landlord advised in a timely fashion of the status of such dispute and the basis therefor, and (y) Tenant delivers to Landlord the waiver of lien promptly after the date that the dispute is settled. Nothing contained in this Section 8.5(B), however, shall relieve Tenant from complying with the provisions of Section 8.5(A)(4) hereof.

8.6.    Effect on Building.

If (i) as a result of any Alterations, any alterations, installations, improvements, additions or other physical changes are required to be performed in or made to any portion of the Building other than the Premises in order to comply with any Requirements (any such alterations, installations, improvements, additions or changes being referred to herein as a "Building Change"), and (ii) such Building Change would not otherwise have had to be performed or made pursuant to applicable Requirements at such time, then (x) Landlord may perform such Building Change, and (y) Tenant shall pay to Landlord the reasonable costs thereof, as additional rent, within thirty (30) days after Landlord gives to Tenant an invoice therefor, which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon.

8.7.    Time for Performance of Alterations.

If the performance of any Alteration by or on behalf of Tenant, or any other Person claiming by, through or under Tenant, during Building Hours interferes with or interrupts the maintenance, repair, management or operation of the Building in any material respect or interferes with or interrupts the use and occupancy of the Building by other tenants in the Building in any material respect, then Landlord shall have the right to require Tenant to perform such Alteration at other times that Landlord reasonably designates from time to time.

8.8.    Removal of Alterations and Tenant's Property.

(A)    On or prior to the Expiration Date, Tenant, at Tenant's expense, shall remove Tenant's Property from the Premises, and, at Tenant's option, Tenant also may remove, at Tenant's expense, all Alterations made by or on behalf of Tenant or any other Person claiming by, through or under Tenant; provided, however, in any case, that Tenant shall repair and restore in a good and workerlike manner to good condition any damage to the Premises or the Building caused by such removal. Landlord, upon notice to Tenant given at least thirty (30) days prior to the Expiration Date, may require Tenant to remove any Specialty Alterations from the Premises, and to repair and restore in a good and workerlike manner to good condition any damage to the

36

Premises or the Building caused by such removal; provided, however, that Landlord shall not have the right to require Tenant to remove any Qualified Alterations. If (x) the Expiration Date is not the Fixed Expiration Date, and (y) Landlord gives a notice to Tenant on or prior to the thirtieth (30th) day after the Expiration Date to the effect that Landlord does not wish to retain a particular Specialty Alteration, then Tenant shall pay to Landlord the reasonable costs incurred by Landlord in so removing such Specialty Alterations, and in so repairing and restoring any such damage to the Building or the Premises, within thirty (30) days after Landlord submits to Tenant an invoice therefor (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon); provided, however, that Landlord shall not have the right to give any such notice to Tenant in respect of Qualified Alterations. Landlord, at Landlord's option, shall have the right to remove any Specialty Alteration instead of Tenant and on or prior to thirty (30) days after Landlord's rendition of a statement therefor (which statement shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon), Tenant shall reimburse Landlord for Landlord's reasonable out-of-pocket costs to remove any such Specialty Alteration. Tenant agrees that (I) the blade signs pursuant to Section 4.4 hereof and the Gap Entrance pursuant to Section 8.11 hereof are each a Specialty Alteration that shall be required to be removed on or prior to the Expiration Date as provided in this Section 8.8 hereof, (II) Landlord shall perform such removal, and (III) Tenant shall reimburse Landlord (in addition for the costs to remove each such Specialty Alteration) for Landlord's reasonable out-of-pocket costs to restore the portion of the façade of the Building where such blade signs and the Gap Entrance were located to the design of such façade contemplated by Landlord's architect on the date hereof. Landlord acknowledges that no portion of the Initial Alterations, other than such blade signs and the Gap Entrance, shall be deemed Specialty Alterations. Tenant's obligation to reimburse Landlord for the removal of any Specialty Alterations and the restoration following the removal of any such Specialty Alterations shall survive the expiration or earlier termination of this Lease. Any Alterations that remain in the Premises after the Expiration Date shall be deemed to be the property of Landlord (with the understanding, however, that Tenant shall remain liable to Landlord for any default of Tenant in respect of Tenant's obligations under this Section 8.8(A)).

(B)    Prior to Tenant's performance of a Specialty Alteration, Tenant shall have the right to request (simultaneously with Tenant's submission to Landlord of plans and specifications for such Specialty Alteration) that Landlord designate that Tenant shall not be required to remove (or pay the cost to remove) such Specialty Alteration upon the expiration or earlier termination of the Term. Landlord shall have the right to approve or deny any such request in Landlord's sole discretion. If (i) Tenant makes any such request, and (ii) Landlord either approves such request, or fails to respond to Tenant's aforesaid request on or prior to the fifteenth (15th) Business Day after the date that Tenant gives such request to Landlord, then Landlord shall not have the right to require Tenant to remove (or pay the cost to remove) such Specialty Alteration upon the expiration or earlier termination of the Term (any such Specialty Alteration which Tenant shall not be required to remove (or to pay the cost of removal) as aforesaid being referred to herein as a "Qualified Alteration").

8.9.    Contractors and Supervision.

All Alterations shall be performed only under the supervision of an independent licensed architect approved by Landlord, which approval Landlord shall not unreasonably withhold,

37

condition or delay. Prior to Tenant's commencing any Alteration, Tenant shall give to Landlord a notice requesting Landlord's consent to the general contractors set forth in such notice that Tenant proposes to use in connection with such Alteration, which consent shall not be unreasonably withheld (and which notice shall expressly refer to the provisions of this Section 8.9 and shall state that if Landlord fails to respond to such notice on or prior to ten (10) Business Days after Landlord's receipt of such notice, then Landlord's consent shall be deemed given to any general contractor set forth in such notice). If Landlord fails to respond to such notice on or prior to ten (10) Business Days after the date that Landlord receives such notice, then Landlord shall be deemed to have consented to each general contractor set forth in such notice. Tenant shall have the right to request Landlord's consent to additional general contractors by notice given in accordance with the terms of this Section 8.9, until Landlord has approved at least four (4) general contractors to perform the Initial Alterations. Prior to Tenant's commencing the Initial Alterations, Tenant shall give to Landlord a notice requesting Landlord's consent to the subcontractors affecting the mechanical, electrical, plumbing, structural and life safety systems of the Building and any trades working on the exterior (excluding cleaning) or roofs of the Building that Tenant proposes to use in connection with the Initial Alterations, which consent shall not be unreasonably withheld (and which notice shall expressly refer to the provisions of this Section 8.9 and shall state that if Landlord fails to respond to such notice on or prior to twenty (20) Business Days after Landlord's receipt of such notice, then Landlord's consent shall be deemed given to any subcontractor set forth in such notice). If Landlord fails to respond to Tenant's notice on or prior to twenty (20) Business Days after the date that Landlord receives such notice, then Landlord shall be deemed to have consented to each subcontractor set forth on such notice. Tenant shall have the right to request Landlord's consent to additional subcontractors by notice given to Landlord in accordance with the terms of this Section 8.9 until each general contractor approved by Landlord as aforesaid has a qualifying list of subcontractors to perform the Initial Alterations. During the process of Tenant's obtaining Landlord's consent for subcontractors pursuant to this Section 8.9, Landlord shall cooperate with Tenant's approved general contractors in providing feedback on the likelihood of Landlord's rejecting or approving any particular subcontractor. Landlord shall have the right to withhold in its sole discretion its approval to any general contractor or subcontractor proposed by Tenant for the Initial Alterations if such general contractor or subcontractor does not use union personnel, it being agreed that, subject to Section 5.7 hereof, Tenant shall have the right to use non-union labor personnel for Alterations other than the Initial Alterations.

8.10.   Landlord's Expenses.

Tenant shall pay to Landlord, from time to time, as additional rent, the reasonable out-of-pocket costs incurred by Landlord in connection with an Alteration (including, without limitation, costs that Landlord incurs in reviewing the plans and specifications for such Alterations, and inspecting the progress of such Alterations), within thirty (30) days after Landlord gives Tenant an invoice therefor (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon), provided, however, that Tenant shall not be required to pay such costs to Landlord in connection with the Initial Alterations.

8.11.   Initial Alterations.

(A)    Tenant, at Tenant's sole cost and expense, shall perform the Initial Alterations pursuant to the plans and specifications (the "Initial Alterations Plans") to be approved by Landlord and in accordance with Exhibit 8.11(A) attached hereto and made a part hereof.   Tenant shall use Landlord's structural engineering firm, LZA Technologies, in connection with the Initial Alterations.

(B)    As part of the Initial Alterations, Tenant, at Tenant's cost and expense, shall install a "blue portal" entrance (the "Gap Entrance") pursuant to plans and specifications to be approved by Landlord, which approval shall not be unreasonably withheld.

(C)    As part of the Initial Alterations, Tenant, at Tenant's cost and expense, shall install shadow boxes, and lighting therein, in the second (2nd) floor storefront of the Premises, including the double-height portion thereof that is behind the third (3rd) floor curtainwall, pursuant to the applicable Landlord's Plans.   Tenant, at Tenant's cost and expense, shall maintain, operate and illuminate such shadow boxes pursuant to the standards therefor set forth on the applicable Landlord's Plans.   Tenant shall not have the right to modify the lighting in such shadow boxes, including, without limitation, the number and type of bulbs and the color of such lighting, from the lighting described on the applicable Landlord's Plans without first obtaining Landlord's prior written consent, which consent Landlord may withhold in its sole discretion.

(D)    If, during Tenant's prosecution of the Initial Alterations, (x) any asbestos or asbestos-containing materials are discovered in the Existing Premises, and (y) Tenant abates such asbestos or asbestos-containing materials, then Landlord, on or prior to thirty (30) days after Tenant's rendition of a statement therefor, shall pay Tenant for Tenant's out-of-pocket, reasonable costs to perform such abatement (which statement shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon).   Landlord shall not be required to pay Tenant for any such removal to the extent that such asbestos or asbestos-containing materials were installed in the Existing Premises by Tenant or any party claiming by, through or under Tenant.   Tenant agrees that Landlord shall not be responsible for any delay in Tenant's prosecution of its Initial Alterations caused by any such abatement by Tenant (whether in the form of a Rental abatement or otherwise).

(E)    Landlord, at Tenant's cost and expense, shall use reasonable efforts to provide Tenant with the use of an elevator (which may be the construction hoist) for transporting Tenant's construction materials to the New Premises during Tenant's prosecution of its Initial Alterations therein (it being understood that Landlord shall require the use of such elevator for substantial periods of time in connection with the Redevelopment Work).   Landlord and Tenant's general contractor shall cooperate in scheduling the available times for Tenant to use such elevator to transport its construction materials as aforesaid, taking into account Landlord's ongoing priority use of such elevator in connection with the Redevelopment Work.   On or prior to thirty (30) days after Landlord's rendition of an invoice therefor, Tenant shall reimburse Landlord for the reasonable, actual, out-of-pocket costs incurred by Landlord in connection with Tenant's use of such elevator and for any other reasonable, actual, out-of-pocket costs incurred by Landlord that are necessitated by Tenant's performance of the Initial Alterations (it being

39

agreed that any such invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon).

(F)     Except as otherwise provided in this Section 8.11 and Exhibit "8.11" attached hereto and made a part hereof, Tenant shall perform the Initial Alterations in accordance with the provisions of this Article 8 (it being agreed that certain of Landlord's obligations with respect to the Initial Alterations are as set forth on said Exhibit "8.11" attached hereto).  Landlord and Tenant shall cooperate with one another as reasonably necessary on an on-going basis during the performance of the Initial Alterations to coordinate Landlord's performance of its work in the Building and Tenant's performance of the Initial Alterations (which cooperation shall include Landlord's and Tenant's employees or representatives attending construction related meetings scheduled by the other party to the extent such attendance is reasonably required given the agenda of the particular meeting).

## Article 9
## REPAIRS

9.1.    <u>Landlord's Repairs.</u>

Subject to the terms of this Article 9, Landlord shall maintain and make all necessary repairs to (i) the Building Systems that provide the Premises with water or steam service, (ii) the Building Systems that provide the Premises with condenser water,  (iii) the Building Systems that provide the Premises with electricity, (iv) the structural portions of the Building, (v) the roof of the Building, (vi) the sidewalks that are adjacent to the Building, and (vii) the exterior walls of the Premises, in each case in conformity with the standards that are customary for first-class office buildings in the vicinity of the Building and in order to keep the same in compliance with applicable Requirements.  Nothing contained in this Section 9.1 shall require Landlord to maintain or repair the systems within the Premises that distribute within the Premises electricity, steam, condenser water, or water.

9.2.    <u>Tenant's Repairs.</u>

(A)     Subject to the terms of this Article 9, Tenant, at Tenant's expense, shall take good care of the Premises (including, without limitation, (i) the Alterations, (ii) the systems within the Premises that distribute within the Premises electricity, steam, condenser water, or water, and (iii) the windows for the Premises).  Tenant's obligations under this Section 9.2(A) shall extend to the storefront for the Premises (including, without limitation, the glass and metal portions and doors thereof).  Tenant shall make all repairs to the Premises as and when needed to preserve the Premises in good condition, except for reasonable wear and tear, obsolescence and damage for which Tenant is not responsible pursuant to the provisions of Article 16 hereof.  Nothing contained in this Section 9.2(A) shall require Tenant to perform any repairs to the Premises that are Landlord's obligation to perform under Section 9.1 hereof.  All repairs made by Tenant as contemplated by this Section 9.2(A) shall be in conformity with the standards that are customary for first-class office buildings in the vicinity of the Building.  Tenant shall perform such repairs in accordance with the terms of Article 8 hereof.

(B)     Subject to the terms of this Section 9.2(B), if (a) Landlord gives Tenant a notice that Tenant has failed to perform a repair that this Section 9.2 obligates Tenant to perform, and (b) Tenant fails to proceed with reasonable diligence to make such repair within twenty (20) days after the date that Landlord gives such notice to Tenant (or such shorter period that Landlord designates in such notice to the extent reasonably required under the circumstances to alleviate an imminent threat to persons or property), then (i) upon three (3) Business Days of prior notice, Landlord may make such repair, and (ii) Tenant shall pay to Landlord, as additional rent, the reasonable expenses thereof, with interest thereon at the Applicable Rate calculated from the date that Landlord incurs such expenses, within thirty (30) days after Landlord gives Tenant an invoice therefor (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon). Nothing contained in this Section 9.2(B) limits the remedies that are available to Landlord after the occurrence of an Event of Default.

9.3.    Certain Limitations.

(A)     Tenant, at Tenant's expense, shall repair in accordance with the terms set forth in Section 9.2 hereof all damage to the Premises, or to any other part of the Building or the Building Systems, in each case to the extent resulting from the carelessness, neglect or improper conduct of, or Alterations made by, Tenant or any other Person claiming by, through or under Tenant; provided, however, that Landlord shall have the right to perform any such repair to the extent that such repair affects the structure of the Building or such repair affects any Building System, in which case Tenant shall pay to Landlord an amount equal to the costs that Landlord reasonably incurs in performing such repair, on or prior to the thirtieth (30th) day after the date that Landlord gives to Tenant an invoice therefor (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon). Nothing contained in this Section 9.3(A) limits the provisions of Section 15.3 hereof.

(B)     Landlord shall repair all damage to the Premises that results from Landlord's carelessness, neglect or improper conduct. Nothing contained in this Section 9.3(B) limits the provisions of Section 15.3 hereof.

9.4.    Overtime.

Subject to the provisions of this Section 9.4, Landlord shall have no obligation to employ contractors or labor at overtime or premium pay rates in connection with (x) Landlord's making repairs as contemplated by this Article 9, or (y) Landlord's performing the work for which Landlord requires a Work Access. If the condition that Landlord is required to repair, or the work for which Landlord requires a Work Access, (i) denies Tenant from having reasonable access to the Premises, (ii) threatens the health or safety of any occupant of the Premises, or (iii) materially interferes with Tenant's ability to conduct its business in the Premises during Tenant's ordinary business hours, then Landlord shall employ contractors or labor at overtime or premium pay rates to the extent reasonably necessary. Landlord, at Tenant's request, shall also perform (a) any other repair that this Article 9 requires Landlord to perform, or (b) any other work for which Landlord requires a Work Access, using contractors or labor at overtime or premium pay rates, in which case Tenant shall pay to Landlord, as additional rent, an amount equal to the excess of (x) the costs that Landlord incurs in performing such repair or such work (using contractors or labor at overtime or premium pay rates), over (y) the costs that Landlord would have incurred in

performing such repair or such work without using contractors at overtime or premium pay rates, within thirty (30) days after the date that Landlord gives to Tenant an invoice therefor (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon).

<div align="center">

Article 10
ACCESS; LANDLORD'S CHANGES

</div>

10.1.   Access.

Subject to the terms of this Section 10.1, Landlord and Landlord's designees may enter the Premises at reasonable times upon reasonable prior notice to Tenant (which notice may be given verbally to the person employed by Tenant with whom Landlord's representative ordinarily discusses matters relating to the Premises) to (i) examine the Premises, (ii) show the Premises to prospective tenants during the last twenty-four (24) months of the Term, (iii) show the Premises to prospective purchasers or master lessees of Landlord's interest in the Real Property, (iv) show the Premises to Mortgagees or Lessors (or prospective Mortgagees or Lessors), (v) gain access to Reserved Areas, or (vi) make repairs, alterations, improvements, additions or restorations that (I) Landlord is required to make pursuant to the terms of this Lease (including, without limitation, Landlord's Work), or (II) are reasonably necessary in connection with the maintenance, repair, management or operation of the Real Property (Landlord's entry upon the Premises to perform such repairs, alterations, improvements, additions or restorations being referred to herein as a "Work Access"). Landlord shall not be required to give Tenant advance notice of the entry by Landlord or Landlord's designees into the Premises as contemplated by this Section 10.1 to the extent necessary by reason of the occurrence of an emergency. Landlord, in connection with a Work Access, shall have the right to bring into the Premises, and store in the Premises in a reasonable manner for the duration of the Work Access, the materials and tools that Landlord reasonably requires to perform the applicable repair, alteration, improvement, addition or restoration. Landlord shall have no liability to Tenant for any loss sustained by Tenant by reason of Landlord's entry upon the Premises; provided, however, that subject to Section 15.3 hereof, Landlord shall remain liable to Tenant for personal injury or property damage that derives from Landlord's negligence or willful misconduct in connection with any such entry upon the Premises.

10.2.   Landlord's Obligation to Minimize Interference.

Subject to Section 9.4 hereof, Landlord shall use commercially reasonable efforts to minimize interference with Tenant's use of the Premises in connection with Landlord's accessing the Premises as contemplated by Section 10.1 hereof, it being agreed that if any such access by Landlord would materially interfere with Tenant's ability to conduct its business in the Premises during Tenant's ordinary business hours, then any such access shall be done during hours other than Tenant's ordinary business hours.

10.3.   Reserved Areas.

The Premises shall not include (i) the demising walls of the Premises (except for the interior face thereof), (ii) the walls of the Premises that constitute the curtain wall for the

<div align="center">42</div>

Building (except for the interior face thereof), (iii) balconies, terraces and roofs that are adjacent to the Premises, and (iv) space that is used for Building Systems or other purposes associated with the operation, repair, management or maintenance of the Real Property, including, without limitation, shafts, stacks, stairways, chutes, pipes, conduits, ducts, fan rooms, mechanical rooms, plumbing facilities, and service closets (the areas described in clauses (iii) and (iv) above being collectively referred to herein as the "Reserved Areas").

10.4.    Ducts, Pipes and Conduits.

From and after the New Premises Commencement Date, Landlord shall have the right to install, use and maintain ducts, pipes and conduits in and through the Premises, provided that (a) such ducts, pipes and conduits are installed on partitioning columns (and furred at points immediately adjacent to partitioning columns) or above hung ceilings, (b) such ducts, pipes and conduits do not reduce the usable area of the Premises by more than a de minimis amount, and (c) Landlord installs such ducts, pipes and conduits in a manner that minimizes, to the extent reasonably practicable, any adverse effect on an Alteration theretofore performed in the Premises.  On or prior to thirty (30) days after Tenant's rendition of a statement therefor (which statement shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon), Landlord shall reimburse Tenant for any reasonable, out-of-pocket expenses incurred by Tenant from and after the New Premises Commencement Date that are necessitated by virtue of Landlord's installation of any ducts, pipes or conduits in accordance with this Section 10.4.

10.5.    Keys.

Subject to the terms hereof, Tenant, at Tenant's option, shall provide Landlord, from time to time, with the keys to the Premises (or with the appropriate means to access the Premises using Tenant's electronic security systems).  If (x) Tenant, in Tenant's sole discretion, elects not to provide Landlord with such keys (or such other appropriate means to access the Premises), and (y) Landlord uses force to gain access to the Premises in the event of an emergency, then Landlord shall have no liability to Tenant by reason thereof and Tenant shall not be entitled to any abatement or diminution of the Rental due hereunder by reason thereof, it being agreed that Tenant, at Tenant's cost and expense, shall be responsible for repairing any damage to the Premises or the Building caused by any such access by Landlord.

10.6.    Landlord's Changes.

(A)    Landlord, from time to time, shall have the right to change the arrangement or location of the public portions of the Building, including, without limitation, lobbies, entrances, passageways, doors, corridors, stairs and toilets.

(B)    Landlord, from time to time, shall have the right to change the name, number or designation by which the Building is commonly known.

(C)

(1)    Landlord shall have the right, from time to time, to close, obstruct or darken the windows of the Premises temporarily to the extent required to comply with a

43

Requirement or to perform repairs, maintenance, alterations, or improvements to the Building. Landlord shall have the right to close, obstruct or darken the windows of the Premises permanently to the extent required to comply with a Requirement.

(2) If, at any time, the windows of the Premises are closed, obstructed or darkened temporarily, as aforesaid, then Landlord shall perform (or cause to be performed) such repairs, maintenance, alterations or improvements, or shall comply with the applicable Requirement (or cause such Requirement to be complied with), in each case with reasonable diligence, and otherwise take such action as may be reasonably necessary to minimize the period during which such windows are temporarily closed, obstructed or darkened (it being understood, however, that subject to Section 9.4 hereof, Landlord shall not be required to perform such repairs, maintenance, alterations or improvements using contractors or labor at overtime or premium pay rates).

## Article 11

## UNAVOIDABLE DELAYS AND INTERRUPTION OF SERVICE

### 11.1.   Unavoidable Delays.

Subject to Article 16 hereof and Article 17 hereof, this Lease and the obligation of Tenant to pay Rental hereunder and to perform all of Tenant's other covenants shall not be affected, impaired or excused, and Landlord shall not have any liability to Tenant, to the extent that Landlord is unable to perform Landlord's covenants under this Lease by reason of any cause beyond Landlord's reasonable control, including, without limitation, strikes, labor troubles, acts of terrorism or the occurrence of an act of God.

### 11.2.   Interruption of Services.

Landlord, from time to time, shall have the right to interrupt or curtail the level of service provided by the Building Systems to the extent reasonably necessary to accommodate the performance of repairs, additions, alterations, replacements or improvements that in Landlord's reasonable judgment are desirable or necessary. Landlord shall use Landlord's diligent efforts to schedule any such interruption or curtailment at times that minimizes, to the extent reasonably practicable, the effect of such interruption or curtailment on Tenant's ability to conduct its business in the Premises during Tenant's ordinary business hours taking into account the seasonal nature of Tenant's business. If such interruption or curtailment of the level of service provided by the Building Systems (i) denies Tenant from having reasonable access to the Premises, (ii) threatens the health or safety of any occupant of the Premises, or (iii) materially interferes with Tenant's ability to conduct its business in the Premises during Tenant's ordinary business hours, then Landlord shall employ contractors or labor at overtime or premium pay rates to the extent reasonably necessary.

44

Article 12
REQUIREMENTS

12.1.   Tenant's Obligation to Comply with Requirements.

(A)   Subject to the terms of this Article 12, Tenant, at Tenant's expense, shall comply with all Requirements applicable to the Premises, including, without limitation, (i) Requirements that are applicable to the performance of Alterations, (ii) Requirements that become applicable by reason of Alterations having been performed, and (iii) Requirements that are applicable by reason of the specific nature or type of business operated by Tenant (or any other Person claiming by, through or under Tenant) in the Premises.  Tenant shall not be required to make any Alteration to the structure of the Building or to the Building Systems in either case to comply with any Requirement unless (a) such Alteration is required by reason of Alterations having been performed by Tenant (or another Person claiming by, through or under Tenant), or (b) such Alteration is required by reason of the specific nature of the use of the Premises by Tenant (or such other Person) (as opposed to the use of the Premises for mere retail use).

(B)   The term "Requirements" shall mean, collectively, (i) all present and future laws, rules, orders, ordinances, regulations, statutes, requirements, codes and executive orders of all Governmental Authorities, and of any applicable fire rating bureau, or other body exercising similar functions, and (ii) all requirements that the issuer of Landlord's Property Policy imposes (including, without limitation, any such requirements that such issuer requires as the basis for the premium that such issuer charges Landlord for Landlord's Property Policy).

(C)   The term "Governmental Authority" shall mean the United States of America, the State of New York, The City of New York, any political subdivision thereof and any agency, department, commission, board, bureau or instrumentality of any of the foregoing, or any quasi-governmental authority, now existing or hereafter created, having jurisdiction over the Real Property or any portion thereof.

12.2.   Landlord's Obligation to Comply with Requirements.

Landlord shall comply with all Requirements applicable to the Premises and the Building other than the Requirements with respect to which Tenant is required to comply pursuant to Section 12.1 hereof, subject, however, to Landlord's right to contest in good faith the applicability or legality thereof.

12.3.   Tenant's Right to Contest Requirements.

Subject to the provisions of this Section 12.3, Tenant, at Tenant's expense, may contest by appropriate proceedings prosecuted diligently and in good faith the legality or applicability of any Requirement affecting the Premises (any such proceedings instituted by Tenant being referred to herein as a "Compliance Challenge").  Tenant shall not have the right to institute a Compliance Challenge unless Tenant first gives Landlord notice thereof.  Tenant shall not institute any Compliance Challenge if, by reason of Tenant's delaying its compliance with the applicable Requirement or by reason of the Compliance Challenge, (a) Landlord (or any Landlord Indemnitee) may be imprisoned, (b) the Real Property or any part thereof may be condemned or vacated, or (c) the certificate of occupancy for the Premises or the Building may

45

be suspended. If Landlord or any Landlord Indemnitee may be subject to any civil fines or penalties or other criminal penalties or if Landlord or any Landlord Indemnitee may be liable to any third party in either case by reason of Tenant's delaying its compliance with the applicable Requirement or by reason of the Compliance Challenge, then Tenant shall furnish to Landlord a bond of a surety company reasonably satisfactory to Landlord, in form and substance reasonably satisfactory to Landlord or such other security reasonably satisfactory to Landlord, in an amount equal to one hundred twenty percent (120%) of the sum of (A) the cost of such compliance, (B) the criminal or civil penalties or fines that may accrue by reason of such non-compliance (as reasonably estimated by Landlord), and (C) the amount of such liability to third parties (as reasonably estimated by Landlord). If Tenant initiates any Compliance Challenge, then Tenant shall keep Landlord advised regularly as to the status of such proceedings.

12.4.   Certificate of Occupancy.

(A)   Subject to the terms of this Section 12.4, Landlord covenants that from and after the Commencement Date a temporary or permanent certificate of occupancy for the Building (or such other certificate as may be required by Requirements from time to time to lawfully occupy the Existing Premises) shall be in full force and effect at all times permitting the Existing Premises to be used for retail purposes. Tenant, at Tenant's cost and expense, shall obtain a change in the certificate of occupancy for the Building that permits the New Premises to be used for retail purposes. Landlord, at Tenant's cost and expense, shall cooperate with Tenant in obtaining such change to the certificate of occupancy. If a temporary certificate of occupancy is in place for the Building then Landlord, at Landlord's cost and expense, shall cause such temporary certificate to be renewed from time to time until a permanent certificate of occupancy is obtained for the Building. If Landlord is unable to renew any such temporary certificate of occupancy by reason of Tenant's failure to comply with Requirements with respect to the Premises as required by this Lease, then Tenant, at Tenant's cost and expense, shall use diligent efforts to cause the Premises to be in compliance with Requirements. Landlord shall have no liability to Tenant under this Section 12.4(A) to the extent the certificate of occupancy for the Building is not in full force and effect by reason of Tenant's default hereunder, by reason of Alterations, or by reason of Tenant's failure to comply with Requirements with respect to the Premises as aforesaid. If there are any violations noted against the Real Property that are not caused by the act or omission of Tenant, its employees, agents or contractors and that prevent Tenant from obtaining a change to the certificate of occupancy for the Building for the New Premises, then Landlord, at Landlord's cost and expense, shall promptly take action to cause any such violations to be removed. If (x) Tenant is unable to obtain such change to the certificate of occupancy by reason of any such violation, and (y) Tenant is delayed in opening for the conduct of business with the public in the Premises (or a portion thereof) by reason thereof, then Tenant shall be entitled to one (1) additional day of free rent for the Premises (or the applicable portion thereof in which Tenant cannot so open for such conduct of business) for each day that Tenant is so delayed in opening the Premises (it being agreed that the New Premises Rent Commencement Date shall occur in all cases on the date that Tenant occupies any portion of the Premises for the conduct of business with the public).

(B)   Tenant shall use the Premises only in a manner that conforms with the certificate of occupancy that is in effect for the Premises. Except as provided in Section 12.4(A)

46

hereof, Tenant shall not have the right to amend the certificate of occupancy for the Premises or the Building without Landlord's prior approval.

## Article 13
## QUIET ENJOYMENT

13.1.  Quiet Enjoyment.

Landlord covenants that Tenant may peaceably and quietly enjoy the Premises for the Term, subject, nevertheless, to the terms and conditions of this Lease.

## Article 14
## SUBORDINATION

14.1.  Subordination.

(A)     This Lease shall be subject and subordinate to each Superior Lease if the applicable Lessor executes and delivers a Nondisturbance Agreement.  This Lease shall be subject and subordinate to each Mortgage if the applicable Mortgagee executes and delivers a Nondisturbance Agreement.  This Lease shall be subject and subordinate to a Condominium Declaration if the Condominium Board executes and delivers a Nondisturbance Agreement. Tenant, at Tenant's expense, shall execute and deliver promptly a Nondisturbance Agreement that a Lessor, a Mortgagee, or the Condominium Board proposes to use and that conforms to the terms of this Article 14.

(B)     The term "Condominium Board" shall mean the board that governs the business and affairs of the condominium that is created by the Condominium Declaration.

(C)     The term "Condominium Declaration" shall mean a condominium declaration that submits the ownership of the fee interest in the Premises to a condominium form of ownership in accordance with Article 9-B of the New York Real Property Law (as such declaration may be amended from time to time).

(D)     The term "Lessor" shall mean a lessor under a Superior Lease.

(E)     The term "Mortgage" shall mean any trust indenture or mortgage which now or hereafter encumbers the Real Property, the Building or any Superior Lease and the leasehold interest created thereby.

(F)     The term "Mortgagee" shall mean any trustee, mortgagee or holder of a Mortgage.

(G)     The term "Nondisturbance Agreement" shall mean, subject to Section 14.2 hereof, an agreement, in recordable form, between a Lessor, a Mortgagee, or the Condominium Board, as the case may be, and Tenant, to the effect that (i) if there is a foreclosure of the Mortgage, then the successor to Landlord by virtue of the foreclosure will not evict Tenant,

47

disturb Tenant's possession under this Lease, or terminate or disturb Tenant's leasehold estate or rights hereunder, and will recognize Tenant as the direct tenant of such successor to Landlord on the same terms and conditions as are contained in this Lease, (ii) if the Superior Lease terminates, then the Lessor will not evict Tenant, disturb Tenant's possession under the Lease, or terminate or disturb Tenant's leasehold estate or rights hereunder, and will recognize Tenant as the direct tenant of such Lessor on the same terms and conditions as are contained in this Lease, or (iii) if there is a sale of the Premises by virtue of the Condominium Declaration, then the successor to Landlord by virtue of such sale will not evict Tenant, disturb Tenant's possession under the Lease, or terminate or disturb Tenant's leasehold estate or rights hereunder, and will recognize Tenant as the direct tenant of such successor on the same terms and conditions as are contained in this Lease.

(H)     The term "Superior Lease" shall mean any lease pursuant to which Landlord now or hereafter obtains or retains its interest in the Real Property or the Building (to the extent that Landlord's interest in the Real Property is a leasehold estate).

14.2.   Terms of Nondisturbance Agreements.

Subject to the terms of this Section 14.2, any Nondisturbance Agreement may provide that the Person that succeeds to Landlord by reason of the foreclosure of a Mortgage, the termination of a Superior Lease, or the exercise of the power of sale as set forth in the Condominium Declaration, as the case may be (any such Person being referred to herein as the "Successor") shall not be:

(A)     liable for any act or omission of any prior landlord (including, without limitation, the then defaulting landlord), except to the extent that (i) such act or omission continues after the date that the Successor succeeds to Landlord's interest in the Real Property, and (ii) such act or omission of such prior landlord is of a nature that the Successor can cure by performing a service or making a repair, or

(B)     subject to any defenses or offsets that Tenant has against any prior landlord (including, without limitation, the then defaulting landlord) (except for any offsets that are expressly permitted under this Lease), or

(C)     bound by any payment of Rental that Tenant has made to any prior landlord (including, without limitation, the then defaulting landlord) more than thirty (30) days in advance of the date that such payment is due, or

(D)     bound by any obligation to make any payment to or on behalf of Tenant to the extent that such obligation accrues prior to the date that the Successor succeeds to Landlord's interest in the Real Property, or

(E)     bound by any obligation to perform any work or to make improvements to the Premises, except for:

(1)     Landlord's Work,

48

(2)    repairs and maintenance that Landlord is required to perform pursuant to the provisions of this Lease and that first become necessary after the date that the Successor succeeds to Landlord's interest in the Real Property or that is otherwise required under subparagraph (A) above,

(3)    repairs to the Premises that become necessary by reason of a fire or other casualty that occurs from and after the date that the Successor succeeds to Landlord's interest in the Real Property and that Landlord is required to perform pursuant to Article 16 hereof,

(4)    repairs to the Premises that become necessary by reason of a fire or other casualty that occurs prior to the date that the Successor succeeds to Landlord's interest in the Real Property and that Landlord is required to perform pursuant to Article 16 hereof, to the extent that the Successor can make such repairs from the net proceeds of Landlord's Property Policy that are actually made available to the Successor (with the understanding, however, that if (i) a fire or other casualty occurs prior to the date that the Successor succeeds to Landlord's interest in the Real Property, (ii) Landlord is required to repair the resulting damage to the Building pursuant to Article 16 hereof, and (iii) the Successor cannot make such repairs from such net proceeds, then Tenant shall have the right to terminate this Lease by giving notice thereof to the Successor within fifteen (15) days after the date that the Successor gives Tenant notice that the Successor does not intend to perform such repairs),

(5)    repairs to the Premises as a result of a partial condemnation that occurs from and after the date that the Successor succeeds to Landlord's interest in the Real Property and that Landlord is required to perform pursuant to Article 17 hereof, and

(6)    repairs to the Premises as a result of a partial condemnation that occurs prior to the date that the Successor succeeds to Landlord's interest in the Real Property and that Landlord is required to perform pursuant to Article 17 hereof, to the extent that the Successor can make such repairs from the net proceeds of any condemnation award made available to the Successor (with the understanding, however, that if (i) a partial occurs prior to the date that the Successor succeeds to Landlord's interest in the Real Property, (ii) Landlord is required to make repairs to the Building pursuant to Article 17 hereof by reason of such partial condemnation, and (iii) the Successor cannot make such repairs from such net proceeds, then Tenant shall have the right to terminate this Lease by giving notice thereof to the Successor within fifteen (15) days after the date that the Successor gives Tenant notice that the Successor does not intend to perform such repairs), or

(F)    bound by any amendment or modification of this Lease made without the consent of the Mortgagee or the Lessor, as the case may be (the aforesaid items in clause (A) through (F) above for which a Successor is not liable being referred to herein as the "Successor Limitation Items").

Any Nondisturbance Agreement may also contain other terms and conditions that are reasonably required by the Mortgagee, the Lessor, or the Condominium Board, as the case may be that do not (i) increase Tenant's monetary obligations under this Lease, (ii) adversely affect or diminish Tenant's rights under this Lease, in either case by more than a *de minimis* extent or (iii) increase Tenant's other obligations under this Lease by more than a *de minimis* extent.  A Successor that

49

is an Affiliate of the Person that constitutes Landlord shall not have the right to include in a Nondisturbance Agreement the Successor Limitation Items, or such other terms and conditions.

14.3. Attornment.

(A)    If, at any time prior to the Expiration Date, a Successor succeeds to Landlord's interest in the Real Property, then Tenant, at the Successor's election, shall attorn, from time to time, to the Successor, in either case upon the then executory terms of this Lease, for the remainder of the Term. If the Successor is not an Affiliate of the Person that constituted Landlord immediately prior to such Successor's obtaining an interest in the Premises, then the Successor shall not have liability for the Successor Limitation Items from and after the date that Tenant so attorns to the Successor.

(B)    The provisions of this Section 14.3 shall apply notwithstanding that, as a matter of law, this Lease terminates upon the termination of any Superior Lease or the foreclosure of a Mortgage. No further instrument shall be required to give effect to Tenant's attorning to a Successor as contemplated by this Section 14.3. Tenant, however, upon demand of any Successor, shall execute, from time to time, instruments, in a recordable form and in a form reasonably satisfactory to the Successor, confirming the foregoing provisions of this Section 14.3. A Mortgagee, a Lessor, or the Condominium Board shall have the right to include such provisions in a Nondisturbance Agreement.

14.4. Amendments to this Lease.

Tenant shall execute and deliver, from time to time, amendments to this Lease, promptly after Landlord's request, to the extent that (x) such amendments are reasonably required by a Mortgagee or a Lessor that in either case is not an Affiliate of Landlord (or are reasonably required by a proposed Mortgagee or proposed Lessor that in either case is not an Affiliate of Landlord and that consummates the applicable Mortgage or the applicable Superior Lease contemporaneously with Tenant's execution and delivery of such amendment hereof), and (y) Landlord gives to Tenant reasonable evidence to the effect that such Mortgagee or Lessor requires such amendments; provided, however, that Tenant shall not be required to agree to any such amendments to this Lease that (i) increase Tenant's monetary obligations under this Lease, (ii) adversely affect or diminish Tenant's rights under this Lease, in either case to more than a *de minimis* extent, or (iii) increase Tenant's other obligations under this Lease to more than a *de minimis* extent.

14.5. Tenant's Estoppel Certificate.

Tenant, within fifteen (15) Business Days after Landlord's request from time to time (but not more frequently than three (3) times in any particular period of twelve (12) months), shall deliver to Landlord a written statement executed by Tenant, in form reasonably satisfactory to Landlord, (1) stating that this Lease is then in full force and effect and has not been modified (or if this Lease is not in full force and effect, stating the reasons therefor, or if this Lease is modified, setting forth all modifications), (2) setting forth the date to which the Fixed Rent, the Tax Payment and other items of Rental have been paid, (3) stating whether, to the best knowledge of Tenant (but without having made any investigation), Landlord is in default under

this Lease, and, if Landlord is in default, setting forth the specific nature of all such defaults, and (4) stating any other matters reasonably requested by Landlord and related to this Lease. Tenant acknowledges that any such statement that Tenant delivers to Landlord pursuant to this Section 14.5 may be relied upon by (x) any purchaser or owner of the Real Property or any interest therein (including, without limitation, any Lessor), or (y) any Mortgagee.

14.6.    Landlord's Estoppel Certificate.

Landlord, within fifteen (15) Business Days after Tenant's request from time to time (but not more frequently than three (3) times in any particular period of twelve (12) months), shall deliver to Tenant a written statement executed by Landlord (i) stating that this Lease is then in full force and effect and has not been modified (or if this Lease is not in full force and effect, stating the reasons therefor, or if this Lease is modified, setting forth all modifications), (ii) setting forth the date to which the Fixed Rent, the Tax Payment and any other items of Rental have been paid, (iii) stating whether, to the best knowledge of Landlord (but without having made any investigation), Tenant is in default under this Lease, and, if Tenant is in default, setting forth the specific nature of all such defaults, and (iv) stating any other matters reasonably requested by Tenant and related to this Lease. Landlord acknowledges that any statement delivered by Landlord to Tenant pursuant to this Section 14.6 may be relied upon by (w) any assignee of Tenant's interest hereunder, (x) any subtenant of all or any part of the Premises, (y) any Person that acquires Control of Tenant (provided that such assignment, sublease or transfer of Control is accomplished in a manner that complies with the provisions of Article 17 hereof), or (z) any Person that extends credit to Tenant.

14.7.    Rights to Cure Landlord's Default.

If (x) a Superior Lease or Mortgage exists, (y) the Lessor or Mortgagee is not an Affiliate of Landlord, and (z) Landlord gives Tenant notice thereof, then Tenant shall not seek to terminate this Lease by reason of Landlord's default hereunder until Tenant has given written notice of such default to such Lessor or such Mortgagee in either case at the address that has been furnished to Tenant. If any such Lessor or Mortgagee notifies Tenant, within ten (10) Business Days after the date that such Lessor or Mortgagee receives such notice from Tenant, that such Lessor or Mortgagee intends to remedy such act or omission of Landlord, then Tenant shall not have the right to so terminate this Lease unless such Lessor or Mortgagee fails to remedy such act or omission of Landlord within a reasonable period of time after the date that such Lessor or Mortgagee gives such notice to Tenant, provided that such Lessor or Mortgagee commences its cure of such act or omission within thirty (30) days after such Lessor's or Mortgagee's receipt of Tenant's notice and thereafter diligently prosecutes such cure to completion (it being understood that such Lessor or Mortgagee shall not have any liability to Tenant for the failure of such Lessor or Mortgagee to so remedy such act or omission of Landlord as long as such Lessor or Mortgagee commences such cure within the aforesaid period of time and diligently thereafter prosecutes such cure to completion).

14.8.    Zoning Lot Merger Agreement.

Tenant hereby waives irrevocably any rights that Tenant may have in connection with any zoning lot merger or transfer of development rights with respect to the Real Property,

including, without limitation, any rights that Tenant may have to be a party to, to contest, or to execute any Declaration of Restrictions (as such term is used in Section 12-10 of the Zoning Resolution of The City of New York effective December 15, 1961, as amended) with respect to the Real Property, which would cause the Premises to be merged with or unmerged from any other zoning lot pursuant to such Zoning Resolution or to any document of a similar nature and purpose. Tenant agrees that this Lease shall be subject and subordinate to any Declaration of Restrictions or any other document of similar nature and purpose now or hereafter affecting the Real Property. In confirmation of such subordination and waiver, Tenant, from time to time, shall execute and deliver promptly any certificate or instrument that Landlord reasonably requests.

14.9.   Existing Mortgages and Existing Superior Leases.

Landlord hereby represents and warrants to Tenant that there are no Mortgages and Superior Leases that exist as of the date hereof.


Article 15
INSURANCE

15.1.   Tenant's Insurance.

(A)     Tenant, at Tenant's expense, shall obtain and keep in full force and effect (i) an insurance policy for Tenant's Property, the interior installation existing in the Existing Premises on the Commencement Date, and the Alterations (including the Initial Alterations), in either case to the extent insurable under the available standard forms of "all-risk" insurance policies (at least as broad as ISO's Causes of Special Loss Form), in an amount equal to one hundred percent (100%) of the replacement value thereof (subject, however, at Tenant's option, to a reasonable deductible) (the insurance policy described in clause (i) above being referred to herein as "Tenant's Property Policy"), and (ii) a policy of commercial general liability and property damage insurance on an occurrence basis, with a broad form contractual liability endorsement (the insurance policy described in this clause (ii) being referred to herein as "Tenant's Liability Policy"). Tenant's Property Policy and Tenant's Liability Policy shall name Tenant as the insured. Tenant's Property Policy shall also include business interruption insurance that is sufficient in amount to pay the Fixed Rent and the Tax Payment due hereunder for a period of at least one (1) year. The Landlord Indemnitees shall be named as additional insureds on Tenant's Liability Policy.

(B)     Tenant's Liability Policy shall contain a provision that (a) no act or omission of Tenant shall affect or limit the obligation of the insurer to pay the amount of any loss sustained, and (b) the policy is non-cancelable with respect to the Landlord Indemnitees unless at least thirty (30) days of advance written notice is given to Landlord, except that Tenant's Liability Policy may be cancelable on no less than ten (10) days of advance written notice to Landlord for non-payment of premium. If Tenant's Liability Policy or Tenant's Property Policy, as the case may be, is cancelled and not replaced by a new Tenant's Liability Policy or Tenant's Property Policy, as the case may be, then Tenant shall give Landlord notice thereof promptly following such cancellation. The minimum amounts of liability under Tenant's Liability Policy

52

shall be a combined single limit with respect to each occurrence in the amount of Ten Million Dollars ($10,000,000) for injury (or death) to persons and damage to property, which minimum amount Landlord may increase from time to time to the amount of insurance that in Landlord's reasonable judgment is then being customarily required by prudent landlords of first-class buildings in the vicinity of the Building from tenants leasing space similar in size, nature and location to the Premises.

(C)    Tenant shall cause Tenant's Liability Policy and Tenant's Property Policy to be issued by reputable and independent insurers that are (x) permitted to do business in the State of New York, and (y) rated in Best's Insurance Guide, or any successor thereto, as having a general policyholder rating of A and a financial rating of at least VII (it being understood that if such ratings are no longer issued, then such insurer's financial integrity shall conform to the standards that constitute such ratings from Best's Insurance Guide as of the date hereof).

(D)    Tenant has the right to satisfy Tenant's obligation to carry Tenant's Liability Policy with an umbrella insurance policy if such umbrella insurance policy contains an aggregate per location endorsement that provides the required level of protection for the Premises. Tenant has the right to satisfy Tenant's obligation to carry Tenant's Property Policy with a blanket insurance policy if such blanket insurance policy provides, on a per occurrence basis, that a loss that relates to any other location does not impair or reduce the level of protection available for the Premises below the amount required by this Lease.

15.2.    Landlord's Insurance.

(A)    Subject to the terms of this Section 15.2, Landlord shall obtain and keep in full force and effect insurance against loss or damage by fire and other casualty to the Building, to the extent insurable on commercially reasonable terms under then available standard forms of "all-risk" insurance policies (at least as broad as ISO's Causes of Special Loss Form), in an amount equal to one hundred percent (100%) of the replacement value thereof or, at Landlord's option, in such lesser amount as will avoid co-insurance (such insurance being referred to herein as "Landlord's Property Policy"). ·

(B)    Landlord shall have the right to provide that the coverage of Landlord's Property Policy is subject to a reasonable deductible. Tenant shall cooperate with Landlord and Landlord's insurance companies in the adjustment of any claims for any damage to the Building. Landlord shall not be required to carry insurance on Tenant's Property, Alterations or the interior installation existing in the Existing Premises on the Commencement Date. Landlord shall not be. required to carry insurance against, or be responsible for, any loss suffered by Tenant due to the interruption of Tenant's business. Landlord shall not be required to carry insurance for the windows for the Premises.

15.3.    Mutual Waiver of Subrogation.

(A)    Subject to the provisions of this Section 15.3, Landlord and Tenant shall each obtain an appropriate clause in, or endorsement on, Landlord's Property Policy or Tenant's Property Policy (as the case may be) pursuant to which the insurance companies waive subrogation or consent to a waiver of right of recovery. Landlord and Tenant also agree that, ·

53

having obtained such clauses or endorsements of waiver of subrogation or consent to a waiver of right of recovery, they shall not make any claim against or seek to recover from the Landlord Indemnitees or the Tenant Indemnitees (as the case may be) for any loss or damage to its property or the property of others resulting from fire or other hazards covered by Landlord's Property Policy or Tenant's Property Policy (as the case may be); provided, however, that the release, discharge, exoneration and covenant not to sue herein contained shall be limited by and be coextensive with the terms and provisions of the waiver of subrogation clause or endorsements or clauses or endorsements consenting to a waiver of right of recovery.

        (B)    If the payment of an additional premium is required for the inclusion of a waiver of subrogation provision as described in Section 15.3(A) hereof, then each party shall advise the other of the amount of any such additional premiums and the other party at its own election may, but shall not be obligated to, pay such additional premium. If such other party does not elect to pay such additional premium, then the party whose insurer is charging the additional premium shall not be required to obtain such waiver of subrogation provision.

        (C)    If either party is unable to obtain the inclusion of such waiver of subrogation provision even with the payment of an additional premium, then such party shall attempt to name the other party as an additional insured (but not a loss payee) under the applicable insurance policy. If the payment of an additional premium is required for naming the other party as an additional insured (but not a loss payee), then such party shall advise the other of the amount of any such additional premium and the other party at its own election may, but shall not be obligated to, pay such additional premium. If such other party does not elect to pay such additional premium or if it is not possible to have the other party named as an additional insured (but not loss payee), even with the payment of an additional premium, then (in either event) the party whose insurer refuses to include such waiver of subrogation provision shall so notify the other party and such party shall not have the obligation to name the other party as an additional insured.

    15.4.   Evidence of Insurance.

        On or prior to the Commencement Date, each party shall deliver to the other party appropriate certificates of insurance required to be carried by the parties pursuant to this Article 15, including evidence of waivers of subrogation and naming of additional insureds in either case as required by Section 15.3 hereof. Each party shall deliver to the other party evidence of each renewal or replacement of a policy at least twenty (20) days prior to the expiration of such policy.

    15.5.   No Concurrent Insurance.

        Tenant shall not obtain any property insurance (under Tenant's Property Policy or otherwise) that covers the property that is covered by Landlord's Property Policy.

    15.6.   Tenant's Obligation to Comply with Landlord's Fire and Casualty Insurance.

        If (i) Tenant (or any other Person claiming by, through or under Tenant) uses the Premises for any purpose other than general retail use, and (ii) the use of the Premises by Tenant (or such other Person) causes the premium for Landlord's Property Policy to exceed the premium

that would have otherwise applied therefor if Tenant (or such Person) used the Premises for general retail purposes, then Tenant shall pay to Landlord, as additional rent, an amount equal to such excess, on or prior to the thirtieth (30th) day after the date that Landlord gives to Tenant an invoice therefor. Nothing contained in this Section 15.6 expands Tenant's rights under Article 4 hereof.

15.7. <u>Tenant's Insurance Proceeds</u>.

(A)    If (x) this Lease terminates by reason of the occurrence of a fire or other casualty pursuant to Article 16 hereof, and (y) a Mortgagee that constitutes an Institutional Lender then holds a Mortgage on Landlord's interest in the Premises, then Tenant shall pay the proceeds of Tenant's Property Policy to the extent deriving from such fire or other casualty as follows:

(1)    first, to Landlord (or, at Landlord's option, to such Mortgagee), until the aggregate amount paid to Landlord (or such Mortgagee) from such proceeds, if any be required, equals the excess of (I) the lesser of (x) the amount of the outstanding indebtedness secured by such Mortgage, and (y) eighty percent (80%) of the fair market value of the Premises on the date that such Mortgagee initially funded the debt secured by such Mortgage, over (II) the proceeds of Landlord's Property Policy that are available to Landlord (or such Mortgagee) by reason of such fire or other casualty for the items Landlord is required to restore pursuant to Section 16.2 hereof (or would have been available to Landlord (or such Mortgagee) if Landlord or the Condominium Board carried Landlord's Property Policy in accordance with the terms hereof); and

(2)    *second*, the remainder to Tenant.

(B)    Landlord and Tenant shall give the other party reasonable access to the such party's books and records to the extent reasonably necessary to determine the amount due from Tenant or Landlord, as the case may be, under this Section 15.7.

(C)    The term "<u>Institutional Lender</u>" shall mean a savings bank, a savings and loan association, a commercial bank or trust company (whether acting individually, as a trustee, as a servicing agent or in a fiduciary capacity), a private pension fund, a credit union or credit company, an insurance company, a religious, educational or eleemosynary institution, a federal, state or municipal employee's welfare, benefit, pension or retirement fund, any governmental agency or entity insured by a governmental agency, any brokerage or investment banking organization (or an Affiliate thereof), whether acting in its own capacity or on behalf of its clients, any real estate mortgage investment conduit or similar investment vehicle), or any combination of Persons that would otherwise constitute Institutional Lenders; provided, however, that (i) if a Person (other than a real estate mortgage investment conduit or similar investment vehicle) shall not constitute an Institutional lender for purposes hereof unless such Person (or such Person and its Affiliates) has net assets of at least Two Hundred Fifty Million Dollars ($250,000,000), and (ii) an Institutional Lender shall also include any other Person that is generally recognized in the capital markets as an institutional lender from and after the date hereof.

(D)    The term "Unamortized Alterations Costs" shall mean, at any particular time with respect to the Premises or the applicable portion thereof, the aggregate amount theretofore paid by or on behalf of Tenant for Alterations in the Premises or the applicable portion thereof, to the extent that such amount then remains unamortized (assuming that such amount is amortized, in equal monthly installments, using an interest factor equal to the Base Rate, over the period commencing on the date that Tenant makes any such payment for Alterations and ending on the Fixed Expiration Date, except that if the Unamortized Alterations Cost is being determined during the Renewal Term, then such excess shall be deemed to be amortized, in equal monthly installments, using an interest factor equal to the Base Rate, over the period commencing on the date that Tenant makes any such payment for Alterations and ending on the last day of the Renewal Term).

## Article 16
## CASUALTY

### 16.1.    Notice.

Tenant shall notify Landlord promptly of any fire or other casualty that occurs in the Premises.

### 16.2.    Landlord's Restoration Obligations.

Subject to the terms of this Section 16.2, Landlord shall repair the damage to the Premises to the extent caused by fire or other casualty, with reasonable diligence. The restoration work to be performed by Landlord shall include, without limitation, any portion of Landlord's Work. Landlord shall not be required to restore Tenant's Property or any Alterations. Landlord shall not be required to restore the windows for the Premises. Landlord shall not be required to commence such restoration until Tenant gives Landlord the notice described in Section 16.1 hereof (unless Landlord otherwise has received actual notice of the fire or other casualty). Landlord shall have the right to adapt the restoration of the Premises as contemplated by this Section 16.2 to comply with applicable Requirements that are then in effect. Landlord shall not be obligated to restore the Premises as provided in this Section 16.2 to the extent that this Lease terminates by reason of such fire or other casualty as provided in this Article 16. Landlord shall give Tenant thirty (30) days of prior notice of the date that Landlord shall complete its restoration of the Premises to the extent required by this Section 16.2.

### 16.3.    Tenant's Restoration Obligations.

Subject to the terms of this Section 16.3 and Section 16.2 hereof, Tenant shall repair the damage to the Premises (including, without limitation, the Alterations and the interior installation that exists in the Existing Premises on the Commencement Date) to the extent caused by fire or other casualty, with reasonable diligence. Nothing contained in this Section 16.3 diminishes Landlord's obligation to perform the restoration that Section 16.2 otherwise obligates Landlord to perform. Tenant shall have the right to adapt such restoration of the Premises (x) to comply with applicable Requirements that are then in effect, or (y) to otherwise meet Tenant's business objectives, with the understanding that Tenant shall not have the right to use this clause (y) to avoid performing the restoration that is reasonably necessary to make the Premises suitable for

56

general retail occupancy. Tenant shall not be obligated to restore the Premises to the extent that this Lease terminates by reason of such fire or other casualty as provided in this Article 16.

16.4.   Rent Abatement.

If, as a result of a fire or other casualty, all or any portion of the Premises shall not be usable by Tenant, for a period of more than fourteen (14) consecutive days, for the conduct of Tenant's business therein in substantially the same manner as prior to such fire or other casualty, the Fixed Rent and the Tax Payment that is otherwise due and payable hereunder for the Premises shall be reduced in the proportion that the number of square feet of usable area of the Premises that is not usable by Tenant by reason of such fire or other casualty for more than such fourteen (14) day period, bears to the total usable area of the Premises immediately prior to such fire or other casualty, which reduction of the Fixed Rent and Tax Payment shall be in effect for the period commencing on the date of the applicable fire or other casualty, and ending on the date that Landlord Substantially Completes the restoration work described in Section 16.2 hereof.

16.5.   Landlord's Termination Right.

If the Building is so damaged by fire or other casualty that, in Landlord's opinion, substantial alteration, demolition, or reconstruction of the Building is required (regardless of whether the Premises have been damaged or rendered untenantable), then Landlord may terminate this Lease by giving Tenant notice thereof on or prior to the ninetieth (90th) day after such fire or other casualty. If Landlord elects to terminate this Lease as aforesaid, then (I) the Term shall expire on a date set by Landlord that is not sooner than (i) the tenth (10th) day after the date that Landlord gives such notice (if all or substantially all of the Premises is rendered untenantable by such fire or other casualty), and (ii) the ninetieth (90th) day after the date that Landlord gives such notice (if less than all or substantially all of the Premises is rendered untenantable by such fire or other casualty), and (II) Tenant, on such date set by Landlord, shall vacate the Premises and surrender the Premises to Landlord free of Tenant's Property (to the extent not damaged and still usable) and otherwise in its "as is" condition. Upon the termination of this Lease under this Section 16.5, the Rental shall be apportioned and any prepaid portion of the Rental for any period after the Expiration Date shall be refunded promptly by Landlord to Tenant (and Landlord's obligation to make such refund shall survive the Expiration Date).

16.6.   Tenant's Termination Right.

(A)     Landlord, within forty-five (45) days after the earlier to occur of (x) the date that Tenant gives Landlord notice of the occurrence of a fire or other casualty as contemplated by Section 16.1 hereof, and (y) the date that Landlord otherwise has actual notice of such fire or other casualty, shall give to Tenant a statement prepared by a reputable and independent contractor setting forth such contractor's estimate in good faith as to the time required for Landlord to Substantially Complete the restoration described in Section 16.2 hereof (the estimated date of the completion of such restoration set forth in such estimate being referred to herein as the "Estimated Restoration Date"; such statement that Landlord gives to Tenant being referred to herein as the "Casualty Statement"). If the Estimated Restoration Date is later than eighteen (18) months after the date of the applicable fire or other casualty, then Tenant may

elect to terminate this Lease by giving notice to Landlord not later than the thirtieth (30th) day after the date that Landlord gives the Casualty Statement to Tenant.

(B)    Subject to the terms of this Section 16.6(B), if (i) a fire or other casualty occurs, and, by reason thereof, Landlord has an obligation to perform a restoration as contemplated by Section 16.2 hereof, (ii) Tenant does not exercise Tenant's right to terminate this Lease under Section 16.6(A) hereof in connection with such fire or other casualty (or Tenant does not have the right to terminate this Lease under Section 16.6(A) hereof in connection with such fire or other casualty), (iii) Landlord fails to Substantially Complete the performance of the restoration work that Landlord is required to perform on or prior to the date that is sixty (60) days after the Estimated Restoration Date, then Tenant shall have the right to terminate this Lease by giving notice thereof (the "Second Bite Termination Notice") to Landlord not later than the tenth (10th) day after the last day of such period of sixty (60) days. Tenant shall not have such right to terminate this Lease if Landlord Substantially Completes the restoration prior to the date that Tenant gives the Second Bite Termination Notice to Landlord.

(C)    If Tenant makes any such election to terminate this Lease pursuant to this Section 16.6, then (I) the Term shall expire on the thirtieth (30th) day after notice of such election is given by Tenant, and Tenant shall vacate the Premises and surrender the Premises to Landlord free of Tenant's Property (to the extent not damaged and still usable) and otherwise in its "as is" condition, (II) any Rental due hereunder shall be apportioned as of the date of such termination, and (III) any portion of the Rental that is then prepaid by Tenant and relates to the period after the Expiration Date shall be promptly refunded by Landlord to Tenant (with the understanding that Landlord's obligation to make any such refund shall survive such termination of this Lease).

16.7.    Termination Rights at End of Term.

If the Premises are substantially damaged by a fire or other casualty that occurs during the period of one (1) year immediately preceding the Fixed Expiration Date, then either Landlord or Tenant may elect to terminate this Lease by notice given to the other party within thirty (30) days after such fire or other casualty occurs. If either party makes such election, then the Term shall expire on the thirtieth (30th) day after the notice of such election is given, and, accordingly, Tenant, on or prior to such thirtieth (30th) day, shall vacate the Premises and surrender the Premises to Landlord free of Tenant's Property (to the extent not damaged and still usable) and otherwise in its "as is" condition. Upon the termination of this Lease under this Section 16.7, the Rental shall be apportioned and any prepaid portion of the Rental for any period after the Expiration Date shall be refunded promptly by Landlord to Tenant (and Landlord's obligation to make such refund shall survive the Expiration Date). For purposes of this Section 16.7, the term "substantially damaged" shall mean that: (a) a fire or other casualty precludes Tenant from using more than fifty percent (50%) of the Premises for the conduct of its business, and (b) Tenant's inability to so use the Premises (or the applicable portion thereof) is reasonably expected to continue until at least the earlier to occur of (i) the Fixed Expiration Date, and (ii) the one hundred twentieth (120th) day after the date that such fire or other casualty occurs.

16.8.   No Other Termination Rights.

Tenant shall have no right to cancel this Lease by virtue of a fire or other casualty except to the extent specifically set forth herein. This Article 16 is intended to constitute an "express agreement to the contrary" for purposes of Section 227 of the New York Real Property Law.

### Article 17
### CONDEMNATION

17.1.   Effect of Condemnation.

(A)   Subject to the provisions of Section 17.2 hereof, if the entire Real Property, the entire Building or the entire Premises is condemned or otherwise acquired by the exercise of the power of eminent domain, then this Lease shall terminate as of the date that such condemnation or acquisition is consummated.

(B)   If only a part of the Real Property and not the entire Premises is so acquired or condemned, then:

(1)   except as hereinafter provided in this Section 17.1, this Lease shall remain effective, and, from and after the date that the condemnation or acquisition is consummated, (w) the Fixed Rent for the Premises that are affected by such acquisition or condemnation shall be reduced in the proportion that the number of square feet of Rentable Area of the part of such Premises so acquired or condemned bears to the total Rentable Area of such Premises immediately prior to such acquisition or condemnation, and (x) the Tax Share for such Premises shall be redetermined based upon the proportion that the number of square feet of Rentable Area of such Premises that is remaining after such acquisition or condemnation bears to the number of square feet of Rentable Area included in the condominium units where the Premises are located after such acquisition or condemnation;

(2)   on or prior to the sixtieth (60th) day after the date that the condemnation or acquisition is consummated, Landlord shall have the right to terminate this Lease by giving notice to Tenant; provided, however, that if the Premises are unaffected by such acquisition or condemnation, then Landlord shall only have the right to so terminate this Lease if Landlord terminates leases (including this Lease) for at least one hundred percent (100%) of the leasable area of the Building (excluding any portion of the Building leased to or occupied by Landlord or Landlord's Affiliates); and

(3)   if (a) the part of the Real Property so acquired or condemned contains more than fifteen percent (15%) of the total area of the Premises immediately prior to such acquisition or condemnation, or (b) by reason of such acquisition or condemnation, Tenant no longer has reasonable means of access to the Premises, then Tenant may elect to terminate this Lease by giving notice to Landlord on or prior to the sixtieth (60th) day after the date that Tenant is given notice of such acquisition or condemnation being consummated.

The Term shall expire on the thirtieth (30th) day after the date that Landlord or Tenant give any such notice to terminate this Lease.

(C)     Upon the termination of this Lease and the Term pursuant to the provisions of this Section 17.1, the Rental shall be apportioned and any prepaid portion of the Rental for any period after such date shall be refunded promptly by Landlord to Tenant (and Landlord's obligation to make such refund shall survive the Expiration Date).

(D)     If a part of the Premises is so acquired or condemned and this Lease and the Term is not terminated pursuant to the foregoing provisions of this Section 17.1, then Landlord, at Landlord's expense, shall restore the part of the Premises that is not so acquired or condemned to a self-contained rental unit inclusive of Alterations that Tenant has therefore Substantially Completed, except that if such acquisition or condemnation occurs prior to the Substantial Completion of the Initial Alterations, then Landlord shall only be required to restore the part of the Premises not so acquired or condemned to a self-contained rental unit exclusive of any Alterations.

### 17.2.   Condemnation Award.

(A)     Subject to Section 17.3 hereof, Tenant shall be entitled to receive the portion of an award for any such acquisition or condemnation of all or any part of the Real Property for the then value of any Tenant's Property included in such taking, for any moving expenses, or for any Unamortized Alterations Costs, and Landlord shall be entitled to receive the remainder of any such reward (the portion of such award to which Tenant is entitled being referred to herein as "Tenant's Award" and the portion of such award to which Landlord is entitled being referred to herein as "Landlord's Award"). Tenant shall have no claim against Landlord or the condemning authority for the value of any unexpired portion of the Term, and, accordingly, Tenant hereby expressly assigns to Landlord all of its right in and to any such award. If, however, (x) this Lease terminates by reason of the occurrence of a condemnation or acquisition pursuant to this Article 17, and (y) a Mortgagee then holds a Mortgage on Landlord's interest in the Premises, then Tenant shall be entitled to first receive any portion of Tenant's Award other than the portion thereof for any Unamortized Alterations Costs and the remainder of the aggregate condemnation or acquisition award shall be paid as follows:

(1)     first, to Landlord (or, at Landlord's option, to such Mortgagee), until the aggregate amount paid to Landlord (or such Mortgagee) from such proceeds, if any be required, equals the excess of (I) the lesser of (x) the amount of the outstanding indebtedness secured by such Mortgage, and (y) the fair market value of the Premises on the date that such Mortgagee initially funded the debt secured by such Mortgage, over (II) the amount of Landlord's Award; and

(2)     *second*, to Tenant, until the aggregate amount paid to Tenant from such proceeds equals the sum of (x) the Unamortized Alterations Cost, and (y) Tenant's moving expenses; and

(3)     *finally*, the remainder to Landlord.

Landlord and Tenant shall give the other party reasonable access to the such party's books and records to the extent reasonably necessary to determine the amount due from Tenant or Landlord, as the case may be, under this Section 17.2.

60

17.3.  Temporary Taking.

If the whole or any part of the Premises is acquired or condemned temporarily during the Term, then (a) Tenant shall give prompt notice thereof to Landlord, (b) the Term shall not be reduced or affected in any way, (c) Tenant shall continue to pay in full all items of Rental payable by Tenant hereunder without reduction or abatement, and (d) Tenant shall be entitled to receive for itself any award or payments for such use, provided, however, that if the acquisition or condemnation is for a period extending beyond the Term, then such award or payment shall be apportioned equitably between Landlord and Tenant.  Tenant, at Tenant's expense, shall make Alterations to restore the Premises to the condition existing prior to any such temporary acquisition or condemnation.

## Article 18
## ASSIGNMENT AND SUBLETTING

18.1.  General Limitations.

(A)     Subject to the terms of this Article 18, without the prior consent of Landlord in each instance, Tenant shall not, and shall not permit any Permitted Party to, consummate a Transfer:  The term "Transfer" shall mean (1)(a) an assignment of a Permitted Party's rights under, or a delegation of such Permitted Party's duties under, the applicable Occupancy Agreement by express assignment or by operation of law or by other means (unless permitted in accordance with this Article 18), (b) a mortgage or other encumbrance of such Permitted Party's interest in the applicable Occupancy Agreement, in whole or in part, (c) a subletting, or further subletting, of the Premises or any part thereof, or (d) the occupancy of the Premises or any part thereof by any Person other than such Permitted Party; and (2) any transaction that modifies or supplements (or further modifies or supplements) an Occupancy Agreement to decrease the rental that is payable thereunder, to change the premises that is demised thereby, or to change the term thereof, in either case in any material respect (it being understood that such modification or supplements shall be treated for purposes hereof as a transaction on the terms of such Occupancy Agreement, as so modified or supplemented, for the balance of the term thereof) (Tenant and any Person other than Tenant that has the right to occupy the Premises (or any part thereof) in accordance with the terms of this Article 18, other than a Person that has a right to occupy the Premises (or an applicable portion thereof) by virtue of Landlord's exercising Landlord's rights under Section 18.3 hereof, being referred to herein as a "Permitted Party"; the term "Occupancy Agreement" shall mean the lease, sublease, license or other agreement pursuant to which a Permitted Party has the right to occupy the Premises (or the applicable portion thereof)).

(B)     Subject to Section 18.7 hereof, the transfer of Control in a Permitted Party, however accomplished, whether in a single transaction or in a series of unrelated or related transactions, shall constitute an assignment of such Permitted Party's interest in this Lease or the Premises (as the case may be) for purposes of this Article 18.

61

(C)    The consent by Landlord to any Transfer shall not relieve Tenant from its obligation to obtain the prior consent of Landlord to any other Transfer to the extent required by this Lease.

(D)    The assignment by any Person that constitutes Tenant of the tenant's interest under this Lease shall not relieve such Person of the obligations of the tenant under this Lease. Such Person's liability under this Lease shall continue notwithstanding (x) the subsequent release of any other Person that constitutes Tenant from liability under this Lease, (y) any limitation on any such other Person's liability hereunder by virtue of the Bankruptcy Code, or (z) any modification or amendment of this Lease that Landlord consummates with any such other Person that constitutes Tenant subsequently; provided, however, that if such other Person is not an Affiliate of such Person, then any such modification or amendment shall not expand such Person's liability hereunder.

(E)    If Tenant assigns the tenant's interest under this Lease in violation of the terms of this Article 18, then such assignment shall be void and of no force and effect against Landlord; provided, however, that Landlord (x) may collect an amount equal to the then Rental from the assignee as a fee for such assignee's use and occupancy, and (y) shall apply the net amount collected to the Rental reserved in this Lease. If the Premises or any part thereof are sublet to, occupied by, or used by any Person other than Tenant (regardless of whether such subletting, occupancy or use violates this Article 18), then Landlord (a) after the occurrence of an Event of Default, may collect amount from the subtenant, user or occupant as a fee for its use and occupancy, and (b) shall apply the net amount collected to the Rental reserved in this Lease. No such assignment, subletting, occupancy or use, with or without Landlord's prior consent, nor any such collection or application of fees for use and occupancy, shall (i) be deemed a waiver by Landlord of any term, covenant or condition of this Lease, (ii) be deemed the acceptance by Landlord of such assignee, subtenant, occupant or uses as tenant hereunder, or (iii) relieve Tenant of the obligations of the tenant under this Lease.

18.2.    Landlord's Expenses.

Tenant shall reimburse Landlord for any reasonable costs that Landlord incurs in connection with any proposed Transfer, including, without limitation, a reasonable processing fee, reasonable attorneys' fees and disbursements and the reasonable costs of making investigations as to the acceptability of the proposed Transferee, within thirty (30) days after Landlord gives to Tenant an invoice therefor (which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon).

18.3.    Recapture Procedure.

(A)    Tenant shall have the right to institute the procedure described in this Section 18.3 (the "Recapture Procedure") (other than with respect to transactions described in Section 18.7 hereof as to which transactions Landlord does not have a right of recapture) by giving to Landlord notice thereof (a "Transfer Notice"), which:

(1)    refers expressly to this Section 18.3 and indicates that such notice constitutes a Transfer Notice,

(2)     sets forth a description of the Premises (or the portion thereof) that is involved in the proposed Transfer (the Premises, or the portion thereof, that is involved in the proposed Transfer being referred to herein as the "<u>Recapture Space</u>") (it being agreed that the Recapture Space must be comprised of (i) the entire Premises, or (ii) a particular Tenant Unit),

(3)     sets forth the material terms under which Tenant intends to consummate the Transfer (including, for example, (a) the rental to be paid by a subtenant, (b) the consideration to be paid by or to an assignee, (c) the work allowance to which a subtenant is entitled, (d) the term of a proposed sublease, and (e) the nature and cost of any work that Tenant intends to perform to prepare the Recapture Space for occupancy by the subtenant or assignee),

(4)     identifies the Person to which Tenant proposes to make the Transfer (the Person to which a Transfer is made being referred to herein as a "<u>Transferee</u>"), and

(5)     sets forth the date on which Tenant proposes to consummate the proposed Transfer (such date being referred to herein as the "<u>Transfer Date</u>") (it being understood that the Transfer Date shall be no sooner than forty-five (45) days, and no later than one hundred ten (110) days, after the date that Tenant gives the Transfer Notice to Landlord) (the material terms of a proposed Transfer as set forth in the Transfer Notice being referred to herein as the "<u>Proposed Transfer Terms</u>").

(B)     The term "<u>Transfer Expenses</u>" shall mean the sum of the actual out-of-pocket expenses that the Permitted Party that makes the applicable Transfer (the "<u>Transferor</u>") pays solely in consummating a Transfer, including, without limitation, (i) brokerage commissions, (ii) allowances that the Transferor makes available to the Transferee to fund the cost of Alterations that the Transferee makes to the Premises (or the applicable portion thereof), (iii) costs that the Transferor pays in making Alterations to prepare the Premises (or the applicable portion thereof) solely for the Transferee's initial occupancy, (iv) the amount payable to Landlord under Section 18.2 hereof for such Transfer, (v) reasonable attorneys' fees and disbursements that the Transferor pays in connection with consummating such Transfer, and (vi) the transfer taxes (and other similar charges and fees) that Tenant pays pursuant to Section 18.5 hereof.

(C)     The term "<u>Amortized Transfer Expenses</u>" shall mean, with respect to any period, the amount of the Transfer Expenses that amortize during such period if the Transfer Expenses are amortized, in equal monthly installments, with interest calculated at the Base Rate, over the period that the Transferee is obligated to make payments to the Transferor in respect of the applicable Transfer.

(D)     The term "<u>Recapture Date</u>" shall mean the thirtieth (30th) day after the date that Tenant gives the Transfer Notice to Landlord.

(E)

(1)     If Tenant gives a Transfer Notice to Landlord, then Landlord shall have the right to terminate this Lease with respect to the Recapture Space, on the terms set forth in this Section 18.3(E), by giving notice thereof (the "<u>Recapture Termination Notice</u>") to Tenant not

later than the Recapture Date (any such termination of this Lease with respect to the Recapture Space being referred to herein as a "Recapture Termination").

(2)    If (x) Landlord gives to Tenant a Recapture Termination Notice, and (y) the Recapture Space constitutes the entire Premises, then the Term shall terminate on the Transfer Date.  If the Term so terminates on the Transfer Date, then Tenant, on the Transfer Date, shall vacate the Premises and deliver exclusive possession thereof to Landlord in accordance with the terms of this Lease that govern Tenant's obligations upon the expiration or earlier termination of the Term.

(3)    If (x) Landlord gives to Tenant a Recapture Termination Notice, and (y) the Recapture Space does not constitute the entire Premises, then:

(a)    effective as of the Transfer Date, the Tax Share for the Premises shall be recalculated to be the quotient (expressed as a percentage) of (I) the number of square feet of Rentable Area of the Premises that remains after excluding therefrom the Recapture Space, bears to (II) the number of square feet of Rentable Area included in the condominium units where the Premises are located,

(b)    the Fixed Rent as set forth in Article 2 hereof at any particular time from and after the Transfer Date shall be reduced by an amount equal to the Fixed Rent that would have been due under this Lease for such calendar month for the Premises (or the applicable portion thereof) that constitutes the Recapture Space, and

(c)    Tenant, on the Transfer Date, shall vacate the Recapture Space and deliver exclusive possession thereof to Landlord in accordance with the terms of this Lease that govern Tenant's obligations upon the expiration or earlier termination of the Term.

(4)    If (x) Landlord elects to consummate a Recapture Termination, and (y) the Transfer described in the applicable Transfer Notice constitutes a sublease or sublicense, then Tenant shall pay to Landlord, as additional rent, on the first day of each calendar month during the period from the Transfer Date to the date that the term of such sublease or sublicense would have expired under the Proposed Transfer Terms, an amount equal to the excess (if any) of:

(a)    the Fixed Rent and the Tax Payment that would have otherwise been due under this Lease for such calendar month for the Premises that constitutes the Recapture Space, over

(b)    the excess of (I) the rental that would have been payable by the Transferee for such calendar month as contemplated by the Proposed Transfer Terms, over (II) the Amortized Transfer Expenses for such month that would have resulted from the Proposed Transfer Terms.

Tenant's obligation to pay such amount to Landlord shall survive the termination of this Lease (or the termination of this Lease only with respect to the Recapture Space, as the case may be). In lieu of paying the foregoing amounts as aforesaid through the date that the term of such sublease or sublicense would have expired under the Proposed Transfer Terms, Tenant shall have the right to pay within thirty (30) days after the date Landlord exercises its right to consummate

the applicable Recapture Termination, such amounts discounted to the Transfer Date using a discount rate mutually agreed upon by Landlord and Tenant (it being agreed that if Landlord and Tenant cannot mutually agree upon a discount rate, then Tenant shall pay such amounts monthly as aforesaid).

(5)     If (x) Landlord elects to consummate a Recapture Termination, and (y) the Transfer described in the applicable Transfer Notice constitutes an assignment of Tenant's interest under this Lease, then Tenant shall pay to Landlord the following amounts:

(a)     the present value of any consideration (except for any portion of such consideration which is included in Transfer Expenses that Tenant would have incurred under the Proposed Transfer Terms) that would have been payable by Tenant to the Transferee under the Proposed Transfer Terms (calculated as of the Transfer Date using a discount rate equal to the Base Rate), and

(b)     the excess, if any, of (I) the present value of the Transfer Expenses that Tenant would have incurred under the Proposed Transfer Terms, over (II) the present value of the consideration (if any) that would have been payable by the Transferee to Tenant under the Proposed Transfer Terms (in either case calculated as of the Transfer Date using a discount rate equal to the Base Rate).

Tenant shall pay the amounts described in clauses (a) and (b) above on the Transfer Date. Tenant's obligation to pay such amounts to Landlord shall survive the termination of this Lease (or the termination of this Lease only with respect to the Recapture Space, as the case may be).

18.4.   Certain Transfer Rights.

Landlord shall not unreasonably withhold, condition or delay Landlord's consent to a Permitted Party's consummating a Transfer (it being agreed that Landlord's consent is not required with respect to a transaction described in Section 18.7 hereof), provided that:

(1)     Tenant has theretofore instituted the Recapture Procedure for such Transfer; provided, however, that Tenant shall not be required to have instituted the Recapture Procedure for a Transfer that is proposed to be consummated by a Permitted Party other than Tenant;

(2)     Landlord's right to elect to consummate a Recapture Termination with respect to the proposed Transfer has lapsed (without Landlord's having exercised Landlord's rights to consummate a Recapture Termination); provided, however, that this Section 18.4(2) shall not apply to a Transfer that is proposed to be consummated by a Permitted Party other than Tenant;

(3)     the Transfer is on terms that are at least as favorable to Tenant as the Proposed Transfer Terms set forth in the Transfer Notice theretofore given by Tenant to Landlord; provided, however that this Section 18.4(3) shall not apply to a Transfer that is proposed to be consummated by a Permitted Party other than Tenant;

65

(4)     the Transfer occurs no earlier than the thirtieth (30th) day before the Transfer Date and no later than one hundred twenty (120) days after the Transfer Date; provided, however, that this Section 18.4(4) shall not apply for a Transfer that is proposed to be consummated by a Permitted Party other than Tenant;

(5)     Tenant submits to Landlord a counterpart of the documents that the Transferor intends to use to consummate the proposed Transfer, which have been executed and delivered by the Transferor and the proposed Transferee, and which are subject to no conditions to the effectiveness thereof (other than Landlord's granting Landlord's consent thereto);

(6)     the Premises (or the applicable portion thereof) has not been listed or otherwise publicly advertised at a rental rate that is less than the market value therefor;

(7)     no Event of Default has occurred and is continuing;

(8)     the proposed Transferee has a financial standing that is reasonably satisfactory to Landlord;

(9)     the proposed Transferee is of a character, is engaged in a business, and proposes to use the Premises (or the applicable portion thereof) in a manner that in each case is in keeping with the standards of a first-class office building in the vicinity of the Building and in accordance with Article 4 hereof (it being understood that Landlord, for purposes of this clause (9), shall have the right to consider in good faith whether the proposed use of the Premises conforms with the mix of retail uses that then exists in the Building);

(10)     if the Transfer constitutes a sublease, then the term thereof shall expire on the day prior to the Fixed Expiration Date;

(11)     if the Transfer constitutes a sublease of a portion of the Premises, then the proposed sublease shall be for a particular Tenant Unit;

(12)     the Transferor and each other Permitted Party whose interest is superior to the interest of the Transferor, and the Transferee, executes and delivers to Landlord a consent to the Transfer in a form reasonably designated by Landlord;

(13)     if the Transfer constitutes an assignment of the tenant's interest under this Lease, the assignee has expressly assumed all of the obligations of Tenant hereunder to the extent accruing from and after the date that the Transfer is effective; and

(14)     if the Transfer constitutes a sublease, such sublease provides expressly that (i) such sublease is subject and subordinate to the Lease (and to the terms thereof), and (ii) if this Lease terminates, then Landlord, at Landlord's option, may take over all of the right, title and interest of the Transferor under such sublease, and the Transferee, at Landlord's option, shall attorn to Landlord pursuant to the then executory provisions of such sublease, except that Landlord shall not be:

66

(a)    liable for any act or omission of the Transferor under such sublease, except to the extent that such act or omission relates to a physical condition that is Landlord's obligation under this Lease,

(b)    subject to any defense or offsets which the Transferee may have against Tenant,

(c)    bound by any previous payment that the Transferee made to the Transferor more than thirty (30) days in advance of the date that such payment was due,

(d)    bound by any obligation to make any payment to or on behalf of the Transferee,

(e)    bound by any obligation to perform any work or to make improvements to the Premises, or the applicable portion thereof demised by such sublease, which is not otherwise Landlord's obligation hereunder,

(f)    bound by any amendment or modification of such sublease made without Landlord's consent, or

(g)    bound to return the Transferee's security deposit, if any, until such deposit has come into Landlord's actual possession and the Transferee is entitled to such security deposit pursuant to the terms of such sublease (the requirements of a proposed sublease as set forth in this Section 18.4(14) being collectively referred to herein as the "Basic Sublease Provisions").

18.5.    Transfer Taxes.

Tenant shall pay, or cause to be paid, any transfer taxes (and other similar charges and fees) that any Governmental Authority imposes in connection with any Transfer (including, without limitation, any such transfer taxes, charges or fees that a Governmental Authority imposes in connection with Landlord's exercising Landlord's rights to consummate a Recapture Termination).

18.6.    Transfer Profit.

(A)    Subject to Section 18.7 hereof, Tenant shall pay to Landlord fifty percent (50%) of the Transfer Profit that Tenant derives from a Transfer (it being agreed that Tenant is not required to pay to Landlord any Transfer Profit derived from a transaction described in Section 18.7 hereof). Tenant shall make payments to Landlord on account of Transfer Profit not later than the thirtieth (30th) day after the date that Tenant receives each payment that constitutes a Transfer Inflow.

(B)

(1)    The term "Transfer Profit" shall mean, with respect to any particular Transfer for any particular calendar month, the excess (if any) of (x) the Transfer Inflow for such Transfer for such calendar month, over (y) the sum of (I) the Transfer Outflow for such Transfer

for such calendar month, and (II) the Amortized Transfer Expenses for such Transfer for such calendar month.

(2)     The term "Transfer Inflow" shall mean, with respect to any particular Transfer for any particular calendar month, the amount that the Transferor receives during such calendar month from or on behalf of the Transferee in connection with the applicable Transfer.

(3)     The term "Transfer Outflow" shall mean (a) with respect to any Transfer that is a sublease (or a further sublease), the aggregate amount that the Transferor pays during the applicable calendar month for the Premises (or the applicable portion thereof that is involved in the Transfer) to the counterparty under the Occupancy Agreement through which the Transferor derives its rights to the Premises or the portion thereof that is involved in the Transfer, and (b) with respect to any Transfer that is an assignment of the tenant's interest under this Lease or the subtenant's interest under a sublease (or further sublease), the Transfer Outflow therefor shall be zero.

(C)     If the Transferor (or an Affiliate thereof) receives consideration from the Transferee (or an Affiliate thereof) in a transaction that occurs concurrently with the applicable Transfer, then the Transfer Inflow shall include (in addition to the consideration that the Transferor receives for the Transfer) an amount equal to the excess of (I) such other consideration, over (II) the cost that the Transferor (or such Affiliate thereof) incurs in acquiring any personal property that the Transferor (or such Affiliate thereof) transferred to the Transferee (or an Affiliate thereof) in such concurrent transaction (to the extent that such cost has not theretofore been amortized in accordance with generally accepted accounting principles).

18.7.   Permitted Transfers.

(A)     A Permitted Party shall have the right to assign such Permitted Party's entire interest under the applicable Occupancy Agreement to an Affiliate of such Permitted Party without (x) Landlord's prior approval, (y) Landlord's having the right to consummate a Recapture Termination in respect thereof, and (z) Tenant's being required to pay Transfer Profit to Landlord in connection therewith, provided that in each case (i) Tenant gives to Landlord, not later than the tenth (10th) Business Day after any such assignment is consummated, an instrument, duly executed by such Permitted Party and the aforesaid Affiliate of such Permitted Party, in form reasonably satisfactory to Landlord, to the effect that such Affiliate assumes all of the obligations of such Permitted Party under such Occupancy Agreement to the extent arising from and after the date of such assignment, and (ii) Tenant, with such notice, provides Landlord with a certificate, signed by an officer of Tenant, stating that the Person to which such Permitted Party is so assigning such Permitted Party's interest under the applicable Occupancy Agreement constitutes an Affiliate of such Permitted Party.

(B)     The merger or consolidation of a Permitted Party into or with another Person shall be permitted without (x) Landlord's prior approval, (y) Landlord's having the right to consummate a Recapture Termination in respect thereof, and (z) Tenant's being required to pay Transfer Profit to Landlord in connection therewith, provided that in each case (i) such merger or consolidation is not principally for the purpose of transferring such Permitted Party's interest in the applicable Occupancy Agreement, (ii) Tenant gives Landlord notice of such

68

merger or consolidation not later than the tenth (10th) Business Day after the occurrence thereof, and (iii) Tenant, within ten (10) Business Days after such merger or consolidation, provides Landlord with a certificate, signed by an officer of Tenant, stating that the requirement described in clause (z)(i) above has been satisfied.

(C)     The assignment of a Permitted Party's entire interest under the applicable Occupancy Agreement in connection with the sale of all or substantially all of the assets of such Permitted Party shall be permitted without (x) Landlord's prior approval, (y) Landlord's having the right to consummate a Recapture Termination in respect thereof, and (z) Tenant's being required to pay Transfer Profit to Landlord in connection therewith, provided that in each case (i) Tenant gives to Landlord, not later than the tenth (10th) Business Day after any such assignment is consummated, an instrument, duly executed by such Permitted Party and the Transferee, in form reasonably satisfactory to Landlord, to the effect that such Transferee assumes all of the obligations of the Permitted Party to the extent arising under the applicable Occupancy Agreement from and after the date of such assignment, (ii) such sale of all or substantially all of the assets of Tenant is not principally for the purpose of transferring such Permitted Party's interest in the applicable Occupancy Agreement, and (iii) Tenant, within ten (10) Business Days after such sale, provides Landlord with a certificate, signed by an officer of such Permitted Party, stating that the requirement described in clause (ii) above has been satisfied.

(D)     The direct or indirect transfer of shares or equity interests in a Permitted Party (including, without limitation, the issuance of treasury stock, or the creation or issuance of a new class of stock, in either case in the context of an initial public offering or in the context of a subsequent offering of equity securities) shall be permitted without (x) Landlord's prior approval, (y) Landlord's having the right to consummate a Recapture Termination in respect thereof, and (z) Tenant's being required to pay Transfer Profit to Landlord in connection therewith, provided that in each case (i) such transfer is not principally for the purpose of transferring the interest of such Permitted Party under the applicable Occupancy Agreement, (ii) Tenant gives Landlord notice of such transfer not later than the tenth (10th) Business Day after the occurrence thereof, and (iii) Tenant, within ten (10) Business Days after the date that such transfer occurs, provides Landlord with a certificate, signed by an officer of Tenant, stating that the requirement described in the immediately preceding clause (i) has been satisfied (except that Tenant shall not be required to comply with this clause (iii) to the extent that such direct or indirect transfer of shares or equity interests is accomplished through the public "over-the-counter" securities market or through any recognized stock exchange).

(E)     A Permitted Party shall have the right to sublease or license the Premises, or any portion thereof, to an Affiliate of such Permitted Party, without (x) Landlord's prior approval, (y) Landlord's having the right to consummate a Recapture Termination in respect thereof, and (z) Tenant's being required to pay Transfer Profit to Landlord in connection therewith, provided that in each case (i) Tenant gives to Landlord a copy of such sublease or license, not later than the tenth (10th) Business Day after any such sublease or license is consummated, (ii) Tenant, with such copy of such sublease or license, provides Landlord with a certificate, signed by an officer of Tenant, stating that the Person to which such Permitted Party is so subleasing or licensing the Premises or a portion thereof constitutes an Affiliate of such Permitted Party, and (iii) such sublease includes the Basic Sublease Provisions.

69

Article 19
RENEWAL

19.1.  Renewal Option.

(A)    Subject to the terms of this Article 19, Tenant shall have the option (the "Renewal Option") to extend the term of this Lease for the entire Premises for one (1) additional period of five (5) years (the "Renewal Term"), which Renewal Term shall commence on the day immediately succeeding the Fixed Expiration Date and end on the day that is five (5) years after the Fixed Expiration Date, provided that (a) this Lease has not been previously terminated, (b) no Event of Default has occurred and is continuing on the date that Tenant gives Landlord notice (the "Renewal Notice") of Tenant's election to exercise the Renewal Option, and (d) the entire Rentable Area of the Tenant Unit that comprises the Banana Republic store following the completion of the Initial Alterations is occupied by Banana Republic.

(B)    The Renewal Option shall be exercisable only by Tenant's delivering the Renewal Notice to Landlord not later than the first (1st) day of the full eighteenth (18th) month before the Fixed Expiration Date (as to which date time shall be of the essence).  Landlord shall have the right to declare Tenant's exercise of the Renewal Option ineffective if (a) a material monetary Event of Default has occurred and is continuing as of the Fixed Expiration Date, or (b) if the entire Rentable Area of the Tenant Unit that comprises the Banana Republic store following the completion of the Initial Alterations is not occupied by Banana Republic on the Fixed Expiration Date, in any such case by giving notice thereof to Tenant during the period commencing on the Fixed Expiration Date and ending on the date that is fifteen (15) days after the Fixed Expiration Date (it being understood that (x) if Landlord so declares Tenant's exercise of the Renewal Option ineffective, then the Term shall terminate on the fifteenth (15th) day after the date that Landlord gives Tenant notice of such declaration (in which case Tenant shall pay the Rental due hereunder in respect of the Renewal Term to the extent accruing during the period commencing on the first day of the Renewal Term and ending on the date that the Term so terminates), and (y) nothing contained in this Section 19.1(B) limits Landlord's other rights or remedies after the occurrence of an Event of Default).

19.2.  Lease Provisions Apply.

If Tenant exercises the Renewal Option, then the leasing of the Premises during the Renewal Term shall be upon the terms set forth herein, except that:

(A)    the Fixed Rent for the Premises during the Renewal Term shall be the Rental Value thereof;

(B)    Landlord shall have no obligation to perform any work in connection with Tenant's exercise of the Renewal Option;

(C)    Landlord shall have no obligation to grant to Tenant any work allowance in connection with Tenant's exercise of the Renewal Option; and

(D)    the provisions of this Article 19 shall not be applicable to permit Tenant to further extend the Term.

70

## Article 20
## FAIR MARKET RENT

20.1.   Certain Definitions.

(A)   The term "Rental Value" shall mean an amount equal to the Fair Market Rent of the Premises on December 1, 2020; provided, however, that at no time shall the Rental Value for the Premises be less than the Base Rental Amount.

(B)   The term "Fair Market Rent" shall mean annual fair market rental value.

(C)   The term "Base Rental Amount" shall mean in connection with the determination of the Rental Value of the Premises, the Fixed Rent that is payable hereunder as of the Fixed Expiration Date (without taking into account any abatement of Fixed Rent that is in effect as of the Fixed Expiration Date).

20.2.   Fair Market Rent Assumptions.

The Fair Market Rent shall be determined assuming that the Premises is free and clear of all leases and tenancies (including this Lease), that the Premises is available for the purposes permitted hereby in the then rental market, that Landlord has had a reasonable time to locate a tenant, and that neither Landlord nor the prospective tenant is under any compulsion to rent, and taking into account all relevant factors.

20.3.   Fair Market Procedure.

(A)   Landlord and Tenant shall each deliver simultaneously to the other, at Landlord's office, a notice (each, a "Rent Notice"), on a date mutually agreed upon, but in no event later than June 1, 2020, with respect to the Rent Notice for the determination of the Fair Market Rent for the Premises, which Rent Notice shall set forth each of their respective determinations of the Fair Market Rent (Landlord's determination of the Fair Market Rent is referred to as "Landlord's Determination" and Tenant's determination of the Fair Market Rent is referred to as "Tenant's Determination"). If (i) Landlord fails to give Landlord's Determination to Tenant, and (ii) Tenant tenders Tenant's Determination to Landlord, then the Fair Market Rent for the Premises shall be Tenant's Determination. If (i) Tenant fails to give Tenant's Determination to Landlord, and (ii) Landlord tenders Landlord's Determination to Tenant, then the Fair Market Rent for the Premises shall be Landlord's Determination.

(B)   If Tenant's Determination is lower than Landlord's Determination, then Landlord and Tenant shall attempt in good faith to agree upon the Fair Market Rent for a period of thirty (30) days after the date that Landlord gives Landlord's Determination to Tenant, and Tenant gives Tenant's Determination to Landlord. If Tenant's Determination is higher than Landlord's Determination, then the Fair Market Rent for the Premises shall be the average of Landlord's Determination and Tenant's Determination. If Landlord and Tenant do not agree on the Fair Market Rent for the Premises within thirty (30) days after the date that Landlord gives Landlord's Determination to Tenant, and the date that Tenant gives Tenant's Determination to Landlord, then Landlord and Tenant shall select jointly an independent real estate appraiser that (i) neither Landlord nor Tenant, nor any of their respective Affiliates, has engaged during the

71

immediately preceding period of three (3) years, and (ii) has at least ten (10) years of experience in leasing retail properties that are similar in character to those in the Building (such appraiser being referred to herein as the "Appraiser").   Landlord and Tenant shall each pay fifty percent (50%) of the Appraiser's fee.

(C)     The parties shall instruct the Appraiser to (i) conduct the hearings and investigations that he or she deems appropriate, and (ii) choose either Landlord's Determination or Tenant's Determination as the better estimate of Fair Market Rent for the Premises, within thirty (30) days after the date that the Appraiser is designated.  The Appraiser's aforesaid choice shall be conclusive and binding upon Landlord and Tenant.  Each party shall pay its own counsel fees and expenses, if any, in connection with the procedure described in this Article 20.  The Appraiser shall not have the power to supplement or modify any of the provisions of this Lease.

(D)     If the final determination of the Fair Market Rent is not made on or before December 1, 2020 in accordance with the provisions of this Article 20, then, pending such final determination, the Fair Market Rent shall be deemed to be an amount equal to the average of Landlord's Determination and Tenant's Determination.  If, based upon the final determination hereunder of the Fair Market Rent, the payments made by Tenant on account of the Rental for the period prior to the final determination of the Fair Market Rent were less than the Rental payable for such period, then Tenant, not later than the thirtieth (30th) day after Landlord's demand therefor, shall pay to Landlord the amount of such deficiency, together with interest thereon at the Base Rate.  If, based upon the final determination of the Fair Market Rent, the payments made by Tenant on account of the Rental for the period prior to the final determination of the Fair Market Rent were more than the Rental due hereunder for such period, then Landlord, not later than the thirtieth (30th) day after Tenant's demand therefor, shall pay such excess to Tenant, together with interest thereon at the Base Rate.

Article 21

DEFAULT

21.1.   Events of Default.

The term "Event of Default" shall mean the occurrence of any of the following events:

(A)     Tenant fails to pay any installment of Fixed Rent when due and such failure continues for five (5) Business Days after the date that Landlord gives notice of such failure to Tenant;

(B)     Tenant fails to pay any installment of Rental (other than Fixed Rent) when due and such failure continues for seven (7) Business Days after the date that Landlord gives notice of such failure to Tenant;

(C)     Tenant's interest under this Lease (or the subtenant's interest under a sublease that Tenant consummates in accordance with the terms of Article 18 hereof) devolves upon or passes to any other Person, whether by operation of law or otherwise, except as expressly permitted under Article 18 hereof;

72

(D)     Tenant defaults in respect of Tenant's obligations under Section 5.7 hereof, and such default continues for more than three (3) Business Days after Landlord gives Tenant notice thereof;

(E)     Tenant defaults in respect of Tenant's obligations under Section 8.5(A)(4) hereof, and such default continues for more than five (5) Business Days after Landlord gives Tenant notice thereof;

(F)     Tenant defaults in the observance or performance of any other covenant of this Lease on Tenant's part to be observed or performed and Tenant fails to remedy such default within thirty (30) days after Landlord gives Tenant notice thereof, except that if (i) such default cannot be remedied with reasonable diligence during such period of thirty (30) days (including by reason of the occurrence of a Force Majeure Event), (ii) Tenant takes reasonable steps during such period of thirty (30) days to commence Tenant's remedying of such default, and (iii) Tenant prosecutes diligently Tenant's remedying of such default to completion, then an Event of Default shall not occur by reason of such default; or

(G)     the Premises are abandoned (as distinguished from being closed pursuant to Section 4.5(C) hereof).

21.2.  Termination.

If (1) an Event of Default occurs, and (2) Landlord, at any time thereafter (but prior to the date such Event of Default is cured it being agreed that Landlord may reject any such cure in Landlord's sole discretion), at Landlord's option, gives a notice to Tenant stating that this Lease and the Term shall expire and terminate on the third (3rd) Business Day after the date that Landlord gives Tenant such notice, then this Lease and the Term and all rights of Tenant under this Lease shall expire and terminate as of the third (3rd) Business Day after the date that Landlord gives Tenant such notice, and Tenant immediately shall quit and surrender the Premises, but Tenant shall nonetheless remain liable for all of its obligations hereunder, as provided in Article 23 hereof and Article 24 hereof.


## Article 22
## TENANT'S INSOLVENCY

21.1.  Assignments pursuant to the Bankruptcy Code.

(A)     The term "Bankruptcy Code" shall mean 11 U.S.C. Section 101 et seq., or any statute of similar nature and purpose.

(B)     If Tenant proposes to assign the tenant's interest hereunder pursuant to the provisions of the Bankruptcy Code to any Person that has made a bona fide offer to accept an assignment of the tenant's interest under this Lease on terms acceptable to Tenant, then Tenant shall give to Landlord notice of such proposed assignment no later than twenty (20) days after the date that Tenant receives such offer, but in any event no later than ten (10) days before the date that Tenant makes application to a court of competent jurisdiction for authority and approval to consummate such assignment. Such notice given by Tenant to Landlord shall (a) set forth the

73

name and address of such Person that has made such bona fide offer, (b) set forth all of the terms and conditions of such bona fide offer, and (c) confirm that such Person will provide to Landlord adequate assurance of future performance that conforms with the terms of Section 22.1(C) hereof. Landlord shall have the right to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such Person (less any brokerage commissions that would otherwise be payable by Tenant out of the consideration to be paid by such Person in connection with such assignment of the tenant's interest under this Lease), by giving notice thereof to Tenant at any time prior to the effective date of such proposed assignment.

(C)     A Person that submits a bona fide offer to take by assignment the tenant's interest under this Lease as described in Section 22.1(B) hereof shall be deemed to have provided Landlord with adequate assurance of future performance only if such Person (a) deposits with Landlord simultaneously with such assignee's taking by assignment the tenant's interest under this Lease an amount equal to the then annual Fixed Rent, as security for the faithful performance and observance by such assignee of the tenant's obligations of this Lease (and such Person gives to Landlord, at least five (5) days prior to the date that the proposed assignment becomes effective, information reasonably satisfactory to Landlord that indicates that such Person has the ability to post such deposit), (b) gives to Landlord, at least five (5) days prior to the date that the proposed assignment becomes effective, such Person's financial statements, audited by a certified public accountant in accordance with generally accepted accounting principles, consistently applied, for the three (3) fiscal years that immediately precede such assignment, that indicate that such Person has a tangible net worth of at least ten (10) times the then annual Fixed Rent for each of such three (3) years, and (c) gives to Landlord, at least five (5) days prior to the date that the proposed assignment becomes effective, such other information or takes such action that in either case Landlord, in its reasonable judgment, determines is necessary to provide adequate assurance of the performance by such assignee of the obligations of the tenant under this Lease; provided, however, that in no event shall such adequate assurance of future performance be less favorable to Landlord than the assurance contemplated by Section 365(b)(3) of the Bankruptcy Code (notwithstanding that this Lease may be construed as a lease of real property in a shopping center).

(D)     If Tenant's interest under this Lease is assigned to any Person pursuant to the provisions of the Bankruptcy Code, then any such assignee shall (x) be deemed without further act or deed to have assumed all the obligations of the tenant arising under this Lease from and after the date of such assignment, and (y) execute and deliver to Landlord upon demand an instrument confirming such assumption.

(E)     Nothing contained in this Article 22 limits Landlord's rights against Tenant under Article 18 hereof.

22.2.   Replacement Lease.

If (i) Tenant is not the Person that constituted Tenant initially, and (ii) either (I) this Lease is disaffirmed or rejected pursuant to the Bankruptcy Code, or (II) this Lease terminates by reason of occurrence of an Insolvency Event, then, subject to the terms of this Section 22.2, the Persons that constituted Tenant hereunder previously, including, without limitation, the Person

74

that constituted Tenant initially (each such Person that previously constituted Tenant hereunder (but does not then constitute Tenant hereunder), and with respect to which Landlord exercises Landlord's rights under this Section 22.2, being referred to herein as a "Predecessor Tenant") shall (1) pay to Landlord the aggregate Rental that is then due and owing by Tenant to Landlord under this Lease to and including the date of such disaffirmance, rejection or termination, and (2) enter into a new lease, between Landlord, as landlord, and the Predecessor Tenant, as tenant, for the Premises, and for a term commencing on the effective date of such disaffirmance, rejection or termination and ending on the Fixed Expiration Date (or the last day of the Renewal Term, if such disaffirmance, rejection or termination occurs during the Renewal Term), at the same Fixed Rent and upon the then executory terms that are contained in this Lease, except that (a) the Predecessor Tenant's rights under the new lease shall be subject to the possessory rights of Tenant under this Lease and the possessory rights of any Person claiming by, through or under Tenant or by virtue of any statute or of any order of any court, and (b) such new lease shall require all defaults existing under this Lease to be cured by the Predecessor Tenant with reasonable diligence. Landlord shall have the right to require the Predecessor Tenant to execute and deliver such new lease on the terms set forth in this Section 22.2 only by giving notice thereof to Tenant within thirty (30) days after Landlord receives notice of any such disaffirmance or rejection (or, if this Lease terminates by reason of Landlord making an election to do so, then Landlord may exercise such right only by giving such notice to Tenant within thirty (30) days after this Lease so terminates). If the Predecessor Tenant defaults in its obligation to enter into said new lease for a period of ten (10) days following Landlord's request therefor, then, in addition to all other rights and remedies by reason of such default, either at law or in equity, Landlord shall have the same rights and remedies against such Predecessor Tenant as if such Predecessor Tenant had entered into such new lease and such new lease had thereafter been terminated as of the commencement date thereof by reason of such Predecessor Tenant's default thereunder.

22.3.   Insolvency Events.

This Lease shall terminate automatically upon the occurrence of any of the following events:

(A)   a Tenant Obligor commences or institutes any case, proceeding or other action (a) seeking relief on its behalf as debtor, or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property; or

(B)   a Tenant Obligor makes a general assignment for the benefit of creditors; or

(C)   any case, proceeding or other action is commenced or instituted against a Tenant Obligor (a) seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts under any

75

existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, which in either of such cases (i) results in any such entry of an order for relief, adjudication of bankruptcy or insolvency or such an appointment or the issuance or entry of any other order having a similar effect, and (ii) remains undismissed for a period of sixty (60) days; or

        (D)     any case, proceeding or other action is commenced or instituted against a Tenant Obligor seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its property which results in the entry of an order for any such relief which is not vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or

        (E)     a Tenant Obligor takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (A), (B), (C), or (D) above; or

        (F)     a trustee, receiver or other custodian is appointed for any substantial part of a Tenant Obligor's assets, and such appointment is not vacated or stayed within fifteen (15) Business Days (the events described in this Section 22.3 being collectively referred to herein as "Insolvency Events").

The term "Tenant Obligor" shall mean (a) Tenant, (b) any Person that comprises Tenant (if Tenant is comprised of more than one (1) Person), (c) any partner in Tenant (if Tenant is a general partnership), (d) any general partner in Tenant (if Tenant is a limited partnership), (e) any Person that has guarantied all or any part of the obligations of Tenant hereunder (if such Person is an Affiliate of Tenant), and (f) any Person that (x) preceded Tenant as the tenant hereunder, and (y) is an Affiliate of Tenant. If this Lease terminates pursuant to this Section 22.3, then (I) Tenant immediately shall quit and surrender the Premises, and (II) Tenant shall nonetheless remain liable for all of its obligations hereunder, as provided in Article 23 hereof and Article 24 hereof.

22.4.   Effect of Stay.

    Notwithstanding anything to the contrary contained herein, if (i) Landlord's right to terminate this Lease after the occurrence of an Event of Default, or the termination of this Lease upon the occurrence of an Insolvency Event, is stayed by order of any court having jurisdiction over an Insolvency Event, or by federal or state statute, (ii) the trustee appointed in connection with an Insolvency Event, or Tenant or Tenant as debtor-in-possession, fails to assume Tenant's obligations under this Lease on or prior to the earliest to occur of (a) the last day of the period prescribed therefor by law, (b) the one hundred twentieth (120th) day after entry of the order for relief, or (c) a date that is otherwise designated by the court, or (iii) said trustee, Tenant or Tenant as debtor-in-possession fails to provide adequate protection of Landlord's right, title and interest in and to the Premises or adequate assurance of the complete and continuous future performance of Tenant's obligations under this Lease as provided in Section 22.1(C) hereof, then Landlord, to the extent permitted by law or by leave of the court having jurisdiction over such proceeding, shall have the right, at its election, to terminate this Lease on five (5) Business Days

of advance notice to Tenant, Tenant as debtor-in-possession or said trustee, and, upon the expiration of said period of five (5) Business Days, this Lease shall cease and expire as aforesaid and Tenant, Tenant as debtor-in-possession or said trustee shall immediately quit and surrender the Premises as aforesaid.

22.5.   Rental for Bankruptcy Purposes.

Notwithstanding anything contained in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, regardless of whether such amounts are expressly denominated as Rental, shall constitute rent for the purposes of Section 502(b)(6) of the Bankruptcy Code, and Tenant's payment obligations with respect thereto shall constitute obligations to be timely performed pursuant to Section 365(d) of the Bankruptcy Code.

<div align="center">

Article 23
REMEDIES AND DAMAGES

</div>

23.1.   Certain Remedies.

(A)     If (x) an Event of Default occurs and this Lease and the Term expires and comes to an end as provided in Article 21 hereof, or (y) this Lease terminates as provided in Section 22.3 hereof, then:

(1)     Tenant shall immediately quit and peacefully surrender the Premises to Landlord, and Landlord and its agents may, without prejudice to any other remedy which Landlord may have, (a) re-enter the Premises or any part thereof, without notice, either by summary proceedings, or by any other applicable action or proceeding, or by force or otherwise (without being liable to indictment, prosecution or damages therefor), (b) repossess the Premises and dispossess Tenant and any other Persons from the Premises, and (c) remove any and all of their property and effects from the Premises; and

(2)     Landlord, at Landlord's option, may relet the whole or any portion or portions of the Premises from time to time, either in the name of Landlord or otherwise, to such tenant or tenants, for such term or terms ending before, on or after the Fixed Expiration Date, at such rental or rentals and upon such other conditions, which may include concessions and free rent periods, as Landlord, in its sole discretion, may determine.

(B)     Landlord shall have no obligation to relet the Premises or any part thereof and shall not be liable for refusal or failure to relet the Premises or any part thereof, or, in the event of any such reletting, for refusal or failure to collect any rent due upon any such reletting. Any such refusal or failure on Landlord's part shall not relieve Tenant of any liability under this Lease or otherwise affect any such liability. Landlord, at Landlord's option, may make such repairs, replacements, alterations, additions, improvements, decorations and other physical changes in and to the Premises as Landlord, in its sole discretion, considers advisable or necessary in connection with any such reletting or proposed reletting, without relieving Tenant of any liability under this Lease or otherwise affecting any such liability.

<div align="center">

77

</div>

(C)     In the event of a breach or threatened breach by Tenant, or any Persons claiming by, through or under Tenant, of any term, covenant or condition of this Lease, Landlord shall have the right to (1) seek to enjoin or restrain such breach, (2) seek to invoke any other remedy allowed by law or in equity as if re-entry, summary proceedings and other special remedies were not provided in this Lease for such breach, and (3) seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease. The right to invoke the remedies hereinbefore set forth are cumulative and nonexclusive and shall not preclude Landlord from seeking to invoke any other remedy allowed at law or in equity.

23.2.   No Redemption.

Tenant, on its own behalf and on behalf of all Persons claiming by, through or under Tenant, including all creditors, does hereby waive any and all rights which Tenant and all such Persons might have under any present or future law to redeem the Premises, or to re-enter or repossess the Premises, or to restore the operation of this Lease, after (a) Tenant has been dispossessed by a judgment or by warrant of any court or judge, or (b) any valid re-entry by Landlord, or (c) any expiration or termination of this Lease and the Term, whether such dispossess, valid re-entry, expiration or termination is by operation of law or pursuant to the provisions of this Lease. The words "re-enter," "re-entry" and "re-entered" as used in this Lease shall not be deemed to be restricted to their technical legal meanings.

23.3.   Calculation of Damages.

(A)     If this Lease terminates by reason of the occurrence of an Event of Default or by reason of the occurrence of an Insolvency Event, then Tenant shall pay to Landlord, on demand, and Landlord shall be entitled to recover:

(1)     all Rental payable under this Lease by Tenant to Landlord (x) to the date that this Lease terminates, or (y) to the date of re-entry upon the Premises by Landlord, as the case may be;

(2)     the excess of (a) the Rental for the period which otherwise would have constituted the unexpired portion of the Term, over (b) the net amount, if any, of rents collected under any reletting effected pursuant to the provisions of clause (2) of Section 23.1(A) hereof for any part of such period (such excess being referred to herein as a "Deficiency"), as damages (it being understood that (x) such net amount described in clause (b) above shall be calculated by deducting from the rents collected under any such reletting all of Landlord's expenses in connection with the termination of this Lease, Landlord's re-entry upon the Premises and such reletting, including, but not limited to, all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alteration costs, contributions to work and other expenses of preparing the Premises for such reletting, (y) any such Deficiency shall be paid in monthly installments by Tenant on the days specified in this Lease for payment of installments of Fixed Rent, and (z) Landlord shall be entitled to recover from Tenant each monthly Deficiency as it arises, and no suit to collect the amount of the Deficiency for any month shall prejudice Landlord's right to collect the Deficiency for any subsequent month by a similar proceeding); and

78

(3)     regardless of whether Landlord has collected any monthly Deficiency as aforesaid, and in lieu of any further Deficiency, as and for liquidated and agreed final damages, an amount equal to the excess of (a) the Rental for the period which otherwise would have constituted the unexpired portion of the Term (commencing on the date immediately succeeding the last date with respect to which a Deficiency, if any, was collected), over (b) the then fair and reasonable net effective rental value of the Premises for the same period (which is calculated by deducting from the fair and reasonable rental value of the Premises the expenses that Landlord would reasonably expect to incur in reletting the Premises, including, but not limited to, all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alteration costs, contributions to work and other expenses of preparing the Premises for such reletting), both discounted to present value at the Base Rate. If, before presentation of proof of such liquidated damages to any court, commission or tribunal, the Premises, or any part thereof, have been relet by Landlord for the period which otherwise would have constituted the unexpired portion of the Term, or any part thereof, then the amount of rent reserved upon such reletting shall be deemed, prima facie, to be the fair and reasonable rental value of the Premises (or the applicable part thereof) so relet during the term of the reletting.

(B)     If the Premises, or any part thereof, are relet together with other space in the Building, then the rents collected or reserved under any such reletting and the expenses of any such reletting shall be equitably apportioned for the purposes of this Section 23.3. Tenant acknowledges and agrees that in no event shall it be entitled to any rents collected or payable under any reletting, regardless of whether such rents exceed the Rental reserved in this Lease.

(C)     Nothing contained in this Article 23 shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages by any statute or rule of law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section 23.3 (it being agreed that any damages pursuant to this Section 23.3 shall not include any consequential damages other than the costs of reletting as provided in this Lease).

## Article 24
## LANDLORD'S AND TENANT'S EXPENSES AND LATE CHARGES

### 24.1.   Landlord's and Tenant's Costs After Event of Default.

Tenant shall pay to Landlord an amount equal to the costs that Landlord incurs in instituting or prosecuting any legal proceeding against Tenant (or any other Person claiming by, through or under Tenant) after the occurrence of an Event of Default, together with interest thereon calculated at the Applicable Rate from the date that Landlord incurs such costs, within thirty (30) days after Landlord gives to Tenant an invoice therefor (it being understood that Landlord shall have the right to collect such amount from Tenant as additional rent to the extent that Landlord incurs such costs during the Term and as damages to the extent that Landlord incurs such costs after the Expiration Date). Landlord shall pay to Tenant an amount equal to the costs that Tenant incurs in instituting or prosecuting any legal proceeding against Landlord after the occurrence of an event of default by Landlord together with interest thereon calculated at the Applicable Rate from the date that Tenant incurs such costs, within thirty (30) days after Tenant

gives to Landlord an invoice therefore (which obligation to pay Tenant shall survive the Expiration Date).

### 24.2. Interest on Late Payments.

If Tenant fails to pay any item of Rental on or prior to the fifth (5th) day after the date that such payment is due, then Tenant shall pay to Landlord, in addition to such item of Rental, as a late charge and as additional rent, an amount equal to interest at the Applicable Rate on the amount unpaid, computed from the date such payment was due to and including the date of payment. Nothing contained in this Section 24.2 limits Landlord's rights and remedies, by operation of law or otherwise, after the occurrence of an Event of Default.

## Article 25
## END OF TERM

### 25.1. End of Term.

On the Expiration Date, Tenant shall quit and surrender to Landlord the Premises, vacant, broom-clean, in good order and condition, ordinary wear and tear and damage for which Tenant is not responsible under the terms of this Lease excepted, and otherwise in compliance with the provisions hereof. Tenant expressly waives, for itself and for any Person claiming by, through or under Tenant, any rights which Tenant or any such Person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any successor law of like import then in force in connection with any holdover summary proceedings that Landlord institutes to enforce the provisions of this Article 25.

### 25.2. Holdover.

If vacant and exclusive possession of the Premises is not surrendered to Landlord on the Expiration Date, then Tenant shall pay to Landlord on account of use and occupancy of the Premises, for each month (or any portion thereof) during which Tenant (or a Person claiming by, through or under Tenant) holds over in the Premises after the Expiration Date, an amount equal to (I) in respect of the first thirty (30) days that Tenant holdsover in the Premises, one and one-half (1 ½) times the Fixed Rent and one hundred percent (100%) of the Additional Rent, in either case that was payable under this Lease during or with respect to the last month of the Term, and (II) in respect of any period of time thereafter, the greater of (i) two (2) times the aggregate Rental that was payable under this Lease during the last month of the Term, and (ii) the then fair market rental value of the Premises. Landlord's right to collect such amount from Tenant for use and occupancy shall be in addition to any other rights or remedies that Landlord may have hereunder or at law or in equity (including, without limitation, Landlord's right to recover Landlord's damages from Tenant that derive from vacant and exclusive possession of the Premises not being surrendered to Landlord on the Expiration Date). Nothing contained in this Section 25.2 shall permit Tenant to retain possession of the Premises after the Expiration Date or limit in any manner Landlord's right to regain possession of the Premises, through summary proceedings or otherwise. Landlord's acceptance of any payments from Tenant after the Expiration Date shall be deemed to be on account of the amount to be paid by Tenant in accordance with the provisions of this Article 25.

80

## Article 26
## NO WAIVER

26.1. <u>No Surrender.</u>

(A)    Landlord shall be deemed to have accepted a surrender of the Premises prior to the Expiration Date only if Landlord executes and delivers to Tenant a written instrument providing expressly therefor.

(B)    No employee of Landlord or of Landlord's agents shall have any power to accept the keys to the Premises prior to the Expiration Date. The delivery of such keys to any employee of Landlord or of Landlord's agents shall not operate as a termination of this Lease or a surrender of the Premises. If Tenant at any time desires to have Landlord sublet the Premises on Tenant's account, then Landlord or Landlord's agents are authorized to receive said keys for such purpose without releasing Tenant from any of Tenant's obligations under this Lease.

26.2. <u>No Waiver.</u>

(1)    Landlord's failure to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease, or any of the Rules, shall not be deemed to be a waiver thereof. The receipt by Landlord of Rental with knowledge of the breach of any covenant of this Lease by Tenant shall not be deemed a waiver of such breach.

(2)    No payment by Tenant or receipt by Landlord of a lesser amount than the monthly Fixed Rent or other item of Rental herein stipulated shall be deemed to be other than on account of the earliest stipulated Fixed Rent or other item of Rental, or as Landlord may elect to apply such payment. No endorsement or statement on any check or any letter accompanying any check or payment as Fixed Rent or other item of Rental shall be deemed to be an accord and satisfaction. Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such Fixed Rent or other item of Rental or to pursue any other remedy provided in this Lease or otherwise available to Landlord at law or in equity.

(B)    Landlord's failure during the Term to prepare and deliver any invoices, and Landlord's failure to make a demand for payment under any of the provisions of this Lease, shall not in any way be deemed to be a waiver of, or cause Landlord to forfeit or surrender, its rights to collect any item of Rental which may have become due during the Term (except to the extent otherwise expressly set forth herein). Tenant's liability for such amounts shall survive the expiration or earlier termination of this Lease by one (1) year.

(C)    No provision of this Lease shall be deemed to have been waived by Landlord, unless such waiver is in writing signed by Landlord.

26.3. <u>No Waiver by Tenant.</u>

Tenant's failure to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease on Landlord's part to be performed, shall not be deemed to be a waiver. The payment by Tenant of any item of Rental or performance of any obligation of Tenant hereunder with knowledge of any breach by Landlord of any covenant of this Lease

shall not be deemed a waiver of such breach, nor shall it prejudice Tenant's right to pursue any remedy against Landlord in this Lease provided or otherwise available to Tenant in law or in equity.  No provision of this Lease shall be deemed to have been waived by Tenant, unless such waiver is in writing signed by Tenant.

## Article 27
## JURISDICTION

27.1.  <u>Governing Law.</u>

This Lease shall be construed and enforced in accordance with the laws of the State of New York.

27.2.  <u>Submission to Jurisdiction.</u>

Tenant hereby (a) irrevocably consents and submits to the jurisdiction of any federal, state, county or municipal court sitting in the State of New York, County of New York, for purposes of any action or proceeding brought therein by Landlord against Tenant concerning any matters relating to this Lease, (b) irrevocably waives all objections as to venue and any and all rights it may have to seek a change of venue with respect to any such action or proceedings, (c) agrees that the laws of the State of New York shall govern in any such action or proceeding and waives any defense to any action or proceeding granted by the laws of any other country or jurisdiction unless such defense is also allowed by the laws of the State of New York, and (d) agrees that any final unappealable judgment rendered against it in any such action or proceeding shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law.  Tenant further agrees that any action or proceeding by Tenant against Landlord concerning any matters arising out of or in any way relating to this Lease shall be brought only in the State of New York, County of New York.

27.3.  <u>Waiver of Trial by Jury.</u>

Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or for the enforcement of any remedy under any statute, emergency or otherwise.  If Landlord commences any summary proceeding against Tenant, then Tenant shall not interpose any counterclaim of whatever nature or description in any such proceeding (unless such counterclaim is mandatory), and shall not seek to consolidate such proceeding with any other action which may have been or will be brought in any other court by Tenant.

Article 28
NOTICES

28.1.   Addresses; Manner of Delivery.

Except as otherwise expressly provided in this Lease, any bills, statements, consents, notices, demands, requests or other communications given or required to be given under this Lease shall (1) be in writing, (2) be deemed sufficiently given if (a) delivered by hand (against a signed receipt), (b) sent by registered or certified mail (return receipt requested), or (c) sent by a nationally-recognized overnight courier, and (3) be addressed in each case:

if to Tenant, at:

> for all notices (including notices of default) other than invoices or statements:
> c/o The Gap, Inc.
> 901 Cherry Avenue
> San Bruno, California  94066
>
> Attn.:  Real Estate Law, Store #711
>
> for all invoices or statements:
>
> The Gap, Inc.
> 40 First Plaza NW
> Albuquerque, New Mexico  87102
>
> Attn.:  Real Estate Payables, Store #711

with a copy to Tenant's attorney:

> Jeffrey A. Moross, Esq.
> Davis & Gilbert, LLP
> 1740 Broadway
> New York, New York  10019

if to Landlord, at:

> UJA-Fed Properties, Inc.
> 130 East 59th Street
> New York, New York  10022
>
> Attn.:  Director of Real Estate

with a copy to:

> UJA-Fed Properties, Inc.
> 130 East 59th Street
> New York, New York  10022
>
> Attn.:  General Counsel
>
> with a copy to Landlord's attorney:

Proskauer Rose LLP
1585 Broadway
New York, New York  10036

Attn.: Lawrence J. Lipson, Esq.

or to such other address or addresses as Landlord or Tenant may designate from time to time on at least ten (10) Business Days of advance notice given to the other in accordance with the provisions of this Article 28.  Any such bill, statement, consent, notice, demand, request, or other communication shall be deemed to have been given on the date received (or on the date refused, if delivered and refused at the applicable above address).  Any such bills, statements, consents, notices, demands, requests or other communications that the Person that is the property manager for the Building gives to Tenant in accordance with the terms of this Article 28 shall be deemed to have been given by Landlord (except that Landlord, at any time and from time to time, shall have the right to terminate or suspend such property manager's right to give such bills, statements, consents, notices, demands, requests or other communications to Tenant by giving not less than five (5) days of advance notice thereof to Tenant).  Landlord's attorney and Tenant's attorney (as identified pursuant to this Article 28) shall have the right to give notices or other communications under this Lease on behalf of Landlord or Tenant, as the case may be.

<div align="center">

Article 29
BROKERAGE

</div>

29.1.   Broker.

Landlord and Tenant each represent to the other that it has not dealt with any broker, finder or salesperson in connection with this Lease other than CB Richard Ellis, Inc. (the "Broker").  Landlord shall pay any commission due to Broker in connection with the execution and delivery of this Lease to Broker pursuant to a separate written agreement between Landlord and Broker.

<div align="center">

Article 30
INDEMNITY

</div>

30.1.   Tenant's Indemnification of the Landlord Indemnitees.

(A)   Subject to the terms of this Section 30.1, Tenant shall indemnify the Landlord Indemnitees, and hold the Landlord Indemnitees harmless, from and against, all losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses but excluding consequential damages other than the costs of reletting as provided in the Lease) that are incurred by a Landlord Indemnitee and that derive from a claim (a "Tenant Liability Claim") made by a third party against such Landlord Indemnitee arising from or alleged to arise from:

<div align="center">

84

</div>

(1)     an act or omission of any Tenant Indemnitee during the Term (including, without limitation, claims that derive from a Permitted Party's conducting such Permitted Party's business in the Premises);

(2)     an event or circumstance that occurs during the Term in the Premises or in another portion of the Building with respect to which Tenant has exclusive use pursuant to the terms hereof (subject, however, to Landlord's rights of access under Article 10 hereof);

(3)     the breach of any covenant to be performed by Tenant hereunder;

(4)     a misrepresentation made by Tenant hereunder (including, without limitation, a misrepresentation of Tenant under Section 29.1 hereof);

(5)     a Compliance Challenge (or Tenant's delaying Tenant's compliance with a Requirement during the pendency of a Compliance Challenge);

(6)     Tenant's installation of the High Speed Line as part of the Initial Alterations; or

(7)     Landlord's cooperating with Tenant as contemplated by Section 8.4(A) hereof.

Tenant shall not be required to indemnify the Landlord Indemnitees, and hold the Landlord Indemnitees harmless, in either case as aforesaid, to the extent that it is finally determined that the negligence or willful misconduct of a Landlord Indemnitee contributed to the loss or damage sustained by the Person making the Tenant Liability Claim.  Nothing contained in this Section 30.1 limits the provisions of Section 32.17 hereof.

(B)     The term "Landlord Indemnitees" shall mean, collectively, Landlord, each Lessor, each Mortgagee, the Condominium Board, any subcommittee of the Condominium Board and their respective partners, members, managers, shareholders, officers, directors, employees, trustees and agents.

(C)     The term "Tenant Indemnitees" shall mean each Permitted Party and their respective partners, members, managers, shareholders, officers, directors, employees, trustees and agents.

(D)     The parties intend that the Landlord Indemnitees (other than Landlord) shall be third-party beneficiaries of this Section 30.1.

30.2.   Landlord's Indemnification of the Tenant Indemnitees.

(A)     Subject to the terms of this Section 30.2, Landlord shall indemnify the Tenant Indemnitees, and hold the Tenant Indemnitees harmless, from and against, all losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses but excluding consequential damages) that are incurred by a Tenant Indemnitee and that derive from a claim (a "Landlord Liability Claim") made by a third party against such Tenant Indemnitee arising from or alleged to arise from:

85

(1)     the breach of any covenant to be performed by Landlord hereunder;

(2)     a misrepresentation made by Landlord hereunder (including, without limitation, a misrepresentation of Landlord under Section 29.1 hereof);

(3)     Landlord's failure to pay the Broker a commission or other compensation in connection herewith; or

(4)     any event or circumstance that occurs during the Term in the Building or in the vicinity of the Building (other than the Premises) as a result of the act or omission of any Landlord Indemnitee.

Landlord shall not be required to indemnify the Tenant Indemnitees, and hold the Tenant Indemnitees harmless, in either case as aforesaid, to the extent that it is finally determined that the negligence or willful misconduct of a Tenant Indemnitee contributed to the loss or damage sustained by the Person making the Landlord Liability Claim.

(B)     The parties intend that the Tenant Indemnitees (other than Tenant) shall be third-party beneficiaries of this Section 30.2.

30.3.   Indemnification Procedure.

(A)     If at any time a Landlord Liability Claim is made or threatened against a Tenant Indemnitee, or a Tenant Liability Claim is made or threatened against a Landlord Indemnitee, then the Person entitled to indemnity under this Article 30 (the "Indemnitee") shall give to the other party (the "Indemnitor") notice of such Landlord Liability Claim or such Tenant Liability Claim, as the case may be (the "Claim"); provided, however, that the Indemnitee's failure to provide such notice shall not impair the Indemnitee's rights to indemnity as provided in this Article 30 except to the extent that the Indemnitor is prejudiced materially thereby. Such notice shall state the basis for the Claim and the amount thereof (to the extent such amount is determinable at the time that such notice is given).

(B)     The Indemnitor shall have the right to defend against the Claim using attorneys that the Indemnitor reasonably selects (it being understood that the attorneys designated by the Indemnitor's insurer shall be deemed approved by the Indemnitee for purposes hereof). The Indemnitor's failure to notify the Indemnitee of the Indemnitor's election to defend against the Claim within thirty (30) days after the Indemnitee gives such notice to the Indemnitor shall be deemed a waiver by the Indemnitor of its aforesaid right to defend against the Claim.

(C)     Subject to the terms of this Section 30.3(C), if the Indemnitor elects to defend against the Claim pursuant to Section 30.3(B) hereof, then the Indemnitee may participate, at the Indemnitee's expense, in defending against the Claim. The Indemnitor shall have the right to control the defense against the Claim (and, accordingly, the Indemnitee shall cause its counsel to act accordingly). If there exists a conflict between the interests of the Indemnitor and the interests of the Indemnitee, then the Indemnitor shall pay the reasonable fees and disbursements of any counsel that the Indemnitee retains in so participating in the defense against the Claim.

(D)     If the Claim is a Tenant Liability Claim, then Landlord shall cooperate reasonably with Tenant in connection therewith. If the Claim is a Landlord Liability Claim, then Tenant shall cooperate reasonably with Landlord in connection therewith.

(E)     The Indemnitor shall not consent to the entry of any judgment or award regarding the Claim, or enter into any settlement regarding the Claim, except in either case with the prior approval of the Indemnitee (any such entry of any judgment or award regarding a Claim to which the Indemnitor consents, or any such settlement regarding a claim to which the Indemnitor agrees, being referred to herein as a "Settlement"). The Indemnitee shall not unreasonably withhold, condition or delay the Indemnitee's approval of a proposed Settlement, provided that the Indemnitor pays, in cash, to the Person making the Claim, the entire amount of the Settlement contemporaneously with the Indemnitee's approval thereof (so that neither the Indemnitor nor the Indemnitee have any material obligations regarding the applicable Claim that remain executory from and after the consummation of the Settlement). If (x) the terms of the Settlement do not provide for the Indemnitor's making payment, in cash, to the Person making the Claim, the entire amount of the Settlement contemporaneously with the Indemnitee's approval thereof, and (y) the Indemnitee does not approve the proposed Settlement, then the Indemnitor's aggregate liability under this Article 30 for the Claim (including, without limitation, the costs incurred by the Indemnitor for legal costs and other costs of defense) shall not exceed an amount equal to the sum of (i) the aggregate legal costs and defense costs that the Indemnitor incurred to the date that the Indemnitor proposes such Settlement, (ii) the amount that the Indemnitor would have otherwise paid to the Person making the applicable Claim under the terms of the proposed Settlement, and (iii) the aggregate legal costs and defense costs that the Indemnitor would have reasonably expected to incur in consummating the proposed Settlement.

(F)     If the Indemnitor does not elect to defend against the Claim as contemplated by this Section 30.3, then the Indemnitee may defend against, or settle, such claim, action or proceeding in any manner that the Indemnitee deems appropriate, and the Indemnitor shall be liable for the Claim to the extent provided in this Article 30.

## Article 31
## LANDLORD'S CONSENTS

### 31.1.   Certain Limitations.

Subject to Section 31.2 hereof, Tenant hereby waives any claim against Landlord for Landlord's unreasonably withholding, unreasonably conditioning or unreasonably delaying any consent or approval requested by Tenant in cases where Landlord expressly agreed herein not to unreasonably withhold, unreasonably condition or unreasonably delay such consent or approval, and Tenant agrees that its sole remedy shall be an action or proceeding to enforce any related provision or for specific performance, injunction or declaratory judgment. If there is a determination that such consent or approval has been unreasonably withheld, unreasonably conditioned or unreasonably delayed, then (1) the requested consent or approval shall be deemed to have been granted, and (2) Landlord shall have no liability to Tenant for its refusal or failure to give such consent or approval. Tenant's sole remedy for Landlord's unreasonably withholding, conditioning or delaying consent or approval shall be as provided in this Article 31.

31.2.  Expedited Arbitration.

(A)     If Landlord withholds or conditions its consent or approval to a proposed transfer because the requirements set forth in Section 18.4(8) or Section 18.4(9) hereof have not been met, and (ii) Tenant believes that Landlord withheld or conditioned such consent with respect to said Section 18.4(8) or Section 18.4(9) unreasonably, then Tenant shall have the right to submit the issue of whether Landlord unreasonably withheld or conditioned such consent or approval solely pursuant to Section 18.4(8)or Section 18.4(9), as the case may be, to an Expedited Arbitration Proceeding only by giving notice thereof to Landlord on or prior to the thirtieth (30th) day after the date that Landlord denied or conditioned such consent or approval.

(B)     The sole decision to be made in the Expedited Arbitration Proceeding shall be whether Landlord unreasonably withheld or conditioned its consent as set forth in clause (A) of this Section 31.2.  If the decision in the Expedited Arbitration Proceeding is that Landlord unreasonably withheld or conditioned such consent, then (i) Landlord shall be deemed to have consented to such matter, and (ii) Landlord shall execute and deliver documentation that is reasonably requested by Tenant to evidence such consent.

(C)     The term "Expedited Arbitration Proceeding" shall mean a binding arbitration proceeding conducted in The City of New York under the Commercial Arbitration Rules of the American Arbitration Association (or its successor) and administered pursuant to the Expedited Procedures provisions thereof; provided, however, that with respect to any such arbitration, (i) the list of arbitrators referred to in Section E-5(b) shall be returned within five (5) Business Days from the date of mailing; (ii) the parties shall notify the American Arbitration Association (or its successor) by telephone, within four (4) Business Days, of any objections to the arbitrator appointed and, subject to clause (vii) below, shall have no right to object if the arbitrator so appointed was on the list submitted by the American Arbitration Association (or its successor) and was not objected to in accordance with Section E-5(b) as modified by clause (i) above; (iii) the notification of the hearing referred to in Section E-8 shall be four (4) Business Days in advance of the hearing; (iv) the hearing shall be held within seven (7) Business Days after the appointment of the arbitrator; (v) the arbitrator shall have no right to award damages or vary, modify or waive any provision of this Lease; (vi) the decision of the arbitrator shall be final and binding on the parties; and (vii) the arbitrator shall not have been employed by either party (or their respective Affiliates) during the period of three (3) years prior to the date of the Expedited Arbitration Proceeding.

Article 32
ADDITIONAL PROVISIONS

32.1.  Tenant's Property Delivered to Building Employees.

Any Building employee to whom any property is entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to such property.

88

32.2. <u>Not Binding Until Execution.</u>

This Lease shall not be binding upon Landlord or Tenant unless and until Landlord and Tenant have executed and unconditionally delivered a fully executed copy of this Lease to each other.

32.3. <u>No Third Party Beneficiaries.</u>

Landlord and Tenant hereby acknowledge that they do not intend for any other Person to constitute a third-party beneficiary hereof except as expressly set forth herein.

32.4. <u>Extent of Landlord's Liability.</u>

(A)     The obligations of Landlord under this Lease shall not be binding upon the Person that constitutes Landlord initially after the sale, conveyance, assignment or transfer by such Person of its interest in the Building or the Real Property, as the case may be (or upon any other Person that constitutes Landlord after the sale, conveyance, assignment or transfer by such Person of its interest in the Building or the Real Property, as the case may be), to the extent such obligations accrue from and after the date of such sale, conveyance, assignment or transfer.

(B)     The members, managers, partners, shareholders, directors, officers and principals, direct and indirect, comprising Landlord shall not be liable for the performance of Landlord's obligations under this Lease.  Tenant shall look solely to Landlord to enforce Landlord's obligations hereunder.

(C)     The liability of Landlord for Landlord's obligations under this Lease shall be limited to Landlord's interest in the Real Property and the proceeds thereof, including the rents, issues and profits therefrom.  Tenant shall not look to any property or assets of Landlord (other than Landlord's interest in the Real Property and the proceeds thereof) in seeking either to enforce Landlord's obligations under this Lease or to satisfy a judgment for Landlord's failure to perform such obligations, it being recognized that nothing herein is intended to limit Tenant's right to seek injunctive or other equitable relief.

32.5. <u>Survival.</u>

Tenant's liability for all amounts that are due and payable to Landlord hereunder shall survive the Expiration Date by one (1) year.

32.6. <u>Recording.</u>

Tenant shall not record this Lease.  Tenant shall have the right to record a memorandum of this Lease only in accordance with the terms of this Section 32.6.  Landlord shall have the right to record a memorandum of this Lease.  If Landlord submits to Tenant a memorandum hereof that is in reasonable form and that otherwise complies with the provisions of Section 291-C of the Real Property Law of The State of New York, then Tenant shall execute, acknowledge and deliver such memorandum within twenty (20) days after Landlord's submission thereof to Tenant.  Tenant shall have the right to exercise Tenant's aforesaid right to record a memorandum hereof only by giving notice thereof to Landlord.  If Tenant gives such notice to Landlord, then

Landlord shall prepare and deliver promptly to Tenant a memorandum hereof in reasonable form and that otherwise complies with the provisions of Section 291-C of the Real Property Law of The State of New York. If Tenant executes, acknowledges and delivers such memorandum to Landlord, then Landlord shall execute and acknowledge such memorandum promptly, and submit such memorandum promptly to the appropriate recorder's office. If Tenant exercises Tenant's aforesaid right to record a memorandum hereof, then Tenant shall reimburse Landlord for the reasonable out-of-pocket costs that Landlord incurs in so preparing and recording such memorandum, within thirty (30) days after Landlord submits to Tenant an invoice therefor, which invoice shall have annexed thereto documentation that reasonably substantiates the charges set forth thereon.

### 32.7. Entire Agreement.

This Lease contains the entire agreement between the parties and supersedes all prior understandings, if any, with respect thereto. This Lease shall not be modified, changed, or supplemented, except by a written instrument executed by both parties.

### 32.8. Exhibits.

If any inconsistency exists between the terms and provisions of this Lease and the terms and provisions of the Exhibits hereto, then the terms and provisions of this Lease shall prevail.

### 32.9. Gender; Plural.

Wherever appropriate in this Lease, personal pronouns shall be deemed to include the other gender and the singular to include the plural.

### 32.10. Divisibility.

If any term of this Lease, or the application thereof to any Person or circumstance, is held to be invalid or unenforceable, then the remainder of this Lease or the application of such term to any other Person or any other circumstance shall not be thereby affected, and each term shall remain valid and enforceable to the fullest extent permitted by law.

### 32.11. Vault Space.

If (i) Tenant uses or occupies any vaults, vault space or other space outside the boundaries of the Real Property that in each case is located below grade, and (ii) such space is diminished by any Governmental Authority or by any Utility Company, then such diminution shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of Rental, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord.

### 32.12. Adjacent Excavation.

If an excavation is made upon land adjacent to the Building, or is authorized to be made, then Tenant, upon reasonable advance notice, shall grant to the Person causing or authorized to cause such excavation a license to enter upon the Premises for the purpose of doing such work as

90

said Person deems necessary to preserve the Building from injury or damage and to support the same by proper foundations, without any claim for damages or indemnity against Landlord, or diminution or abatement of Rental.

### 32.13. Captions.

The captions are inserted only for convenience and for reference and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

### 32.14. Parties Bound.

The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors, and, except as otherwise provided in this Lease, their assigns.

### 32.15. Authority.

(A)    Tenant hereby represents and warrants to Landlord that (i) Tenant is duly organized and validly existing in good standing under the laws of Delaware, and possesses all licenses and authorizations necessary to carry on its business at the Premises, (ii) Tenant has full power and authority to carry on its business, enter into this Lease and consummate the transaction contemplated hereby, (iii) the individual executing and delivering this Lease on Tenant's behalf has been duly authorized to do so, (iv) this Lease has been duly executed and delivered by Tenant, (v) this Lease constitutes a valid, legal, binding and enforceable obligation of Tenant (subject to bankruptcy, insolvency or creditor rights laws generally, and principles of equity generally), (vi) the execution, delivery and performance of this Lease by Tenant will not cause or constitute a default under, or conflict with, the organizational documents of Tenant or any agreement to which Tenant is a party, (vii) to the best of its knowledge, the execution, delivery and performance of this Lease by Tenant will not violate any Requirement, and (viii) all consents, approvals, authorizations, orders or filings of or with any court or governmental agency or body, if any, required on the part of Tenant for the execution, delivery and performance of this Lease have been obtained or made.

(B)    Landlord hereby represents and warrants to Tenant that (i) Landlord is duly organized and validly existing under the laws of the State of New York, and possesses all licenses and authorizations necessary to carry on its business, (ii) Landlord has full power and authority to carry on its business, enter into this Lease and consummate the transaction contemplated hereby, (iii) the individual executing and delivering this Lease on Landlord's behalf has been duly authorized to do so, (iv) this Lease has been duly executed and delivered by Landlord, (v) this Lease constitutes a valid, legal, binding and enforceable obligation of Landlord (subject to bankruptcy, insolvency or creditor rights laws generally, and principles of equity generally), (vi) to the best of its knowledge, the execution, delivery and performance of this Lease by Landlord will not cause or constitute a default under, or conflict with, the organizational documents of Landlord or any agreement to which Landlord is a party, (vii) the execution, delivery and performance of this Lease by Landlord does not violate any Requirement, and (viii) all consents, approvals, authorizations, orders or filings of or with any

91

court or governmental agency or body, if any, required on the part of Landlord for the execution, delivery and performance of this Lease have been obtained or made.

32.16.  Rent Control.

If at the commencement of, or at any time or times during, the Term, the Rental reserved in this Lease is not fully collectible by reason of any Requirement, then Tenant shall enter into such agreements and take such other steps (without additional expense to Tenant) as Landlord may reasonably request and as may be legally permissible to allow Landlord to collect the maximum rents which may from time to time during the continuance of such legal rent restriction be legally permissible (and not in excess of the amounts reserved therefor under this Lease).  Upon the termination of such legal rent restriction prior to the expiration of the Term, (a) the Rental shall become and thereafter be payable hereunder in accordance with the amounts reserved in this Lease for the periods following such termination, and (b) Tenant shall pay to Landlord, if legally permissible, an amount equal to the excess of (i) the items of Rental which would have been paid pursuant to this Lease but for such legal rent restriction, over (ii) the rents paid by Tenant to Landlord during the period or periods such legal rent restriction was in effect.

32.17.  Consequential Damages.

Tenant shall have no liability for any consequential damages that Landlord (or a Landlord Indemnitee) suffers, it being agreed, however, that nothing contained herein shall limit Landlord's right to collect the amounts set forth in Section 25.2 hereof.  Landlord shall have no liability for any consequential damages suffered by Tenant or any Person claiming by, through or under Tenant or any Tenant Indemnitee.

32.18.  Tenant's Advertising.

Tenant shall not use a picture, photograph or drawing of the Building (or a silhouette thereof) in Tenant's letterhead or promotional materials without Landlord's prior approval, it being agreed, however, that without obtaining Landlord's prior approval Tenant shall be permitted to use a picture, photograph or drawing solely of the Premises in Tenant's letterhead or promotional materials.

32.19.  Advertising and Trademarks.

Tenant shall not be required to advertise its business in any manner nor participate in or pay any charges for any advertisement or promotion of any kind nor participate in events of any kind, including, without limitation, any sales or price reductions of its merchandise or the giving away of its merchandise or anything of value.  Landlord recognizes that the trademarks, servicemarks, trade name, copyrights and logo of Tenant and Tenant's Affiliates (collectively, "Intellectual Property Rights") are proprietary rights of Tenant and Tenant's Affiliates that are protected under applicable Requirements.  Landlord shall not use the Intellectual Property Rights in any manner whatsoever (including, without limitation, to express or imply any endorsement by Tenant or Tenant's Affiliates).

32.20.  Confidentiality.

Subject to the terms of this Section 32.20, Landlord and Tenant shall each keep confidential the terms of this Lease.  Landlord and Tenant shall each have the right to make disclosures of the terms of this Lease (i) to the extent required by Requirements, (ii) to the extent reasonably required to enforce such party's rights hereunder, (iii) to the extent reasonably necessary in connection with such party's financing, selling, leasing, or otherwise transferring or capitalizing its assets or its business (or any such transaction consummated by such party's Affiliate) (including, without limitation, disclosures that are reasonably necessary to comply with rules of the Securities and Exchange Commission or any stock exchange), (iv) to the extent reasonably required in connection with such party's books and records being audited, and (v) to the extent reasonably required in constructing, operating, maintaining, repairing or restoring the Premises or the other portions of the Building.  Landlord shall also have the right to make disclosures of the terms of this Lease to Landlord's governing boards and the governing boards of Landlord's Affiliates. If applicable Requirements require Landlord or Tenant to file a copy of this Lease in a manner that provides the general public with access thereto, then such party shall file a copy hereof that is redacted to remove the material economic terms hereof to the extent reasonably practicable and to the extent permitted by applicable Requirements.  Neither Landlord nor Tenant shall unreasonably withhold, condition or delay its approval of any disclosure of the terms of this Lease that is not otherwise authorized by this Section 32.20 and that the other party proposes to make.

93

IN WITNESS WHEREOF, Landlord and Tenant have duly executed and delivered this Lease as of the date first above written.

UJA-FED PROPERTIES, INC., Landlord

By: _____      _____
Name: ROGER W. EINIGER                    JOHN A. ROSENTHAL
Title: TREASURER                          CHIEF FINANCIAL OFFICER

THE GAP, INC., Tenant

By: _____
Name: HOLLY A. ADAMS
Title: SENIOR DIRECTOR
       ASSOCIATE GENERAL COUNSEL

94



**SWANKE HAYDEN CONNELL ARCHITECTS**

EXHIBIT 1.3

| 2ND FLOOR | **UJA - FEDERATION OF NEW YORK** | 3/2/04 |
|---|---|---|
| AREA CALCULATION   RETAIL:  14,940 sf | | NTS |

Exhibit "4.3"

Rules

1.  Tenant shall not obstruct the common areas of the Building. Tenant shall not use the common areas of the Building for any purpose other than for emergency egress.

2.  Tenant shall not use any plumbing fixtures that are connected to Building Systems for any purpose other than the ordinary purpose for which such plumbing fixtures are installed.

3.  Tenant shall not use the Premises in any manner that materially and unreasonably interferes with the use of any other portion of the Building for ordinary business purposes.

4.  Tenant shall not at any time keep in the Premises any flammable, combustible or explosive substance, except for any such substances that are incidental to the use of the Premises for ordinary retail purposes.

5.  Tenant shall not bring any bicycles, vehicles or animals of any kind (except for service animals) into the Premises, except as part of a display in accordance with the Lease.

6.  Tenant shall subject to inspection by Landlord or Landlord's designee, at Landlord's request, all items being brought into the Premises by or on behalf of Tenant (including, without limitation, packages, boxes, bags, handbags, attache cases, and suitcases, but excluding merchandise deliveries). Landlord may refuse entry into the Building to any Person who refuses to cooperate with such inspection or who is carrying any item which has a reasonable likelihood of being dangerous to persons or property.

7.  Tenant, at Tenant's expense, shall operate its interior lights for the employees of Landlord while such employees make repairs in the Premises in accordance with the terms of this Lease.

8.  Tenant shall cooperate reasonably with Landlord in connection with Landlord's efforts to prevent any Person from canvassing, soliciting or peddling in the Building.

Exhibit 4.4



SIGN AND COMPONETS
BY SIGN VENDOR

REMOVABLE TOP FOR
MAINTENANCE ACCESS

WHITE OPAQUE
PLEXIGLASS OR SIM.

HINGED PANEL FOR
MAINTENANCE ACCESS

W6 BOLTED TO EXISTING
STRUCTURE, LEVEL WITH
STRUCTURAL GROUT

INTERNAL LIGHT FIXTURE
AS RECOMMENDED BY
SIGN MANUFACTURER,
REPLACEMENT ACCESS
FROM ABOVE

STAINLESS STEEL
HOUSING, #4 FINISH
BACK-CUT THE
CORNERS FOR SHARP
EDGE PROFILE

INTERNALLY ILLUMINATED
LOGO SIGN W/ HINGED
PANEL FOR MAINTENCE
ACCESS.
BACKLITE WHITE
TRANSLUCENT LETTERING
IN PLANE WITH SS (TEXT
STYLE BY GAP) BOTH
SIDES OF SIGN

EDGE OF EXISTING
MULLION

EXISTING BULLNOSE
MULLION

GAP - 59TH AND LEXINGTON
GAP BLADE SIGN
DATE: 01.11.05, UPDATED: 02.02.05
SCALE: 1-1/2" = 1'-0"



STAINLESS STEEL
BLADE SIGN BY GAP

GAP

Exhibit 4.4

**GAP - 59TH AND LEXINGTON**
ELEVATION - STOREFRONT SIGNAGE
DATE: 01.11.05
SCALE: 1-1/2" = 1'-0"



## SWANKE HAYDEN CONNELL ARCHITECTS

Exhibit 4.4

SIGN BY TENANT, CENTERED IN
GLASS FIELD, 15" LETTERS MAX.

SIGN BY TENANT, CENTERED IN
GLASS FIELD, 15" LETTERS MAX.

BANANA REPUBLIC    BANANA REPUBLIC

SUBWAY

59TH STREET

INTERIOR DECAL LETTERING BY TENANT, TYP.
5" LETTERS MAX., LOCATE 6" FROM B.O. GLASS

SIGN BY TENANT, CENTERED IN
GLASS FIELD, 15" LETTERS MAX.

BANANA REPUBLIC

LEXINGTON AVENUE

INTERIOR DECAL LETTERING BY TENANT, TYP.
5" LETTERS MAX., LOCATE 6" FROM B.O. GLASS

| No. | Date | Revisions | Job Title UJA FEDERATION | | Scale 1/16" = 1'-0" | Sketch Number SKE-03 |
|-----|------|-----------|---------------------------|--|---------------------|----------------------|
| | | | Drawing Title TENANT SIGNS: ELEVATION | | Drawn By EMK | EXHIBIT |
| | | | | | Issued 12.16.04 | Job No. 6213A |

Swanke Hayden Connell Ltd.
Swanke Hayden Connell & Partners, LLP
295 Lafayette Street, New York, New York 10012
Phone  212 226 9696, Fax  212 219 0059

© 2004 Swanke Hayden Connell Architects

Exhibit 5.6



Exhibit 5.6



BANANA REPUBLIC

Exhibit 5.6



Exhibit 5.6



EXHIBIT 7.2.1



**SWANKE HAYDEN CONNELL ARCHITECTS**

PHASE 1 WORK AREA

PHASE 1 TAKEBACK AREA

PHASE 2 WORK AREA

NOTE: PHASE 2 WORK AREA CONTINUES TO STOREFRONT

PHASE 2 TAKEBACK AREA

FINAL DEMISE. WALL

AHU
ELEC
AHU

| No. | Date | Revisions | Job Title | Scale | Sketch Number |
|-----|------|-----------|-----------|-------|---------------|
| 1 | 12.03.04 | REV. SOUTH BORDER | UJA FEDERATION | 1/8" = 1'-0" | **SK 041014** |
| 2 | 2.17.05 | REVISED | Drawing Title<br>RETAIL TAKEBACK PHASING | Drawn By<br>EMK | |
| | | | | Issued<br>10.14.04 | Job No.<br>6213A |

Swanke Hayden Connell Ltd.
Swanke Hayden Connell & Partners, LLP
295 Lafayette Street, New York, New York 10012
Phone   212 226 9696, Fax   212 219 0059

© 2004 Swanke Hayden Connell Architects

EXHIBIT 7.2.1



PHASE 2 TAKE-BACK
AREA = 18 SF



EXHIBIT 7.2.1

SWANKE HAYDEN CONNELL ARCHITECTS

PHASE 2 TAKE-BACK
AREA = 46 SF

| No. | Date | Revision | Job Title | Drawing Title | Scale | Sheet's Number |
|---|---|---|---|---|---|---|
| 1 | 2/17/06 | REVISED | UJA-FEDERATION OF NEW YORK | | 1/16"=1'-0" | **PSK-53b.2** |
| | | | 130 E. 59TH STREET, NY, NY | | Drawn By JK | Job No. |
| | | | | | Issued 2/17/06 | 8213A |

Swanke Hayden Connell Ltd./ Swanke Hayden Connell & Partners, LLP
295 Lafayette Street, New York, New York 10012/ Phone 212 226 9696, Fax 212 219 9059

EXHIBIT 7.2-2

*Architecture, Design & Planning Worldwide* **Gensler**

January 12, 2005

Christine Flynn
UJA – Federation of New York
130 East 59th Street
New York, NY 10022

Subject:    Phase 1 Landlord take back space – Scope of Work
            Project Name: Gap/Banana Republic
            Project Number: 12.4365.009/.010
            File Code: 1TC

Dear Christine,

Please find below the agreed upon scope of work for Phase One of Landlord take back space.  Please
retain for your records.

Gap:
• GC to demolish existing mechanical unit and discard as required.
• GC to re-use existing shelving and hardware as indicated and discard excess shelving.

Banana Republic:
• Gap's Vendor to disconnect all existing Loss Prevention equipment to be reinstalled the following
day.
• GC to remove mirrors in existing Mannequin Room and install new power as indicated on the plans.
• GC to dismantle countertop in existing LP office, cut to size and reinstall in new Loss Prevention
office.  Relocate standards and shelves, cut to size and reinstall in new LP office.
• GC to match new trimmed openings to existing in style and type.
• Gap's Vendor to reinstall all Loss Prevention equipment after construction is complete.  The LP
system is to be down for only one day.

Sincerely,

Robert Black
Gensler

Enclosure

cc:    Kathleen Jordan / Gensler
       Lauren Kruse / Gap Inc.
       Alan Hochman / Gap Inc.
       Shari Krasnow / Ferzan, Robbins and Assoc.

*Morristown*



**NOTE:**
1. SECURITY SYSTEM RELOCATED BY GAP VENDOR.
2. G.C. TO MATCH (E) FINISHES AT ALL AFFECTED AREAS.
3. ALL WORK TO BE COMPLETED BY LANDLORD'S G.C. U.O.N.

REMOVE (E) MIRRORS IN (E) MANNEQUIN CLOSET. PATCH & REPAIR ALL WALLS AS NECESSARY TO ACCEPT (N) FINISHES.

(E) MANNEQUIN CLOSET

(E) BREAK ROOM

(E) LOSS PREVENTION

SALVAGE LP DOOR FOR RELOCATION

POWER CONNECTION MAY NEED TO BE RECONFIGURED AT THIS LOCATION

SALVAGE ALL (E) STANDARDS, SHELVING, SECURITY EQUIPMENT & ASSOCIATED ELECTRICAL FOR RE-INSTALLATION

26    31    38

25    32    37

DEMOLITION PLAN

**Gensler**

10 North Park Place
Suite 400
Morristown NJ 07960
Telephone 973.290.8500
Facsimile 973.290.8585

| Project | BANANA REPUBLIC | | |
|---|---|---|---|
| Description | LL TAKEBACK OPTION | | |
| Project No. | 12.4365.010 | Date | 11.30.04 |
| Issue/Rev | SK-1 | By | RB |
| File Name | $$DESIGNFILESPECIFICATION$$ | | |
| Scale | 1/8"=1'-0" | Sketch No. | SK-1 |

© 2002 Gensler

Jan 18 05 05:53p                                                                    p.4



NOTE:
1. SECURITY SYSTEM RELOCATED BY GAP VENDOR.
2. PATCH & REPAIR ALL WALLS AS NECESSARY TO ACCEPT NEW FINISHES.
3. G.C. TO MATCH (E) FINISHES AT ALL AFFECTED AREAS.
4. ALL WORK TO BE COMPLETED BY LANDLORD'S G.C. U.O.N.

RELOCATED LOSS PREVENTION MONITOR ROOM. (INCLUDES RELOCATION OF STANDARDS, SHELVES, EQUIPMENT & ASSOCIATED ELECTRICAL)

RELOCATED QUAD OUTLETS (2)

LOCATION OF PROPOSED ACCESS GOES THRU (E) LP MONITOR ROOM BASED ON SITE SURVEY

SK4

CONSTRUCTION PLAN

# Gensler

10 North Park Place
Suite 400
Morristown NJ 07960
Telephone 973.290.8500
Facsimile 973.290.8585

| Project | BANANA REPUBLIC | | |
|---|---|---|---|
| Description | LL TAKEBACK OPTION | | |
| Project No. | 12.4365.010 | Date | 11.30.04 |
| Issue/Rev | SK-2 | By | RB |
| File Name | $$DESIGNFILESPECIFICATIONS$$ | | |
| Scale | 1/8"=1'-0" | Sketch No. | SK-2 |

© 2002 Gensler



**NOTE:**
1. SECURITY SYSTEM RELOCATED BY GAP VENDOR.
2. G.C. TO MATCH (E) FINISHES AT ALL AFFECTED AREAS.
3. ALL WORK TO BE COMPLETED BY LANDLORD'S G.C. U.O.N.

(R) BREAKROOM DOOR

DOOR BEYOND

PATCH & REPAIR WALLS AS NECESSARY TO ACCEPT (N) FINISHES.

ELEVATION

## Gensler

10 North Park Place
Suite 400
Morristown  NJ  07960
Telephone  973.290.8500
Facsimile  973.290.8585

| Project | BANANA REPUBLIC | | |
|---|---|---|---|
| Description | LL TAKEBACK OPTION | | |
| Project No. | 12.4365.010 | Date | 11.30.04 |
| Issue/Rev | SK-4 | By | RB |
| File Name | $$DESIGNFILESPECIFICATION$$ | | |
| Scale | 1/8"=1'-0" | Sketch No. | SK-4 |

© 2002 Gensler



NOTE:
1. ALL SHELVING NOT RELOCATED TO BE DEMOLISHED.
2. G.C. TO PATCH & REPAIR WALLS AS NECESSARY.
3. G.C. TO MATCH (E) FINISHES AT ALL AFFECTED AREAS.
4. ALL WORK TO BE COMPLETED BY LANDLORD'S G.C. U.O.N.

RELOCATE & FIX 2 DOUBLE 30D"X48W" SHELVING UNITS.

NOTE: DISCARD SHELVING NOT RE-USED.

REMOVE (E) HVAC UNIT

RELOCATE FIRST 15D"X48W" SHELVING UNIT AS REQUIRED.

NOTE: DISCARD SHELVING NOT RE-USED.

## Gensler

10 North Park Place
Suite 400
Morristown NJ 07960
Telephone 973.290.8500
Facsimile 973.290.8585

| Project | GAP | | |
|---|---|---|---|
| Description | LL TAKEBACK OPTION | | |
| Project No. | 12.4365.009 | Date | 11.30.04 |
| Issue/Rev | SK-3 | By | RB |
| File Name | $$DESIGNFILESPECIFICATION$$ | | |
| Scale | 1/8"=1'-0" | Sketch No. | SK-3 |

©2002 Gensler

EXHIBIT 7.4(A)

UJA FEDERATION OF NEW YORK - CORE & SHELL
List of Drawings

12-10-04 ADDENDUM #5 ISSUE
Project # 6213 A

— = DRAWING NOT INCLUDED IN ISSUE    XXX = DRAWING DELETED    • = DRAWING ISSUED ON DATE INDICATED    *ITALIC* = PROGRESS ISSUE - NOT FOR CONSTRUCTION

| DWG NO. | DRAWING TITLE | SCALE | SIZE | 11-17-03 Des. Issue | 1-19-04 DD Issue | 2-18-04 MTA Issue | 4-15-04 MTA Issue | 4-15-04 65% CDs | 4-15-04 DOB Filing | 4-30-04 Bulltn #1 | 8-3-04 Struct RFI | 6-18-04 100% CDs | 7-14-04 Addendum #1 | 7-23-04 DOB Filing: Tax Exempt | 7-23-04 DOB Filing: Taxable | 8-28-04 Addendum #2 | 8-3-04 Addendum #3 | 8-13-04 Addendum #4 | 10-8-04 100% CD Str. Retrofit | 12-10-04 Addendum #5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **VOLUME 1:** | | | | | | | | | Not Filed | | | | | | | | | | | |
| **FRONT SHEETS** | | | | | | | | | | | | | | | | | | | | |
| T-0a | COVER SHEET - VOLUME 1 | NA | 30"x42" | • | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | • |
| T-0b | MTA COVER SHEET | NA | 30"x42" | — | — | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — |
| ~~T-1~~ | ~~LEGENDS, NOTES & ABBREVIATIONS~~ | NA | ~~30"x42"~~ | ▲ | ▲ | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| T-1 | LIST OF DRAWINGS | NA | 30"x42" | — | — | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| T-1.1 | MTA NOTES & DRAWING LIST | NA | 30"x42" | — | — | • | • | • | • | — | — | • | — | — | • | — | — | — | — | — |
| T-2 | NOTES, ABBREVIATIONS, SYMBOLS & LEGENDS | NA | 30"x42" | • | • | • | • | • | • | — | — | • | — | • | • | — | — | — | — | • |
| T-3 | HANDICAP NOTES | NA | 30"x42" | • | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| T-4 | HANDICAP NOTES | NA | 30"x42" | • | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| EG-1A | EGRESS DIAGRAMS - CELLAR TO 6TH FLOOR | 1" = 20' | 30"x42" | • | — | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| EG-1B | EGRESS DIAGRAMS - 7TH TO UPPER PENTHOUSE FLOOR | 1" = 20' | 30"x42" | — | — | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| PA-1 | 7TH FLOOR PUBLIC ASSEMBLY PLAN | 3/16" | 30"x42" | — | — | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| C-1 | LAND SURVEY | NTS | 30"x42" | — | — | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| A-001 | ARCHITECTURAL SITE PLAN | 1/16" | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| A-002 | ILLUMINATED MTA ENTRY POST | As Noted | 30"x42" | — | — | — | — | — | — | — | — | • | — | • | • | — | — | — | — | — |
| **ELEVATOR DRAWINGS** | | | | | | | | | | | | | | | | | | | | |
| EL-1 | NEW PASS / SERVICE ELEV. PLANS & SECTIONS | 1/4" | 30"x42" | • | • | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| EL-2 | NEW PASS / SERVICE ELEV. DETAILS | 1/4" | 30"x42" | • | — | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| **FAÇADE MAINTENANCE** | | | | | | | | | | | | | | | | | | | | |
| FM-1 | FAÇADE MAINTENANCE SYSTEM EQUIPMENT LAYOUT | 1/8" | 30"x42" | — | • | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| FM-2 | FAÇADE MAINTENANCE SYSTEM SECTIONS & DETAILS | As Noted | 30"x42" | — | — | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| FM-3 | FAÇADE ANCHOR LOCATIONS - SOUTH & WEST | As Noted | 30"x42" | — | — | — | — | • | • | — | — | • | — | — | — | — | — | — | — | — |
| **BASE BUILDING GRAPHICS (PROGRESS ISSUE / FOR INFORMATION ONLY)** | | | | | | | | | | | | | | | | | | | | |
| *DL* | *BASE BUILDING GRAPHICS - DRAWING LIST* | As Noted | 30"x42" | — | — | — | — | — | — | — | — | • | — | — | — | — | — | — | — | — |
| *G-0* | *BASE BUILDING GRAPHICS - GND. FL. LOBBY SIGNAGE* | As Noted | 30"x42" | — | — | — | — | — | — | — | — | • | — | — | — | — | — | — | — | — |
| *G-1* | *BASE BUILDING GRAPHICS - BLDG. SERVICE & STAIR ID* | As Noted | 30"x42" | — | — | — | — | — | — | — | — | • | — | — | — | — | — | — | — | — |
| *G-2* | *BASE BUILDING GRAPHICS - ELEVATOR GRAPHICS* | As Noted | 30"x42" | — | — | — | — | — | — | — | — | • | — | — | — | — | — | — | — | — |
| *G-3* | *BASE BUILDING GRAPHICS - MISC. GRAPHICS* | As Noted | 30"x42" | — | — | — | — | — | — | — | — | • | — | — | — | — | — | — | — | — |
| **ARCHITECTURAL - EXISTING CONDITIONS (REMOVED FROM SET - SEE DEMOLITION DWGS.)** | | | | | | | | | | | | | | | | | | | | |
| AE-100 | EXISTING - CELLAR FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-101 | EXISTING - GROUND FLOOR & MEZZ. PLAN | 1/8" | 30"x42" | • | • | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-102 | EXISTING - SECOND FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-103 | EXISTING - THIRD FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-104 | EXISTING - FOURTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-105 | EXISTING - FIFTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-106 | EXISTING - SIXTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-107 | EXISTING - SEVENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-108 | EXISTING - EIGHTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-109 | EXISTING - NINTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-110 | EXISTING - TENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-111 | EXISTING - ELEVENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-112 | EXISTING - TWELFTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-113 | EXISTING - THIRTEENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-114 | EXISTING - FOURTEENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-115 | EXISTING - FIFTEENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-116 | EXISTING - SIXTEENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-117 | EXISTING - SEVENTEENTH FLOOR PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-118 | EXISTING - MAIN ROOF PLAN | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| AE-119 | EXISTING - UPPER PH AND PH ROOF PLANS | 1/8" | 30"x42" | • | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |

**IJA FEDERATION OF NEW YORK - CORE & SHELL**
List of Drawings

DWG NO./DRAWING NOT INCLUDED IN ISSUE   • = DRAWING ISSUED ON DATE INDICATED   ITALIC = PROGRESS ISSUE - NOT FOR CONSTRUCTION

**12-10-04 ADDENDUM #5 ISSUE**
Project # 6215 A

| DWG NO. | DRAWING TITLE | SCALE | SIZE | 11-17-03 Des. Issue | 1-16-04 DD Issue | 2-11-04 BTA Issue | 4-12-04 BTA Issue | 4-16-04 Bril. Cos. | 4-19-04 DOB Filing | 4-26-04 Suite #1 | 5-3-04 Depot DD | 5-24-04 DOB SG. | 5-24-04 Adden. #1 | 7-23-04 DOB Filing/ Tkt Permit | 7-23-04 DOB Filing/ Adden-Set | 5-28-04 DOB Filing/ Adden-Set #2 | 8-24-04 Adden. #3 | 9-1-04 Adden. #4 | 9-1-04 Adden. #5 | 10-4-04 DOB Permit | 12-10-04 Adden. #5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-501 | EXISTING - NORTH & EAST EXTERIOR ELEVATION | 1/16" | 30"x42" | • • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| A-502 | EXISTING - SOUTH & WEST EXTERIOR ELEVATIONS | 1/16" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| A-550 | EXISTING - NORTH-SOUTH BUILDING SECTIONS | 1/16" | 30"x42" | | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| A-551 | EXISTING - EAST-WEST BUILDING SECTION | 1/16" | 30"x42" | | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| A-505 | EXISTING - AMBER & ROOF PENTHOUSE SECTIONS | 1/16" | 30"x42" | | | | | • | • | • | • | • | • | • | • | • | • | • | • | • |
| A-523 | EXISTING - 14TH STOREFRONT DETAILS | 1/2" | 30"x42" | | | | | • | • | • | • | • | • | • | • | • | • | • | • | • |

**ARCHITECTURAL - CORE & SHELL DEMOLITION**

| DWG NO. | DRAWING TITLE | SCALE | SIZE | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AD-100 | DEMOLITION - CELLAR FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-101 | DEMOLITION - GROUND FLOOR & MEZZ. PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-102 | DEMOLITION - SECOND FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-103 | DEMOLITION - THIRD FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-104 | DEMOLITION - FOURTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-105 | DEMOLITION - FIFTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-106 | DEMOLITION - SIXTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-107 | DEMOLITION - SEVENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-108 | DEMOLITION - NINTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-109 | DEMOLITION - NINTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-110 | DEMOLITION - TENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-111 | DEMOLITION - ELEVENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-112 | DEMOLITION - TWELFTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-113 | DEMOLITION - THIRTEENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-114 | DEMOLITION - FOURTEENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-115 | DEMOLITION - FIFTEENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-116 | DEMOLITION - SIXTEENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-117 | DEMOLITION - SEVENTEENTH FLOOR PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-118 | DEMOLITION - MAIN ROOF PLAN | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-119 | DEMOLITION - UPPER PH AND PH ROOF PLANS | 1/8" | 30"x42" | | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • | • |
| AD-201 | DEMOLITION - NORTH & EAST EXTERIOR ELEVATIONS | 1/16" | 30"x42" | 1 | • | • | • | • | • | • | • | 1 | • | • | • | 1 | 1 | 1 | 1 | 1 |
| AD-202 | DEMOLITION - SOUTH & WEST EXTERIOR ELEVATIONS | 1/16" | 30"x42" | | • | • | • | • | • | • | • | | • | • | • | | | | | |
| AD-203 | DEMOLITION - NORTH-SOUTH BUILDING SECTIONS | 1/16" | 30"x42" | | • | • | • | • | • | • | • | | • | • | • | | | | | |
| AD-204 | DEMOLITION - EAST-WEST BUILDING SECTION | 1/16" | 30"x42" | | • | • | • | • | • | • | • | | • | • | • | | | | | |
| AD-205 | DEMOLITION - AMBER & ROOF PENTHOUSE SECTIONS | 1/16" | 30"x42" | | • | • | • | • | • | • | • | | • | • | • | | | | | |
| AD-523 | DEMOLITION - 14TH ENTRANCE AREA | 1/2" | 30"x42" | | • | • | • | • | • | • | • | | • | • | • | | | | | |

**ARCHITECTURAL - CORE & SHELL CONSTRUCTION**

| A-028 | (ARCHITECTURAL CORE PROPOSAL [STRUCT.] SHOWN) | | 30"x42" | | | | | | | | | | | | | | | | | |
| A-031 | (ALTERNATE/EXAM PROPOSED/AQ-SPA-A SHOWN) | | 30"x42" | | | | | | | | | | | | | | | | | |

## UJA FEDERATION OF NEW YORK - CORE & SHELL
### List of Drawings

— = DRAWING NOT INCLUDED IN ISSUE    XXX = DRAWING DELETED    ● = DRAWING ISSUED ON DATE INDICATED    ITAL = PROGRESS ISSUE - NOT FOR CONSTRUCTION

**12-10-04 ADDENDUM #3 ISSUE — Project #8213.A**

| DWG NO. | DRAWING TITLE | SCALE |
|---|---|---|
| A-100 | CELLAR FLOOR PLAN | 1/8" |
| A-101 | GROUND FLOOR & MEZZ. PLAN | 1/8" |
| A-102 | SECOND FLOOR PLAN | 1/8" |
| A-103 | THIRD FLOOR PLAN | 1/8" |
| A-104 | FOURTH FLOOR PLAN | 1/8" |
| A-105 | FIFTH FLOOR PLAN | 1/8" |
| A-106 | SIXTH FLOOR PLAN | 1/8" |
| A-107 | SEVENTH FLOOR PLAN | 1/8" |
| A-108 | EIGHTH FLOOR PLAN | 1/8" |
| A-109 | NINTH FLOOR PLAN | 1/8" |
| A-110 | TENTH FLOOR PLAN | 1/8" |
| A-111 | ELEVENTH FLOOR PLAN | 1/8" |
| A-112 | TWELFTH FLOOR PLAN | 1/8" |
| A-113 | THIRTEENTH FLOOR PLAN | 1/8" |
| A-114 | FOURTEENTH FLOOR PLAN | 1/8" |
| A-115 | FIFTEENTH FLOOR PLAN | 1/8" |
| A-116 | SIXTEENTH FLOOR PLAN | 1/8" |
| A-117 | SEVENTEENTH FLOOR PLAN | 1/8" |
| A-118 | MAIN ROOF LEVEL PLAN | 1/8" |
| A-119 | UPPER PH AND PH ROOF PLANS | 1/8" |
| A-201 | NORTH & EAST EXTERIOR ELEVATIONS | 1/8" |
| A-202 | SOUTH & WEST EXTERIOR ELEVATIONS | 1/8" |
| A-301 | NORTH-SOUTH BUILDING SECTION | 1/8" |
| A-302 | EAST-WEST BUILDING SECTION | 1/8" |
| A-303 | ENLARGED BUILDING SECTIONS - ROOF & SCREENWALL | 1/8" |
| A-320 | CELLAR & GROUND FLOOR CORE PLANS | 3/8" |
| A-321 | SECOND & THIRD FLOOR CORE PLANS | 3/8" |
| A-322 | FOURTH & FIFTH FLOOR CORE PLANS | 3/8" |
| A-323 | SIXTH & SEVENTH FLOOR CORE PLANS | 3/8" |
| A-324 | EIGHTH & NINTH FLOOR CORE PLANS | 3/8" |
| A-325 | TENTH & ELEVENTH FLOOR CORE PLANS | 3/8" |
| A-326 | TWELFTH & THIRTEENTH FLOOR CORE PLAN | 3/8" |
| A-327 | FOURTEENTH & FIFTEENTH FLOOR CORE PLANS | 3/8" |
| A-328 | SIXTEENTH & SEVENTEENTH FLOOR CORE PLANS | 3/8" |
| A-329 | ROOF & PENTHOUSE CORE PLANS | 3/8" |
| A-330 | ROOF & PENTHOUSE ROOF & PH/TB TOWER PLAN | 3/8" |
| A-500 | TYPICAL BUILDING CORE SECTIONS | 3/8" |
| A-600 | TYPICAL TOILET PLANS, SECTIONS, AND DET'LS | 3/8" |
| A-601 | TYPICAL CORE AND CELLAR TOILET ELEVATIONS | 3/8" |
| A-403 | STAIR 'A' SECTION | 3/8" |
| A-404 | STAIR 'B' AND 'C' | 3/8" |
| A-405 | STAIR 'B' PLANS & SECTIONS | 3/8" |
| A-406 | STAIR 'C' PLANS & SECTION | 3/8" |
| A-407 | TYPICAL STAIR DETAILS | 1 1/2" |
| A-408 | TYPICAL STAIR DETAILS | 1 1/2" |
| A-409 | NEW ELEVATOR PLANS & SECTIONS | 1/4" |
| A-410 | NEW ELEVATOR PLANS | 1/4" |
| A-412 | ELEVATOR DETAILS | 1/4" |

**UIA FEDERATION OF NEW YORK – CORE & SHELL**
List of Drawings

12-10-04 ADDENDUM #8 ISSUE
Project #213 A

| DWG NO. / DRAWING TITLE | SCALE | SIZE |
|---|---|---|
| A-500 KEY TO FACADE TYPES & AREA DIAGRAM | | MTR |
| A-501 EXT. WALL DET'S – NORTH ABOVE ENTRANCE (AREA V) | 1/2" | 30"x42" |
| A-503 EXT. WALL DET'S – NORTH ABOVE ENTRANCE (X & Y) | 1/2" | 30"x42" |
| A-504 EXT. WALL DET'S – NORTH BUILDING & SCREENWALL | 1/2" | 30"x42" |
| A-506 EXT. WALL DET'S – NORTH TYP. LOWER (AREA X) | 1/2" | 30"x42" |
| A-507 EXT. WALL DET'S – NORTH TYP. LOWER (AREA Y) | 1/2" | 30"x42" |
| A-508 EXT. WALL DET'S – NORTH (UPPER FLOORS AREA X) | 1/2" | 30"x42" |
| A-509 EXT. WALL DET'S – NORTH (UPPER FLOORS AREA V) | 1/2" | 30"x42" |
| A-510 EXT. WALL DET'S – EAST (AREA X) | 1/2" | 30"x42" |
| A-511 EXT. WALL DET'S – EAST (AREA V) | 1/2" | 30"x42" |
| A-513 EXT. WALL DET'S – SOUTH (AREA V) | 1/2" | 30"x42" |
| A-414 EXT. WALL DET'S – SOUTH @ ADJ. BLDG. PARAPET | 1/2" | 30"x42" |
| A-417 EXT. WALL DET'S – SOUTH THRU-HOUSE SCREENWALL | 1/2" | 30"x42" |
| A-418 EXT. WALL DET'S – WEST (AREA V) | 1/2" | 30"x42" |
| A-419 NORTH & EAST STOREFRONT ELEVATIONS | 1/4" | 30"x42" |
| A-421 SOUTH & WEST PARTIAL ELEVATIONS | 1/4" | 30"x42" |
| A-423 STOREFRONT DETAILS TYPE 1 | 1/2" | 30"x42" |
| A-424 STOREFRONT DETAILS TYPE 1 W/ DOORS | 1/2" | 30"x42" |
| A-425 EXTERIOR WALL PLAN DETAILS | 1" | 30"x42" |
| A-428 STOREFRONT DETAILS TYPE 2 W/ METAL ENTRANCE | 1/2" | 30"x42" |
| A-429 STOREFRONT/SIGNAGE TYPE & IMAGE ENTRANCE | 1/2" | 30"x42" |
| A-430 EXTERIOR WALL DETAILS @ SOUTH HANDICAP BUILDING | 1/2" | 30"x42" |
| A-441 EXTERIOR WALL PLAN DETAILS | | 30"x42" |
| A-442 EXTERIOR WALL SECTION DETAILS | | 30"x42" |
| A-443 EXTERIOR WALL PLAN DETAILS | | 30"x42" |
| A-444 EXTERIOR WALL SECTION DETAILS | | 30"x42" |
| A-451 EXTERIOR WALL PLAN DETAILS | | 30"x42" |
| A-452 EXTERIOR WALL SECTION DETAILS | | 30"x42" |
| A-453 EXTERIOR WALL PLAN DETAILS | | 30"x42" |
| A-454 EXTERIOR WALL SECTION DETAILS | | 30"x42" |
| A-480 TYPICAL ROOFING & PARAPET DETAILS | 1" | 30"x42" |
| A-481 TYPICAL ROOFING DETAILS | 1" | 30"x42" |

6213 Douglas Mauser.vb

UIA – Federation Of NY
Drawing Register Channel Attributes

**LUTA FEDERATION OF NEW YORK - CORE & SHELL**

List of Drawings

— = DRAWING NOT INCLUDED IN ISSUE    • = DRAWING ISSUED ON DATE INDICATED    ITALIC = PROGRESS ISSUE - NOT FOR CONSTRUCTION

12-31-04 ADDENDUM #2 ISSUE
Project # 0213 A

| DWG NO. | DRAWING TITLE | SCALE | SIZE |
|---|---|---|---|
| A-001 | GROUND FLOOR LOBBY - PLAN & FLOOR PATTERN | 1/4" | 30"x42" |
| A-002 | GROUND FLOOR LOBBY - REFLECTED CEILING PLAN | 1/4" | 30"x42" |
| A-003 | GROUND FLOOR LOBBY - INTERIOR ELEVATIONS 1 | 1/4" | 30"x42" |
| A-004 | GROUND FLOOR LOBBY - INTERIOR ELEVATIONS 2 | 1/4" | 30"x42" |
| A-005 | GROUND FLOOR LOBBY - SECTIONS & DETAILS | 1/4" | 30"x42" |
| A-006 | GROUND FLOOR LOBBY - SECTIONS & DETAILS | 1/4" | 30"x42" |
| A-007 | GROUND FLOOR LOBBY - PLAN DETAILS | 1/4" | 30"x42" |
| A-010 | GROUND FLOOR LOBBY - SECTIONS | 1/4" | 30"x42" |
| A-410 | GROUND FLOOR LOBBY - DETAILS | As Noted | 30"x42" |
| A-411 | GROUND FLOOR LOBBY - DETAILS | As Noted | 30"x42" |
| A-412 | GROUND FLOOR LOBBY - DETAILS | As Noted | 30"x42" |
| A-413 | GROUND FLOOR LOBBY - DETAILS | As Noted | 30"x42" |
| A-414 | GROUND FLOOR LOBBY - DETAILS | As Noted | 30"x42" |
| A-415 | GROUND FLOOR LOBBY - DETAILS | As Noted | 30"x42" |
| A-420 | LOBBY RECEPTION DESK - PLAN & ELEVATIONS | As Noted | 30"x42" |
| A-421 | LOBBY RECEPTION DESK - FRAMING PLAN & SECTIONS | As Noted | 30"x42" |
| A-422 | LOBBY RECEPTION DESK - DETAILS | As Noted | 30"x42" |
| A-418 | LOBBY RECEPTION DESK - DETAILS | As Noted | 30"x42" |
| A-435 | LOBBY RECEPTION DESK - DETAILS | As Noted | 30"x42" |
| A-436 | LOBBY RECEPTION DESK - DETAILS | As Noted | 30"x42" |
| A-437 | LOBBY RECEPTION DESK - DETAILS | As Noted | 30"x42" |
| A-438 | LOBBY RECEPTION DESK - DETAILS | As Noted | 30"x42" |
| A-430 | TYP. ELEVATOR CABS - PLANS AND ELEVATIONS | 1/2" | 30"x42" |
| A-431 | TYP. ELEVATOR CABS - DETAILS | 3" | 30"x42" |
| A-701 | PARTITION SCHEDULE & DETAILS | 3" | 30"x42" |
| A-702 | PARTITION MISC. INTERIOR DETAILS & LINTEL SCHEDULE | 1 1/2", 3" | 30"x42" |
| A-703 | DOOR TYPES, ELEVATIONS & DETAILS | 1/4", 3" | 30"x42" |
| A-801 | MISC. REFLECTED CEILING PLANS & DETAILS | As Noted | 30"x42" |

**VOLUME 2**

| | | | |
|---|---|---|---|
| T-00 | COVER SHEET VOLUME 2 | 3/8", 1" | 30"x42" |
| T-01 | LIST OF DRAWINGS | NA | 30"x42" |

**STRUCTURAL**

| | | | |
|---|---|---|---|
| S-001 | NOTES | NA | 30"x42" |
| S-100 | FOUNDATION PLAN | 1/8" | 30"x42" |
| S-101 | PART FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-102 | SECOND FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-103 | THIRD FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-104 | FOURTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-105 | FIFTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-106 | SIXTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-107 | SEVENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-108 | EIGHTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-109 | NINTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-110 | TENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-111 | ELEVENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-112 | TWELFTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-113 | THIRTEENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-114 | FOURTEENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-115 | FIFTEENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-116 | SIXTEENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-117 | SEVENTEENTH FLOOR FRAMING PLAN | 1/8" | 30"x42" |
| S-118 | MAIN ROOF FRAMING PLAN | 1/8" | 30"x42" |
| S-119 | MECHANICAL ROOM FLOOR AND ROOF FRAMING PLANS | 1/8" | 30"x42" |
| S-120 | ROOF LEVEL, PART PLANS | 1/8" | 30"x42" |

**UJA FEDERATION OF NEW YORK - CORE & SHELL**
**List of Drawings**

**12-10-04 ADDENDUM #5 ISSUE**
**Project # 6213 A**

— = DRAWING NOT INCLUDED IN ISSUE    XXX = DRAWING DELETED    • = DRAWING ISSUED ON DATE INDICATED    *ITALIC* = PROGRESS ISSUE - NOT FOR CONSTRUCTION

| DWG NO. | DRAWING TITLE | SCALE | SIZE | 11-17-03 Des. Issue | 1-19-04 DD Issue | 2-18-04 MTA Issue | 4-15-04 MTA Issue | 4-15-04 90% CDs | 4-15-04 DOB Filing | 4-30-04 Bulletin #1 | 5-3-04 Struct RFI | 6-18-04 100% CDs | 7-14-04 Addendum #1 | 7-23-04 DOB Filing: Tax Exempt | 7-23-04 DOB Filing: Taxable | 8-30-04 Addendum #2 | 9-3-04 Addendum #3 | 9-13-04 Addendum #4 | 10-5-04 100% CD Str. Retrofit | 12-10-04 Addendum #5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S-201 | NORTH & EAST EXT. ELEV'S - WIND PRESSURES (NEG) | 1/16" | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-202 | SOUTH & WEST EXT. ELEV'S - WIND PRESSURES (NEG) | 1/16" | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-203 | NORTH & EAST EXT. ELEV'S - WIND PRESSURES (POS) | 1/16" | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-204 | SOUTH & WEST EXT. ELEV'S - WIND PRESSURES (POS) | 1/16" | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-205 | ROOF DESIGN - WIND PRESSURES | 1/16" | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-206 | ~~SCREEN WALL DETAILS~~ | ~~As Noted~~ | 30"x42" | — | • | — | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| S-300 | COLUMN REINFORCEMENT SCHEDULE | NA | 30"x42" | — | — | — | — | — | — | — | • | • | • | — | • | — | — | — | — | — |
| S-301 | COLUMN REINFORCEMENT DETAILS | NA | 30"x42" | — | — | — | — | — | — | — | • | • | • | — | • | — | — | — | — | — |
| S-400 | SUPPL. RETROFIT DETAILS - REINFORCED CONC. COL'S I | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | • | • | — | — | • | • | — |
| S-401 | SUPPL. RETROFIT DETAILS - REINFORCED CONC. COL'S II | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | • | • | — | — | • | • | — |
| S-402 | SUPPL. RETROFIT DETAILS - STEEL COLUMNS | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | • | • | — | — | • | • | — |
| S-403 | SUPPL. RETROFIT DETAILS - GROUND FLOOR SLAB | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | • | — | — | • | • | — |
| S-404 | SUPPL. RETROFIT DETAILS - SECOND FLOOR SLAB | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | • | • | — | — | • | • | — |
| S-405 | SUPPL. RETROFIT DETAILS - 3-RD FLOOR SLAB | 1/8" | 30"x42" | — | — | — | — | — | — | — | — | — | — | — | — | — | — | • | • | — |
| S-406 | SUPPL. RETROFIT DETAILS - 4TH TO 8TH FLOOR SLAB | 1/8" | 30"x42" | — | — | — | — | — | — | — | — | — | — | — | — | — | — | • | • | — |
| S-407 | SUPPL. RETROFIT DETAILS - MISC. DETAILS 1 | As Noted | 30"x42" | — | — | — | — | — | — | — | — | — | — | — | — | — | — | • | • | — |
| S-408 | SUPPL. RETROFIT DETAILS - MISC. DETAILS 2 | As Noted | 30"x42" | — | — | — | — | — | — | — | — | — | — | — | — | — | — | • | • | — |
| S-500 | TYPICAL CONCRETE DETAILS I | As Noted | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-501 | TYPICAL CONCRETE DETAILS II | As Noted | 30"x42" | — | • | — | — | — | — | — | — | • | — | • | • | — | — | — | — | — |
| S-502 | TYPICAL STEEL DETAILS I | As Noted | 30"x42" | — | • | — | — | • | • | — | — | • | • | • | • | — | — | — | — | — |
| S-503 | TYPICAL STEEL DETAILS II | As Noted | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-504 | TYPICAL STEEL DETAIL/SECTION & DETAILS | As Noted | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-505 | TYPCIAL MASONRY DETAILS | As Noted | 30"x42" | — | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-506 | DETAILS AND SECTIONS | As Noted | 30"x42" | — | • | — | — | — | — | — | — | • | — | — | • | — | — | — | — | — |
| S-507 | DETAILS AND SECTIONS | As Noted | 30"x42" | — | — | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| S-508 | DETAILS AND SECTIONS | As Noted | 30"x42" | — | — | — | — | • | • | — | — | • | • | • | • | — | — | — | — | — |
| S-509 | DETAILS AND SECTIONS | As Noted | 30"x42" | — | • | — | — | — | — | — | — | • | • | • | • | — | — | — | — | • |
| S-510 | CANOPY DETAILS AND SECTIONS | As Noted | 30"x42" | — | • | — | — | — | — | — | — | • | • | — | • | — | — | — | — | — |
| S-511 | DETAILS AND SECTIONS | As Noted | 30"x42" | — | • | — | — | • | • | — | — | • | • | — | • | — | — | — | — | — |
| S-512 | DETAILS AND SECTIONS | As Noted | 30"x42" | — | • | — | — | • | • | — | — | • | — | — | • | — | — | — | — | — |
| S-513 | DETAILS AND SECTIONS | As Noted | 30"x42" | — | • | — | — | — | — | — | — | • | — | — | • | — | — | — | — | — |
| S-600 | ROOF & SCREEN WALL ELEVATIONS I | As Noted | 30"x42" | — | — | — | — | • | • | — | — | • | • | — | • | — | — | — | — | — |
| S-601 | ROOF & SCREEN WALL ELEVATIONS II | As Noted | 30"x42" | — | — | — | — | • | • | — | — | • | • | — | • | — | — | — | — | — |
| S-602 | ROOF & SCREEN WALL ELEVATIONS III | As Noted | 30"x42" | — | — | — | — | • | • | — | — | • | • | — | • | — | — | — | — | — |
| MECHANICAL | | | | | | | | | | | | | | | | | | | | |
| M-001 | MECHANICAL LEGEND, SYMBOLS & DRAWING LIST | NA | 30"x42" | • | • | — | — | • | • | — | — | • | — | • | • | — | — | — | — | — |
| MD-100 | MECHANICAL CELLAR DEMOLITION PLAN | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | — | • | • | — | — | — | — |
| MD-101 | MECHANICAL 1ST FLOOR DEMOLITION PLAN | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-102 | MECHANICAL 2ND FLOOR DEMOLITION PLAN | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-103 | MECHANICAL 3RD FLOOR DEMOLITION PLANS | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | • | — | — | — | — | — | — |
| MD-104 | MECHANICAL 4TH FLOOR DEMOLITION PLANS | 1/8" | 30"x42" | — | — | — | — | • | • | — | — | • | — | • | — | — | — | — | — | • |
| MD-105 | MECHANICAL DEMOLITION TYP. 5TH THRU 8TH FL PLANS | 1/8" | 30"x42" | — | — | — | — | • | • | — | — | • | — | • | — | — | — | — | — | — |
| MD-108 | MECHANICAL 9TH AND 10TH FLOOR DEMOLITION PLANS | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | • | — | — | — | — | — | — |
| MD-111 | MECHANICAL 11TH & 12TH FLOOR DEMOLITION PLANS | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-113 | MECHANICAL 13TH FLOOR DEMOLITION PLAN | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-114 | MECHANICAL 14TH FLOOR DEMOLITION PLAN | 1/8" | 30"x42" | • | • | — | — | • | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-115 | MECHANICAL DEMOLITION PLAN FOR 15TH & 16TH FL. | 1/8" | 30"x42" | — | • | • | — | — | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-117 | MECHANICAL 17TH FLOOR DEMOLITION PLAN | 1/8" | 30"x42" | — | • | • | — | — | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-118 | MECHANICAL MAIN ROOF DEMOLITION PLAN | 1/8" | 30"x42" | — | • | • | — | — | • | — | — | • | — | — | • | — | — | — | — | — |
| MD-119 | MECHANICAL UPPER ROOF DEMOLITION PLAN | 1/8" | 30"x42" | — | • | • | — | — | • | — | — | • | — | — | • | — | — | — | — | — |

**UJA FEDERATION OF NEW YORK – CORE & SHELL**
List of Drawings

XXX = DRAWING DELETED      • = DRAWING ISSUED ON DATE INDICATED      ISSUE = PROGRESS ISSUE - NOT FOR CONSTRUCTION      12-10-04 ADDENDUM #1 ISSUE Project # 0213 A

| DWG NO. | DRAWING TITLE | SCALE | SIZE | 11-17-03 Des. Issue | 1-05-04 DD Issue | 3-15-04 MTA Issue | 4-05-04 MTA Issue | 4-12-04 90% CDs | 4-15-04 DOB Filing | 4-23-04 Buildg #1 | 5-03-04 Struct 100% | 6-04-04 York CDs | 7-14-04 Adden-dum #1 | 7-23-04 DOB Filing Tax Exempt | 7-23-04 DOB Filing Tax Exempt | 9-30-04 Adden-dum #2 | 9-3-04 Adden-dum #3 | 9-13-04 Adden-dum #4 | 10-8-04 CD No. Revised | 11-19-04 Adden-dum #5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M-100 | MECHANICAL CELLAR FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-101 | MECHANICAL 1ST FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-102 | MECHANICAL 2ND FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-103 | MECHANICAL 3RD FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-104 | MECHANICAL 4TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-105 | MECHANICAL 5TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-106 | MECHANICAL 6TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-107 | MECHANICAL 7TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-108 | MECHANICAL 8TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-109 | MECHANICAL 9TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-110 | MECHANICAL 10TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-111 | MECHANICAL 11TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-112 | MECHANICAL 12TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-113 | MECHANICAL 13TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-114 | MECHANICAL 14TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-115 | MECHANICAL 15TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-116 | MECHANICAL 16TH FLOOR PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-117 | MECHANICAL ROOF PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-118 | MECHANICAL UPPER ROOF PLAN | 1/8" | 30"x42" | | | | | | | | | | | | | | | | |
| M-201 | AIR RISER DIAGRAM | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-202 | MECH. CONDENSER & HOT WATER RISER DIAGRAM | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-401 | MECHANICAL SCHEDULE SHEET #1 | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-402 | MECHANICAL SCHEDULE SHEET #2 | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-601 | MECHANICAL DETAILS SHEET #1 | As Noted | 30"x42" | | | | | | | | | | | | | | | | |
| M-602 | MECHANICAL DETAILS SHEET #2 | As Noted | 30"x42" | | | | | | | | | | | | | | | | |
| M-603 | MECHANICAL DETAILS SHEET #3 | As Noted | 30"x42" | | | | | | | | | | | | | | | | |
| M-604 | MECHANICAL DETAILS SHEET #4 | As Noted | 30"x42" | | | | | | | | | | | | | | | | |
| M-605 | MECHANICAL DETAILS SHEET #5 | As Noted | 30"x42" | | | | | | | | | | | | | | | | |
| M-606 | MECHANICAL DETAILS SHEET #6 | As Noted | 30"x42" | | | | | | | | | | | | | | | | |
| M-607 | MECHANICAL DETAILS SHEET #7 | As Noted | 30"x42" | | | | | | | | | | | | | | | | |
| M-600 | MECHANICAL MOTOR LIST NOTES SHEET #1 | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-601 | MECHANICAL MOTOR LIST NOTES SHEET #2 | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-701 | MECHANICAL AC UNIT FLOW DIAGRAM | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-702 | MECHANICAL CONDENSER WATER SYSTEM | NA | 30"x42" | | | | | | | | | | | | | | | | |
| M-703 | MECHANICAL MAKE-UP & SPILL AIR FANS | NA | 30"x42" | | | | | | | | | | | | | | | | |

## U.A. FEDERATION OF NEW YORK - CORE & SHELL

List of Drawings

12-10-04 ADDENDUM #3 ISSUE
Project # 6213 A

| DWG NO./DRAWING TITLE | SCALE | SIZE |
|---|---|---|
| **ELECTRICAL** | | |
| E-001 SYMBOL LIST, GENERAL NOTES | 1/8" | 30"x42" |
| E-100 ELECTRICAL CELLAR FLOOR PLAN | 1/8" | 30"x42" |
| E-101 ELECTRICAL GROUND FLOOR PLAN | 1/8" | 30"x42" |
| E-102 ELECTRICAL SECOND FLOOR PLAN | 1/8" | 30"x42" |
| E-103 ELECTRICAL THIRD FLOOR PLAN | 1/8" | 30"x42" |
| E-104 ELECTRICAL FOURTH FLOOR PLAN | 1/8" | 30"x42" |
| E-105 ELECTRICAL 5th FLOOR PLAN | 1/8" | 30"x42" |
| E-106 ELECTRICAL 6th FLOOR PLAN | 1/8" | 30"x42" |
| E-107 ELECTRICAL 7th FLOOR PLAN | 1/8" | 30"x42" |
| E-108 ELECTRICAL 8th FLOOR PLAN | 1/8" | 30"x42" |
| E-109 ELECTRICAL 9th FLOOR PLAN | 1/8" | 30"x42" |
| E-110 ELECTRICAL 10th FLOOR PLAN | 1/8" | 30"x42" |
| E-111 ELECTRICAL 11th FLOOR PLAN | 1/8" | 30"x42" |
| E-112 ELECTRICAL 12th FLOOR PLAN | 1/8" | 30"x42" |
| E-113 ELECTRICAL 13th FLOOR PLAN | 1/8" | 30"x42" |
| E-114 ELECTRICAL 15th FLOOR PLAN | 1/8" | 30"x42" |
| E-115 ELECTRICAL 16th FLOOR PLAN | 1/8" | 30"x42" |
| E-116 ELECTRICAL 17th FLOOR PLAN | 1/8" | 30"x42" |
| E-117 ELECTRICAL 18th FLOOR PLAN | 1/8" | 30"x42" |
| E-118 ELECTRICAL ROOF PLAN | 1/8" | 30"x42" |
| E-119 ELECTRICAL UPPER ROOF PLAN | 1/8" | 30"x42" |
| E-120 ELECTRICAL WINDOW WASHING PLAN | 1/8" | 30"x42" |
| E-200 ELECTRICAL CELLAR FLOOR PLAN LIGHTING | 1/8" | 30"x42" |
| E-201 ELECTRICAL 1st FLOOR PLAN LIGHTING | 1/8" | 30"x42" |
| E-220 ELECTRICAL SECOND FLOOR PLAN LIGHTING | 1/8" | 30"x42" |
| E-230 ELECTRICAL THIRD FLOOR PLAN LIGHTING | 1/8" | 30"x42" |
| E-300 ELECTRICAL RISER DIAGRAM | NA | 30"x42" |
| E-301 ELECTRICAL RISER DIAGRAM - FIRE ALARM | NA | 30"x42" |
| E-302 ELECTRICAL RISER DIAGRAM - TELECOM | NA | 30"x42" |
| E-303 RISER | NA | 30"x42" |
| E-304 ELECTRICAL EXISTING RISER DIAGRAM | NA | 30"x42" |
| E-400 ELECTRICAL LEGEND OF EQUIPMENT | NA | 30"x42" |
| E-401 ELECTRICAL PANEL SCHEDULES | NA | 30"x42" |
| E-402 ELECTRICAL - DETAILS | NA | 30"x42" |
| E-403 ELECTRICAL - DETAILS | NA | 30"x42" |
| E-500 ELECTRICAL CELLAR FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-501 ELECTRICAL 1st FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-502 ELECTRICAL 2nd FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-503 ELECTRICAL 3rd FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-504 ELECTRICAL 4th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-505 ELECTRICAL 5th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-506 ELECTRICAL 6th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-507 ELECTRICAL 7th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-508 ELECTRICAL 8th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-509 ELECTRICAL 9th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-510 ELECTRICAL 10th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-511 ELECTRICAL 11th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-512 ELECTRICAL 12th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-513 ELECTRICAL 13th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-514 ELECTRICAL 15th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-515 ELECTRICAL 16th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-516 ELECTRICAL 17th FLOOR PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-517 ELECTRICAL ROOF PLAN - FIRE ALARM | 1/8" | 30"x42" |
| E-518 ELECTRICAL UPPER ROOF PLAN - FIRE ALARM | 1/8" | 30"x42" |

**UJA FEDERATION OF NEW YORK - CORE & SHELL**

List of Drawings

12-16-04 ADDENDUM #5 ISSUE
Project # 6213 A

| DWG NO. | DRAWING TITLE | SCALE | SIZE | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**PLUMBING**

| P-001 | SYMBOL LIST AND NOTES | NA | 30"x42" |
| P-050 | NEW WORK FLOOR PLAN UNDERGROUND PIPING |
| P-100 | CELLAR FLOOR PLAN |
| P-101 | GROUND FLOOR AND MEZZANINE PLANS |
| P-102 | SECOND FLOOR PLAN |
| P-103 | THIRD FLOOR PLAN |
| P-104 | FOURTH FLOOR PLAN |
| P-105 | FIFTH FLOOR PLAN |
| P-106 | SIXTH FLOOR PLAN |
| P-107 | SEVENTH FLOOR PLAN |
| P-108 | EIGHTH FLOOR PLAN |
| P-109 | NINTH AND TENTH FLOOR PLANS |
| P-110 | ELEVENTH THRU FOURTEENTH FLOOR PLANS |
| P-111 | FIFTEENTH AND SIXTEENTH FLOOR PLANS |
| P-112 | SEVENTEENTH FLOOR PLAN |
| P-113 | MAIN ROOF PLAN |
| P-114 | UPPER ROOF PLAN |
| P-600 | DOMESTIC WATER RISER DIAGRAM |
| P-601 | SANITARY RISER DIAGRAM |
| P-602 | MARKON RISER DIAGRAM |
| P-800 | SCHEDULES |
| P-801 | DETAILS |

**FIRE PROTECTION**

| FP-001 | SYMBOL LIST AND NOTES | NA | 30"x42" |
| FP-100 | CELLAR FLOOR PLAN |
| FP-101 | GROUND FLOOR AND MEZZANINE PLANS |
| FP-102 | SECOND FLOOR PLAN |
| FP-103 | THIRD FLOOR PLAN |
| FP-104 | FOURTH FLOOR PLAN |
| FP-105 | FIFTH AND SIXTH FLOOR PLAN |
| FP-106 | SEVENTH FLOOR PLAN |
| FP-107 | EIGHTH FLOOR PLAN |
| FP-108 | NINTH AND TENTH FLOOR PLANS |
| FP-109 | ELEVENTH THRU FOURTEENTH FLOOR PLAN |
| FP-110 | FIFTEENTH FLOOR PLAN |
| FP-111 | SIXTEENTH FLOOR PLAN |
| FP-112 | SEVENTEENTH FLOOR PLAN |
| FP-113 | MAIN ROOF PLAN |
| FP-500 | FIRE PROTECTION RISER DIAGRAM |
| FP-800 | SCHEDULES AND DETAILS |

# UJA FEDERATION OF NEW YORK - CORE & SHELL

List of Drawings

— = DRAWING NOT INCLUDED IN ISSUE    XXX = DRAWING DELETED    • = DRAWING ISSUED ON DATE INDICATED    (TAG) = PROGRESS ISSUE - NOT FOR CONSTRUCTION

**12-16-04 ADDENDUM #5 ISSUE**
Project # 0212 A

| DWG NO. | DRAWING TITLE | SCALE | SIZE | 11-17-03 Des. Issue | 1-30-04 DD Issue | 3-16-04 NTA Issue | 4-16-04 NTA Issue | 4-16-04 50% CDs | 6-15-04 DOB Filing | 4-29-04 Addm #1 | 8-9-04 Street Rft | 5-19-04 100% CDs | 7-14-04 DOB Filing Amd #1 | 7-23-04 DOB Filing Tax Exempt | 7-23-04 Addendum #2 | 8-5-04 Addm #3 | 8-9-04 Addm #4 | 8-19-04 Addm #4 | 10-4-04 Addm. Bundle | 12-16-04 Addm. #5 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SECURITY | (SEC Drawings not issued in Circular / Gap Iss.) | | | | | | | | | | | | | | | | | | | |
| SEC-100 | CELLAR FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-101 | GROUND FLOOR & MEZZ. SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-102 | SECOND FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-103 | THIRD FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-104 | FOURTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-105 | FIFTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-106 | SIXTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-107 | SEVENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-108 | EIGHTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-109 | NINTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-110 | TENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-111 | ELEVENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-112 | TWELFTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-113 | THIRTEENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-114 | FOURTEENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-115 | FIFTEENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-116 | SIXTEENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-117 | SEVENTEENTH FLOOR SECURITY PLAN | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-118 | MAIN ROOF LEVEL SECURITY PLAN | 1/8" | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-119 | UPPER PH AND PH ROOF SECURITY PLANS | 1/8" | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-120 | SECURITY SYSTEM RISER DIAGRAM | N/A | 30"x42" | — | — | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |
| SEC-201 | SECURITY SYSTEM DETAILS | N/A | 30"x42" | — | • | — | — | • | — | — | — | • | — | — | — | — | — | — | — | — |

Exhibit "7.4(F)"

Existing Premises

[to be inserted]



EXHIBIT 7.4(F)



EXHIBIT 7.4(F)

SWANKE HAYDEN CONNELL ARCHITECTS

AREA TO BE LEASED TO THE GAP AND DELIVERED NO LATER THAN JULY 27, 2005

| No. | Date | Revisions | Job Title | Drawing Title | Scale | Sketch Number |
|---|---|---|---|---|---|---|
| 1 | 2.17.05 | REVISED | UJA-FEDERATION OF NEW YORK | CELLAR EXISTING VS. PROPOSED OVERLAY PLAN | 1/16"=1'-0" | PSK-53a.1 |
| | | | 130 E. 59TH STREET, NY, NY | | Drawn By JK | Job No. |
| | | | | | Issued 2/17/05 | 5213A |

Swanke Hayden Connell Ltd./ Swanke Hayden Connell & Partners, LLP
295 Lafayette Street, New York, New York 10012/ Phone 212 226 9696, Fax 212 219 0929
© 2004 Swanke Hayden Connell Architects

Exhibit "7.5"

New Premises Work

A.    General Conditions.

1)    Tenant shall accept existing clear heights in the New Premises.

2)    All wind and seismic conditions shall conform to applicable Requirements.

3)    Vertical risers, ducts, roof drains, and sewer lines to be installed by Landlord as part of the New Premises Work shall be tight to columns and/or the demising walls.

4)    The noise and transmission levels from any mechanical, electrical and plumbing systems and equipment furnished and/or installed by Landlord as part of the New Premises Work shall conform to all applicable Requirements.

B.    Demolition.

1)    Landlord shall remove all previous finishes in the New Premises including flooring, floor fastening and adhesives, ceiling, ceiling finishes, ceiling attachments, furniture, fixtures (including light fixtures), equipment and supplies and all improvements including, but not limited to, vaults, safes, customer service counters, food preparation equipment, escalators, stairs and food storage equipment.  Landlord shall remove all abandoned electrical wiring and conduit in the New Premises.

2)    Landlord shall disconnect all abandoned mechanical ductwork and supports in the New Premises and shall cap such ductwork and such supports to the underside of the ceiling deck, the floor, or to the demising walls, as the case may be, and shall fill all holes created thereby.  Landlord shall remove all abandoned plumbing fixtures, piping and support materials.  All abandoned plumbing or drain lines shall be capped at the floor, underside of ceiling deck, demising walls, or wet columns, as the case may be, and Landlord shall fill all holes created thereby.

3)    Landlord may remove certain vertical risers and shall give Tenant prior notice thereof.

4)    Landlord shall abate any ACM in the New Premises as well as any other hazardous materials in the New Premises that are in violation of applicable Requirements; it being agreed, however, that Landlord, in Landlord's sole discretion, may abate certain of the ACM discovered in the New Premises as part of Landlord's performance of the Storefront Work.

5)    Landlord shall deliver the New Premises in broom clean condition, free and clear of all trash and construction rubbish.  Landlord shall exterminate the New Premises and any other portions of the Existing Premises that reasonably require extermination as a result of Landlord's extermination in the New Premises.

C.    Concrete.

1)    Landlord shall provide new concrete slabs in the New Premises (the "New Slab") to infill the area in the New Premises where the escalator and stairs are removed. The New Slab shall be trowelled concrete with a minimum strength of 2,500 psi at twenty-eight (28) days. The New Slab shall be a minimum of four (4) inches thick and shall be designed for a live load capacity of seventy-five (75) psi. Landlord shall pour the New Slab in the New Premises no later than seven (7) days prior to the New Premises Commencement Date. The New Slab shall be leveled to the existing surrounding slab elevation.

2)    Landlord shall cause the existing slab of the New Premises and the New Slab (collectively, the "Slab") to be uniformly flat, at a single elevation without depressions and with a maximum surface variation of one-quarter inch (1/4") (depression or bowing) in the center of any four (4) points on the plane of the Slab that defines a ten (10) foot by ten (10) foot area. The surface of the Slab shall be smooth and of uniform solid concrete with no visible rock, gravel or similar substance. The Slab flatness and levelness shall be measured using the American Concrete Institute #117 as FF 25/FL 17.

3)    Allowable Slab flatness and levelness tolerances to be verified with site laser-mapped ten (10) foot grid, including columns, supplied by Landlord upon completion of demolition and repairs.

4)    Floor repair, patching and leveling materials for the Slab (if the Slab does not meet the criteria set forth in (1) through (6) of this Section C) shall be as follows: topical repairs shall be made using the following approved cementitious topping material only, Mapei-Ultraplan M20, manufactured by Mapei, strictly following manufacturer's written specifications for surface preparation, priming, thickness and method of application. The foregoing material shall be applied only by an experienced, qualified applicator with a minimum of three (3) years documented experience with specified or similar materials.

D.    Demising Walls/Doors.

1)    For the demising walls in the New Premises, Landlord shall furnish and install metal studs and gypsum board taped, primed, paint ready, and fire-rated pursuant to applicable Requirements. The aforesaid walls shall provide a secure and lockable space after the installation of Tenant's hardware by Tenant.

2)    Landlord shall install a Building standard door leading from the New Premises into the fire-stairs adjacent to the New Premises. Tenant, at Tenant's cost and expense, shall use Building standard hardware for such door or, upon obtaining Landlord's consent, hardware that is superior to Building standard hardware, which consent shall not be unreasonably withheld, conditioned or delayed.

E.    Fire Rating.

Landlord shall fire rate all structural items contained in the New Premises in accordance with applicable Requirements (including, without limitation, ceilings, columns and beams).

F.    Elevators.

In connection with Tenant's installing an elevator as part of the Initial Alterations in the location of Tenant's existing elevator, Landlord shall cut the slab opening in the slab of the second (2nd) and third (3rd) floors of the Building to accommodate such elevator and shall install structural framing at such slab opening.  The shaft for such elevator shall be no greater than the dimension of the existing elevator shaft.  Landlord shall enclose the overrun shaft for such elevator on the third (3rd) floor of the Building.

G.  <u>Condenser Water</u>.

Landlord shall furnish and install condenser water supply and return piping to the New Premises and shall provide a four inch (4") valve tap outlet on the second (2nd) floor of the Building.

H.  <u>Electrical Work</u>.

Landlord shall provide the conduit and conductors from Landlord's main electrical room/board, which shall terminate at a disconnect switch in the Premises in a location designated by Landlord.

EXHIBIT 8.2

SWANKE HAYDEN CONNELL ARCHITECTS



////// INDICATES AREA OF NO PENETRATION

EAST 59TH STREET

IUA FEDERATION

CARBON FIBER AREA ON 2ND FLOOR

SK 041209

Swanke Hayden Connell Ltd./ Swanke Hayden Connell & Partners, LLP

Exhibit "8.11(A)"

Initial Alterations

1.  Tenant's sound transmission to premises adjacent to the Premises shall not exceed NC-40.

2.  If and to the extent required by Requirements, Tenant shall install a smoke evacuation system for the Premises as part of the Initial Alterations.

3.  Tenant shall install as part of the Initial Alterations a standalone interior fire alarm (IFA) system in the Premises with central station connection. Landlord shall cause the IFA system to be connected to Landlord's Class "E" System for remote and trouble indication. Tenant, on or prior to thirty (30) days after Landlord's rendition of a statement therefor, shall reimburse Landlord for the costs incurred by Landlord in connecting the IFA system to Landlord's Class "E" System and for any reprogramming charges incurred by Landlord for such connection.

4.  Tenant shall install a sprinkler system that complies with applicable Requirements in the New Premises, including the second (2nd) floor double height space, using Tenant's existing street water connection, which shall be metered at Tenant's cost and expense.

5.  Tenant may extend its existing hydraulic elevator located in the current Gap store to serve the New Premises.

6.  Tenant shall access its domestic water for use in the New Premises from a Building water riser located in the Existing Premises as specified by Landlord.

7.  Landlord will not unreasonably withhold its consent to Tenant's proposed design for toilets, sanitary, waste and vent piping. Tenant shall tie any such piping into existing Building piping at locations specified by Landlord.

8.  Tenant shall discharge toilet exhaust through exhaust shafts specified by Landlord.

10. Tenant's designated high speed connection vendor shall have the right to install High Speed Line in order to link the Premises to Tenant's chain-wide telecommunications network, including the right to install High Speed Line from the Premises to such vendor's connection box. There shall be no charge payable to Landlord in connection with the installation or use of the High Speed Line. Tenant shall clearly mark and designate connections and lines outside the Premises. Tenant shall reuse its existing conduit from the existing switching equipment in the Building.

11. Landlord will not unreasonably withhold its consent to all proposed door hardware that leads from the Premises into the Building.

13. Tenant, at Tenant's cost and expense, shall have the right to relocate as part of the Initial Alterations existing vertical risers, ducts, roof drains, sewer lines, etc. that are not tight to the columns and/or demising walls in the New Premises.

# Exhibit B

JUN 1 5 2020

# Gap Inc.

GPS Services
Two Folsom Street
San Francisco, CA 94105

Matthew Irwin
(415) 427-0103
Matthew_Irwin@gap.com

June 12, 2020

Via Federal Express

Ponte Gadea
270 Biscayne Blvd., Way, Suite 201
Miami, Florida 33131

Joshua D. Bernstein, Esq.
Akerman LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103

**Re: The Lease dated February 18, 2005 for Premises located on the ground level, second (2nd) floor, and portions of the basement of 734 Lexington Avenue, New York, New York 10022 a/k/a Unit A, 130 East 59th Street, New York, New York, 10022 (the "Building") – Supplemental Notice of Casualty**

Dear Landlord:

I am writing to you as Landlord on behalf of The Gap, Inc. ("Tenant") under the lease dated February 18, 2005, initially between The Gap, Inc. and UJA-Fed Properties, Inc., as amended from time to time (the "Lease"), for premises in the above-referenced Building (the "Premises").

Out of an abundance of caution, and cumulative to the notices provided in prior correspondence, and the actual notice you indubitably have received based upon publications by the government and all forms of media, please take notice, pursuant to Article 16 of the Lease, that the Premises were rendered wholly unusable by casualty on or about March 19 and each day thereafter as a result of the complete shutdown of retail operations in response to the COVID-19 crisis, including applicable civil orders preventing the operation of a retail store at the Premises. The casualty persisted for a period of more than fourteen (14) consecutive days, and prevented Tenant or any other retailer from conducting Tenant's or any other retail business therein in substantially the same manner as prior to such casualty. Based upon current regulations and guidelines, the Premises will continue to not be usable in substantially the same manner as prior to such casualty for the foreseeable future.

Nothing in this letter is intended to waive or prejudice Tenant's right to assert any other right under the Lease or under law. All rights are expressly reserved.

Sincerely,

*Matthew Irwin*
Matthew Irwin (Jun 12, 2020 18:08 PDT)

Matthew Irwin
Associate General Counsel
Gap Inc.

# Exhibit C



PONTEGADEA

New York

270 Biscayne Blvd., Way, Suite 201
Miami, Florida 33131

June 8, 2020

**THREE (3) BUSINESS DAY NOTICE OF TERMINATION**

<u>**VIA FEDEX OVERNIGHT**</u>

To:         Tenant:       The Gap, Inc.
                          901 Cherry Avenue
                          San Bruno, California 94066
                          Attn.: Real Estate Law, Store #711

                          Jeffrey A. Moross Esq.
                          David & Gilbert, LLP
                          1740 Broadway
                          New York, New York 10019

RE:         Premises:     The premises located on the ground level, second (2nd) floor, and
                          portions of the basement of 734 Lexington Avenue, New York,
                          New York 10022 a/k/a Unit A, 130 East 59th Street, New York,
                          New York, 10022 (the "Building"), and as depicted on Exhibit A
                          attached hereto.

**PLEASE TAKE NOTICE** that Tenant failed to cure its default by June 5, 2020 (the

"Cure Date") by paying to Landlord the total amount of outstanding Fixed Rent due and owing

in the total amount of $1,225,000.00, representing (i) Fixed Rent in the total amount of

$612,500.00 for outstanding April 2020 Fixed Rent that was due to Landlord on April 1, 2020,

and (ii) Fixed Rent in the total amount of $612,500.00 for outstanding May 2020 Fixed Rent that

was due to Landlord on May 1, 2020, pursuant to that FIVE (5) BUSINESS DAY NOTICE TO

CURE, dated May 26, 2020 (the "Notice to Cure").

**PLEASE TAKE FURTHER NOTICE** that Landlord hereby elects to terminate your

tenancy of the Premises on June 15, 2020 (the "Termination Date"), that date being at least three

(3) business days from the expiration of the Cure Date given in the Notice to Cure, pursuant to Section 21.2 of that certain Lease, dated as of February 18, 2005, by and between UJA-FED Properties, Inc., predecessor-in-interest to Ponte Gadea New York, LLC ("Landlord") and The Gap, Inc. ("Tenant"), and as confirmed in the Gap Estoppel Certification, dated January 19, 2006 (collectively the "Lease").

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 21.2 of the Lease, Tenant remains liable for all of its obligations under the Lease, as provided in Articles 23 and 24 of the Lease.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 23.1 of the Lease, Tenant is required to immediately quite and peacefully surrender the Premises to Landlord by the Termination Date.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Section 25.2 of the Lease, if Tenant fails to surrender the Premises to Landlord on or before the Termination Date, Tenant is required to pay to Landlord use and occupancy of the Premises for each month (or any portion thereof) during which Tenant holds over in the Premises after the Termination Date, in an amount equal to (I) in respect of the first thirty (30) days that Tenant holdsover in the Premises, one and one-half (1 ½) times the Fixed Rent and one hundred percent (100%) of the Additional Rent, in either case that was payable under the Lease during or with respect to the last month of the Term, and (II) in respect of any period of time thereafter, the greater of (i) two (2) times the aggregate Rental that was payable under this Lease during the last month of the Term, and (ii) the then fair market rental value of the Premises.

**PLEASE TAKE FURTHER NOTICE THAT** unless Tenant removes itself from the Premises on or before the Termination Date, Landlord will commence an action against Tenant

to enforce its rights under the Lease, including but not limited to an action to recover unpaid rent and to declare that the Lease termination pursuant to this THREE (3) BUSINESS DAY NOTICE OF TERMINATION.

**PLEASE TAKE FURTHER NOTICE THAT** unless Tenant removes itself from the Premises on or before the Termination Date, Landlord also intends to commence, and will commence in accordance with applicable rules and orders, summary proceedings to remove Tenant from the Premises for the holding over after the expiration of your term and will demand the value of Tenant's use and occupancy of the Premises during such holding over pursuant to Article 25 of the Lease.

**PLEASE TAKE FURTHER NOTICE** that any costs and expenses, including attorneys' fees, that Landlord incurs in pursuing its rights and remedies against Tenant based on Tenant's default shall be recoverable by Landlord pursuant to Articles 21, 23, 24, and 25 of the Lease.

**PLEASE TAKE FURTHER NOTICE** that this Notice is being served upon you in accordance with Articles 21 and 28 of the Lease.

**P**LEASE **TAKE FURTHER NOTICE**, that any response to this Notice shall be sent and directed to the below-named attorneys.

DATED:        June 8, 2020

                                                    Very Truly Yours,

                                                    Ponte Gadea New York LLC

                                                    By:

                                                          Alina Toyos, Vice President

Joshua D. Bernstein, Esq.
Akerman LLP
666 Fifth Avenue, 20th Floor
New York, New York 10103

**Exhibit A**

 **Shipment Receipt**

## Address Information

**Ship to:**
Jeffrey A. Moross Esq.

David & Gilbert, LLP
1740 Broadway
NEW YORK, NY
10019
US
(212) 468-4800

**Ship from:**
Alina Rojas Toyos
Ponte Gadea USA, Inc.
270 Biscayne Blvd Way
Suite 201
Miami, FL
33131
US
3053739559

## Shipment Information:
Tracking no.: 770651347168
Ship date: 06/08/2020
Estimated shipping charges: 74.25 USD

## Package Information
Pricing option: FedEx Standard Rate
Service type: First Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.50   LBS
Declared Value: 0.00   USD
Special Services:
Pickup/Drop-off: Use an already scheduled pickup at my location

## Billing Information:
Bill transportation to: MyAccount-028
Your reference:  NY Lex The Gap 3 days notice
P.O. no.:
Invoice no.:
Department no.:

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

## Please Note

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

 **Shipment Receipt**

**Address Information**

**Ship to:**                                      **Ship from:**
Jeffrey A. Moross Esq.                    Alina Rojas Toyos
                                                      Ponte Gadea USA, Inc.
David & Gilbert, LLP                     270 Biscayne Blvd Way
1740 Broadway                            Suite 201
NEW YORK,  NY                           Miami,  FL
10019                                          33131
US                                              US
(212) 468-4800                             3053739559

**Shipment Information:**
Tracking no.: 770651347168
Ship date: 06/08/2020
Estimated shipping charges:  74.25 USD

**Package Information**
Pricing option: FedEx Standard Rate
Service type: First Overnight
Package type: FedEx Envelope
Number of packages: 1
Total weight: 0.50   LBS
Declared Value: 0.00  USD
Special Services:
Pickup/Drop-off: Use an already scheduled pickup at my location

**Billing Information:**
Bill transportation to: MyAccount-028
Your reference:  NY Lex The Gap 3 days notice
P.O. no.:
Invoice no.:
Department no.:

**Thank you for shipping online with FedEx ShipManager at fedex.com.**

**Please Note**

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1000, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.
The estimated shipping charge may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable FedEx Service Guide or the FedEx Rate Sheets for details on how shipping charges are calculated.

# Exhibit D



**Ponte Gadea New York, LLC**
270 Biscayne Blvd Way, Suite 201
Miami FL 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA 94066
California
IC Code: 377

| STATEMENT OF ACCOUNT | |
|---|---|
| Date: | 8/1/2020 |

**Code**

**U010/17      GAP / BANANA REPUBLIC**

| Date | Invoice # | Description | Amount(USD) |
|---|---|---|---|
| 3/25/2019 | 20190321 | w/t The Gap - Fiscal 17/18 UJA Recon. Overpayment | -861.28 |
| 12/31/2019 | 2010300000 | 1st Half 2019/2020 RET Refund Net of Appeal Fees | -5,412.42 |
| 4/1/2020 | 2010100049 | April 2020 Base Rent | 612,500.00 |
| 4/1/2020 | 2010100049 | April 2020 Additional Rent | 5,216.93 |
| 5/1/2020 | 2010100060 | May 2020 Base Rent | 612,500.00 |
| 5/1/2020 | 2010100060 | May 2020 Additional Rent | 5,216.93 |
| 6/1/2020 | 2010100074 | June 2020 Prorated Base Rent (6/1/20-6/15/20) | 306,250.00 |
| 6/1/2020 | 2010100074 | June 2020 Prorated Additional Rent (6/1/20-6/15/20) | 2,608.46 |
| 6/1/2020 | 2010100088 | June 2020 Holdover Charges (6/16/20-6/30/20) | 461,983.47 |
| 6/1/2020 | 2010100088 | June 2020 Interest on Late Payments | 1,183.81 |
| 7/1/2020 | 2010100089 | July 2020 Holdover Charges | 1,082,031.44 |
| 7/29/2020 | 2010100108 | 1st Half 2020/2021 RET (July-December 2020) | 1,357,721.53 |
| 8/1/2020 | 2010100109 | August 2020 Holdover Charges | 1,230,216.93 |

| Amount Due | 5,671,155.80 |
|---|---|
| **Total Amount Due** | **5,671,155.80** |



**Ponte Gadea New York, LLC**

270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

## INVOICE

**Invoice No.: 2010100109**

Date: 08/01/2020

| Code | Description | Amount(USD) |
|---|---|---|
| U010/17 | GAP / BANANA REPUBLIC | |
| | **08/01/2020-08/31/2020-Holdover Charges** | |
| | *Holdover Charges* | **1,225,000.00** |
| | **08/01/2020-08/31/2020-CAM Oper.Expenses** | |
| | | **5,216.93** |
| Amount Due | | 1,230,216.93 |
| **Total Amount Due** | | **1,230,216.93** |

**Method of payment: Wire Transfer**
**Bank Name: HSBC**
**Routing No.: 021001088**
**Account No.:** ▉▉▉▉▉▉



**Ponte Gadea New York, LLC**

270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

| INVOICE |
| --- |
| **Invoice No.: 2010100108** |
| Date: 07/29/2020 |

| Code | Description | Amount(USD) |
| --- | --- | --- |
| U010/17 | GAP / BANANA REPUBLIC | |
| | el 07/01/2020-Prepaid Real Estate Taxes | |
| | *RET Period Jan to Jun 21 (1st half FY 20-21)* | **1,357,721.53** |
| | Amount Due | 1,357,721.53 |
| | **Total Amount Due** | **1,357,721.53** |

**Method of payment: Wire Transfer**
**Bank Name: HSBC**
**Routing No.: 021001088**
**Account No.:** ███████

INVOICE

# Ponte Gadea New York, LLC

270 Biscayne Blvd Way, Suite 201
Miami, FL 33131
Phone: 305-373-9559

| | |
|---|---|
| *FOR:* | 2020-2021 Real Estate Taxes |
| *BILL TO:* | The GAP |
| | 130 E 59th Street |
| | New York, NY |

| DESCRIPTION | | AMOUNT |
|---|---|---|
| | | |
| Amount due for 2020-2021 Real Estate Taxes of 07/01/2020 | | |
| For Period covering July 1st, 2020 to December 31, 2020 | | |
| | | |
| Amount of Real Estate Taxes and BID Taxes | | 1,548,369.67 |
| Add: Convinience Fee for Online payment | | - |
| Less Non Recoverable From the GAP | | (190,648.14) |
| | | |
| **Non Recoverable from the GAP Base year Calculation** | | |
| Base year Tax | 1,131,296.28 | |
| Base taxes | (750,000.00) | |
| Non Recoverable Amount | 381,296.28 | |
| | | |
| Half year Non Recoverable Amount | 190,648.14 | |
| | | |
| | | |
| *SUBTOTAL* | | $          1,357,721.53 |
| | | |
| **TOTAL** | | **$          1,357,721.53** |

**PG New York**
**Property Tax Reconciliation by tenant**
**2020/2021**

| | | | |
|---|---|---|---|
| | **Bill date** | | 7/1/2020 |

| | | |
|---|---|---|
| Estimated Market Value | $ | 66,864,000 |
| Billable Assessed Value | $ | 29,340,300 |

| | | |
|---|---|---|
| | | **1st Half** |
| **Tax Rate** | | 10.5370% |

**Tenant:**   **THE GAP**

**Tax Year**

| |
|---|
| 2020/2021 |
| July 1, 2020 thru June 30, 2021 |

| | total Billing | | Jul-20 1st half billing |
|---|---|---|---|
| 2020/2021  RET 1st half | $ 1,545,793.71 | $ | 1,545,793.71 |
| 2020/2021  RET 2nd half | 1,545,793.71 | | - |
| | 3,091,587.41 | | 1,545,793.71 |
| | | | |
| ICIP Adjustment | - | | - |
| | | | |
| **2020/2021 RET before tax rate Adj** | 3,091,587.41 | | 1,545,793.71 |
| | | | |
| Tax Rate Adjustment | - | | - |
| | | | |
| **Adjusted Actual 2020/2021 RET** | **3,091,587.41** | | **1,545,793.71** |
| | | | |
| **Add :** | | | |
| *East Mid-Mahattan BID* | | | |
| 1st half | **2,575.96** | | **2,575.96** |
| 2nd half | **2,575.96** | | |
| | **5,151.92** | | **2,575.96** |
| | | | |
| **Less:** | | | |
| | | | |
| Adopted Tax Rate | - | | |
| | - | | - |
| **Less/Add:** | | | |
| Credit Adjustment | - | | |
| East Mid Manhattan Sup | - | | |
| Convenience Fee | - | | - |
| | - | | - |
| | | | |
| **2020/2021 Actual RET adjusted** | **3,096,739.33** | | **1,548,369.67** |
| | | | |
| Less:    Base year | (381,296.28) | | (190,648.14) |
| **Total Actual 2020/2021 RET** | $ 2,715,443.05 | $ | 1,357,721.53 |



**Property Tax Bill**
**Quarterly Statement**
Activity through June 6, 2020

**Owner name:** PONTE GADEA NEW YORK, LLC
**Property address:** 130 E. 59TH ST. APT. A
**Borough, block & lot:** MANHATTAN  (1), 01313, 1101

**Mailing address:**
C/O PONTE GADEA USA, INC.
PONTE GADEA NEW YORK, LLC
270 BISCAYNE BOULEVARD W. SUITE 201
MIAMI FL  33131-2123

| | |
|---|---|
| Outstanding Charges | $0.00 |
| New Charges | $1,548,369.68 |
| **Amount Due** | **$1,548,369.68** |

*Please pay by July 1, 2020*

PTS - HD
1400.01
40 - 0 - 4
105836

---



**PLEASE INCLUDE THIS COUPON IF YOU PAY BY MAIL OR IN PERSON  1-01313-1101**

**Pay Today The Easy Way**
**nyc.gov/payonline**

**Total amount due by July 1, 2020**                                      $1,548,369.68
**If you want to pay everything you owe by July 1, 2020 please pay**      $3,081,281.42

Amount enclosed: [                    ]

#810631020060601#

C/O PONTE GADEA USA, INC.
PONTE GADEA NEW YORK, LLC
270 BISCAYNE BOULEVARD W. SUITE 201
MIAMI FL  33131-2123

**Make checks payable & mail payment to:**
NYC Department of Finance
P.O. Box 680
Newark NJ  07101-0680

810631020060b  01  1013131101  0000154836968  0000308128142  200701112021000      8



**Department of Finance**

**Statement Details**

June 6, 2020
Ponte Gadea New York, LLC
130 E. 59th St. Apt. a
1-01313-1101
Page 2

| Previous Charges | Amount |
|---|---|
| **Total previous charges including interest and payments** | **$0.00** |

| Current Charges | Activity Date | Due Date | Amount |
|---|---|---|---|
| Finance-Property Tax | | 07/01/2020 | $1,545,793.72 |
| East Mid-Manhat BID- Chg | | 07/01/2020 | $2,575.96 |
| **Total current charges** | | | **$1,548,369.68** |

| Tax Year Charges Remaining | Activity Date | Due Date | Amount |
|---|---|---|---|
| Finance-Property Tax | | 01/01/2021 | $1,545,793.72 |
| East Mid-Manhat BID- Chg | | 01/01/2021 | $2,575.96 |
| **Total tax year charges remaining** | | | **$1,548,369.68** |
| **If you want to pay everything you owe by July 1, 2020 please pay** | | | **$3,081,281.42** |
| If you pay everything you owe by July 1, 2020, you would save: | | | $15,457.94 |

| Overpayments/Credits | Activity Date | Due Date | Amount |
|---|---|---|---|
| Refund Available | | 07/01/2019 | $-9,408.46 |
| Credit Applied | 11/22/2019 | | $9,408.46 |
| | | Total credit applied | $9,408.46 |
| **Total overpayments/credits remaining on account** | | | **$0.00** |

**Annual Property Tax Detail**

| | Overall Tax Rate | Taxes |
|---|---|---|
| Tax class   4 -  Commercial Or Industrial | | |
| Current tax rate | 10.5370% | |
| **Estimated Market Value   $66,864,000** | | |
| **Billable Assessed Value** | **$29,340,300** | |
| **Taxable Value** | $29,340,300 x 10.5370% | |
| **Tax Before Abatements and STAR** | $3,091,587.44 | **$3,091,587.44** |
| **Annual property tax** | | **$3,091,587.44** |

### Home banking payment instructions:

1. **Log** into your bank or online bill pay website.
2. **Add** the new payee:  NYC DOF Property Tax.  Enter your account number, which is your boro, block and lot, as it appears here: 1-01313-1101 .  You may also need to enter the address for the Department of Finance.  The address is P.O. Box 680, Newark NJ 07101-0680.
3. **Schedule** your online payment using your checking or savings account.

**Did Your Mailing Address Change?**
If so, please visit us at **nyc.gov/changemailingaddress** or call **311**.

When you provide a check as payment, you authorize us either to use information from your check to make a one-time electronic fund transfer from your account or to process the payment as a check transaction.





**Ponte Gadea New York, LLC**

270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

| INVOICE |
|---|
| **Invoice No.: 2010100089** |
| Date: 07/01/2020 |

| Code | Description | Amount(USD) |
|---|---|---|
| U010/17 | GAP / BANANA REPUBLIC | |
| | **07/01/2020-07/15/2020-Base Rent** | |
| | *Holdover Charges* | **444,556.45** |
| | **07/16/2020-07/31/2020-Base Rent** | |
| | *Holdover Charges* | **632,258.06** |
| | **07/01/2020-07/31/2020-CAM Oper.Expenses** | |
| | | **5,216.93** |
| Amount Due | | 1,082,031.44 |
| **Total Amount Due** | | **1,082,031.44** |

**Method of payment: Wire Transfer**
**Bank Name: HSBC**
**Routing No.: 021001088**
**Account No.:** ██████



270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

## INVOICE

### Invoice No.: 2010100074

Date: 06/01/2020

| Code | Description | Amount(USD) |
|------|-------------|-------------|
| U010/17 | GAP / BANANA REPUBLIC | |
| | **06/01/2020-06/15/2020-Base Rent** | |
| | | **306,250.00** |
| | **06/01/2020-06/15/2020-CAM Oper.Expenses** | |
| | | **2,608.46** |
| | Amount Due | 308,858.46 |
| | **Total Amount Due** | **308,858.46** |

**Method of payment: Wire Transfer**
**Bank Name: HSBC**
**Routing No.: 021001088**
**Account No.:** ■■■■■■



**Ponte Gadea New York, LLC**

270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

| INVOICE |
|---|
| **Invoice No.: 2010100088** |
| Date: 06/01/2020 |

| Code | Description | Amount(USD) |
|---|---|---|
| U010/17 | GAP / BANANA REPUBLIC | |
| | **06/16/2020-06/30/2020-Base Rent** | |
| | *Holdover Charges* | **459,375.00** |
| | **06/16/2020-06/30/2020-CAM Oper.Expenses** | |
| | | **2,608.47** |
| | **el 06/30/2020-Additional Rent** | |
| | *Interest on Late Payments* | **1,183.81** |
| | Amount Due | 463,167.28 |
| | **Total Amount Due** | **463,167.28** |

**Method of payment: Wire Transfer**
**Bank Name: HSBC**
**Routing No.: 021001088**
**Account No.:** ███████



270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

## INVOICE

### Invoice No.: 2010100060

Date: 05/01/2020

| Code | Description | Amount(USD) |
|---|---|---|
| U010/17 | GAP / BANANA REPUBLIC | |
| | **05/01/2020-05/31/2020-Base Rent** | |
| | | **612,500.00** |
| | **05/01/2020-05/31/2020-CAM Oper.Expenses** | |
| | | **5,216.93** |
| Amount Due | | 617,716.93 |
| **Total Amount Due** | | **617,716.93** |

**Method of payment: Wire Transfer**
**Bank Name: HSBC**
**Routing No.: 021001088**
**Account No.** █████████



270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO: ___

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO: _____

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

## INVOICE

### Invoice No.: 2010100049

Date: 04/01/2020

| Code | Description | Amount(USD) |
|------|-------------|-------------|
| U010/17 | GAP / BANANA REPUBLIC | |
| | **04/01/2020-04/30/2020-Base Rent** | |
| | | **612,500.00** |
| | **04/01/2020-04/30/2020-CAM Oper.Expenses** | |
| | | **5,216.93** |
| | Amount Due | 617,716.93 |
| | **Total Amount Due** | **617,716.93** |

**Method of payment: Wire Transfer**
**Bank Name: HSBC**
**Routing No.: 021001088**
**Account No.:** ███████



**Ponte Gadea New York, LLC**

270 Biscayne Boulevard Way, Suite 201
Miami, FL, 33131
USA

BILL TO:

The Gap, Inc
901 Cherry Avenue
San Bruno, CA, 94066
California
Customer Code: 979

MAIL TO:

The Gap, Inc
Managed by: Cushman & Wakefield
LID#05219 Store #00711
901 Cherry Avenue
San Bruno CA  94066
California
IC Code: 377

## CREDIT MEMO

**Invoice No.: 2010300000**

Date: 12/31/2019

| Code | Description | Amount(USD) |
|------|-------------|-------------|
| U010/17 | GAP / BANANA REPUBLIC | |
| | **el 12/31/2019-Additional Op. Expenses Adjust** | |
| | *1st Half 2019/2020 RET Refund Net Appeal Fees For Future Savings* | **-5,412.42** |
| | *(Through End of Lease Only)* | |
| | Amount Due | -5,412.42 |
| | **Total Amount Due** | **-5,412.42** |

**Method of payment: Cheque**

**Ponte Gadea New York, LLC**
130 East 59th Street

| Inv # | Ck# | Date | Description | | The Gap |
|-------|-----|------|-------------|---|---------|
| | 2004599 | 11/22/2019 | 1st Half 2019-2020 RET Refund | | (9,408.46) |
| 10480 | | 12/10/2019 | Tax Appeal charge (The Gap's Share) | | 3,996.04 |
| | | | Net RET Refund | | (5,412.42) |
| | | | | | |
| | | | Total Tax Refund | | (9,408.46) |
| | | | Tax Appeal charge | | 3,996.04 |
| | | | Net Total Due to PG/(From PG) | | (5,412.42) |

| | | | | Lease Expiration:<br>11/30/20 | The Gap Share of<br>Savings |
|--|--|--|--|--|--|
| | 2019-2020 | Projected Tax Savings (Jul 2019-Jun 2020) | | (18,816.91) | (18,816.91) |
| | 2020-2021 | Projected Tax Savings (Jul 2020-Jun 2021) | | (18,816.91) | (7,823.33) |
| | | | | | (26,640.24) |
| | | | | **15% Tax Appeal Fee** | **3,996.04** |

SHERMAN & GORDON, P.C.

494 EIGHTH AVENUE

NEW YORK, NY 10001-2519

(212) 302-3600

FAX (212) 575-9308

PONTE GADEA NEW YORK, LLC
c/o Ms. Alina R. Toyos
Ponte Gadea USA, Inc.
270 Biscayne Boulevard Way
Suite 201
Miami, FL 33131

1313/1101M
P-018
10480

FOR PROFESSIONAL SERVICES RENDERED:

December 10, 2019

**In obtaining reduction of real property tax assessment for the 2019-20 tax year:**

Premises:  130 East 59th Street

Block:  1313      Lot:  1101

| | |
|---|---|
| Original Actual Assessment........................................................................ | $30,794,850 |
| Reduced Actual Assessment ....................................................................... | 29,900,000 |
| Actual Assessment reduction ..................................................................... | 894,850 |
| Tax Rate* | 10.514% |
| Actual Assessment reduction x Tax Rate.......................................................... | 94,084 |
| **Fee @ 15%** .......................................................................................... | **$14,112** |

\* The tax rate was recently raised from 10.514% to 10.537%.  For billing purposes we are using
the original tax rate.



Refunds Unit
59 Maiden Lane 20th Floor
New York, NY 10038

DATE  November 22, 2019
CHECK  NUMBER  2004599
AMOUNT PAID  $9,408.46

1013131101-1013131101
202000382004599
FINANCE-PROPERTY TAX



PONTE GADEA NEW YORK, LLC
SHERMAN & GORDON, P C
494 EIGHTH AVENUE,
23RD FLOOR
NEW YORK, NY 10001-2519

"REFUND MAY INCLUDE MULTIPLE PERIODS"

The NYC Department of Finance is pleased to present you with this refund check for an overpayment associated with the account shown above.
If you have questions regarding this refund, please contact us at http://nyc.gov/propertyrefunds.

Please note that any refund paid may be subject to audit and possible recoupment.

PLEASE DETACH BEFORE DEPOSITING CHECK



New York City Department of Finance
Refunds Unit
59 Maiden Lane 20th Floor
New York, NY 10038

CHECK
NUMBER        2004599

November 22, 2019

*** VOID AFTER 180 DAYS ***

50-937
213

PAY
TO THE
ORDER OF

PONTE GADEA NEW YORK, LLC
SHERMAN & GORDON, P.C.
494 EIGHTH AVENUE,
23RD FLOOR
NEW YORK,, NY 10001-2519

CHECK AMOUNT
$9,408.46

EXACTLY *********9,408 DOLLARS AND 46 CENTS





JPMorgan Chase Bank  N A
Syracuse  NY

COURT ORDER 1013131101-1013131101

Authorized Signature

⑈ 2004599⑈

SHERMAN & GORDON, P.C.

494 EIGHTH AVENUE
NEW YORK, NY 10001-2519

(212) 302-3600

FAX (212) 575-9308

INFO@SHERMANTAX.COM

DEC 1 6 2019

ISAAC SHERMAN
JONATHAN L. SHERMAN
JOANNE SHERMAN INGERMAN
MICHAEL R. LIPPMAN

NAHUM L. GORDON
(1937-2017)

DEBORAH L.F. MANTILLA
ANGELLA GALLIMORE
LEGAL ASSISTANTS

December 10, 2019

Ms. Alina R. Toyos
Ponte Gadea USA, Inc.
270 Biscayne Boulevard Way
Suite 201
Miami, FL 33131

Re:     130 East 59th Street (retail unit)
        Block 1313   Lot 1101
        Real Estate Tax Appeal

Dear Alina:

I am pleased to advise that New York City Department of Finance has approved and implemented our recent Tax Commission settlement, which reduced the 2019-20 Actual Assessment of your retail unit at 130 East 59th Street.  Owing to the five-year phase-in of Actual Assessment changes into tax bills, the savings from this settlement will be realized through the 2023-24 tax year.

As expected, a $9,408.46 tax credit was refunded, representing 1st half 2019-20 tax savings. A second $9,408.46 credit was posted against 2nd half tax, due January 2020.  See the enclosed page from the City Collector records for details.  Further savings from the settlement should be reflected in tax bills for each of the following four years, as the Actual Assessment reduction continues to be phased-into Transitional Assessments.

Enclosed is our invoice for obtaining the settlement.  Kindly arrange for payment at your earliest convenience.  Thank you very much.

Sincerely yours,

Jonathan L. Sherman

Enclosures

**Ponte Gadea Lexington, LLC**   Block: 1313   Lot: 1101

130 East 59th Street

*Last Settlement: 2018-19 Actual Assessment reduced to 29,900,000*

July 26, 2019

## OFFER OF SETTLEMENT

| Tax Year | Original Actual Assessment | Proposed Actual Assessment | Actual Assessment Reduction | |
|---|---|---|---|---|
| 2019-20 | 30,794,850 | 29,900,000 | 894,850 | -2.9% |

## EFFECT OF OFFER ON TRANSITIONAL ASSESSMENTS
(Exclusive of future changes in Actual Assessments)

| Tax Year | Original Transitional Assessment | Proposed Transitional Assessment | Reduction Transitional Assessment | Projected Tax Rate | Projected Tax Savings |
|---|---|---|---|---|---|
| 2019-20 | 28,924,640 | 28,745,670 | 178,970 | 10.514% | 18,817 – |
| 2020-21 | 29,660,480 | 29,481,510 | 178,970 | 10.514% | 18,817 – |
| 2021-22 | 30,382,910 | 30,203,940 | 178,970 | 10.514% | 18,817 |
| 2022-23 | 30,615,880 | 30,436,910 | 178,970 | 10.514% | 18,817 |
| 2023-24 | 30,794,850 | 30,615,880 | 178,970 | 10.514% | 18,817 |

*Total, Transitional Assessment Reductions:*   894,850   $94,085

Fee @ 15%   14,113



🏠 Property Information    Apply for Exemptions    Get Help

Property Address Search      BBL Search      REUC Search

**Property Info**
**Account Balance**
**Account History**
**Notices of Property Value**
**Property Tax Bills**
**Benefits - Prop. Owners**
**Benefits - Business & Construction**
**Benefits - Gov & Non-Prof**
**Market Values & Assessments**
   2019-2020 Final
   Current & Prior Years

**130 EAST 59 STREET #A**

Borough: MANHATTAN
Block: 1313 Lot: 1101

**Notes**

This account history is for informational purposes only. The amounts below do not include interest due through today. Visit our NYCePay or CityPay payment sites for today's balance. Payments made today will be visible the next business day.

**Profile**

| | |
|---|---|
| Building Class | RK - RETAIL SPACE |
| Tax Class | 4 |
| Unused SCRIE Credit | |
| Unused DRIE Credit | |
| Refund Available | |
| Overpayment amount | |

**Account History Details**

| Year | Period | Charge Type | Account ID | Original Due Date | Interest Begin/Process Date | Trans. Type | Action Type | Reason | Payment # | Payment Date | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2020 | 3 | BID | 32000 | 01/01/2020 | 01/01/2020 | SAC | ORG | | | 06/01/2019 | 2,581.00 |
| 2020 | 3 | TAX | | 01/01/2020 | 01/01/2020 | TAX | ORG | | | 06/01/2019 | 1,520,568.34 |
| | | | | | | TAX | ADJ | COURT ORDER | | 10/04/2019 | -9,408.46 |
| | | | | | | TAX | ADJ | MID YEAR TAX CHG | | 01/01/2020 | 6,611.52 |
| 2020 | 3 | TXCM | 6110101376 | 01/01/2020 | 01/01/2020 | SAF | ADJ | SA NEW/ADJ | | 10/31/2019 | 175.00 |
| 2020 | 1 | BID | 32000 | 07/01/2019 | 07/01/2019 | SAC | ORG | | | 06/01/2019 | 2,581.00 |
| | | | | | | SAC | PAY | | 131958501 | 06/27/2019 | -2,581.00 |
| | | | | | | SAC | PAY | | 131958501 | 10/31/2019 | 2,581.00 |
| | | | | | | SAC | PAY | | 131958501 | 10/04/2019 | -2,581.00 |
| | | | | | | SAC | PAY | | 131958501 | 10/04/2019 | 2,581.00 |
| | | | | | | SAC | PAY | | 131958501 | 10/31/2019 | -2,581.00 |
| 2020 | 1 | TAX | | 07/01/2019 | 07/01/2019 | TAX | ORG | | | 06/01/2019 | 1,520,568.34 |
| | | | | | | TAX | ADJ | COURT ORDER | | 10/04/2019 | -9,408.46 |
| | | | | | | CHG | PAY | | 131958501 | 10/04/2019 | -1,511,159.88 |
| | | | | | | CHG | PAY | | 131958501 | 06/27/2019 | -1,520,568.34 |
| | | | | | | CHG | PAY | | 131958501 | 10/04/2019 | 1,517,987.34 |
| | | | | | | CHG | PAY | | 131958501 | 10/31/2019 | 2,581.00 |
| | | | | | | CHG | PAY | | 131958501 | 10/31/2019 | 1,508,578.88 |
| | | | | | | CHG | PAY | | 131958501 | 10/31/2019 | 2,581.00 |
| | | | | | | CHG | PAY | | 131958501 | 10/31/2019 | -1,511,159.88 |
| 2019 | 3 | BID | 32000 | 01/01/2019 | 01/01/2019 | SAC | ORG | INIT CHG | | 05/22/2018 | 2,575.06 |
| | | | | | | SAC | PAY | BILL PYMT | 9220119 | 12/31/2018 | -2,575.06 |
| 2019 | 3 | TAX | | 01/01/2019 | 01/01/2019 | TAX | ORG | INIT CHG | | 06/01/2018 | 1,484,043.20 |
| | | | | | | TAX | ADJ | ROAV TXCOM | | 07/27/2018 | -12,287.70 |
| | | | | | | CHG | PAY | BILL PYMT | 9220120 | 12/31/2018 | -1,471,755.50 |
| 2019 | 1 | BID | 32000 | 07/01/2018 | 07/01/2018 | SAC | ORG | INIT CHG | | 05/22/2018 | 2,575.06 |
| | | | | | | SAC | PAY | BILL PYMT | 9220116 | 07/02/2018 | -2,575.06 |
| 2019 | 1 | TAX | | 07/01/2018 | 07/01/2018 | TAX | ORG | INIT CHG | | 06/01/2018 | 1,484,043.20 |
| | | | | | | TAX | ADJ | ROAV TXCOM | | 07/27/2018 | -12,287.70 |
| | | | | | | CHG | PAY | BILL PYMT | 9220118 | 07/02/2018 | -484,043.20 |

*Handwritten annotations:*

*2H 2019-20 tax appeal credit posted against Jan. 2020 tax*

*1H 2019-20 tax appeal credit refunded*