UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

THE GAP INC.,

        Plaintiff,

    -v-                               No.  20 CV 4541-LTS-KHP

PONTE GADEA NEW YORK LLC,

        Defendant.

--------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

        Plaintiff The Gap Inc. ("Gap") brings this action, asserting claims for breach of contract, declaratory judgment, rescission, reformation, money had and received, and unjust enrichment against Defendant Ponte Gadea New York LLC ("Ponte Gadea").  Ponte Gadea asserts counterclaims for declaratory judgment and breach of contract.  The parties' claims arise out of a lease agreement for premises at the corner of 59th Street and Lexington Avenue in Manhattan, in which Gap has operated a retail business, and the impact of the COVID-19 pandemic, and Gap and governmental actions in response thereto.  Gap contends, in essence, that its closure of the two stores operating on the premises in response to the pandemic, the governmental measures taken in response to the pandemic that restrict or condition store operations, and changes in the volume of foot traffic in the vicinity of the stores warrant Gap's release from its obligations under the lease as of March 19, 2020.  Ponte Gadea, pointing to provisions of the lease and Gap's failure to vacate the premises, contends that it is entitled to continued payment of rent and to holdover rent for occupancy after Ponte Gadea gave notice of termination of the lease for non-payment.  The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

The parties have cross-moved for summary judgment.  Gap seeks summary judgment in its favor on all of its claims and judgment dismissing Ponte Gadea's counterclaims. Ponte Gadea seeks the dismissal of all of Gap's claims and judgment in its favor on the counterclaims.  The Court has considered carefully all of the parties' submissions.  For the following reasons, Ponte Gadea's motion is granted as to liability on its first and second counterclaims, Gap's Complaint is dismissed, and Gap's motion is denied in its entirety.

BACKGROUND

Unless otherwise indicated, the following facts are undisputed.[1]  Gap operates a national retail network of stores specializing in fashion for men, women, and children.  (Docket Entry No. 30 ("Pl. 56.1 St.") ¶ 1.)  On February 18, 2005, Gap entered into a lease agreement with Ponte Gadea's predecessor-in-interest[2] for premises for the operation of two "first-class retail businesses," a Banana Republic store and a Gap store, at 130 East 59th Street, New York, NY 10022.  (Docket Entry No. 18 ("Def. 56.1 St.") ¶ 1; Docket Entry No. 16-1 Ex. A (the "Lease") at 1 & §§ 4.1, 4.5(A).)  The term of the Lease extended to January 31, 2021, unless terminated or extended by the parties.  (Pl. 56.1 St. ¶ 14.)

Four provisions of the Lease—section 1.7(H), Article 16, Article 21, and Article 25—are of particular relevance to the parties' cross-motions.  First, section 1.7(H) defines a "Force Majeure Event" to mean "a strike or other labor trouble, fire or other casualty,

---

[1]    Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer.  Citations to the parties' respective Local Civil Rule 56.1 Statements incorporate by reference the parties' citations to underlying evidentiary submissions.

[2]    The original landlord later assigned the Lease to Ponte Gadea.  (Pl. 56.1 St. ¶ 12.)

governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, or any other cause beyond Tenant's reasonable control."

> Second, Article 16, titled "Casualty," sets forth the parties' restoration obligations, termination rights, and rent obligations in the event of a "fire or other casualty." Section 16.1 provides that Gap "shall notify Landlord promptly of any fire or other casualty that occurs in the Premises." Sections 16.2 and 16.3 set forth the parties' obligations to "repair the damage to the Premises to the extent caused by fire or other casualty," which obligations are excused "to the extent that this Lease terminates by reason of such fire or other casualty as provided in this Article 16." Section 16.4 provides for a proportional abatement of Gap's rent obligations if, "as a result of a fire or other casualty, all or a portion of the Premises shall not be usable by Tenant" for a period of more than 14 days. Section 16.5 provides Ponte Gadea with a termination right if "the Building is so damaged by fire or other casualty that, in Landlord's opinion, substantial alteration, demolition, or reconstruction of the Building is required," and section 16.6 provides Gap a termination right if (1) an independent contractor's estimate to complete the premises restoration work contemplated in section 16.2 exceeds 18 months, or (2) by reason of a fire or other casualty, "Landlord has an obligation to perform a restoration as contemplated by Section 16.2," but fails to do so within the requisite timeframe. Section 16.7 provides that either party may terminate the Lease if "the Premises are substantially damaged by a fire or other casualty that occurs during the period" of one year preceding the end of the Lease. Finally, section 16.8 provides that Gap has "no right to cancel this Lease by virtue of a fire or other casualty except to the extent specifically set forth herein."

Third, Article 21 governs defaults under the Lease.  It defines an "Event of Default" as occurring when (among other circumstances not relevant here) Gap <u>fails to pay monthly rent when due</u> pursuant to section 1.6(A) (and fails to remedy that failure within five business days of notice from Ponte Gadea).  (Lease §§ 1.6(A), 21.1(A).)  It also defines an "Event of Default" as occurring when:

> Tenant defaults in the observance or performance <u>of any other covenant</u> of this Lease on Tenant's part to be observed or performed and Tenant fails to remedy such default within thirty (30) days after Landlord gives Tenant notice thereof, <u>except that if (i) such default cannot be remedied with reasonable diligence during such period of thirty (30) days (including by reason of the occurrence of a Force Majeure Event)</u>, (ii) Tenant takes reasonable steps during such period of thirty (30) days to commence Tenant's remedying of such default, and (iii) Tenant prosecutes diligently Tenant's remedying of such default to completion, then an Event of Default shall <u>not</u> occur by reason of such default[.]

(<u>Id.</u> § 21.1(F) (emphasis added).)  Section 21.1(F)'s reference to a Force Majeure Event is the Lease's only use of that defined term.  The occurrence of an Event of Default provides Ponte Gadea with a right to terminate the lease, in which event "Tenant immediately shall quit and surrender the Premises, but Tenant shall nonetheless remain liable for all of its obligations hereunder[.]"  (<u>Id.</u> § 21.2.)

Finally, Article 25 of the Lease, which governs the end of the Lease term, imposes a holdover rental payment liability for use and occupancy after the expiration or termination date of the Lease.  (Lease § 25.2.)

In December 2019 and the first quarter of 2020, a new coronavirus disease referred to as COVID-19 spread throughout the world, resulting in a global pandemic.  World Health Organization, <u>Coronavirus disease (COVID-19) pandemic</u>, https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited March 8, 2021). Beginning in March 2020, the spread of COVID-19 caused significant disruptions in New York

State and New York City.  (Pl. 56.1 St. ¶ 36.)  On March 7, 2020, the State declared a state of emergency (id. ¶ 37) and, on March 20, 2020, the State ordered non-essential businesses (including those operated by Gap in the leased premises) to reduce their in-person workforces by 100% no later than March 22, 2020, at 8:00 p.m., in order to reduce transmission of the virus. (Def. 56.1 St. ¶ 27.)

Gap's response to the COVID-19 pandemic was also significant.  On March 17, 2020, Gap "decided . . . to close all its stores in the United States, Canada, and Mexico to protect the wellbeing of its employees and customers."  (Docket Entry No. 29 ("Pl. Opp.") at 12); accord Gap Inc. Blogs, Gap Inc. Announces Temporary Closure of Stores in North America, https://www.gapinc.com/en-us/articles/2020/03/gap-inc-announces-temporary-closure-of-stores-in-n (last visited March 4, 2021).  In Gap's Form 8-K filing dated April 23, 2020, Gap disclosed that, in April 2020, it had "suspend[ed] rent payments under the leases" for all of its stores in North America.  (Def. 56.1 St. ¶ 30.)  Consistent with that decision, Gap has not paid rent pursuant to the Lease since March 2020.  (Id. ¶¶ 28-32.)  On June 8, 2020, Ponte Gadea served Gap with a Notice of Termination, which stated that Gap's failure to pay rent, if not cured within five business days, would constitute an Event of Default under section 21.1 of the Lease, and that Ponte Gadea would have the right to terminate the Lease and to seek recovery of unpaid rent and other relief and remedies available under the Lease.  (Id. ¶¶ 51-52; see also Docket Entry No. 16-9 ("Notice of Termination").)

Also on June 8, 2020, New York City entered "phase one" of its reopening, allowing retail stores, including Gap, to offer curbside pick-up.  (Def. 56.1 St. ¶ 40.)  On June 12, 2020, Gap began offering curbside pickup at the Banana Republic store on the premises.

(Docket Entry No. 44 ("Def. Add'l 56.1 St.") ¶ 11.)[3]  On June 22, 2020, New York City entered "phase two" of its reopening, allowing retail stores, including Gap, to permit customers to shop indoors at no more than 50% capacity, subject to mandatory masking and social distancing requirements.  (Pl. 56.1 St. ¶ 40.)[4]  Thereafter, Gap opened certain of its other retail locations in Manhattan to indoor shopping (Def. Add'l 56.1 St. ¶¶ 17-19, 21-22), but did not so open its stores at 59th and Lexington—though it did offer curbside pick-up at the Banana Republic store between June 12, 2020, and September 20, 2020, and at the Gap store between August 27, 2020, and September 20, 2020.  (Docket Entry No. 50 ("Supp. Rondholz Decl.") ¶ 6.)  Gap also continued to use the stores for online order fulfillment (id.), and to store its merchandise.  (Id.; Def. 56.1 St. ¶ 37.)  As of September 25, 2020, Gap's Senior Director of Real Estate, Jennifer Rondholz, attested that Gap was "currently on pace to vacate the Premises by October 15, 2020." (Supp. Rondholz Decl. ¶ 8.)

<u>DISCUSSION</u>

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is considered material if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  To defeat summary judgment, the nonmoving

---

[3]    Gap also filed this action on June 12, 2020.

[4]    New York City has since undergone additional phases of opening (and closing), but neither party contends that subsequent changes to the City's and State's restrictions are material for purposes of these cross-motions.  (See Pl. 56.1 St. ¶ 41.)

party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted).  The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."  Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).

The same legal standards apply when analyzing cross-motions for summary judgment.  Schultz v. Stoner, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004).  "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

Here, certain claims of both parties are premised on alleged breaches of contract. Under New York law, "if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence."  Spinelli v. Nat'l Football League, 903 F.3d 185, 200 (2d Cir. 2018) (citation omitted).  If, however, "'the intent of the parties can[not] be ascertained from the face of their agreement,' the contract is ambiguous and its interpretation presents a question of fact."  Id. (citation omitted).

Gap's Complaint in this action asserts six causes of action, each of which hinges on Gap establishing that the parties' Lease terminated in, or should be deemed to have been rescinded or reformed as of, March 2020, as a result of the COVID-19 pandemic and associated governmental restrictions, such that, from March 19, 2020, Gap had no rent payment liability under the Lease.[5]  In Count One, Gap asserts that Ponte Gadea breached the Lease by demanding

---

[5]     Gap identifies March 19, 2020, the date it closed its stores at the premises, as the date it claims the Lease was terminated.  (Compl. ¶¶ 2, 20, 23-24, 30.)

that Gap continue to pay rent after that date, and by taking other actions consistent with the
continued validity of the Lease after March 2020.  (Compl. ¶¶ 29-34.)  In Count Two, Gap seeks
a declaratory judgment regarding the termination, rescission, or reformation of the Lease as of
March 2020, and the parties' obligations thereafter.  (Id. ¶¶ 35-42.)  In Count Three, Gap seeks
rescission of the Lease, "as a result of the frustration of purpose of the Lease, the illegality,
impossibility and impracticability of the Lease, and/or the failure of consideration."  (Id. ¶¶ 43-
48.)  In Count Four, Gap seeks reformation of the Lease, "to reflect the Parties' true intent that
Tenant would have no obligation to pay rent once it was deprived of the use of the Premises," or
that "the amount of rent for the Term would have otherwise been adjusted to account for the
portion of the Lease's Term during which Tenant could not operate a retail store in the
Premises."  (Id. ¶¶ 49-56.)  In Counts Five and Six, Gap asserts claims for money had and
received and unjust enrichment, and seeks to recover "the rent and other consideration paid for
the period of time" it was "unable to operate a retail store at the Premises" (id. ¶¶ 64, 73), i.e.,
after March 19, 2020.  (Compl. ¶¶ 57-74; see also Pl. Opp. at 18 ("Gap paid funds to Ponte
Gadea to which it was not entitled in the form of rent for the second half of March 2020[.]").)

> Ponte Gadea asserts three counterclaims.  Count One seeks a declaration that:
>
> (i) an Event of Default occurred pursuant to Section 21.1(A) of the Lease
> due to Gap's non-payment of Fixed Rent for April 2020 and May 2020;
> (2) the Lease terminated on June 15, 2020 pursuant to [Ponte Gadea's]
> Notice of Termination; (3) Gap became a holdover tenant effective June
> 15, 2020, entitling Ponte Gadea to holdover rent in accordance with
> Section 25.2 of the Lease; and (4) Gap must immediately and peacefully
> surrender the Premises.

(Docket Entry No. 9 ("Counterclaims") ¶ 194.)  In Count Two, Ponte Gadea asserts that Gap
breached the Lease by failing to pay rent and failing to vacate the Premises and/or pay holdover
rent once Ponte Gadea terminated the Lease effective June 15, 2020.  (Id. ¶¶ 195-205.)  In Count

Three, Ponte Gadea asserts, in the alternative, that "in the event the Court determines that the Lease terminated due to a 'casualty,' as defined in Article 16 of the Lease," Gap has nonetheless breached the Lease by failing to vacate the premises and by failing to pay holdover rent.  (Id. ¶¶ 206-14.)

Ponte Gadea seeks summary judgment on its counterclaims, as well as on Gap's affirmative claims, based on Gap's failure to pay rent in and after April 2020.  (Docket Entry No. 17 ("Def. Mem.") at 9-24.)  Gap's failure to pay monthly rent after March 2020 is undisputed. (Def. 56.1 St. ¶¶ 28-29, 31-32.)  Gap cross-moves for summary judgment in its own favor on its Complaint and Ponte Gadea's counterclaims, however, relying on five theories as to why the parties' Lease terminated (or should be deemed rescinded or reformed) as of March 2020.  Gap argues that: (1) the COVID-19 pandemic constituted a "casualty" for purposes of section 16.4 of the Lease, entitling Gap to abatement of its rent obligations; (2) the pandemic frustrated the primary purpose of the Lease; (3) the pandemic rendered performance under the Lease impossible, illegal, or impracticable; (4) as a result of the pandemic, there was a failure of consideration; and (5) the parties made a mutual mistake by failing to address the future possibility of the COVID-19 pandemic in the Lease.  (Compl. ¶¶ 21-26; Pl. Opp. at 10-25.)

Ponte Gadea's counterclaims rest on the propositions that: Gap is obligated under the Lease to make timely rent payments; it is undisputed that Gap has not done so; the sole force majeure provision of the Lease only prevents certain non-monetary defaults from triggering the landlord's right to terminate the lease; Ponte Gadea gave proper notice to cure the non-payment, and proper notice of termination, effective June 15, 2020; and Gap is liable for rent payments through the termination date and for holdover payments thereafter, in light of its failure to vacate

the premises.  Gap's six affirmative claims are largely in the nature of affirmative defenses to

Ponte Gadea's claims of rights to payments in accordance with the Lease.

Because both parties' claims rise or fall on the resolution of Gap's five theories as

to why the parties' Lease terminated (or should be deemed rescinded or reformed) as of March

2020, the Court first addresses each separately below.

Casualty

Gap's first theory as to why it bears no liability for rental payments under the

Lease after March 2020 is that the COVID-19 pandemic and its resulting lockdowns constituted

a "casualty" within the meaning of Article 16 of the Lease that rendered the entire premises

unusable such that Gap was entitled to an abatement of its rent payment obligations under Article

16.4 of the Lease.

The text and structure of Article 16, which refers in several instances to a "fire or

other casualty" causing "damage" occurring "in" or "to" the "Premises," and describes in detail

the restoration obligations of the parties in the event such damage occurs, leave no doubt that

"casualty" refers to singular incidents, like fire, which have a physical impact in or to the

premises—and does not encompass a pandemic, occurring over a period of time, outside the

property, or the government lockdowns resulting from it.[6]  Indeed, the rent abatement to which

Gap claims entitlement is, under the Lease, one that ends "on the date that Landlord

Substantially Completes the restoration work" required in the event of a casualty.  (Lease §

16.4.)  Section 16.2 of the Lease requires the Landlord to "repair the damage to the Premises to

---

[6]      Notably, section 1.7(H) defines a Force Majeure Event to include a "fire or other
         casualty" or a "governmental preemption of priorities or other controls in connection with
         a national or other public emergency," suggesting that the parties did not understand a
         "casualty" to encompass governmental preemption or controls such as those imposed in
         light of the COVID-19 pandemic.

the extent caused by fire or other casualty, with reasonable diligence."  It is self-evident that Ponte Gadea is not in a position to do restoration work that could eliminate the pandemic or alter the government restrictions that constrain Gap's operations.  Hence, there is no reasonable reading of the Lease's casualty provision or the rent abatement provision cited by Gap that would be triggered by the pandemic-related changes cited by Gap.  This conclusion is consistent not only with the clear text of the Lease but also with persuasive recent decisions of the Supreme Court of New York, New York County, which have generally concluded that the pandemic is not a "casualty" as that term is generally used in commercial leases.  1140 Broadway LLC v. Bold Food, LLC, No. 652674/2020, 2020 WL 7137817, at *3 (N.Y. Co. Sup. Ct. Dec. 3, 2020) ("To the extent that defendants argue that the ongoing pandemic should constitute a 'casualty' that could entitle defendants to an abatement, that claim is denied.  That portion of the lease refers to physical damage, not the failure of defendants' business to retain its clients.") (granting summary judgment in favor of landlord); Dr. Smood New York LLC v. Orchard Houston, LLC, No. 652812/2020, 2020 WL 6526996, at *2 (N.Y. Co. Sup. Ct. Nov. 2, 2020) (rejecting tenant's argument "that the pandemic constitutes a 'casualty'" as "entirely without merit," in part because "there has been no physical harm to the demised premises").  But see 188 Ave. A Take Out Food Corp. v. Lucky Jab Realty Corp., No. 653967/2020, 2020 WL 7629597, at *3 (N.Y. Co. Sup. Ct. Dec. 21, 2020) (concluding, in a Yellowstone injunction proceeding, that plaintiff-tenants had established a likelihood of success on the merits of their claim that the pandemic constituted a "casualty" within the meaning of the parties' lease).

        The Court's reading of the Lease is consistent with general authority regarding the term "casualty" as well.  Black's Law Dictionary defines it as a "serious or fatal accident," or a "person or thing injured, lost, or destroyed."  Black's Law Dictionary (11th ed. 2019).  New

York courts, while not establishing a definitive general definition of "casualty," have found the term applicable to singular events, such as fires, that cause physical damage in or to a property. See, e.g., 45 Broadway Owner LLC v. NYSA-ILA Pension Tr. Fund, 107 A.D.3d 629, 631 (1st Dep't 2013) (holding that casualty, as that term was used in a lease discussing damage caused by a "fire or other casualty," included a flood resulting from a rusted gauge on an HVAC system); Blue Water Realty, LLC v. Salon Mgmt. of Great Neck, Corp., 189 A.D.3d 496, 2020 WL 7250444, at *1 (1st Dep't Dec. 10, 2020) (holding that casualty, which the First Department had previously defined as an "accident" or an "unfortunate occurrence," did not include repeated leaks and flooding which were a "common occurrence" in the leased premises).

The Court therefore concludes that the COVID-19 pandemic and its effects did not constitute a casualty under Article 16 of the parties' Lease, and that Ponte Gadea is entitled as a matter of law to summary judgment dismissing Gap's breach of contract claim to the extent it is premised on a right to a casualty-based rent abatement by reason of the effects of the pandemic and operational constraints in connection therewith.

Frustration

Gap's second theory as to why the parties' Lease terminated in March 2020 is that the COVID-19 pandemic and resulting governmental restrictions frustrated the principal purpose of the Lease, which Gap characterizes as its operation of two first-class retail businesses on the premises.

"The doctrine of frustration of purpose discharges a party's duties to perform under a contract where a 'wholly unforeseeable event renders the contract valueless to one party.'" Axginc Corp. v. Plaza Automall, Ltd., 759 F. App'x 26, 29 (2d Cir. 2018) (quoting United States v. Gen. Douglas MacArthur Senior Vill., Inc., 508 F.2d 377, 381 (2d Cir. 1974)).

"In order to be invoked, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, the transaction would have made little sense." In re Condado Plaza Acquisition LLC, 620 B.R. 820, 839-40 (Bankr. S.D.N.Y. 2020).  The event which allegedly frustrates performance must be both "virtually cataclysmic" and "wholly unforeseeable." Gander Mountain Co. v. Islip U-Slip LLC, 923 F. Supp. 2d 351, 359 (N.D.N.Y. 2013) (quoting Gen. Douglas MacArthur, 508 F.2d at 381), aff'd, 561 F. App'x 48 (2d Cir. 2014).  "Examples of a lease's purposes being declared frustrated have included situations where the tenant was unable to use the premises as a restaurant until a public sewer was completed, which took nearly three years after the lease was executed . . . and where a tenant who entered into a lease of premises for office space could not occupy the premises because the certificate of occupancy allowed only residential use and the landlord refused to correct it." Ctr. for Specialty Care, Inc. v. CSC Acquisition I, LLC, 185 A.D.3d 34, 42-43 (1st Dep't 2020) (citing Benderson Dev. Co. v. Commenco Corp., 44 A.D.2d 889 (4th Dep't 1974), aff'd, 37 N.Y.2d 728 (1975), and Jack Kelly Partners LLC v. Zegelstein, 140 A.D.3d 79 (1st Dep't 2016)).

"It is not enough," however, "that the transaction will be less profitable for an affected party or even that the party will sustain a loss." In re Condado Plaza Acquisition LLC, 620 B.R. at 839-40 (citation omitted).  See also Latipac Corp. v. BMH Realty LLC, 93 A.D.3d 115, 123 n.4 (1st Dep't 2012) ("Manifestly, the return of nine apartments to rent-stabilized status does not render impossible plaintiff's contemplated use of the building; it simply reduces the profitability of that use to a certain extent."); Bierer v. Glaze, Inc., No. 05-CV-2459 (CPS), 2006 WL 2882569, at *7 (E.D.N.Y. Oct. 6, 2006) ("Under New York law, changes in market conditions or economic hardship do not excuse performance.").

In this case, Gap has not framed a genuine issue of material fact in connection with its frustration defense.   First, to the extent Gap contends that New York State's blanket prohibition on non-essential business between March 22 and June 8, 2020, frustrated the purpose of the Lease, the possibility of just such a prohibition was referenced in the Lease itself, defeating any claim that the possibility was "wholly unforeseeable."   (Lease § 1.7(H) (defining a "Force Majeure Event" to mean "a strike or other labor trouble, fire or other casualty, governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, or any other cause beyond Tenant's reasonable control.") (emphasis added).)  See Gander Mountain, 923 F. Supp. 2d at 362 (N.D.N.Y. 2013) (commercial tenant could not invoke frustration of purpose to terminate lease based on tenant's inability to obtain insurance to protect against flood risk, where flood risk was foreseeable); Fifth Ave. of Long Island Realty Assocs. v. KMO-361 Realty Assocs., 211 A.D.2d 695, 696 (2d Dep't 1995) (affirming rejection of commercial tenant's frustration defense (based on the bankruptcy of the tenant's sublessee), where the "terms of the lease indicate[d] that it was foreseeable that the tenant might find itself in bankruptcy proceedings, or that the defendant might cease the type of retail operation contemplated by the parties, but that no protection for the defendant in the event of such occurrences was provided").

Second, to the extent Gap contends that the pandemic itself frustrated the purpose of the Lease to operate a retail business, Gap has not shown that the purpose of the Lease (according to Gap, the operation of a "first-class retail business"[7]) was "so completely"

---

[7]     Gap relies extensively on the "first-class" nature of its permitted use of the premises under the Lease, arguing that the contemplated "first-class" operation was to be physically and operationally identical to pre-pandemic store configuration and occupancy conditions.  The Lease supports no such restrictive reading.  Rather, the Lease uses the term "first-class" to distinguish between "[d]iscount, promotional and off-price retailers,"

frustrated by the COVID-19 pandemic that "the transaction [makes] little sense." Crown IT Servs., Inc. v. Koval-Olsen, 11 A.D.3d 263, 265 (1st Dep't 2004).  Gap argues that, as a result of the COVID-19 pandemic, "Gap was forced to shut down retail operations at the Premises to protect its customers and employees from an unforeseeable and highly contagious virus[.]"  (Pl. Opp. at 23.)  Gap also states that it entered into the Lease for the purpose of operating stores located "in the heart of what, until recently, was one of the busiest high end shopping districts in Midtown Manhattan" (id. at 4), with extensive foot traffic that has diminished substantially in light of COVID-19.  (See Pl. 56.1 St. ¶¶ 48-51; see also id. ¶¶ 4-9.)  Gap claims that "without the ability to operate the Premises as a retail store, 'the transaction would have made little sense.'" (Pl. Opp. at 23 (citation omitted).)

Gap does not dispute, however, that it in fact operated the stores at issue here for periods of time since the onset of the pandemic, offering customers curbside pick-up, or that it opened other retail locations in Manhattan to in-person shopping, during the pandemic.  (Def. Add'l 56.1 St. ¶¶ 2-5, 11, 15-19, 21-22.)  Instead, Gap maintains that it has since stopped offering even curbside pick-up at the stores on the premises, and that its other stores, at which it has offered in-person shopping notwithstanding the capacity and hygiene restrictions imposed as a result of the pandemic, are "in other parts of the City, with different demographics, under different leases, with different landlord-tenant relationships[.]"  (Docket Entry No. 51 ("Pl. Reply") at 3.)  Gap makes no proffers regarding any relevant differences in the terms of its leases for the other premises, and it points to no covenant in the Lease in which Ponte Gadea made any

---

such as "Daffy's, Center 21, Conway's, Payless Shoes," or Marshalls, and non-discount retail businesses selling quality merchandise, such as stores "similar in quality" to Sony, Apple, or T Anthony stores.  (Lease § 4.1.)

guarantee regarding foot traffic or the nature or demographic characteristics of the area of the Lexington Avenue store premises.

While undeniably unfortunate, the COVID-19 pandemic has not amounted to a frustration of the Lease's purpose of Gap operating a retail business at the Premises.  Instead, the evidence suggests that Gap has made a business decision to close its stores at 59th and Lexington, perhaps due to the pandemic's greater financial impact on those stores than on its other stores (see Pl. 56.1 St. ¶¶ 48-51; Pl. Opp. at 12 ("[F]oot traffic on Lexington Avenue never recovered . . . the precipitous decline in foot traffic and office workers destroyed the entire economic justification for the consideration demanded and paid for the premises and monthly rent."), while it continues to operate its retail businesses at other locations in Manhattan that are also subject to the health and safety risks of the COVID-19 pandemic.[8]  The possibility that the stores at issue in this case may suffer particularly adverse financial consequences from the COVID-19 pandemic does not amount to frustration of the purpose of the Lease.  1140 Broadway LLC, 2020 WL 7137817, at *2 ("Here, the lease was for office space in a building and the tenant's business was devastated by a pandemic.  That does not fit into the narrow doctrine of frustration of purpose.") (granting summary judgment on frustration defense in favor of landlord); 35 East 75th Street Corp. v. Christian Louboutin L.L.C., No. 154883/2020, 2020 WL 7315470, at *2 (N.Y. Co. Sup. Ct. Dec. 9, 2020) ("Contrary to defendant's argument, [the frustration] doctrine has no applicability here.  This is not a case where the retail space defendant

---

[8]      The Court recognizes Gap's health concerns about its employees and customers.  (See, e.g., Pl. 56.1 St. ¶ 52 ("Because asymptomatic people can spread the disease, there is no way to prevent carriers of COVID-19 from entering stores without requiring customers to first have a negative test result, which is simply impractical given the time from test to result.").)  However, the undisputed evidence presented establishes that Gap has operated other retail locations, including in Manhattan, on an in-person basis, notwithstanding these concerns.

leased no longer exists, nor is it even prohibited from selling its products.  Instead, defendant's business model of attracting street traffic is no longer profitable because there are dramatically fewer people walking around due to the pandemic.") (granting summary judgment on frustration defense in favor of landlord); Dr. Smood, 2020 WL 6526996, at *2 (rejecting tenant's argument that the purpose of its lease had been frustrated where the tenant had "been operating out of the demised premises," providing "both counter service and pickup of orders submitted online," since "at least July, 2020," while asserting it had no obligation to pay rent); Greater New York Auto. Dealers Ass'n, Inc. v. City Spec, LLC, 70 Misc. 3d 1209(A), 136 N.Y.S.3d 695, at *9 (N.Y. Civ. Ct. 2020) ("[E]ven if Respondent were forced by the Executive Order to close in-person operations at the Premises, a four-month closure out of a five-year lease did not frustrate the overall purpose of the Lease.").  See also Cai Rail, Inc., v. Badger Mining Corp., No. 20-CV-4644 (JPC), 2021 WL 705880, at *9 (S.D.N.Y. Feb. 22, 2021) ("At most, Badger has shown that the contract has become unprofitable and 'more onerous,' which does not excuse performance under New York law."); In re: CEC Entertainment, Inc., No. 20-33162, 2020 WL 7356380, at *9 (Bankr. S.D. Tex. Dec. 14, 2020) (concluding that the debtor, which operated a nationwide chain of Chuck E. Cheese venues, could not rely on the COVID-19 pandemic to avoid its obligations to pay rent to six lessors in three states, in part because "the purpose of each lease is not entirely frustrated").  But see Intern. Plaza Associates L.P. v. Amorepacific US, Inc., No. 155158/2020, 2020 WL 7416600, at *2 (N.Y. Co. Sup. Ct. Dec. 14, 2020) (denying summary judgment for landlord based on a tenant's failure to pay commercial rent during COVID-19 pandemic because court found issues of fact regarding foreseeability).

The Court therefore concludes that Ponte Gadea is entitled as a matter of law to summary judgment dismissing Gap's claims to the extent they rest on the proposition that Gap's Lease obligations terminated because the purpose of the Lease was frustrated.

Impossibility

Gap's third theory as to why the parties' Lease terminated in March 2020 is that the COVID-19 pandemic and resulting governmental restrictions rendered the parties' performance of the Lease impossible or impracticable.

"[U]nder New York law, impossibility (which is treated synonymously with impracticability) is a defense to a breach of contract action 'only when . . . performance [is rendered] objectively impossible . . . by an unanticipated event that could not have been foreseen or guarded against in the contract.'"  Axginc Corp. v. Plaza Automall, Ltd., 759 F. App'x 26, 29 (2d Cir. 2018) (quoting Kel Kim Corp. v. Cent. Markets, Inc., 70 N.Y.2d 900, 902 (1987)). Accord RW Holdings, LLC v. Mayer, 131 A.D.3d 1228, 1230 (2d Dep't 2015) ("a party seeking to rescind a contract [on impossibility grounds] must show that the intervening act was unforeseeable, even if the intervening act consisted of the actions of a governmental entity or the passage of new legislation"); Millgard Corp. v. E.E. Cruz/Nab/Fronier-Kemper, No. 99-CV-2952 (LBS), 2004 WL 1900359, at *4 (S.D.N.Y. Aug. 24, 2004) ("Foreseeability negates a defendant's use of impossibility as an affirmative defense.").  "The [New York] Court of Appeals explained that a defense to contract performance such as impossibility should be applied narrowly and only in extreme circumstances 'due in part to judicial recognition that the purpose of contract law is to allocate risks.'"  Sher v. Allstate Ins. Co., 947 F. Supp. 2d 370, 383 (S.D.N.Y. 2013) (quoting Kel Kim, 70 N.Y.2d at 902); accord Ebert v. Holiday Inn, No. 11-CV-4102 (ER), 2014 WL 349640, at *7 (S.D.N.Y. Jan. 31, 2014) ("Case law is clear that

impossibility excuses a party's performance 'under very limited and narrowly defined circumstances.'") (citation omitted), aff'd, 628 F. App'x 21 (2d Cir. 2015).  "Economic hardship, even to the extent of bankruptcy or insolvency, does not excuse performance" under the doctrine of impossibility.  Ebert, 628 F. App'x at 23 (collecting cases).

    Gap's impossibility defense fails because the very text of the Lease demonstrates that the conditions that Gap claims render performance impossible were foreseeable.  Cf. Gander Mountain, 923 F. Supp. 2d at 362 ("Impossibility and frustration of purpose refer to two distinct doctrines in contract law, but both require unforeseeability.") (citation omitted).  To the extent Gap relies on the government's prohibition and limitations of physical retail business as a result of the pandemic, the inclusion and limited application of the Force Majeure Event definition of the Lease demonstrate that the parties foresaw, and apportioned the risk associated with, the possibility that government measures in the event of a public emergency could affect performance under the Lease.  Furthermore, to the extent Gap relies on the COVID-19 pandemic itself as the basis of impossibility or frustration of purpose, Gap's contentions are insufficient to raise a genuine issue of material fact because the undisputed evidence shows that Gap in fact operated a retail business at the stores at issue in this case by way of curbside pick-up, and operated other retail locations on an in-person basis, during the pandemic.  The fact that its continued performance may be burdensome, "even to the extent of insolvency or bankruptcy," Bank of New York v. Tri Polyta Fin. B.V., No. 01-CV-9104 (LTS) (DFE), 2003 WL 1960587, at *5 (S.D.N.Y. Apr. 25, 2003) (Swain, J.) (citation omitted), does not render Gap's performance objectively impossible under New York law.  Accord 35 East 75th Street Corp., 2020 WL 7315470, at *3 ("The subject matter of the contract—the physical location of the retail store—is still intact.  And defendant is permitted to sell its products.  The issue is that it cannot sell enough

to pay the rent.  That does not implicate the impossibility doctrine."); 1140 Broadway LLC, 2020

WL 7137817, at *2 (same); Atlantic Garage Management LLC. v. Boerum Commercial LLC,

No. 512250/2020, 2020 WL 7350542, at *2 (N.Y. Co. Sup. Ct. Dec. 2, 2020) (rejecting parking

garage tenant's theory that COVID-19 restrictions made it "impossible . . . to perform under the

terms of the lease," in light of the general rule that "[i]mpossibility occasioned by financial

hardship does not excuse performance of a contract") (citation omitted); Cai Rail, Inc., 2021 WL

705880, at *10 (rejecting impossibility defense premised on the effects of the COVID-19

pandemic, even where the parties' contract became "dramatically" unprofitable to one party).

   The Court therefore concludes that Ponte Gadea is entitled as a matter of law to

summary judgment dismissing Gap's claims to the extent they rest on the proposition that Gap's

Lease obligations terminated due to impossibility of performance.

Failure of Consideration

   Gap's fourth theory is that the COVID-19 pandemic led to a "failure of

consideration" under New York law.

   "Failure of consideration exists wherever one who has promised to give some

performance fails without his or her fault to receive in some material respect the agreed quid pro

quo for that performance.  Failure of consideration gives the disappointed party the right to

rescind the contract."  Indep. Energy Corp. v. Trigen Energy Corp., 944 F. Supp. 1184, 1199

(S.D.N.Y. 1996) (quoting Fugelsang v. Fugelsang, 131 A.D.2d 810 (2d Dep't 1987)).  Rescission

based on a failure of consideration is "not permitted for a slight, casual, or technical breach, but,

as a general rule, only for such as are material and willful, or, if not willful, so substantial and

fundamental as to strongly tend to defeat the object of the parties in making the contract."

Callanan v. Powers, 199 N.Y. 268, 284 (1910).  For example, a tenant's eviction "suspends the

obligation of payment either in whole or in part, because it involves a failure of the consideration for which rent is paid."  Fifth Ave. Bldg. Co. v. Kernochan, 221 N.Y. 370, 372 (1917) (Cardozo, J.).

Gap's failure of consideration defense is unavailing because Gap has continued to receive the consideration promised under the Lease—retail premises for its operations—from the defendant landlord during the course of the COVID-19 pandemic.  Gap does not dispute that it has continued to use the stores to house its merchandise; that, for a period during the pandemic, it offered curbside pick-up at the stores; that it has been legally authorized to offer both curbside pick-up and in-person shopping at the stores, at least since June 2020; and that it remained in possession of the stores.  (Def. 56.1 St. ¶¶ 40-41; Def. Add'l 56.1 St. ¶¶ 2-12, 26.)  As of the parties' most recent submission, Gap had not been evicted from the premises, and had not abandoned the premises.  (Def. Add'l 56.1 St. ¶ 26.)  Even if the COVID-19 pandemic resulted—through no fault of the parties—in a partial failure of consideration, that partial failure would not be a basis for rescission.  CAB Bedford LLC v. Equinox Bedford Ave., Inc., No. 652535/2020, 2020 WL 7629593, at *3 (N.Y. Sup. Ct. Dec. 22, 2020) (rejecting tenant gym operator's failure of consideration argument based on the COVID-19 pandemic and its resulting temporary shutdown of gyms in New York City); Niagara Frontier Transp. Auth. v. Patterson-Stevens, Inc., 237 A.D.2d 965, 966 (4th Dep't 1997) (holding that "only a partial failure of consideration" was not a basis to avoid the consequences of a contract).  Furthermore, Gap has not proffered any facts demonstrating that rescission of the Lease, under which the parties and Ponte Gadea's predecessor have performed since 2005, would even be possible.

Ponte Gadea is entitled as a matter of law to summary judgment dismissing Gap's claims to the extent they are premised on failure of consideration.

Mutual Mistake

Gap's fifth theory is that the Lease should be reformed because the parties made a mutual mistake in drafting the Lease when they failed to foresee and address the possibility of a pandemic such as COVID-19.  Gap proffers conclusory declarations claiming that it would never have entered into a lease under which it would have remained obligated to pay rent in the current pandemic-affected circumstances.  It has made no proffer whatsoever as to whether its original counterparty intended to shoulder the entire risk of a pandemic-related downturn in the retail business, nor any evidence corroborating its alleged expectations as to allocation of risk.

"In the proper circumstances, mutual mistake or fraud may furnish the basis for reforming a written agreement."  Chimart Assocs. v. Paul, 66 N.Y.2d 570, 573 (1986).  In order to establish entitlement to reformation based on mutual mistake, a party must show that "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement."  Id.  "Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties."  George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 219 (1978).  "The mutual mistake must exist at the time the contract is entered into and must be substantial."  Weissman v. Bondy & Schloss, 230 A.D.2d 465, 468 (1st Dep't 1997).  A party's "prediction or judgment as to events to occur in the future, even if erroneous, is not a 'mistake' as that word is defined here."  Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 994 (S.D.N.Y. 1989) (quoting Restatement (Second) of Contracts § 151 cmt. (a), and collecting cases).

"Procedurally, there is a 'heavy presumption that a deliberately prepared and executed written instrument manifest[s] the true intention of the parties[.]'"  Chimart Assocs, 66

N.Y.2d at 574 (citation omitted).  See also id. at 571 ("Where a written agreement between sophisticated, counseled businessmen is unambiguous on its face, one party cannot defeat summary judgment by a conclusory assertion that, owing to mutual mistake or fraud, the writing did not express his own understanding of the oral agreement reached during negotiations.").

In this case, Gap alleges that, "[h]ad the Parties been able to foresee the events of the COVID-19 crisis at the time of contracting, the Parties would have provided language stating their true intent" that Gap "would not pay rent or other consideration for the Premises if [its intended] use was rendered impossible or impracticable."  (Compl. ¶ 54.)  In its summary judgment papers, Gap explains that the parties made a "mutual mistake" because the term "first-class retail business" was not "properly defined" to exclude the operation of a retail business during a pandemic, and because the "Lease omitted the intended protection of the Lease's purpose."  (Pl. Reply at 7; see also Pl. Opp. at 20 ("Gap's evidence proves the entire purpose of the lease was for Gap to operate a 'first-class retail business.'  [ ].  Gap and [Ponte Gadea's predecessor-in-interest] had a shared definition of that term which in no way included the Plexiglas barriers and face masks the current crisis and laws require.").)  As support for this theory, Gap submits the affidavits of two former employees of Gap (one of whom negotiated the Lease, and the other of whom signed the Lease), each of whom attests that, had the parties foreseen the limitations imposed by the COVID-19 pandemic on Gap's operation of a "first-class retail business," they would either not have entered into the Lease or would have entered into the Lease on unspecified different terms.[9]

---

[9]     See Docket Entry No. 35 ¶ 15 ("It was never the intent of the parties to require Gap to operate or pay rent under such circumstances. . . . If anything, the parties intended that if Gap could not operate a first-class retail stores similar to its other stores as they existed in 2005 . . . the Lease would terminate."); id. ¶ 16 ("Had anyone foreseen that the Premises would be required to be closed for an unspecified period of time, and that when they

Gap's claim that, had it anticipated the limitations imposed by the COVID-19 pandemic in advance, it would not have entered the Lease (at least on the same terms), is not sufficient to support a "mutual mistake" affirmative defense under New York law.  Gap has failed to proffer any facts supporting an inference that the alleged mistake "exist[ed] at the time" the Lease was entered into.  See Weissman, 230 A.D.2d at 468. Gap's declarants attest that the parties did not anticipate the COVID-19 pandemic when they entered into the Lease.  However, mistaken assumptions about the future do not amount to mutual mistakes warranting rescission of a contract.  de la Gueronniere v. Simon, No. 97-CV-4813 (DC), 1998 WL 226199, at *3 (S.D.N.Y. May 4, 1998) ("As to the happening of this future event, the parties' mistaken assumptions do not, as a matter of law, rise to the level of a mutual mistake.") (emphasis in original), aff'd, 166 F.3d 1199 (2d Cir. 1998); Raphael v. Booth Mem'l Hosp., 67 A.D.2d 702, 703 (2d Dep't 1979) ("Equity will not relieve a party of its obligations under a contract merely because subsequently, with the benefit of hindsight, it appears to have been a bad bargain[.]").  Moreover, Gap's affiants' unilateral beliefs about how the possibility of a pandemic in 2020 might have affected the parties' negotiation of the Lease in 2005 does not overcome the "heavy presumption" that the plain language of the Lease captures the complete intention of the parties.

---

reopened they would be required to be operated according to the rules, restrictions and limitations that substantially impair the ability to operate the store as expected, the Lease would not have made any sense, the Lease would not have been entered into, or would not have been entered into on the same terms."); Docket Entry No. 32 ¶ 17 ("The intent of the parties was that the Lease would terminate or otherwise be of no force or effect if Gap was unable to operate a first-class retail store consistent with its other stores in 2005."); id. ¶ 23 ("The COVID-19 crisis and the societal disruption it has caused were not anticipated by the parties that drafted and signed the Lease. . . . It was never the intent of the parties that Gap would continue to pay exorbitant, Manhattan real-estate prices for a glorified storage space, or for the placement of signage on the building.  Any provisions that can be read to the contrary would more properly be characterized as a mistake in the drafting of the Lease.").

See Chimart Assocs., 66 N.Y.2d at 574 ("As to mutual mistake, Paul sets forth no basis for his

contention that both parties reached an agreement other than that contained in the writing.");

Khezrie v. Greenberg, No. 98-CV-3638 (ERK), 2001 WL 1922664, at *7 (E.D.N.Y. Dec. 11,

2001) ("New York courts have consistently granted summary judgment against a party seeking

reformation where the only evidence supporting the claim was that party's bald and self-serving

allegation of an oral agreement or understanding at odds with the written agreement.").[10]

   Because Gap has not proffered any facts framing a genuine dispute as to the

existence of any basis for termination, rescission, or reformation of the Lease, the Court

concludes that Ponte Gadea is entitled as a matter of law to summary judgment dismissing Gap's

claims based on the Lease's termination in March 2020, rescission, or reformation.  Because all

of Gap's claims, including those for unjust enrichment, money had and received, and breach of

contract, turn on Gap's unsupported and legally flawed assertion that it had no obligations to

make payments under the Lease after March 19, 2020, Ponte Gadea is entitled as a matter of law

to summary judgment dismissing Gap's Complaint in its entirety.

---

[10] In its opposition brief, Gap argues that summary judgment should be denied or deferred
on its mutual mistake defense because "there has been no opportunity to take discovery
from the only other party that engaged in this mutual mistake, [Ponte Gadea's
predecessor-in-interest]."  (Pl. Opp. at 20.)  However, Gap neither filed an affidavit
pursuant to Federal Rule of Civil Procedure 56(d)—which requires a nonmoving party
who seeks further discovery in order to oppose a motion for summary judgment to file an
affidavit or declaration showing the "specified reasons" why the Court should defer
considering the motion or deny it, or allow time to obtain further discovery—nor
proffered evidence that could reasonably support an inference that there was an
agreement that could support a finding of mutual mistake.  "[T]he failure to file an
affidavit under Rule 56[d] is itself sufficient grounds to reject a claim that the opportunity
for discovery was inadequate[.]"  Paddington Partners v. Bouchard, 34 F.3d 1132, 1137
(2d Cir. 1994).  In any event, as explained above, Gap's mere conclusory hindsight
proffer that its negotiator would have held out for different terms is legally insufficient to
support a viable claim for mutual mistake.

For the reasons set forth above, Ponte Gadea is also entitled to summary judgment as to liability on its first and second counterclaims.[11]  In that connection, the Court finds and declares, based on the undisputed facts of record, that the Lease was terminated by Ponte Gadea effective June 15, 2020, and that Ponte Gadea is entitled pursuant to section 25.2 of the Lease to payment for holdover occupancy from that date.  Because the parties filed and briefed their cross-motions during the term of the Lease, which ended on January 31, 2021, the Court has by separate order entered simultaneously herewith referred this case to the Hon. Katherine H. Parker, United States Magistrate Judge, for an inquest on Ponte Gadea's damages, including outstanding unpaid rent from April 2020, holdover rent from June 15, 2020, and applicable costs and interest under Articles 23 and 24 of the Lease.  The parties are directed to contact Judge Parker's chambers for instructions.

CONCLUSION

For the foregoing reasons, Ponte Gadea's motion for summary judgment (Docket Entry No. 15) is granted as to liability only and denied without prejudice in all other respects, and Gap's cross-motion for summary judgment (Docket Entry No. 28) is denied in its entirety.

This case is referred to Magistrate Judge Parker for an inquest on Ponte Gadea's damages.

---

[11]     In light of the Court's conclusions set forth in this Memorandum Opinion and Order, Ponte Gadea's third counterclaim, which is pled in the alternative "in the event the Court determines that the Lease terminated due to a 'casualty,'" is moot and is dismissed without prejudice.  The Court also declines to reach Ponte Gadea's request for an order requiring the payment of use and occupancy pending the conclusion of the litigation (see Def. Mem. at 23-24) in light of the Court's resolution of the parties' cross-motions, which entitles Ponte Gadea to a judgment for all amounts determined to be outstanding under the Lease.

The Clerk of Court is respectfully directed to terminate the motions at Docket Entry Nos. 15 and 28.


        SO ORDERED.

Dated: New York, New York
        March 8, 2021

                                        /s/ Laura Taylor Swain
                                        LAURA TAYLOR SWAIN
                                        United States District Judge