**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

THE GAP INC.,

                                          Plaintiff,

                    -against-

PONTE GADEA NEW YORK LLC,

                                          Defendant.

-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED:  8/10/2021
```

**20-CV-4541 (KHP)**

<u>**OPINION AND ORDER ON**</u>
<u>**DAMAGES**</u>

**KATHARINE H. PARKER, United States Magistrate Judge**

This case concerns the impact of COVID-19 on lease agreements.  Plaintiff The Gap Inc. ("Gap") was a long-term tenant in a building located at the corner of 59th Street and Lexington Avenue in Manhattan, New York under a lease with Defendant Ponte Gadea New York LLC ("Ponte Gadea").  (ECF No. 63-1, Ex. 1, hereinafter, the "Lease").  In June 2020, after the COVID-19 pandemic resulted in a government-mandated cessation of in-person shopping, Gap brought this suit seeking relief from its Lease.  On March 8, 2021, the Honorable Laura Taylor Swain granted summary judgment in favor of Ponte Gadea on the issue of liability only.  (ECF No. 56.) Judge Swain then referred this case to the undersigned to conduct an inquest to determine Ponte Gadea's recoverable damages based on the terms of the Lease.  (ECF No. 57.)  On May 25, 2021, I heard oral argument on the rent dispute and other related procedural issues.  The parties then consented to my jurisdiction to enter a final judgment in this case pursuant to 28 U.S.C. § 636(c).  (ECF No. 85.)

## BACKGROUND[1]

On February 18, 2005, Gap entered into the Lease with Ponte Gadea's predecessor-in-interest for property on which to operate two retail businesses: (1) a Banana republic store and (2) a Gap store located at 130 East 59th Street, New York, NY 10022 (hereinafter, the "Premises").  The terms of the Lease extended to January 31, 2021, unless prematurely terminated or otherwise extended by the parties.  (Lease § 1.2.)

### I.  *"Fixed Rent" and "Termination" Under the Lease*

Under the terms of the Lease, the fixed rent for the Premises during the relevant period was $612,500 per month (the "Fixed Rent").  (Lease § 1.5(5).)  For purposes of this decision, the relevant period is December 1, 2015 to January 31, 2021 "or such earlier or later date that the term of this Lease expires or otherwise terminates . . ."  (Lease §§ 1.2, 1.5(5).)[2]  The Lease specifies that Fixed Rent should be paid "in equal monthly installments, in advance, on the first (1st) day of each calendar month during the Term."  (Lease § 1.6(A).)

In the event of a default, as defined by Lease § 21.1, Ponte Gadea possessed the express right to terminate the Lease "as of the third (3rd) Business Day after the date that [Ponte Gadea] gives [Gap] . . . notice, and [Gap] immediately shall quit and surrender the Premises," while remaining liable for Gap's other obligations under Articles 23 and 24 of the Lease.  (Lease § 21.2.)

---

[1] The Court assumes familiarity with the facts of this case.  That said, the Court will set forth the key terms of the parties' Lease relevant to resolving the instant damages dispute.  For additional detail on the context of this dispute and for a full account of the facts related to the already-resolved issue of liability, the Court refers to Judge Swain's decision on the cross motions for summary judgment.  (ECF No. 56.)

[2] January 31, 2021 is the "Fixed Expiration Date," as defined in the Lease.

2

As discussed in more detail below, it is already established that Ponte Gadea terminated the Lease as of June 15, 2020, making that the "Expiration Date," as defined in the Lease (hereinafter, the "Expiration Date").  The "Term" therefore expired on this same date.  (Lease §§ 1.2, 1.5(5).)

## II. Key Damages Provisions

Three Articles of the Lease – Articles 23, 24, and 25 – are particularly relevant to calculating damages in this case.  Article 23 provides the remedies available to Ponte Gadea and the method for calculating damages in the event of default.  It provides that, in the event Gap defaults on its obligations under the Lease, Gap "shall immediately quit and peacefully surrender the Premises to [Ponte Gadea]."  (Lease § 23.1(A)(1).)  Section 23.1(A)(2) confirms that Ponte Gadea is not obligated to relet the Premises in order to mitigate any damages and/or any unpaid rent owed by Gap.  (*See also* Lease § 23.1(B).)  Subsection (C) further provides that the remedies set forth in the Lease and available to Ponte Gadea in the event of Gap's default are "cumulative and nonexclusive."  (Lease § 23.1(C).)

With respect to calculating damages, the Lease provides that Ponte Gadea is entitled to: (1) all rent (including taxes and fees in addition to the Fixed Rent) "to the date that [the] Lease terminates;" (2) the excess of that rent "for the period which otherwise would have constituted the unexpired portion of the Term, over . . . the net amount, if any, of rents collected under any reletting" (hereinafter, "Deficiency"); and (3) regardless of any such Deficiency, "an amount equal to the excess of (a) the Rental for the period which otherwise would have constituted the unexpired portion of the Term (commencing on the date immediately succeeding the last date

3

with respect to which a Deficiency, if any, was collected), over (b) the then fair and reasonable net effective rental value of the Premises for the same period . . . both discounted to present value at the Base Rate." (Lease §§ 23.3(A)(1)-(3).)  Finally, the Lease also provides that "[n]othing contained in this Article 23 shall be deemed to limit or preclude the recovery by [Ponte Gadea] . . . of the maximum amount allowed to be obtained as damages by any statute or rule of law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth" in Section 23.3.  (Lease § 23.3(C).)  That said, the Lease provides that Ponte Gadea is not entitled to "consequential damages" but that this limitation on "consequential damages" does not limit Ponte Gadea's right to collect holdover fees described in Article 25 Section 2 of the Lease.  (Lease § 32.17.)

Article 24 sets forth the expenses and late charges available to Ponte Gadea as damages in the event of Gap's default.  Specifically, Gap must pay for Ponte Gadea's legal costs and fees incurred in connection with any lawsuit commenced to enforce the terms of the Lease plus interest.  (Lease § 24.1.)[3]  Furthermore, if Gap is found to have failed to pay any rent on or prior to the fifth day after the date rent is due, then Gap is obligated to pay "a late charge . . . as additional rent, [in] an amount equal to interest at the Applicable Rate on the amount unpaid, computed from the date such payment was due to and including the date of payment."  (Lease § 24.2.)

---

[3] If these costs and fees are incurred during the unexpired Term of the Lease, the amount is to be considered as additional rent.  If these costs and fees are incurred after the Expiration Date, the amount is to be considered as damages.  (Lease § 24.1.)

4

Article 25 contains the Lease's holdover provision.  Under Article 25 Section 1, Gap is obligated to "quit and surrender" the Premises to Ponte Gadea on the Expiration Date.  If Gap fails to surrender the Premises as required, then Gap must pay Ponte Gadea a holdover fee[4] for each month that Gap remains in the Premises.  (Lease § 25.2.)  The holdover fee is equal to:

> (I) in respect of the first thirty (30) days that Tenant holdsover in the Premises, one and one half (1 1/2) times the Fixed Rent and one hundred percent (100%) of the Additional Rent,[5] in either case that was payable under this Lease during or with respect to the last month of the Term, and (II) in respect of any period of time thereafter, the greater of (i) two (2) times the aggregate Rental that was payable under this Lease during the last month of the Term, and (ii) the then fair market rental value of the Premises.

(Lease § 25.2.)  Furthermore, the Lease confirms that Ponte Gadea's right to collect these holdover fees is in addition to, not in lieu of, the other remedies provided for by the Lease and those otherwise available by operation of law.  (Lease § 25.2.)

### III. Procedural History

In light of the devastating impact of COVID-19 on retailers, Gap stopped paying rent at many of its retail locations across the country and sought to consolidate all of its rent disputes with various landlords into one multi-district litigation proceeding.  Consistent with this goal, after commencing this lawsuit, Gap moved to stay this case pending resolution of its motion to transfer the matter to a multi-district litigation.  (*See* ECF No. 12.)  The undersigned ordered the

---

[4] The Lease does not use the term holdover fee or holdover rent.  Rather, it refers to the payment due during a holdover period as an amount for use and occupancy.  (Lease § 25.2.)  For ease of reference, the Court refers to this amount as a holdover fee to distinguish it from rent due under other provisions of the Lease.

[5] The term "Additional Rent" is not defined in the Lease, but the parties appear to agree on what constitutes Additional Rent for purposes of this Inquest as those amounts referred to as "additional rental" under the Lease.

parties to brief their respective cross motions for summary judgment while the Judicial Panel on Multidistrict Litigation ("JPML") considered Gap's motion to transfer.

The parties filed their respective cross motions for summary judgment in August 2020. (ECF Nos. 15, 28.)  Additionally, on August 28, 2020, Gap began the process of vacating the Premises.  (ECF No. 71 ("Rondholz Decl.") ¶ 11.)  Gap fully vacated and turned over the keys to the Premises to Ponte Gadea on October 14, 2020.  (*Id.* ¶ 12.)

In the interim, on October 2, 2020, the JPML denied Gap's motion to transfer and consolidate the rent disputes.  (*See* ECF No. 53.)  Then, on March 8, 2021, Judge Swain granted Ponte Gadea's motion for summary judgment as to liability only and denied Gap's motion for summary judgment in its entirety.  (ECF No. 56.)  The Court found "based on the undisputed facts of record, that the Lease was terminated by Ponte Gadea effective June 15, 2020, and that Ponte Gadea is entitled pursuant to section 25.2 of the Lease to payment for holdover occupancy from that date."  (*Id.* at 26.)  As noted above, Judge Swain also referred the matter to the undersigned to conduct an inquest on Ponte Gadea's damages, "including outstanding unpaid rent from April 2020, holdover rent from June 15, 2020, and applicable costs and interest under Articles 23 and 24 of the Lease."  (*Id.*)  The parties later consented to my jurisdiction to enter a final judgment in this case pursuant to 28 U.S.C. § 636(c).  (ECF No. 85.)

Immediately after the initial referral, this Court ordered additional briefing and later heard oral argument on the issue of damages.  Ponte Gadea now requests that the Court enter an Order on damages in the total amount of $9,414,112.79.  Gap, on the other hand, asserts that it only owes $3,984,550.23 under the terms of the Lease.

6

## THE PARTIES' POSITIONS

The crux of the parties' primary dispute with respect to Ponte Gadea's damages concerns the "Rental" and "Holdover" provisions of the Lease.  (*See generally* Lease §§ 23, 25.2.)  Below, the Court will outline the parties' respective views on how these provisions interact and how they should be applied in the case at bar.

### I. *Ponte Gadea's Position*

The Lease provides that, in the event of Gap's default, Ponte Gadea is entitled to "all Rental payable under this Lease . . . to the date that this Lease terminates."  (Lease § 23.3(A)(1).)  "Rental" is defined as "collectively, the Fixed Rent, the Tax Payment and the additional rent payable" by Gap to Ponte Gadea.  (Lease § 1.4(B).)

### A. *Fixed Rent*

Ponte Gadea argues that it is entitled to Fixed Rent from the time of default through the Expiration Date (June 15, 2020) as well as the Fixed Rent it would have collected through the Fixed Expiration Date (January 31, 2021) had the Lease been performed in full.  Nonetheless, Ponte Gadea does not seek Fixed Rent during the holdover period—that is to say, the period between June 15, 2020 and October 14, 2020 when Gap continued to use and occupy the Premises after the June 15, 2020 Expiration Date.[6]  Rather, Ponte Gadea requests: (1) unpaid rent that accrued from the time Gap stopped paying rent in April 2020 through June 15, 2020; (2) holdover fees for the period June 16, 2020 through October 14, 2020 (discussed below); and

---

[6] The Court addresses the holdover period in more detail below.

(3) unpaid rent that accrued from October 15, 2020 through January 31, 2021 (*i.e.*, the original

anticipated end date for the lease).  (ECF No. 63 at 10-12.)

   B.  *Additional Rent*

      Ponte Gadea also argues that it is entitled to $50,708.54 in Additional Rent.  Specifically,

it asserts that Gap is obligated to pay its share of the common area maintenance ("CAM")

charges for the building in which the Premises is located, which remain unpaid.  These charges

relate to heating fuel, water, and other maintenance fees (ECF No. 63 at 12,) and Ponte Gadea

argues that Gap owes its share of the maintenance charges for the entirety of the relevant

period (*i.e.*, April 2020 through January 2021).

   C.  *Tax Payments*

      According to Ponte Gadea, Gap paid taxes for the entirety of 2020 but failed to pay

taxes for January 2021.  Thus, based on Lease §§ 2.1 and 2.2, Ponte Gadea argues that Gap is

liable for a Tax Payment obligation covering January 2021 in the amount of $240,427.40 – 17%

of the total tax amount owed for the first half of 2021.  Moreover, Ponte Gadea also maintains

that it is entitled to recover a tax auditing filing fee for the tax assessment year 2020/2021 in

the amount of $1,354.79.  Gap does not dispute that it owes these taxes.

   D.  *Holdover Fees*

      Perhaps the most significant dispute between the parties concerns application of the

Lease's holdover provision.  Ponte Gadea asserts that it is entitled to holdover fees calculated in

accordance with Lease § 25.2 starting from June 16, 2020 (the day after the Expiration Date)

through October 14, 2020 (the date that Gap vacated the Premises).  (ECF No. 63 at 13.)  Under

Lease § 25.2, the holdover fees are calculated as a function of the Fixed Rent and the Additional

Rent (discussed above) and potentially – if the holdover period lasts more than 30 days – the

then fair market rental value of the Premises.  According to Ponte Gadea, that amounts to

$4,539,415.32 in holdover fees.

### II.  Gap's Position

Gap contends, pursuant to Lease § 23.3(A)(1), that Ponte Gadea is only entitled to Fixed

Rent from April 2020 to October 14, 2020 – the date that Ponte Gadea re-entered the Premises.

According to Gap, that amount totals $3,984,550.23.  (ECF No. 74 at 8.)  Gap asserts that Ponte

Gadea is not entitled to any recovery under the Lease's holdover provision because, it argues,

that provision only applies to a tenant who fails to vacate the Premises after the Fixed

Expiration Date of the Lease – *i.e.*, January 31, 2021 – which is not the case here.  Furthermore,

Gap argues that Ponte Gadea's interpretation of the holdover provision amounts to an illegal

penalty under New York contract law.[7]  (*See* ECF No. 74 at 9 (citing *Trustees of Columbia Univ.

in City of New York v. D'Agostino Supermarkets, Inc.*, 36 N.Y.3d 69, 75 (2020)).)

In the alternative, Gap contends that the damages provisions in Section 23.3 and the

holdover provision in Section 25.2 are mutually exclusive.  Thus, assuming the Court finds that

Ponte Gadea is entitled to holdover fees under the terms of the Lease, Gap argues that it would

---

[7] Because the Court has subject matter jurisdiction in this case based on diversity of citizenship among the parties
pursuant to 28 U.S.C. § 1332, the Court must determine which law governs by applying the choice of law rules of
New York, the forum in which this Court sits. *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008).
In contract cases, New York law applies the "grouping of contacts" approach, which identifies the state with the
"most significant relationship to the transaction and the parties." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
84 N.Y.2d 309, 317 (1994).  Here, the Premises is located in New York State and the parties agree that New York
law applies.

only owe Ponte Gadea Fixed Rent up until the date the lease was terminated (June 15, 2020) and holdover fees from that date until the date Ponte Gadea re-entered the Premises (October 14, 2020).  With that formula, Gap posits that it would owe $6,103,602.65 in combined Fixed Rent and holdover fees/rent.

With respect to rent sought for the period from October 15, 2020 through the Fixed Expiration Date, Gap says it is not liable for any payment because Lease Section 23.3 damages are computed either through the Expiration Date or the date of re-entry upon the Premises by the Landlord, citing Section 23.3(A)(1).   Additionally, Gap argues that Ponte Gadea did not meet its burden to show any calculable damages after it regained possession of the Premises in October 2020.

Finally, Gap asserts that Ponte Gadea's interest calculation for the outstanding CAM fees is incorrect because, it argues, the correct date from which CAM interest should be calculated is 30 days *after* the date Gap received the invoice for those fees, not the date of the invoice as Ponte Gadea suggests.

## **ANALYSIS**

The Court, having reviewed the terms of the Lease in detail, finds that all of the parties' disputes can be resolved based on the plain language of the Lease.

### I. *Ponte Gadea is Entitled to Rental Through June 15, 2020 and Holdover Fees*

At the outset, it bears noting that there is no dispute that Ponte Gadea is entitled to Rental from April 2020 through June 15, 2020.  (*See* ECF No. 63 at 10; ECF No. 74 at 8.)  This is also consistent with the Lease terms.  The Lease provides that, in the event of default, Gap

must pay Ponte Gadea "all Rental payable under this Lease . . . (x) to the date that this Lease terminates, or (y) to the date of re-entry upon the Premises by Landlord, as the case may be." (Lease §23.3(A)(1).)  Further, as already noted above, Judge Swain previously determined "based on the undisputed facts of record, that the Lease was terminated by Ponte Gadea effective June 15, 2020."  (ECF No. 56 at 26.)  Thus, Gap is liable for all unpaid Rental that accrued up to June 15, 2020.

From that point, the parties dispute the proper calculation of damages throughout the remainder of the relevant period.  Gap broadly asserts that the Lease's holdover provision (Section 25.2) cannot kick in to effect at the June 15, 2020 Expiration Date because "holdover provisions are intended to compensate landlords when tenants refuse to leave *after the natural expiration of a lease* for interfering with the opportunity to lease the premises to others."  (ECF No. 74 at 10-11 (emphasis added).)  Even if the Court were to accept this proposition as a general matter for real estate contracts in New York City, such a construction of the contract in this case would contradict the express language of Lease § 25.2.  That provision explicitly states that if Gap does not surrender the Premises "on the Expiration Date," Gap is liable for holdover fees.  (Lease § 25.2.)  Thus, the Lease expressly contemplates applying holdover fees even if the Lease is terminated before the Fixed Expiration Date.  Given that the Expiration Date has already been established as June 15, 2020, the holdover provision applies to the period during which Gap remained in the Premises after that date.

11

While it is true that Section 23.3 of the Lease specifically addresses the amount of, and calculation method for, damages stemming from an event of default and that Ponte Gadea chose to terminate the Lease in light of Gap's default, neither of these facts imply, as Gap argues, that Section 23.3 provides the *exclusive* remedy for default under the Lease.  To the contrary, Section 23.3(C) explicitly authorizes other categories of damages in addition to – not in lieu of – the damages contemplated in Article 23:

> Nothing contained in this Article 23 shall be deemed to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages by any statute or rule of law, or of any sums or damages to which Landlord may be entitled in addition to the damages set forth in this Section 23.3 (it being agreed that any damages pursuant to this Section 23.3 shall not include any consequential damages other than the costs of reletting as provided in this Lease).

(Lease § 23.3(C).)[8]

Gap argues that the Court must prioritize the specific language set forth in Section 23.3 over the (purportedly) more general holdover language in Section 25.2.  While, as a general matter, courts construing contracts give specific terms greater weight than general language, the cases Gap relies on are inapposite to the facts of this case.  For instance, the *Long Island Lighting Co.* case involved a situation where the Second Circuit overturned the District Court and required a party to pay "rate reductions" in accordance with a specific formula provided in the parties' settlement agreement.  *County of Suffolk v. Long Island Lighting Co.*, 266 F.3d 131 (2d Cir. 2001).  The District Court had found that a statement in the settlement agreement that

---

[8] Similarly, the holdover provision also provides that Ponte Gadea's right to collect a holdover fee from Gap is "in addition to any other rights or remedies that landlord may have hereunder or at law or in equity."  (Lease § 25.2.) Thus, Sections 23.3(C) and 25.2 of the Lease are consistent with one another insofar as they clarify that the remedies available to Ponte Gadea are cumulative, not mutually exclusive.

the paying party "shall pay . . . a total of $390 million in the form of rate reductions" was a plain

statement barring the paying party from enjoying the tax savings attendant to its payment

obligation.  However, a related provision in the settlement agreement provided a detailed

formula to calculate the rate reductions and that formula explicitly incorporated the tax savings

excluded by the District Court's interpretation.  *Id.* at 136, 138-39.  Thus, the Second Circuit

held that specific formula took precedence over the District Court's plain reading of the "shall

pay" language in another provision.  *Id.* at 139.  Unlike in *Long Island Lighting Co.*, however, in

this case the damages provision and holdover provision are not in conflict and do not create

any ambiguity as to their application.[9]

Accordingly, for the reasons set forth above, the holdover provision applies to the

period from June 16, 2020 to October 14, 2020.  *See Ross v. Thomas*, 728 F. Supp. 2d 274, 284

(S.D.N.Y. 2010) ("If the contract language is clear and unambiguous on its face, the

court must give effect to the plain-meaning of the contract's terms and provisions.  [T]he

court's analysis is initially focused solely on the language of the contract itself. If that language

is unambiguous, its plain meaning alone dictates the outcome") (internal citations and

quotation marks omitted).

## II.   The Holdover Provision is Not an Unenforceable Penalty

---

[9] *See also John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) (confirming, in a footnote, as a general principle, that definitive contract language will trump any general recitation of the parties' intent that is inconsistent with that definitive language); *Commerzanstalt v. Telewide Sys.*, 880 F.2d 642, 649 (2d Cir. 1989) (holding that a plaintiff cannot recover both benefit-of-the-bargain damages for breach of contract and out-of-pocket expenses for fraud; there is no fraud claim at issue in the case at bar).

To the extent the holdover provision is read to apply to the period post-dating the Expiration Date, Gap argues it is nonetheless unenforceable under New York law because it amounts to an unenforceable liquidated damages penalty.

Under New York law, parties are free to agree to a liquidated damages clause "provided that the clause is neither unconscionable nor contrary to public policy." *D'Agostino Supermarkets, Inc.*, 36 N.Y.3d at 71 (citing *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 24 N.Y.3d 528, 536 (2014)).  "A contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation . . . If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977) (cleaned up).

In other words, liquidated damages provisions should be conceived as "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *D'Agostino Supermarkets, Inc.*, 36 N.Y.3d at 74-75 (citing *Truck Rent-A-Center, Inc.*, 41 N.Y.2d at 424).  Crucially, the reasonableness of that estimate must be measured "as of the time the parties entered the contract, not as of the time of the breach." *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 200 (E.D.N.Y. 1999).  Furthermore, Gap – as the party seeking to avoid payment of holdover fees – has the burden of establishing that *at the time of contracting* the liability

prescribed by the holdover provision was disproportionate to the foreseeable losses to be caused by its default.  *D'Agostino Supermarkets, Inc.*, 36 N.Y.3d at 75.

The Lease's holdover provision provides, in part, that if Gap holds over on the Premises Gap must pay an amount equal to 150% of Fixed Rent for the first month during the holdover period and at least 200% for every month thereafter.  (Lease § 25.2.)  Gap asserts that these percentages are simply multiples of the base rent that would have accrued during the holdover period anyway and that, therefore, applying the holdover provision would result in a damages award grossly disproportionate to the harm actually suffered by Ponte Gadea.  (*See* ECF No. 74 at 10-11.)  This provision was entered into on February 18, 2005—nearly fifteen years prior to Gap's breach.  Gap has not provided any evidence to suggest that it was unreasonable at the commencement of the Lease for the Lease signatories to agree to the percentage multiples set forth in the holdover provision.  Indeed, it would have been exceedingly difficult for the parties to have accurately forecasted the rental value of the Premises over the approximately 16-year lifespan of the Lease; it would have been equally difficult to predict Ponte Gadea's actual damages in the event of default at future points during the Lease Term.

Under New York Law, absent evidence showing that a holdover provision grossly deviates from the damages probably suffered in the future, the Court must enforce it. *See Koylum, Inc. v. Peksen Realty Corp.*, No. 99-cv-3793 (ADS), 2004 U.S. Dist. LEXIS 24158, at *17-19 (E.D.N.Y. Dec. 2, 2004) ("[w]here there is no evidence of a gross deviation from actual damages, courts will enforce a liquidated damages clause calling for double or even treble rent when a tenant fails to timely vacate premises"); *Federal Realty L.P. v. Choices*

*Women's Med. Ctr.*, 289 A.D.2d 439, 735 N.Y.S.2d 159 (2d Dep't 2001) (granting summary

judgment enforcing a treble-rent liquidated damages clause against non-vacating tenant,

absent evidence that sum was grossly disproportionate to the foreseeable damages)*; see*

*also Thirty-Third Equities Co. v. Americo Grp., Inc.*, 294 A.D.2d 222, 222, 743 N.Y.S.2d 10, 10 (1st

Dep't 2002) (enforcing a liquidated damages clause obligating the holdover tenant to pay two

and one-half times the monthly rent).  Additionally, New York courts have recently enforced

holdover fees that equated to 150-200% of base rent, finding that they did not amount to

unenforceable liquidated damages.  *Glaze Teriyaki v. Macarthur Props. I*, No. 653883/2013,

2021 N.Y. Misc. LEXIS 2039 at *5-7 (Sup. Ct. N.Y. Apr. 15, 2021) (approving holdover provision

that required the holdover tenant to pay 200% of the base rent that would have accrued over a

two-and-a-half-year holdover period).

Here, based on the parties' submissions, the record evidence, and the Court's hindsight,

it is relatively clear that the percentages set forth in Lease § 25.2 (the holdover provision) are

higher than the damages suffered by Ponte Gadea as a result of Gap's failure to vacate the

Premises.  First, had Gap performed under the Lease, Ponte Gadea could have only reasonably

expected to recover the rent that would have otherwise been due under the Lease.  (*E.g.* Lease

§§ 1.5(5), 1.6.)  Second, Gap has demonstrated that Ponte Gadea failed to relet the Premises

after Gap vacated.  Third, given that retail stores throughout New York City were closed for

much of the COVID-19 pandemic, it is unlikely that Ponte Gadea would have been able to relet

the Premises at all during the holdover period.  Thus, it is highly unlikely that Ponte Gadea

would have been able to secure a new lease before the Fixed Expiration Date, let alone a lease

16

representing a 150 to 200% increase in the amount of rent Gap was paying. *See Thirty-Third Equities, Co.*, 294 A.D.2d at 222 (approving a holdover provision, in part, because of evidence that the subject premises were subsequently leased for significantly more money).

However, the Court cannot base its evaluation of the enforceability of the holdover provision on the realities of the present day. The case law is clear; the Court must limit its inquiry to whether "the provision for liquidated damages is reasonably related to potential harm that was difficult to estimate when the parties made their contract." *Ctr. For Specialty Care, Inc. v. CSC Acquisition I, LLC*, 187 A.D.3d 46, 54 (1st Dep't 2020). There is no doubt, given the fluctuations in the New York City commercial real estate market, that damages to a landlord due to a holdover tenant in 2020 would have been hard to predict in 2005. At other times during the Lease demand for commercial property was greater and Ponte Gadea may very well have been able to rent the Premises, which is at a prime location in New York City near subways and other high traffic areas, for more than the rent paid by Gap under the Lease. Therefore, I find that the holdover provision in the Lease was reasonable given the length of the Lease and the fact that numerous New York courts have approved similar holdover provisions. Furthermore, Gap failed to meet its evidentiary burden to show that the percentages prescribed in Section 25.2 were unlikely to bear a reasonable relationship to Ponte Gadea's foreseeable damages in the event of a breach at the time of contracting.

Accordingly, for the reasons set forth above, Gap is liable for holdover fees for the period from June 16, 2020 to October 14, 2020.[10]

---

[10] This Court does not address whether Gap failed to preserve its unenforceability defense. Rather, I find that even if this defense were construed as not having been included in Gap's affirmative defenses, Gap should be permitted

### III. *Ponte Gadea is Not Entitled to Rental After the Expiration Date*

The parties also dispute whether Gap is liable for Fixed Rent that allegedly accrued from the date Ponte Gadea re-entered the Premises (October 14, 2020) through the Fixed Expiration Date (January 31, 2021).  Section 1.6 of the Lease governs the payment of Fixed Rent. Subsection (A) specifically provides that Gap must pay Fixed Rent "in equal monthly installments, in advance, on the first (1st) day of each calendar month ***during the Term*."  (Lease § 1.6(A) (emphasis added).)  As already discussed above, the Term of the Lease unambiguously ends "on the Expiration Date"—in this case, June 15, 2020.  (*See* Lease § 1.2.)  Furthermore, Section 23.3(A)(1) only provides for Rental up "to the date that this Lease terminates" or "to the date of re-entry upon the Premises by Landlord, as the case may be."  The only way to reconcile Section 1.6 and 23.3(A)(1) is to read the latter option provided for in 23.3(A)(1) of Rental "to the date of re-entry" as occurring sometime within the Term, since Rental (and Fixed Rent) is expressly and specifically payable only during the Term.  This reading would allow for a situation when a Tenant abandons the property and stops paying before the Landlord terminates the Lease pursuant to Section 21.2 of the Lease.  Indeed, this possibility is contemplated under the Lease in Section 21.1(G).

---

to assert this defense pursuant to the liberal amendment standards under the Federal Rules of Civil Procedure and the Second Circuit's preference for deciding issues on the merits, rather than potential procedural shortcomings. *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (affirming district court's decision to permit amendment because the nonmovant failed to show prejudice or bad faith); *Aniero Concrete Co. v. New York City Constr. Auth.*, No. 94-cv-9111, 1997 U.S. Dist. LEXIS 22, at *42 (S.D.N.Y. Jan. 3, 1997) (granting leave to amend after the filing of a summary judgment motion, in part, because the motion was filed early on in discovery); *Worley v. City of New York*, No. 17-cv-4337 (LGS), 2020 U.S. Dist. LEXIS 26398, at *82 (S.D.N.Y. Feb. 12, 2020) ("the Second Circuit has a strong preference for resolving issues and claims on their merits rather than on procedural technicalities").

A reading that would require payment of Rental through a holdover period after the Term would be contrary to Section 1.6(A) and render the "otherwise" language in Sections 23.3(A)(2)-(3) a nullity.  The Court reads the various provisions of the Lease as incentivizing a Tenant who defaults to leave the Premises promptly and to encourage reletting when possible.  Indeed, the Landlord does not profit from the defaulting Tenant when it is possible to relet the Premises at the same base rent or a higher rent.  (*See* Lease § 23.3(A)(2).)

Thus, the Lease only contemplates, and Ponte Gadea is only entitled to, unpaid Rental (which includes Fixed Rent, additional rent, and taxes) that accrued up to the June 15, 2020 Expiration Date.

The cases relied on by Ponte Gadea on this issue do not warrant a different result.  For instance, in *Holy Props. Ltd. v. Kenneth Cole Prods.*, 87 N.Y.2d 130, 134-35 (1995), the Court held that the landlord was entitled to recover all unpaid rent through the expiration of the lease term.  However, as the Court of Appeals noted, the lease at issue in that case "expressly provided that . . . upon [the tenant's] abandonment of the premises or eviction, it would remain liable for all monetary obligations arising under the lease."  *Id.* at 134.  Here, there is simply no Lease provision that provides for recovery of Rental beyond the Expiration Date.  Instead, per the provisions discussed above, the Lease provides for Rental only up until the date of termination.

### IV.  Additional Liquidated Damages and Fair Market Value

While Ponte Gadea is not entitled to Rental that would have otherwise accrued through the Fixed Expiration Date had it not terminated the Lease, liquidated damages under Lease § 23.3(A)(3) are still available.  That provision provides:

> If this Lease terminated by reason of the occurrence of an Event of Default . . . then Tenant shall pay to Landlord, on demand, and Landlord shall be entitled to recover . . . as and for liquidated and agreed final damages, an amount equal to the excess of (a) the Rental for the period which *otherwise* would have constituted the unexpired portion of the Term . . . over (b) the then fair and reasonable net effective rental value of the Premises for the same period . . . both discounted to present value at the Base Rate.

(Lease § 23.3(A)(3) (emphasis added).)  And, as noted above, Section 23.3 damages are non-exclusive to other remedies available under the Lease.

The key phrase on which liability under this provision turns is "for the period which otherwise would have constituted the unexpired portion of the Term."  Though the Term expired on June 15, 2020 pursuant to Ponte Gadea's decision to terminate the Lease, Section 23.3(A)(3) sets damages for the period that *otherwise* would have constituted the unexpired portion of the Term, which the Court reads to mean the period between when the Lease terminated by virtue of a default and the contemplated end date of the Lease, *i.e.* the Fixed Expiration Date.  Said another way, Lease § 23.3(A)(3) authorizes Ponte Gadea to recover damages based, in part, on the Rental that *would have* accrued if the Lease had not been terminated – *i.e.*, from the Expiration date (June 15, 2020) through the Fixed Expiration Date (January 31, 2021).  This interpretation is consistent with other portions of the Lease.  For example, Section 23.3(A)(2) uses the same phrasing and provides an alternative remedy in the event the Lease terminates because of a default.  Thus, Ponte Gadea is entitled to the damages

consistent with the plain language of Section 23.3(A)(3) calculated between the Expiration Date and the otherwise contemplated end of the Term, that is, the Fixed Expiration Date.[11]

Ponte Gadea does not seek these damages during the period for which it seeks holdover fees; rather, it seeks them only from the end of the holdover period (October 15, 2020) through the Fixed Expiration Date (January 31, 2021).[12]  However, Ponte Gadea failed to submit sufficient evidence to establish the fair rental value of the Premises during this period.  No comparators have been presented through any affidavit.  Thus, the Court cannot compute the amounts due pursuant to Section 23.3(A)(3).

Accordingly, the parties are directed to meet and confer with an aim to determine the fair market value of the Premises from October 15, 2020 through January 31, 2021.  If the parties are unable to reach agreement, Ponte Gadea shall submit a letter to the Court – not to exceed three pages in length – by no later than August 27, 2021 setting forth its position on the fair rental value of the Premises during the relevant period with an appropriate affidavit and evidence attached.  Gap shall submit its position letter and any evidence with its valuation by no later than September 17, 2021.

### V. *Interest*

---

[11] The Court also notes that this liquidated damages provision is enforceable and does not constitute an unlawful penalty for the same reasons that the holdover provision was found to be valid *supra* at pp. 13-17 and n.10. Specifically, at the time of contracting the damages the Landlord would sustain in the event the Lease was terminated were not easily ascertainable and the liquidated damages provided for in Section 23.3(A)(3) bear a reasonable relation to the Landlord's probable losses because the damages are directly tied to the amount Ponte Gadea could have recovered through mitigation efforts.

[12] Counsel for Ponte Gadea confirmed this at oral argument.  (*See* ECF No. 90 at 20:1-18.)

Now that the Court has determined the scope of damages to which Ponte Gadea is entitled, the Court must also specify the applicable prejudgment interest rate to be applied to those damages categories.  As noted above, Article 24 Section 2 of the Lease provides that, in the event Gap fails to pay any amount of Rental, Gap will be liable for "an amount equal to interest at the Applicable Rate on the amount unpaid, computed from the date such payment was due to and including the date of payment."  The parties agree that, insofar as Ponte Gadea is entitled to Gap's unpaid Rental, the applicable interest rate for those damages is 5.25%.  (*See* Lease § 1.7(B).)

Ponte Gadea contends that the 5.25% interest rate is only applicable to unpaid Rental and that it is entitled to prejudgment interest on holdover fees at the higher statutory interest rate of 9%.  Under N.Y. C.P.L.R. § 5004, the rate of interest in breach of contract awards "shall be at the rate of nine per centum per annum."  *See also* N.Y. C.P.L.R. § 5001.  Gap's position is that Lease § 24.2 provides the applicable interest rate for holdover fees because such fees are calculated as a function of Rental, bringing those fees within the ambit of Lease § 24.2.  To be sure, holdover fees under the Lease are calculated as a multiple of Fixed Rent and Additional Rent, which are components of Rental (as defined in the Lease).  But, the plain language of Lease § 24.2 clearly limits the Applicable Rate to instances where Gap "fails to pay any item of Rental."

The fact that Rental is one of the variables used to calculate holdover fees does not convert holdover fees into a category of unpaid Rental as defined in the lease.  "Rental" is comprised of Fixed Rent, the Tax Payment, and the additional rent payable by Tenant.

22

Holdover fees are not described as rent or additional rent anywhere in the Lease; rather, they are described as an amount "on account of use and occupancy of the Premises." (Lease § 25.2.) Gap does not cite any Lease provision or case law that supports its position, and a plain reading of the Lease shows that the parties did not negotiate a specific interest rate for holdover fees.

To the extent that Gap argues that "awarding interest on payments for a period of occupancy during the original lease term at a higher rate of interest than if the Lease had been performed according to its terms would create a windfall that is prohibited by New York law," its argument is unpersuasive. (ECF No. 74 at 16 (citing *Commerzanstalt*, 880 F.2d at 649).) To start, the premise of Gap's argument is incorrect. Had the Lease been "performed according to its terms," no interest rate would be necessary because Gap would have remitted timely Rental payments to Ponte Gadea. Additionally, the case law cited by Gap on this issue is inapposite. In the *Commerzanstalt* case, the Second Circuit held that the plaintiffs could not recover double damages under *both* their breach of contract and fraud claims. Such double recovery was impermissible because it put the plaintiffs in a better position than they would have been in had the contract been performed in accordance with its terms. *Commerzanstalt*, 880 F.2d at 649. In this case, however, the holdover fees and the unpaid Rental are wholly distinct categories of damages that arise out of different Lease provisions and apply to different time frames. Thus, applying the statutory interest rate to damages arising out of the holdover provision does not create a windfall for Ponte Gadea; it adheres to the statutory rate provided under New York law and is consistent with the express terms of the Lease.

In sum, Gap has not provided any legitimate basis to support application of the Applicable Rate set forth in the Lease to holdover fees.

The parties also disagree on the interest calculation for outstanding maintenance costs. The Lease provides, and the parties do not dispute, that Gap must pay additional rent for any costs incurred by Ponte Gadea in connection with providing water, steam, and other services to maintain the Premises.  (*See, e.g.*, Lease § 5.3.)  However, the parties dispute the appropriate date from which interest on these costs is meant to be calculated.

Based on the Court's review of the applicable provisions, Gap is only required to make payments for water and steam "on or prior to thirty (30) days after [Gap's] receipt of a reasonably substantiated statement therefor."  (*See id.*)  Thus, interest for any unpaid CAM fees should only begin to accrue after that 30-day period elapsed.  It appears, however, that Ponte Gadea's proposed damages calculations begin calculating interest for CAM on the date it provided Gap with the invoice for those fees: June 1, 2020.  Given the plain language of the applicable provisions, Gap is correct that the parties should begin calculating interest on the outstanding CAM fees from July 1, 2020.  (ECF No. 72 ("Dyer Decl.") ¶ 7.)

### VI. Attorneys' Fees

The parties do not dispute that Ponte Gadea is generally entitled to an award of attorney's fees incurred in connection with terminating the Lease and prosecuting this action. (*See* Lease § 24.1 ("Tenant shall pay to Landlord an amount equal to the costs that Landlord incurs in instituting or prosecuting any legal proceeding against Tenant . . . after the occurrence of an Event of Default").)  Additionally, Gap does not dispute that the rates charged by Ponte

24

Gadea's counsel were reasonable given the circumstances of this case.  What Gap does contest is the reasonableness of the hours spent by defense counsel on this matter.

A district court exercises "considerable discretion" in awarding attorneys' fees.  *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2007); *see also Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011).  "The party seeking fees bears the burden of demonstrating that its requested fees are reasonable."  *TufAmerica Inc. v. Diamond*, No. 12-cv-3529 (AJN), 2016 WL 1029553, at *3 (S.D.N.Y. Mar. 9, 2016), reconsideration granted in part, No. 12-cv-3529 (AJN), 2016 WL 3866578 (S.D.N.Y. July 12, 2016), and on reconsideration in part, No. 12-cv-3529 (AJN), 2018 WL 401510 (S.D.N.Y. Jan. 12, 2018) (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984)).

Attorneys' fees are awarded by determining a presumptively reasonable fee, or a "lodestar," reached by multiplying a reasonable hourly rate by the number of hours reasonably expended.  *TufAmerica Inc.*, 2016 WL 1029553, at *3 (citing *Millea*, 658 F.3d at 166); *see also Bergerson v. N.Y. State Office of Mental Health, Cent. N.Y. Psychiatric Ctr.*, 652 F.3d 277, 289-90 (2d Cir. 2011).  As noted above, the parties do not dispute that the rates charged by Ponte Gadea's attorneys were reasonable.  Indeed, the Court has reviewed Ponte Gadea's rates and finds them reasonable for attorney time in this District.  *See TufAmerica Inc.*, 2016 WL 1029553, at *5 (rate must be "in line with those rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation") (cleaned up).

When evaluating hours expended, the Court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and

reasonably expended." *Haley v. Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (quoting *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (per curiam)).  In determining whether hours are excessive, "the critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'"  *Samms v. Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)).  "Hours that are excessive, redundant, or otherwise unnecessary, are to be excluded . . . and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application."  *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (internal citations and quotation marks omitted); *accord Alicea v. City of New York*, 272 F. Supp. 3d 603, 608-09 (S.D.N.Y. 2017) (quoting *Kirsch*, 148 F.3d at 173); *TufAmerica Inc.*, 2016 WL 1029553, at *3.

Here, Ponte Gadea seeks to recover its legal costs incurred in connection with three distinct buckets of work that its attorneys performed on its behalf: (1) counseling and drafting in connection with Ponte Gadea's decision to terminate the Lease and subsequent efforts to compel Gap to vacate the Premises; (2) defending against Gap's motion to transfer this case to a nationwide multi-district litigation panel; and (3) writing and oral advocacy in connection with the parties' cross motions for summary judgment and the inquest on damages.  Nine individuals from Akerman LLP ("Akerman") worked for Ponte Gadea throughout these three phases of the

case.  In total, Ponte Gadea seeks $569,936.50 for 916.5 hours spent on the matter plus $259.56 in disbursements.[13]

There is no doubt that the Akerman attorneys who performed work in this case are highly competent—a factor the Court considers in determining the appropriate amount of fees to award.  John Wood, the relationship partner between Akerman and Ponte Gadea, regularly speaks on the subject of commercial leases and has authored numerous publications on that topic.  Joshua Bernstein, lead litigation counsel for this matter, has decades of experience in commercial leases, real estate, and commercial landlord/tenant disputes.  Darryl Graham and Kathleen Prystowsky, the Akerman partners who spent the most time on the case, also have significant experience in complex real estate disputes.  And Megan Admire, the lead associate on the case, is a 2016 law school graduate and former judicial law clerk with commercial litigation experience.

Recognizing the skill and experience of these attorneys, the Court must next assess how many of the hours billed (by both partners and associates) were usefully and reasonably expended.

Having reviewed Akerman's time sheets in detail, the Court finds that Akerman's attorneys spent a somewhat excessive amount of time on this case.  The Court does not question, and indeed applauds Akerman's zeal in representing Ponte Gadea.  However, Akerman could have effectively litigated this case more efficiently.  Generally speaking, the

---

[13] On April 19, 2021, Ponte Gadea filed a Notice of Withdrawal with respect to its claim for costs incurred in connection with legal research.  (ECF No. 68.)  The Court acknowledges this withdrawal and will factor it into its final fee award.

Court believes that Akerman could have achieved the same result for its client in fewer total hours billed.

Throughout the case, Akerman's attorneys collectively spent: (1) 28.7 hours on drafting the Notice of Default and the Notice of Termination; (2) 63.4 hours on drafting Ponte Gadea's Answer and counterclaims; (3) 328.6 hours on discovery and summary judgment briefing; (4) 217.4 hours in opposing Gap's motion to transfer and the related motion to stay; and (5) 277.8 hours in connection with the inquest proceedings.  (ECF No. 63 at 27; ECF No. 86 ¶ 12.)

With these totals in mind, there are certain categories of billing that are particularly concerning to the Court.  First, with respect to Ponte Gadea's motion for summary judgment, Akerman drafted limited materials in support of that motion: (1) a two-page attorney declaration; (2) a three-page client declaration with limited exhibits; and (3) the briefs. However, in total, Akerman billed over 300 hundred hours in connection with its summary judgment motion.  This is an excessive amount of hours, especially considering that Akerman had four attorneys (three partners and one senior associate) spend 108.9 total hours reviewing and revising an already-drafted 25-page opposition brief.  (*See* ECF No. 63, Ex. 3 at 37-41.)

Second, it appears that Ponte Gadea is requesting 47.3 hours of attorneys' fees for preparation before the oral argument before the JPML.  The record reflects that Akerman was aware that it would be allotted a mere two minutes for that argument.  Thus, the amount of attorney time spent preparing for such a hearing is unreasonable.  To be sure, it was completely understandable that counsel for Ponte Gadea wanted to adequately prepare before entering into a complex oral argument before the JPML—a relatively unfamiliar forum for most

attorneys.  The Court also recognizes that Mr. Graham had to be prepared to answer any questions the panel might have had and, accordingly, it was imperative for Mr. Graham to review hundreds of documents submitted in connection with the hearing.  However, even after factoring those considerations into the analysis, the Court still finds that 47.3 hours of attorney time for a two-minute oral argument is disproportionate.

Third, the Court also takes particular note of the amount of time Mr. Graham spent preparing for the inquest hearing.  From May 13, 2021 to May 24, 2021, Akerman's attorney time records show that Mr. Graham spent approximately 118 hours preparing for that oral argument.  The Court finds this to be an excessive amount of time.  To be sure, Mr. Graham could not have known that the oral argument would last less than two hours.  On the other hand, the parties submitted two memoranda of law in support of their inquest positions and those briefs cited to relatively little case law.  (*See generally* ECF Nos. 63, 74.)  Indeed, and as noted above, most of the disputed issues pertained to interpreting the plain language of the Lease—a document the attorneys were already intimately familiar with after extensive summary judgment briefing.

Fourth, Akerman's block billing is problematic in this case.  While block billing is not prohibited in the Second Circuit, a substantial amount of block billing often renders it difficult for a reviewing court to determine whether the attorney work at issue was necessary.  *Sea Spray Holdings, Ltd. v. Pali Fin. Grp.*, 277 F. Supp. 2d 323, 325-26 (S.D.N.Y. 2003).  Just by way of example, Akerman's attorney time records indicate that, on August 12, 2020, Ms. Prystowsky spent 6.6 hours "working on [the] motion for summary judgment," including research, drafting

29

the 56.1 Statement and various declarations, compiling exhibits, and corresponding with colleagues.  (ECF No. 63, Ex. 3 at 27.)  There is no way for the Court to ascertain how much time was spent on each task and, therefore, it is difficult to determine whether the hours expended on these tasks were reasonable in number.  As this is merely one example of the block billing practices that were consistently employed by Akerman's attorneys in this case, the Court finds an adjustment to the fees request is appropriate.  (*See id.* at 26-33.)

To address these issues discussed above, the Court has the authority to impose a percentage-based reduction of Akerman's hours.  *See Alicea*, 272 F. Supp. 3d at 612 (where plaintiff's counsel engaged in numerous instances of excessive and unjustified billing, the court found that "[a] fifty percent cut [was] warranted"); *La Barbera v. VLF11 Mgmt. Corp.*, No. 08-cv-2615 (ENV) (MDG), 2012 U.S. Dist. LEXIS 63548, at *20 (E.D.N.Y. Apr. 3, 2012) (based on excessive billing on tasks and duplication of work by multiple attorneys, court found "that a 45% percent reduction in total hours is appropriate to correct for the unreasonable amount of time expended by counsel on this case").  Having reviewed all of the time records, and consistent with the analysis above, I find that a uniform 20% reduction of Akerman's hours total is warranted in this case.

Accordingly, I find that, to date, Ponte Gadea is entitled to $455,949.20 (569,936.50 x .80) in attorneys' fees.  I will also grant Ponte Gadea's additional related request for $259.56 in disbursements, which Gap does not dispute.

### VII. Meet and Confer and Other Directives

Separate and apart from the Court's order directing the parties to meet and confer with respect to the rental value of the Premises from October 15, 2020 through January 31, 2021, the parties are also directed to meet and confer to determine the damages total, which needs to be recalculated, based on this Opinion and Order.  If the parties are unable to reach agreement on the specific damages amounts to be awarded, Ponte Gadea shall submit another letter to the Court – not to exceed three pages in length – setting forth both a list of the damages items about which the parties agree and the remaining issues in dispute.  Ponte Gadea should submit this letter, if necessary, by no later than August 27, 2021.  Gap shall submit its response by no later than September 17, 2021.  If the parties are able to agree on a final damages total, the parties should submit a joint letter to the Court by no later than August 27, 2021 setting forth the calculation methodology and the final amount.  In either case, the Court directs the parties to assume an August 10, 2021 judgment date for the purposes of calculating prejudgment interest.

## **CONCLUSION**

The parties are hereby directed to meet and confer in accordance with the Court's rulings, as set forth in further detail above.

**SO ORDERED.**

DATED:         New York, New York
                    August 10, 2021

_____
KATHARINE H. PARKER
United States Magistrate Judge