

Darryl R. Graham

Akerman LLP
1251 Avenue of the Americas
37th Floor
New York, NY  10020

T: 212 880 3800
F: 212 880 8965

September 10, 2021

**VIA ECF**
Honorable Katharine H. Parker, U.S.M.J.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *The Gap, Inc. v. Ponte Gadea New York LLC*
               Case 1:20-cv-4541(LTS)(KHP)

Dear Judge Parker:

      We serve as counsel to Ponte Gadea New York LLC ("Ponte Gadea" or "Landlord") in the above-captioned action and hereby submit Ponte Gadea's position concerning the Fair Market Value of the Premises in order to allow the Court to compute the damages due pursuant to Section 23.3(A)(3) of the Lease (the "23.3(A)(3) Calculation") for the time period of October 15, 2020 through and including January 31, 2021 (the "Replacement Tenant Period") as directed in Your Honor's August 10, 2021 Opinion and Order on Damages (the "Damages Order"). [ECF No. 92].

      In support of Ponte Gadea's 23.3(A)(3) Calculation, attached hereto are the Declarations of Alina Toyos, the Vice President of Asset Management for Ponte Gadea USA, Inc., which wholly owns Landlord, and the Declaration of Andrew Kahn, the Executive Managing Director of Retail Services for Cushman & Wakefield, who is being proffered as an expert in the area of retail leasing.

    **I.**    **Ponte Gadea's 23.3(A)(3) Calculation**

      As explained in further detail in the attached Declarations, Ponte Gadea's position is that there was not a viable retail tenant to replace Gap for the Premises during the Replacement Tenant Period.  This conclusion is based on the actual offers Ponte Gadea received for the Premises and the market conditions at the time.  Accordingly, Ponte Gadea's damages for the Replacement Tenant Period under the 23.3(A)(3) Calculation is **$2,332,660.26**.

      Section 23.3(A)(3) of the Lease calculates damages as "an amount equal to the excess of (a) the Rental for the period which otherwise would have constituted the unexpired portion of the Term … over (b) the then fair and reasonable net effective rental value of the Premises for the same period … both discounted to present value at the Base Rate."  (Lease § 23.3(A)(3).)  "[N]et

Honorable Katharine H. Parker, U.S.M.J.
September 10, 2021
**2 | P a g e**

---

effective rental value" is "calculated by deducting from the fair and reasonable rental value of the Premises the expenses that Landlord would reasonably expect to incur in reletting the Premises, including, but not limited to, all repossession costs, brokerage commissions, legal expenses, attorneys' fees and disbursements, alternation costs, contributions to work and other expenses of preparing the Premises for such reletting." (*Id.*)

1. **Step 1: The Calculation of Rental for the Replacement Period**

The first step in the 23.3(A)(3) Calculation is to establish the total Rental for the Replacement Tenant Period, which is $2,191,158.31, with interest at 9% accruing at $141,501.96 through August 10, 2021, for a total amount of Rental of $2,332,660.26.[1]

2. **Step 2: The Calculation of Fair and Reasonable Net Effective Rental Value of the Premises for the Tenant Replacement Period**

The next step is to calculate the fair and reasonable net effective rental value of the Premises for the Tenant Replacement Period. Ponte Gadea's position is that the net effective rental value of the Premises for October 15, 2020 to January 31, 2021 was $0, or even a negative number.

As explained in the Toyos Declaration, Ponte Gadea made good faith efforts to relet the Premises both before and during the Tenant Replacement Period. While Ponte Gadea did receive two offers to lease a portion of the Premises prior to Gap's surrender on October 14, 2020 (the "Surrender Date"), there was no final lease agreement as of the Surrender Date. Accordingly, the actual net effective rental value of the Premises for the Replacement Tenant Period was $0. (Toyos Decl. ¶¶ 10-45, 57-60.)

Notwithstanding, the Toyos Declaration further explains that even if Ponte Gadea had entered into a written lease agreement with either of the prospective tenants on the terms they proposed, neither of those theoretical leases would have resulted in Ponte Gadea receiving rental payments during the Tenant Replacement Period. Rather, Ponte Gadea would only have incurred expenses during this period, as both prospective tenants requested Ponte Gadea undertake significant Landlord Work, which would have included, *inter alia*, demolishing the premises, re-demising the premises, and ensuring certain utilities for the premises, including vertical transportation. Thus, even if Ponte Gadea had entered into a lease prior to the Surrender Date, the net effective rental value during the Replacement Tenant Period would have been less than $0. (*See* Toyos Decl. ¶¶61-67.)

Ponte Gadea's inability to identify a replacement tenant for this period is not surprising given the prevailing market conditions, as demonstrated in the accompanying expert declaration of Mr. Kahn. As Mr. Kahn explains, the COVID-19 pandemic caused a significant disruption to the retail leasing market. However, even under normal conditions, it would not have been possible for Ponte Gadea to replace Gap as a tenant during the 3½ month Replacement Tenant

---

[1] A breakdown of this calculation is attached hereto as Exhibit C.

Period.  This is because, even under normal conditions, the process for replacing a retail tenant takes approximately 3 years for the landlord to begin collecting rent.  This process includes the time for preparing the marketing materials (~1-3 months), marketing the space (~6 months), conducting site visits (~18 months), negotiating a final letter of intent with basic business terms (~6 months), negotiating a written lease agreement (~3-6 months), completing any landlord's work (~8-10 months), and completing the tenant's work (~12 months).  Accordingly, Mr. Kahn's opinion is that there was no viable replacement tenant to replace Gap during the Replacement Tenant Period.  (*See* Kahn Decl., Opinion 1.)

Alternatively, Mr. Kahn opines that it may have been possible for Ponte Gadea to secure a "pop up" tenant for the Premises, though this was an unlikely scenario given the market conditions in 2020.  In the unlikely event Ponte Gadea had been able to secure a "pop up" tenant, Mr. Kahn opines Ponte Gadea could have received a maximum amount of $75,000 in total rent for the Tenant Replacement Period.  (*See* Kahn Decl., Opinion 2.)

Notwithstanding, Ponte Gadea notes that the Lease expressly provides that Ponte Gadea has no obligation to mitigate its damages by reletting the Premises, much less on any conceivable terms.  (*See* Lease § 23.1.)  Ponte Gadea further notes that it did not receive any "pop up" tenant offers for the Premises during the Replacement Tenant Period.  (Toyos Decl. ¶ 58.)

For all these reasons and those stated in further detail in the attached Declarations, Ponte Gadea's position is that the fair and reasonable net effective rental value of the Premises for the Replacement Period is $0.

### 3. Step 3: Discounting to Present Value

The third step is to discount the Rental and net effective rental value to present value.  As the Court is aware, present value calculations are designed to discount future streams of revenue to present dollars.  *See e.g. Metz v. United Techs. Corp.*, 754 F.2d 63, 67 (2d Cir. 1985) ("[I]t is proper to discount awards for future [damages] to present value."); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 243 (S.D.N.Y. Bankr. 2014) (outlining methods "to determine the present worth of future anticipated earnings").  Given that the Replacement Tenant Period does not continue into the future, but has already passed in time, it is not possible or appropriate to perform a present value calculation.

## II. Conclusion: Ponte Gadea's Final 23.3(A)(3) Calculation

Applying each of the factors outlined above, the 23.3(A)(3) Calculation results in total damages to Ponte Gadea for the Replacement Tenant Period of **$2,332,660.26**.

Honorable Katharine H. Parker, U.S.M.J.
September 10, 2021
**4 |** P a g e

We thank the Court for its attention to this matter.

                                          Respectfully submitted,

                                          */s/ Darryl R. Graham*

                                          Darryl R. Graham

59765829