

Davis+Gilbert LLP
1675 Broadway
New York, NY 10019
212 468 4800
dglaw.com

October 1, 2021

**Joshua H. Epstein**
d 212 468 4869
jepstein@dglaw.com

**VIA ECF**

Hon. Katharine H. Parker, U.S.M.J.
United States District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Re: *The Gap, Inc. v. Ponte Gadea New York LLC*
Case No. 1:20-cv-4541(LTS)(KHP)

Dear Judge Parker:

We represent Plaintiff/Tenant The Gap, Inc. ("Gap" or "Tenant") in the above-captioned action. Pursuant to the Court's orders dated August 10, 2021 (ECF Dkt. No. 92) (the "August 10 Order") and August 23, 2021 (Dkt. No. 94), and in response to defendant Ponte Gadea New York LLC's ("Ponte Gadea" or "Landlord") September 10, 2021 letters (Dkt. Nos. 95, 96), we write to address Landlord's contentions about the damage-related items remaining in dispute in this action, including the liquidated damages available to under § 23.3(A)(3) of the Lease for the period of October 15, 2020 through and including January 31, 2021 (the "Unexpired Term").[1]

Landlord's calculation of § 23.3(A)(3) Liquidated Damages is completely wrong. Landlord *elected* to terminate the Lease, ending Landlord's entitlement to full contractual rent. The Court made this clear in the first damages inquest in this action, denying Landlord contract rent and directing Landlord to the relevant Lease provision. (Dkt. No. 92, at 19-20.) In this *second* attempt to substantiate damages for the Unexpired Term, Landlord seeks to do an end-run around its election by again arriving at the full contractual rent as "Liquidated Damages." The result of Landlord's improper calculation results not in an enforceable liquidated damages calculation, but instead in a penalty. This is contrary to New York law.

*Section 23.3(A)(3) Provides for "Liquidated Damages" based on the Fair and Reasonable Net Effective Rental Value—not "Replacement Tenant" Income*

The Lease provides for "liquidated damages" for the Unexpired Term, and sets forth a specific calculation to arrive at that amount. These liquidated damages are comprised of the difference (if any) between the contractual rent under the Lease and the "***then fair and reasonable net effective rental value***" of the Premises for the relevant time period.

[1] Given the overlapping nature of the arguments made in Landlord's two submissions, and in the interest of judicial economy, Gap submits this single, six-page letter in lieu of two separate three-page letters.





The Lease does not define "net effective rental value," and Landlord in its submission conspicuously makes no attempt to explain this term. But "net effective rental value" has a very specific customary meaning among real estate practitioners. As discussed in the accompanying Declarations of Sharon Locatell and Jennifer Rondholz, "net effective rent" and/or "net effective rental value" means "the present value over the term of the lease of the rental stream less the amortized costs of any capital expenses incurred in obtaining the lease. Such costs are inclusive of leasing commissions, tenant installation costs (TI) and/or free rent" (Locatell Decl., § II, p. 6; Rondholz Decl. ¶ 12.) This is a calculated amount that takes into account rent-free months and other allowances. In other words, this formula determines the average monthly amount a landlord receives from the property assuming a deal is struck between a willing lessor and lessee at a market rate on market terms, even if the landlord receives little or nothing, or even makes payments (*i.e.* for tenant improvements) in particular months over a longer period. Net effective rent looks at the total amount the landlord receives, accounts for any lease concessions (e.g. construction periods, a number of months of free rent or a tenant improvement allowance), and amortizes the total rent paid and those concessions monthly over the entire lease term.[2] *See, e.g., Herman Miller, Inc. v. Thom Rock Realty Co., L.P.*, 849 F. Supp. 911, 923 n.1 (S.D.N.Y. 1994) (citing expert submissions to explain that "[t]he 'effective' rental rate is a function of the face rental, any periods of free rent given to the tenant, and any work allowances afforded to the tenant.").

Landlord does not address the Premises' "net effective rental value." Instead, Landlord redefines the Unexpired Term as the "Replacement Tenant Period," which then leads to Landlord's conclusion that no "Replacement Tenant" could have been secured for the Unexpired Term. But "Replacement Tenant Period" does not appear anywhere in the Lease, and "net effective rental value" clearly does not mean the *actual* rental income Landlord either realized or would have realized over a specific short-term period from a prospective tenant. Landlord's flawed, circular, and self-serving argument would always lead to the conclusion that the initial months of any lease have a value of "zero dollars" because: (i) it typically takes months (or even years) to prepare commercial premises for tenant occupancy before Landlord receives any cash payments from a tenant; (ii) virtually no commercial tenants would pay rent during the first months of a lease; and/or (iii) all commercial landlords incur expenses preparing premises for new tenant occupancy.[3] The industry approach to "net effective rental value" discussed above accounts for all of these considerations. Landlord's approach is not how "net effective rental value" is calculated, under any reasonable interpretation of that term. Section 23.3(A)(3) clearly contemplates that the Premises has some rental value during the Unexpired

---

[2] As a basic example, a landlord agreeing to a lease calling for $120,000.00 in monthly rent for 15 years (180 months) but allowing six months of free rent and a $720,000.00 tenant improvement allowance, receives a net effective monthly rent of $112,000. (a) $120,000 monthly rent, times (b) 174 such payments, minus (c) $720,000 in allowances, divided by (d) 180 months (the entire term of the lease).

[3] Notably, this Court has previously rejected a party's attempt to do what Landlord has attempted here: ascribe a zero-dollar value to a premises' rental value following a party's breach of the relevant lease. *See Herman Miller v. Thom Rock Realty Co.*, 92 Civ. 2125 (RWS), 1995 U.S. Dist. LEXIS 8442, at *4-5 (S.D.N.Y. June 19, 1995).





Term. Interpreted as Landlord proposes, § 23.3(A)(3) would be meaningless, however, and would incentivize Landlord *not* to relet the Premises unless it could do so for more rent than the original tenant was paying. That would be an absurd interpretation, because when the rent is higher, there is no deficiency for the tenant to pay as damages.

*Landlord Cannot Use its Strategic Decision to Terminate as a*
*Back-Door to Full Contractual Rent*

Two critical facts must be considered to avoid Landlord's misdirection and omission: (1) Landlord knew it needed to find a new tenant years before the Expiration Date, had been actively marketing the Premises well before the pandemic began, and long before the June 15, 2020 termination date, and had multiple proposals for the space. (*See, e.g.* Ex. 3 to Landlord's Toyos Declaration, a June 2020 proposal from a national bank.) It just didn't accept them. Thus Landlord's suggestion that the property has zero value because it could not find a tenant is false. (2) Landlord made a strategic decision in electing to terminate its Lease with the Gap instead of collecting rent owed under the Lease and New York law; to award contract rent for this period after awarding a Holdover Penalty for the prior period would make the former a penalty, or require the later to be reconsidered.

First, the evidence available to date demonstrates that Landlord began marketing the Premises long before the COVID-19 pandemic began in March 2020 or the Lease was terminated on June 15, 2020. As further discussed in the accompanying Declaration of Jennifer Rondholz, Landlord likely began marketing the Premises in mid- 2019 to prepare for the Lease's natural expiration in January 2021, after Gap advised it was not willing to pay the rent increases Landlord sought. (*See* Rondholz Decl., ¶¶ 5, 7.), Regardless, Landlord was already conducting walk-throughs of the Premises with prospective tenants as early as February 2020. (*See id.*, ¶ 9). Even assuming it would take approximately three years for Landlord to begin collecting rent on the Premises—a timeline that Gap disputes—nothing prevented Landlord from marketing the Premises as early as 2018. In any case, Landlord clearly did not wait until October 2020 to begin marketing the Premises—no landlord would—and could have obtained a new tenant for the Premises long before June 15, 2020. (Rondholz Decl. ¶¶ 1-3, 4-10.) Thus, Landlord cannot earnestly suggest that the timing of Gap's surrender of the Premises somehow prevented Landlord from re-letting the Premises. Indeed, the only purpose of the Holdover Penalty is to compensate for damage resulting from the Landlord's inability to provide possession to another tenant, damage that no party could expect during the Lease's term

Second, Landlord made a strategic decision to terminate the Lease. Landlord could have continued collecting contractual rent until the Lease's natural expiration on January 31, 2021. By electing the remedy of termination, however, Landlord made a business decision, presumably to get new prospective tenants into the Premises sooner or to begin new construction. Regardless of the reason, in making this decision to terminate, a sophisticated actor like Landlord surely had a business strategy to market the Premises before and following the Lease termination. Landlord disingenuously insinuates that Gap's failure to vacate the Premises put Landlord in an





intractable position, resulting in "zero" net effective rent. In light of the facts, however, the suggestion that Landlord was blindsided with no plan to secure a new tenant is false.

Landlord's attempt to recover 100% contract rent for the Unexpired Term, based on the meritless argument that Landlord could not place a tenant in the space for those specific months, effectively imposes a penalty against Tenant, the second such penalty that Tenant would be paying. In the August 10 Order, the Court ruled that Gap was liable for holdover rent for June 16, 2020 to October 14, 2020, finding that "Gap has not provided any evidence to suggest that it was unreasonable at the commencement of the Lease for the Lease signatories to agree to the percentage multiples set forth in the holdover provision." (Dkt. No. 92.) The Court's conclusion overlooked Gap's evidence on this point and the conclusion should be reconsidered and changed.[4] Where properly negotiated—and not intended as a penalty—however, a holdover rent provision could only provide for payment exceeding contractual rent if the payment roughly approximated the landlord's damages arising from the holdover tenant's prevention of Landlord from leasing the premises to a successor tenant. Where no such new tenant is waiting to take possession, however, there is no damage, and the holdover rent serves no purpose other than to punish the tenant. Landlord builds its whole argument here on the premise that there was no tenant waiting to lease the Premises. The Court should not allow Landlord to recover an additional penalty here, on top of the penalty Landlord already recovered for the holdover period. Indeed, the 150% to 200% holdover rent amounts awarded to Landlord necessarily took account of the impact of any delays in Landlord's ability to turn over possession of the Premises to a theoretical tenant after Landlord elected to terminate. Accepting Landlord's contention concerning Liquidated Damages here and applying no deduction based on net effective rental value would provide Landlord with a *further* windfall in connection the same *entirely theoretical* damage.

*The Premises' Fair And Reasonable Net Effective Rental Value as Determined By*
*<u>Sharon Locatell, MAI, CER, MRICS, of Appraisers & Planners, Inc.</u>*

In light of the foregoing, and as the Court has previously held, the correct means of determining the fair and reasonable rental value of premises in a lease dispute requires an examination of other *actual*, comparable leases, accounting for factors such as free rent periods and other allowances, and arriving at a final value to apply to the relevant period. *See 720 Lex Acquisition LLC v. Guess? Retail, Inc.*, 2014 U.S. Dist. LEXIS 117518 (S.D.N.Y 2014). To that end, Sharon Locatell, the President of Appraisers & Planners, Inc., has conducted an appraisal of the net effective rental value for the Unexpired Term.

---

[4] Gap supplied evidence concerning the punitive effect of the enforcement of the holdover provision multipliers through the Declarations of Smita Butala (Dkt. No. 70) and Jennifer Rondholz (Dkt. No. 71). ("The actual loss Landlord would suffer if Gap failed to vacate the Premises if the Lease terminated before the Fixed Expiration Date was not only capable of precise estimate; it was expressly provided for in the Lease." (Dkt. No. 70, ¶ 8, and see ¶ 18.) "[The holdover provision] is designed to provide the Landlord with damages for the loss of the ability to rent the Premises as a result of the presence of a tenant holding over and failing to vacate the Premises…I am not aware of such a provision ever being employed…prior to the natural expiration of the Lease." (Dkt. No. 71, ¶ 14, and see ¶¶ 13, 19.))





For the Gap and Banana Republic spaces, in addition to her experience and other data regularly used by experts in her field, Ms. Locatell considered four (4) comparable leases for retail spaces in the surrounding area executed since the fourth quarter of 2018.[5] *See* Locatell Decl. § V, pp. 17-18. Their average lease term is 10 to 15 years, and retail landlords have been offering six (6) months of free rent at the outset of these leases. *See* Locatell Decl. § V, p. 21. The analysis demonstrates that the fair and reasonable net effective rental value of the Premises for the entire Unexpired Term was approximately $1,413,009.00 without downtime.[6] *See* Locatell Decl. § VII, p. 25.

Finally, the Lease calls for discounting that figure to present value. As Landlord stated in its letter, the relevant period is now in the past. Thus, this step in the process is unnecessary.

The fairness and reasonableness of Ms. Locatell's conclusion is further supported by the independent conclusion of Gap's own leasing expert, its Senior Director of Real Estate, Jennifer Rondholz, based upon her own knowledge, experience, and work in the retail leasing market, and the lease renewal discussions. (Rondholz Decl. ¶¶ 1-3, 10-13.)

Based upon Ms. Locatell's net effective rent calculation, the correct calculation of Liquidated Damages for the Unexpired Term under § 23.3(A)(3) as directed by the Court's order is $738,592.00.[7] *See* Locatell Decl. § VII, p. 25.

*In addition to Liquidated Damages, Other Damages Items*
*Remain in Dispute and Subject to Offset*

In addition to the liquidated damages issue discussed above, several other damages issues remain in dispute.

First, Gap disputes the amount of taxes Landlord claims to be due. In the August 10 Order, the Court stated that "Gap does not dispute that it owes these taxes." (Dkt. No. 92, at 8.) As Gap argued in its prior briefing—and as the Court agreed—however, Landlord used the wrong method to calculate damages for the first inquest. The Court agreed the Landlord is not entitled to contractual rent, so Gap had no occasion to dispute individual items Landlord claimed. Gap's Fifth Affirmative Defense for Setoff was not a topic of Landlord's motion for summary judgment, has not been summarily adjudicated, and the defense concerns the amount of damages to which Ponte Gadea is entitled. It is not addressed, however, by the procedures the Court established to brief the damages remaining to be awarded, or reduced from those

---

[5] Ms. Locatell conducted her empirical analysis of the net effective rental value without the benefit of discovery. Relevant data relating to the rental value of the Premises, including proposed term sheets, lease drafts and communications with brokers and prospective tenants, is not publicly available and would likely need to be obtained via subpoena to ensure its accuracy.

[6] If the Court were to conclude that downtime should be considered, the net effective rental value would be approximately $1,211,428.00. *Id.* at § VII, p. 26.

[7] If the Court were to conclude that downtime should be considered, the liquidated damages would be approximately $940,173.00. *Id.* at § VII, p. 26.





already awarded. Investigation, discovery and further briefing should be permitted on this defense before the Court issues its award.

In any event, Gap does not owe the taxes Landlord claims are due. (*See* Dyer Decl. ¶¶ 1-4, and Ex. A.; Lease §2.2(H)-(I); Locatell Decl. §§ I, VII.) Under Lease § 2.2(I) Landlord was required to furnish a tax bill with a tax statement to Gap before Gap's time to pay taxes begins running, but Landlord has provided no evidence that it actually furnished this tax statement. (Dyer Decl., ¶ 4.)[8] Without fulfilling that condition, no tax is due, as pled in the Eighteenth Affirmative Defense which has also not been summarily adjudicated. Moreover, according to the New York City Department of Finance website, Landlord is overcharging Gap, based on incorrect amounts of taxes assessed. (*See* Dyer Decl., ¶ 4, Ex. A; Locatell Decl., §I, 2nd ●.)

Second, Gap disputes the legal fees Landlord seeks to recover. The evidence submitted by Landlord, once again heavily redacted, reflects the same excessive overbilling reflected in Landlord's previously submitted invoices leading to the Court's August 10 order. This issue requires an inquest to determine the *reasonable* fees Landlord can recover, particularly in preparing yet another flawed damage model. Gap is prepared to stipulate, however, to the Court's application of the same across-the-board 20% reduction in fees applied to Landlord's previous attorneys' fees evidence, if the Court is inclined to apply that same reduction.

As addressed in part at the recent conference, additional investigation and discovery are necessary to ascertain the correct amount of the damages incurred and the offsets to which Gap is entitled, and procedures should be established to try the full damages claimed, including those set forth in the Court's prior order, to avoid the piecemeal and manifest injustice attendant to briefing without discovery that have elided the relative burdens of proof.

Respectfully submitted,

*/s/ Joshua H. Epstein*

JHE

Enclosures
CC: All Counsel (Via ECF)

---

[8] Landlord also claims entitlement to costs relating to its tax audit. Landlord's evidence in support of this charge, however, makes it apparent that Landlord is charging Gap for 2021 auditing based on an invoice for 2020 auditing, and is thus charging Gap for a cost not yet incurred. (*See* Pavlik Dec., Dkt. 63-9, ¶¶ 15-16 and Ex. 3,4.) In addition, the Lease does not provide for Gap's payment of such a fee, so Landlord is not entitled to charge Gap for this cost. (*See* Dyer Dec., ¶ 5.)